UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
 UNITED STATES OF AMERICA       *
                                *   12-CR-144-01-PB
            v.                  *   March 3, 2014
                                *   11:05 a.m.
        HIEU NGO                *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF WAIVER OF INDICTMENT
AND PLEA TO INFORMATION HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:


For the Government:      Arnold H. Huftalen, AUSA
                        U.S. Attorney's Office


For the Defendant:      Michael J. Connolly, Esq.
                        Hinckley, Allen & Snyder


Probation:              Sean Buckley



Interpreter:            Huan Dao



Court Reporter:         Susan M. Bateman, LCR, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

P R O C E E D I N G S

(Deputy Clerk swears in the Interpreter)

THE COURT:  Court is now in session and has for consideration today a waiver of indictment and a plea to an Information in criminal case number 12-CR-144-01-PB, United States of America versus Hieu Minh Ngo.

THE COURT:  First, I apologize for the delay. I had something I had to do for a telephone conference at noon, and I had to finish that.

Sir, I understand you intend to plead guilty to an Information charging you with three offenses.

The first one is wire fraud, the second is identity fraud, and the third is access device fraud.

Are you intending to plead guilty to those charges?

THE DEFENDANT:  Yes.

THE COURT:  I'm going to ask you some questions.  You need to speak your answers to me because what we say is being recorded.  You also need to respond truthfully, so I'll ask the clerk to place you under oath now.

(Deputy Clerk swears in the defendant)

THE COURT:  How far did you go in school?

THE DEFENDANT:  Twelfth grade.

THE COURT:  Can you read in your own language?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  There are a couple of documents that are important here.  I want to make sure that an interpreter has read them to you.

The first document is called an Information, that is the document that has the charges against you.  Did an interpreter read that document to you?

THE DEFENDANT:  Yes.

THE COURT:  And the second document is called an acknowledgment and waiver of rights form.  It's the document that you and your attorney have signed -- or excuse me.  You may not have signed it yet.  Do you have a signed copy?  If you haven't yet signed it, let me just ask -- oh, it is signed.  Okay.

So I have the original that you and your attorney signed.  That document has something called Attachment A.  So I want to be sure.  Has an interpreter read the acknowledgment form and Attachment A to you?

THE DEFENDANT:  I understand.

THE COURT:  And do you understand both documents?

THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  And did you have a chance to talk

2   to your lawyer about all of the documents?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Have you ever been treated for a

5   mental illness?

6          THE DEFENDANT:  Yes.

7          THE COURT:  What have you been treated for?

8          THE DEFENDANT:  I heard voices in my head.

9          THE COURT:  When did you last hear voices?

10          THE DEFENDANT:  Since 2012.

11          THE COURT:  Have you heard them after 2012,

12   or was 2012 the last time you heard voices?

13          THE DEFENDANT:  Since 2012 up to today, your

14   Honor.

15          THE COURT:  All right.  And have you been

16   receiving any treatment for these voices you've been

17   hearing?

18          THE DEFENDANT:  Yes, your Honor, but I still

19   don't know what's the cause of those voices.

20          THE COURT:  All right.  Let's talk about what

21   treatment you're receiving.  Are you taking any

22   medicine for that?

23          THE DEFENDANT:  Yes, but it did not help.

24          THE COURT:  All right.  Do you know what

25   medicine -- are you currently taking a medicine for

1  it?

2          THE DEFENDANT:  No, your Honor.  I stop

3  because it cause me tired and it did not help.

4          THE COURT:  All right.  Are you taking any

5  medicine at all today?

6          THE DEFENDANT:  No, your Honor.

7          THE COURT:  Have you received any other

8  mental health treatment for your condition?

9          THE DEFENDANT:  Well, when I was in Vietnam I

10  was in a hospital and they checked me with the MRI.

11          THE COURT:  How about now?  Are you receiving

12  any treatment at all for it while you're here?

13          THE DEFENDANT:  No, your Honor.

14          THE COURT:  How often do you hear voices now?

15          THE DEFENDANT:  All the time, your Honor, but

16  it gets worse.  When everything is quiet, it gets

17  worse.

18          THE COURT:  Can you tell me what the voices

19  say to you?

20          THE DEFENDANT:  I hear voices, like haunted

21  stuff, ghosts, evil.  Sometimes they chase me.

22          THE COURT:  Do you have any other symptoms of

23  mental illness?

24          THE DEFENDANT:  No, your Honor.

25          THE COURT:  Mr. Connolly, auditory

hallucinations are a symptom of potentially
significant mental illness. You have been interacting
with your client. Have you seen anything in your
interactions with him that would call into question
his ability to enter a guilty plea today?

         MR. CONNOLLY: No, I haven't, your Honor. I
have met with Mr. Ngo on more than ten occasions.
I've spent several hours with Mr. Ngo. I've had
extensive communications with his sister. His
sister's name is Eden Ngo. Eden Ngo is fluent in
English.

         Mr. Ngo himself actually speaks English
fairly well. He's able to understand me in English
and he responds to me in English.

         Neither Mr. Ngo nor his sister, Eden Ngo,
have ever advised me of any mental illness on the part
of Mr. Ngo at all. I am surprised to hear his
responses this morning to your questions.

         THE COURT: All right. Thank you.

         Mr. Ngo, in order to waive your rights --
your constitutional rights here, you have to be able
to provide your lawyer with -- you have to be able to
assist your lawyer in providing you with a defense and
you have to be competent and to understand the rights
that you're giving up by pleading guilty.

1          I want to ask you a few questions about these
2     issues so that I can try to make an assessment of
3     whether the voices you're hearing in any way are
4     affecting your judgment today.  Do you understand?
5               THE DEFENDANT:  Okay.
6               THE COURT:  Have these voices given you any
7     instruction about what you are supposed to do with
8     respect to the charges against you?
9               THE DEFENDANT:  You mean it harms me or --
10              THE COURT:  Does it tell you to do something
11    about the charges, to plead guilty, to go to trial?
12    Are the voices in any way specific to the charges
13    against you?
14              THE DEFENDANT:  No, your Honor.
15              THE COURT:  Are the voices in any way -- do
16    they concern the crimes that you committed?
17              THE DEFENDANT:  Basically the voices cause me
18    headaches and fatigue, but ever since I did this crime
19    I did a lot of thinking and that's why my head is
20    always in pain.
21              THE COURT:  Let me ask you some questions
22    about the court proceedings here today.  I'm the
23    judge.  What does a judge do in a case like yours?
24              THE DEFENDANT:  The judge will make a
25    judgment toward my crime and give me the sentence.

1          THE COURT:  Do you think that as the judge
2     that I'm on your side or the prosecutor's side, or am
3     I impartial and not related to either side?
4          THE DEFENDANT:  Impartial.
5          THE COURT:  Mr. Connolly, sitting beside you,
6     is your lawyer.  What's his job?
7          THE DEFENDANT:  He would help me about my
8     case and also help me get a fair sentence.
9          THE COURT:  All right.  And the person
10    sitting across at the other table, Mr. Huftalen --
11    could you stand up, Mr. Huftalen.  He's the
12    prosecutor.  What does the prosecutor do?
13         THE DEFENDANT:  He provide all the documents
14    proving that I'm guilty.
15         THE COURT:  All right.  You have told me you
16    want to plead guilty today, and one of the things you
17    would be giving up by pleading guilty is your right to
18    have a jury trial.  A jury -- they would sit in that
19    box over there, and if there were a trial they would
20    be your jury.  What does a jury do at a trial?
21         THE DEFENDANT:  I think that they will
22    consider what is the fair sentence for my crime.
23         THE COURT:  They would figure out a sentence
24    for your crime?  They would also -- you've told me
25    today you want to plead guilty.  But if you wanted to

have a trial instead, the jury would determine whether

you committed the crime or not.  Do you understand

that?

        THE DEFENDANT:  I understand.

        THE COURT:  It's up to you to decide whether

you want to have a trial or whether you want to plead

guilty.  No one can make you plead guilty.  It's

totally up to you.  Do you understand that?

        THE DEFENDANT:  I understand.

        THE COURT:  The defendant appears to be lucid

and competent to me.  He understands the role that

each of the central players have in the criminal

justice system.

        Mr. Connolly has represented to me that he

has seen no signs of impairment which would affect the

defendant's ability to participate in the process.

        Nevertheless, I am concerned whenever a

defendant claims to hear voices.  While this is not

uncommon, it can be a sign of significant mental

illness.

        What I propose to do is proceed with the plea

colloquy here.  And if I otherwise find his answers

acceptable, I will provisionally accept the plea.

        But I am going to ask to appoint Dr.

Drukteinis to complete a competency evaluation of the

defendant and provide that to me prior to sentencing.
If the evaluation raises issues that require further
investigation, I will undertake it at that time.

        Did you receive any mental health treatment
or were you prescribed my medication for the voices
while you were here in the United States?

        THE DEFENDANT:  Yes, your Honor.  And I took
it for a couple weeks or so, but I had to stop because
it cause me to be very tired.

        THE COURT:  All right.

        Mr. Connolly, I would ask you to endeavor to
obtain the defendant's U.S. mental health records so
that they can be made available to Dr. Drukteinis, or
whoever I ultimately appoint here, so that we can
facilitate the examination.

        MR. CONNOLLY:  I will, your Honor.

        THE COURT:  Mr. Huftalen.

        MR. HUFTALEN:  I just wanted to share with
your Honor that when the defendant was arrested in
February of 2013 in Guam, he appeared in court there,
was appointed a federal defender at that point, dealt
with agents, and there was no indication at that point
by any of the parties involved that the defendant
lacked the ability to communicate and understand what
was going on.

1          Since then I have met with the defendant,

2   along with defense counsel, and Special Agent Matt

3   O'Neil, and no one in that meeting noticed or

4   expressed concerns with respect to Mr. Ngo's ability

5   to comprehend what was going on.

6          Mr. Ngo is facing additional charges in the

7   District of New Jersey for computer hacking.  He has

8   been writted to New Jersey.  He appeared on that case,

9   has met with agents and government lawyers, and I

10  believe Mr. Connolly, in New Jersey.  No one noticed

11  any issues there.

12          He has also traveled to the Southern District

13  of New York and met with agents and prosecutors there

14  because he has relevant information of an evidentiary

15  value to a criminal prosecution in the Southern

16  District, and none of the agents or prosecutors in the

17  Southern District of New York have expressed to me

18  that they noticed any inability of Mr. Ngo to

19  understand who the players were, what their respective

20  roles were.

21          Not that that's dispositive of anything, but

22  I wanted to share that with you and put that on the

23  record.

24          THE COURT:  All right.  Thank you.

25          You've told me that an interpreter has read

this Information to you; that's the charge.  The

charges in that Information are felony charges, and

you have a right to have those charges presented to a

grand jury to see whether an indictment would be

returned against you.

A grand jury is a group of citizens, at least

16 and not more than 23.  The prosecutor would present

his evidence to the grand jury and the grand jury

would have to determine whether there was probable

cause to believe you committed these crimes.  The

grand jury could not return indictments against you

unless at least twelve members found probable cause.

You could not be held for trial unless a grand jury

returned an indictment against you.

Let me ask my clerk.  Do I have a separate

waiver of indictment, or is that embodied in the

acknowledgment and waiver of rights?

(Deputy Clerk confers with the Court)

Okay.  So you have signed a document telling

me you're giving up your right to have this matter

proceed to the grand jury.  If I accept your waiver,

the case will proceed against you on the Information

just as though you had been indicted.

Do you understand what I said to you about

the indictment?

1          THE DEFENDANT:  I do.

2          THE COURT:  And do you wish to give up your

3    right to have the matter presented to the grand jury?

4       (Attorney Connolly consults with the defendant)

5          THE COURT:  Do you agree to waive your right

6    to have the matter presented to the grand jury?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  I find that the defendant has

9    knowingly, voluntarily and intelligently given up his

10   right to have the matter presented to the grand jury.

11   The case will proceed against him on the Information

12   just as though he had been indicted.

13          Now, you have a right to a trial on these

14   charges.  That's what I was talking to you about

15   before.  You have a right to a trial, and you've told

16   me you want to give up that right.

17          If the case had gone to a trial, you wouldn't

18   have to prove your innocence.  Instead, it would be up

19   to the government to prove your guilt beyond a

20   reasonable doubt.  Do you understand?

21          THE DEFENDANT:  I understand.

22          THE COURT:  To prove your guilt the

23   government has to prove certain things, and I want to

24   review what the government has to prove with you.

25   These are in the attachment that was read to you.

1          So the first charge is wire fraud.  To prove

2    wire fraud, the government would have to prove first

3    that there was a scheme substantially as charged in

4    the Information.

5          Second, he would have to prove that the

6    scheme involved the misrepresentation or concealment

7    of a material fact or matter, or the scheme involved a

8    scheme to obtain money or property by means of false

9    or fraudulent pretenses involving a false statement

10   concerning a material matter.

11         Third, the prosecutor would have to prove

12   that you knowingly and willfully participated in the

13   scheme with the intent to defraud.

14         And fourth, he would have to prove that for

15   the purpose of executing the scheme, or in furtherance

16   of it, that you caused an interstate or foreign wire

17   communication to be used, or it was reasonably

18   foreseeable that for the purpose of executing the

19   scheme that an interstate or foreign wire

20   communication would be used on or about the dates

21   alleged in the Information.

22         This is what would have to be proved before

23   wire fraud could be established.  Do you understand?

24         THE DEFENDANT:  Yes.

25         THE COURT:  The second charge is identity

fraud.  To be guilty of that charge the prosecutor
would have to prove first that you acted knowingly.

          Second, he would have to prove that you
transferred, possessed or used without lawful
authority a means of identification of another person.

          Third, he would have to prove that you did so
with the intent to commit or to aid and abet or in
connection with other unlawful activity.

          That's what would have to be proved to prove
the second charge, identity fraud.  Do you understand?

          THE DEFENDANT:  I do.

          THE COURT:  The third charge, access device
fraud, involves the following things that the
prosecutor would have to prove:

          First, that you used or trafficked in access
devices, including but not limited to payment card
numbers, bank account numbers, and bank routing
numbers and other associated data.

          Second, that you used and trafficked in them
without authorization and thereby obtained something
of value of at least $1,000 during a one year period.

          Third, that you must have acted knowingly,
willfully and with intent to defraud.

          And fourth, that your conduct affected
interstate or foreign commerce.

1          That's what has to be proved to prove access

2    device fraud.  Do you understand?

3          THE DEFENDANT:  I do.

4          THE COURT:  Mr. Huftalen, could you make a

5    brief proffer of the evidence supporting your charges?

6          MR. HUFTALEN:  I will, your Honor.  I have a

7    fairly lengthy proffer which Mr. Ngo has reviewed -- I

8    know because he's asked me to make some minor

9    changes -- but I will try to make it as brief as I

10   can.

11         THE COURT:  Well, let me ask you, is it in

12   writing?

13         MR. HUFTALEN:  It's not in writing in a form

14   that I could pass up to the Court.  It has a number

15   of --

16         THE COURT:  I have a telephone conference

17   that I have to hold at 12:00 o'clock.  So if we don't

18   finish by five of, I'm going to have to take a break

19   until after that conference which could be over an

20   hour.  Okay?

21         MR. HUFTALEN:  Understood.  Thank you.

22         In the event this case were to proceed to

23   trial, the government would prove beyond a reasonable

24   doubt the following:

25         Between 2007 and the defendant's arrest in

February of 2013, he ran a business from his home in
Vietnam through which he sold personally identifiable
information, which is referred to as PII, which can,
and in this case did, include individuals' names,
addresses, Social Security numbers, dates of birth,
places of work, duration of work, dates of employment,
state driver's license numbers, mother's maiden names,
bank account numbers, bank routing numbers, e-mail
account names and addresses and other account
passwords.

He also sold stolen payment card numbers for
credit cards and debit cards, and he also sold access
through websites that he ran to more than 1,300
criminals around the world to obtain PII of millions
of United States citizens which was stored in
databases in the United States.

Mr. Ngo sold what are referred to in the
carding industry, which is credit card fraud industry,
"fulls", F-U-L-L-S or F-U-L-L-Z.  Those are slang
terms that are used to describe a package of PII that
includes a number of the things that I just said but
also includes, among others, Social Security numbers.

"Fulls" are used by carders to take over
identities of people in order to engage in various
crimes, including bank fraud, credit card fraud, ATM,

bust-out fraud, and the filing of fraudulent United
States personal income tax returns requesting refunds.

Much of the information in "fulls", including
but not limited to Social Security numbers,
constitutes means of identification, as that term is
defined at 18 U.S. Code 1028(d)(7).

During the course of the investigation
conducted by an undercover United States Secret
Service agent in New Hampshire, it was learned that
Mr. Ngo had advertised that he had more than one half
million "fulls" for sale.

Mr. Ngo sold "fulls" and access to PII
through websites that he ran and required his
customers to pay him through Liberty Reserve.

Liberty Reserve is an anonymous offshore
payment means which at the time was located in Costa
Rica.

From 2010 to 2013 Mr. Ngo acquired, offered
for sale and sold "fulls" from an inventory that he
maintained on his website of more than 150,000
"fulls".  He repeatedly acquired and transferred to
others "fulls" of individuals in the United States,
including individuals located in New Hampshire.

The bank account information contained in
some of those "fulls" included branches of banks

located in New Hampshire.  Mr. Ngo sold and
transferred "fulls" into the District of New
Hampshire.

Mr. Ngo also sold and trafficked in stolen
payment card data from credit cards and debit cards.
That information typically contained the victim
account holders' payment card numbers, expiration
date, account holder name, account holder address and
phone number.

Mr. Ngo transferred to others stolen payment
card data of account holders in the District of New
Hampshire.

Additionally, and perhaps most significantly,
the evidence would show that Mr. Ngo administered
websites whereby he allowed his more than 1,300
customers, both domestic in the U.S. and from many
countries around the globe, to access a database of
PII in the United States.

He would charge his clients through their
Liberty Reserve accounts, and they would pay him
through his Liberty Reserve account.

With respect to one database in particular,
Mr. Ngo allowed his clients to make more than three
million queries of U.S. citizens' PII.

That database which contained PII of

approximately 200 million U.S. citizens was located in Ohio.

The name of the company that owned that database was U.S. Info Search.  U.S. Info Search had a contractual arrangement with a California company named Court Ventures whereby customers of Court Ventures had access to the U.S. Info Search data as well as Court Ventures' data, and vice versa.

Mr. Ngo contracted with Court Ventures fraudulently representing that he was a private investigator from Singapore, and through that contract with Court Ventures was able to make available to his clients access to the U.S. Info Search database containing 200 million U.S. citizens' information.

Over an 18-month period, approximately 3.1 million queries were made.  At this point the government does not know how many U.S. citizens' PII was compromised, although that information will be available in the near future.  And we don't know because the way the process worked was a bad actor could type in the name of an individual and a state --

THE COURT:  I've got to be concerned about time.  How much more do you have?

MR. HUFTALEN:  I'm getting close to the end.

THE COURT:  All right.

1        MR. HUFTALEN:  During the course of his

2   conduct within the dates said in the Information, Mr.

3   Ngo sent "fulls" to New Hampshire.  He took payment

4   for "fulls" from New Hampshire.  He sent means of

5   identification to New Hampshire and to others.  There

6   were 45,000 deposits from his customers into this

7   Liberty Reserve account totalling more than

8   $1.9 million.

9        The U.S. Secret Service has conducted

10  investigations into many of his customers, all of whom

11  have stated that they only obtained the information

12  from Mr. Ngo to engage in criminal fraud.

13       The evidence would establish that at the time

14  Mr. Ngo knew that he was providing the information for

15  others to engage in fraud.

16       That, your Honor, I believe would be

17  sufficient to allow a jury to find the defendant

18  guilty of the three charges listed in the Information.

19       THE COURT:  Do you disagree with anything

20  that the prosecutor has said about your crimes?

21       MR. CONNOLLY:  Your Honor, I had a chance to

22  review the factual proffer with Mr. Ngo before the

23  proceeding began today, and I would like to make the

24  following clarifications.

25       Mr. Ngo was in fact aware that the people who

purchased the personal identifying information from

him intended to use it for fraudulent purchases. He,

however, was not aware that the information was being

used to commit what Mr. Huftalen described as ATM

fraud, nor was Mr. Ngo aware that the information

would be used to commit tax fraud or used for the

submission of fraudulent tax returns.

Mr. Huftalen indicated that the defendant

allowed his clients to conduct more than three million

queries on the U.S. database which he described. Mr.

Ngo was not aware of the number of queries that were

conducted by his clients. He doesn't dispute the

number. He just simply did not have that knowledge.

Furthermore, Mr. Huftalen described that

there was information concerning 200 million U.S.

citizens on the U.S. database. Mr. Ngo was not aware

of the number of U.S. citizens whose information was

maintained on the database.

With those clarifications, Mr. Ngo agrees to

the facts presented by Mr. Huftalen.

THE COURT: Do you agree with what your

lawyer said?

THE DEFENDANT: Yes, your Honor.

THE COURT: You face a maximum possible

prison term of 20 years on the first count, that is,

the wire fraud count; 15 years on Count 2; and 10
years on Count 3.  Count 2 is the identity fraud and
Count 3 is the access device fraud.  Do you
understand?

        THE DEFENDANT:  Yes, I do.

        THE COURT:  You could be fined up to twice
the gross gain to you resulting from your offense or
twice the gross loss resulting from your offense,
whichever is greater.  Do you understand?

        THE DEFENDANT:  I understand.

        THE COURT:  You could be sentenced to
supervised release of up to three years on each count.
And if you violate supervised release, you could be
sent back to prison.  Do you understand?

        THE DEFENDANT:  I understand.

        THE COURT:  I'm not going to have time to
finish.  I apologize.

        This is a telephone conference of the
Executive Committee of the Judicial Conference, which
is the governing committee of the Judicial Conference.
It's an emergency telephone call.  I have to take it.
It has to start at 12:00 o'clock.

        I'll let you know when we can come back and
finish.

        (RECESS)

1          THE COURT:  All right.  Let's pick up where
2   we left off.  I reviewed with you the possible maximum
3   penalties that you face, but when I sentence you I
4   will use something called the Sentencing Guidelines to
5   help determine your sentence.  Have you discussed in
6   general with your lawyer how the Sentencing Guidelines
7   may apply in this case?

8          THE DEFENDANT:  Yes.

9          THE COURT:  So when I sentence you, I will
10  use those guidelines to determine a guideline
11  sentencing range.  That's a range of months.  I will
12  then treat the guidelines as advisory.  So I could
13  sentence you within that range of months, but I could
14  sentence you above it or I could sentence you below
15  it.  Do you understand?

16          THE DEFENDANT:  I understand.

17          THE COURT:  By pleading guilty, you're giving
18  up certain constitutional rights that you have.

19          You have a right to a trial.  That would be
20  in front of the jury.  The jury would consist of
21  twelve people.  All twelve people would have to find
22  you guilty beyond a reasonable doubt; otherwise you
23  could not be found guilty.

24          You could have an attorney appointed for you
25  at no cost if you could not afford an attorney.  You

could bring witnesses into court and have them testify for you.  You could testify if you wanted to.  If you wanted instead to remain silent, you could do that, and I would tell the jury it could not hold your silence against you.  You could be present throughout the trial and you could have your lawyer cross-examine any witnesses who testify against you.

By pleading guilty, you're giving up all of these rights.  Do you understand that?

THE DEFENDANT:  I understand.

THE COURT:  If I accept your guilty plea, there won't be any trial.  The only thing that will be left is for me to sentence you.  Do you understand that?

THE DEFENDANT:  I understand.

THE COURT:  Did anyone threaten you in an effort to try to get you to plead guilty?

THE DEFENDANT:  No, your Honor.

THE COURT:  May I see counsel at sidebar briefly?

(SIDEBAR)

(THIS PORTION OF THE RECORD IS ORDERED UNDER SEAL BY THE COURT)

(CONCLUSION OF SIDEBAR)

THE COURT:  Has anyone made any promises to

1  you to try to get you to plead guilty other than as

2  set forth in the March 3rd letter to your lawyer from

3  Mr. Huftalen?

4          THE DEFENDANT:  No, your Honor.

5          THE COURT:  Are you satisfied with the legal

6  advice you've received from your attorney?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  This is the last chance you have

9  to change your mind.  Do you feel you've had enough

10  time to think about your decision to plead guilty?

11          THE DEFENDANT:  I want to plead guilty.

12          THE COURT:  You told me that an interpreter

13  has read the charges to you in the Information, so I

14  won't have him read it to you again unless you want me

15  to.  Do you want me to read the charges to you again?

16          THE DEFENDANT:  I think I understood

17  everything, your Honor.

18          THE COURT:  I'll take your pleas now.

19          As to Count 1 of the Information charging you

20  with the offense of wire fraud, how do you plea to

21  that charge, guilty or not guilty?

22          THE DEFENDANT:  Guilty.

23          THE COURT:  As to Count 2 charging you with

24  the offense of identification fraud, how do you plead

25  to that charge, guilty or not guilty?

1          THE DEFENDANT:  Guilty.

2          THE COURT:  And as to Count 3 charging you

3    with fraud in connection with access devices, how do

4    you plead to that charge, guilty or not guilty?

5          THE DEFENDANT:  Guilty.

6          THE COURT:  Having questioned the defendant

7    and his counsel on the offered pleas of guilty, the

8    defendant and his counsel having informed the Court

9    that they have conferred concerning the offered pleas

10   of guilty, and the Court having observed the defendant

11   making his answers, his demeanor and manner while

12   answering questions, his apparent intelligence and his

13   attitude, and the Court having observed that the

14   defendant does not appear to be under the influence of

15   any medication, drug or other substance which may

16   affect his judgment in any manner, the Court finds

17   that the pleas of guilty of the defendant have a

18   factual basis, are free of any coercive influence of

19   any kind, are competently and voluntarily made with

20   full knowledge of the charges against him and the

21   consequences of his pleas, that there have been no

22   promises of any kind made to him apart from the

23   statements set forth in the written plea agreement

24   which has been filed with the court, and no threats or

25   coercion have been exerted upon him in any manner.

I've sat through a fairly lengthy hearing here and had a chance to watch the defendant closely. I've also received factual proffers from the government and defense counsel regarding the defendant's ability to work with lawyers for the government and the defense. And notwithstanding his complaint of having heard voices, I'm satisfied that he is competent. Therefore, I am modifying my prior ruling, and I'm not going to require a competency assessment.

If either the attorney for the government or the attorney for the defendant should have any reason hereafter to question the defendant's competency, they must immediately notify the Court and I will determine whether an evaluation is required.

I accept the defendant's guilty plea. He's now adjudged guilty of the offenses set forth in Counts 1 through 3 of the Information.

Sentencing will take place on June 16th at 10:00 a.m.

The parties should consult local rules for other dates bearing on the sentencing process.

The defendant is currently in custody. I see no reason to change his custody status.

Anything else?

1          MR. HUFTALEN:  One very minor thing, Judge.

2          Just before you spoke of the defendant's

3    competence you made reference to a signed plea

4    agreement that was filed with the Court, and I know

5    that you intended to say the March 3rd letter and the

6    waiver and the acknowledgment.

7          THE COURT:  Right.  There isn't a formal plea

8    agreement in the ordinary sense that we recognize it,

9    and I should have treated my findings -- where I said

10   plea agreement, I meant other than the March 3rd

11   letter.  Thank you for correcting me.

12         MR. HUFTALEN:  Thank you.

13         THE COURT:  Anything else?

14         MR. HUFTALEN:  Nothing from the government.

15         MR. CONNOLLY:  Nothing from the defense.

16         THE COURT:  All right.  Once again, I

17   apologize for keeping you here.  I know it's

18   inconvenient.  I try hard not to do it, but I just had

19   to this time.

20         MR. HUFTALEN:  Thank you.

21         MR. CONNOLLY:  Thank you, Judge.

22         (Conclusion of hearing at 1:30 p.m.)

23

24

25

C E R T I F I C A T E

      I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.


Submitted: 3-7-14

**SUSAN M. BATEMAN, LCR, RPR, CRR**
LICENSED COURT REPORTER, NO. 34
STATE OF NEW HAMPSHIRE