UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

_____
                                )
UNITED STATES OF AMERICA        )
                                )
       v.                       )     CASE NO. 12CR00144-1-PB
                                )     CASE NO. 14CR00081-1-PB
HIEU MINH NGO                   )
_____)

**SENTENCING MEMORANDUM
AND REQUEST FOR DOWNWARD VARIANCE**

Hieu Minh Ngo ("Mr. Ngo") submits this memorandum of law and request for a downward variance for the Court's consideration in connection with his sentencing on June 15, 2015.

**I.     INTRODUCTION**

Mr. Ngo is a 25 year old citizen of Vietnam who has no prior criminal convictions. He was arrested in the District of Guam on February 7, 2013 and has been in custody ever since (more than 28 months). He has pled guilty to seven counts relating to trafficking in stolen personal identifying information ("PII") in two separate actions. Mr. Ngo pled guilty to these charges without ever challenging the Government's case. He made no substantive pre-trial motions, took no steps to proceed to trial, and never once suggested that his conduct was defensible. Rather, he readily admitted to his conduct and accepted full responsibility for his actions. Immediately upon his acceptance of responsibility, Mr. Ngo began to make amends for his actions and started the process of rehabilitation. Mr. Ngo has submitted to numerous proffer interviews conducted by federal prosecutors in the District of New Hampshire, the District of New Jersey, the Southern District of New York, the Southern District of Ohio and the Western District of Washington and has testified at a trial in U. S. District Court in the Southern District of Ohio against a defendant who was convicted. To date, Mr. Ngo's cooperation has resulted in 13 people who have been convicted, charged, or who are close to being charged, according to the U.S. Attorney's Office for the District

of New Hampshire. Mr. Ngo has made the most of his two plus years of incarceration by seeking out every opportunity to improve himself. He has been a model prisoner who has been recognized by the Strafford County Department of Corrections as a peer leader and mentor. Mr. Ngo is deeply remorseful for his actions and humbly asks the Court for a lenient sentence of time served so that he can reunite with his family in Vietnam and realize his potential to become a productive and law-abiding member of society.

## II. RELEVANT BACKGROUND

### A. Personal and Family Circumstances

Mr. Ngo refers the Court to paragraphs 59-70 of the Revised PSR filed on March 3, 2015 (ECF No. 37) ("Revised PSR") for a description of his personal and family history. Without minimizing the seriousness of his conduct, Mr. Ngo respectfully asks the Court to consider the fact that he was barely of adult age (ages 18-22) during the time period when he engaged in the offense conduct. Mr. Ngo also draws the Court's attention to the fact that he comes from a tightly-knit family that has been extremely loving and supportive of him throughout this ordeal and is committed to assisting Mr. Ngo transition back to society and lead a life that reflects the improved person he has become as a result of his incarceration, atonement and rehabilitation.

### B. The Offense Conduct

The charges in this case stem from Mr. Ngo's unauthorized access and sale of PII. Mr. Ngo refers the Court to his objections to the original PSR filed on February 2, 2015 (ECF No. 37-4), and Paragraphs 19-31 of the Revised PSR, for a description of the offense conduct.

### C. Mr. Ngo's Substantial Assistance and Cooperation

The Government has indicated that it intends to file a motion for a downward departure pursuant to U.S.S.G. § 5K1.1 based on Mr. Ngo's substantial assistance. While Mr. Ngo expects

that the Government will make known to the Court the full nature and extent of his substantial assistance, Mr. Ngo highlights the following facts for the Court's consideration:

- Mr. Ngo immediately admitted to and accepted responsibility for his participation in the offense conduct upon his arrest in February 2013.

- During his ensuing 28 months of incarceration, Mr. Ngo pled guilty, cooperated fully, and provided substantial assistance to the Government.

- Mr. Ngo cooperated with prosecutors and federal agents in the District of New Hampshire by, among other things, submitting to numerous lengthy proffer sessions where he candidly discussed his and others' involvement in the offense conduct.

- Mr. Ngo traveled to the District of New Jersey and the Southern District of New York in order to provide proffer interviews to federal prosecutors who are investigating similar activities in those areas. Both prosecutors informed Mr. Ngo's counsel that the information he provided was very helpful and that they would submit letters to the Court in connection with his sentencing.

- Mr. Ngo also provided substantial assistance to prosecutors and federal agents from the Southern District of Ohio in connection with the trial in the matter of United States v. Ealy, 13CR175. After submitting to a lengthy proffer session prior to trial, Mr. Ngo was transported to the Southern District of Ohio (Dayton) where he was called as the Government's lead trial witness. Due to Mr. Ngo's pre-trial detention, his transportation from the District of New Hampshire to the Southern District of Ohio took several weeks and involved numerous flights and stop-overs at various federal and county facilities along the way. After testifying for a full day against Mr. Ealy, Mr. Ngo remained incarcerated in Dayton, Ohio for several more weeks pending the conclusion of the Ealy trial, before repeating the multiple week-long trip back to the District of New Hampshire. With Mr. Ngo's assistance, on November 19, 2014, a jury convicted Mr. Ealy of numerous counts of mail and wire fraud, as well as other offenses.

- On May 21, 2015, Mr. Ngo submitted to a proffer interview conducted by a federal prosecutor and agents from the Western District of Washington in connection with an investigation of similar activities to those engaged in by Mr. Ngo. Mr. Ngo was completely forthcoming during this interview and provided the Government with specific information regarding the names, means and methods used by underground hackers in Vietnam.

- Mr. Ngo has offered to provide additional assistance to the Government in the form of contacting his former customers, in an effort to assist the Government in obtaining additional arrests and convictions. To date, Mr. Ngo has not been afforded that opportunity.

**D.      The Government's Calculation of the Loss Amount and Adjusted Offense Level**

Mr. Ngo disputes the Government's loss amount of "more than $100 million but less than $200 million," which is a combination of (1) an "intended loss" figure of $64,737,742, and (2) a "presumed loss" figure of $81,163,500.[1]  Mr. Ngo also disputes the resulting guideline range of 360 months to 780 months.[2]  The Government arrived at its loss calculation as follows:

- 176,000 "Fullz."  As a starting point for its loss calculation, the Government asserts that Mr. Ngo possessed 176,000 unauthorized access devices known as "fullz" (a slang term used to describe a full package of PII.[3]

- "Intended Loss" of $64,737,742.  The Government next attributes an "intended loss" amount of $64,737,742 to 13,673 of the 176,000 fullz.  According to the Revised PSR, "the IRS has confirmed that 13,673 U.S. citizens whose PII was sold as 'fullz' have been victimized through fraudulent individual income tax filings that claimed fraudulent refunds through the use of the victims' PII."  Revised PSR, at ¶ 29.  The Revised PSR further indicates that the IRS has traced $64,737,742 in fraudulent tax filings to those 13,673 fullz, the "majority of" which, the Government concedes, have been "unsuccessful."  Id.

- Despite the fact that the "majority of" those fraudulent filings have been "unsuccessful," it is the Government's position that $64,737,742 is an appropriate "intended loss" amount attributable to Mr. Ngo because "this loss was the pecuniary harm that was intended as a direct result of [Mr. Ngo] trafficking 176,000 unauthorized access devices to his clients."  See Addendum to Revised PSR (ECF No. 37-1), at ¶ 2.

- "Presumed Loss" of $81,163,500.  Next, with respect to the 162,327 fullz for which there is no evidence of any actual *or* intended loss (176,000 - 13,673) the Government applies the $500 per unauthorized access device "special rule" set forth in U.S.S.G. §2B1.1, comment. (n.3(F)(i)).  This calculation results in an "presumed loss" figure of $81,163,500 attributable to these 162,327 fullz ($500 x 162,327).

- "More Than $100 Million But Less Than $200 Million.  The Government then combines the "intended loss" figure of $64,737,742 with the "presumed loss" figure

---

[1] This "presumed loss" figure is the product of a special rule set forth in U.S.S.G. §2B1.1, comment. (n.3(F)(i)), which provides that "[i]n a case involving any counterfeit access device or unauthorized access device, loss…shall be not less than $500 per access device."
[2] Based on a total offense level of 42 and a criminal history category of I, the guideline imprisonment range is 360 months to life.  However, because the statutorily authorized maximum sentences are less than the maximum of the applicable guideline range, the advisory guideline range is 360 to 780 months.  U.S.S.G. §5G1.2(b).
[3] The Revised PSR indicates that "forensic examination" of Mr. Ngo's web sites identified "176,000 'fullz.'"  Revised PSR, ¶ 21, n.2.  Notably, the original PSR filed on February 2, 2015 stated that "forensic examination" of Mr. Ngo's websites identified "slightly less than 170,000 fullz."  It is unclear what accounts for this change.

4

of $81,163,500, for a total loss of $145,901,242 -- i.e., or "more than $100 million but less than $200 million."

Under the 2014 version of the Sentencing Guidelines, a loss amount of more than $100 million but less than $200 million results in a 26-level increase to the offense level (from base offense level 7 to 33).[4]  The Government then adds 6 levels because the offense allegedly involved more than 250 victims; 2 levels because the offense was committed outside of the United States; 2 levels because the offense involved the trafficking of unauthorized access devices; and 2 levels because Mr. Ngo was convicted of an offense under 18 U.S.C. § 1030 and the offense involved an intent to obtain personal information, for an Adjusted Offense Level of 45.  Revised PSR, at ¶¶ 40A-43, 47.  After a 3-level reduction for acceptance of responsibility, the Total Offense Level is 42 and the guidelines range is 360 to 780 months.  Revised PSR, at ¶¶ 49-51.

As discussed below, Mr. Ngo disputes the Government's loss calculation and respectfully submits that application of the special rule in this case results in an overly-harsh sentence that violates the parsimony principle set forth in 18 U.S.C. § 3553(a).  Mr. Ngo further disputes the Government's "intended loss" figure of $64,737,742 on the grounds there is no evidence that Mr. Ngo intended to cause that amount of pecuniary harm.  Mr. Ngo also submits that, in determining loss in this case, it is improper for the Government to use *both* the intended loss figure *and* the presumed loss figure that is the result of the special rule.  See U.S.S.G. § 2B1.1, comment. (n.3) (defining loss as the "greater of actual loss *or* intended loss.") (emphasis added).

---

[4] Under the amendments to the guidelines that will take effect on November 1, 2015, this same loss amount (i.e., $145,901,242) would result in a 24-level enhancement, instead of a 26-level enhancement, due to changes to the loss table to account for inflation.  This would result in a Total Offense Level of 40, instead of 42, and an imprisonment range of 292-365 months, instead of 360-780 months.  See April 30, 2015 amendments to § 2B1.1, attached hereto as Exhibit A.

5

## III. SENTENCING FACTORS UNDER *UNITED STATES V. BOOKER*

### A. 18 U.S.C. § 3553(a)

U.S. v. Booker, 543 U.S. 220 (2005), authorizes this Court to impose a non-guideline sentence. While the Court must commence with a guideline calculation, the United States Sentencing Guidelines are merely advisory and district courts are required to consider all of the factors listed in 18 U.S.C. § 3553(a) in imposing a sentence. Gall v. U.S., 552 U.S. 38, 49 (2007); Booker, 543 U.S. at 272; U.S. v. Martin, 520 F.3d 87, 91 (1st Cir. 2008) (A district court should begin its sentencing analysis with the advisory guidelines calculation, then its "next steps should include hearing argument from the parties as to the proper sentence in a particular case, weighing the applicability of the sundry factors delineated in 18 U.S.C. § 3553(a), reaching an ultimate sentencing determination, and explicating that decision on the record")(citing Gall, 552 U.S. at 49).

The paramount directive in 18 U.S.C. § 3553(a) is that the Court impose a sentence that is "sufficient, but not greater than necessary," to achieve the purposes which underlie the sentencing statute. 18 U.S.C. § 3553(a). Section 3553(a) directs sentencing courts to consider a number of factors, including:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The kinds of sentence and the sentencing range established [and recommended by the Sentencing Guidelines] . . .

(5) Any pertinent policy statement . . . issued by the Sentencing Commission . . .

(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) The need to provide restitution to any victims of the offense.

18 U.S.C. §§ 3553(a)(1) - (a)(7).

The importance of, and rationale for, the post-<u>Booker</u> and -<u>Gall</u> sentencing procedure described above has been summarized by the First Circuit Court of Appeals as follows:

> This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

<u>Martin</u>, 520 F.3d at 91 (citing <u>Gall</u>, 552 U.S. at 52).

For the reasons set forth below, Mr. Ngo respectfully submits that a variant sentence of time-served (approximately 28 months) is sufficient, but not greater than necessary, to effectuate the sentencing purposes of 18 U.S.C. § 3553(a) (i.e., to punish Mr. Ngo for this offense, deter him and others from committing similar offenses, promote respect for the law, protect society, and take into account his acceptance of responsibility, personal characteristics, and efforts at rehabilitation).

**B. Imposition of a Guideline Sentence Would Impose Punishment That is Greater Than Necessary to Achieve the Goals of Sentencing.**

The starting point in the Court's analysis is the advisory guideline calculation. There is no plea agreement in this case and, as outlined above, Mr. Ngo disputes the Government's loss amount of more than $100 million but less than $200 million, Total Offense Level of 42, and the resulting guidelines range of 360 to 780 months. The guideline calculation put forward by the Government

could result in imprisonment for 30 to 65 years for an individual with no prior criminal convictions who committed the relevant conduct when he was barely an adult (age 18 to 22), and whose personal gain was no more than $400,000.  There is no evidence of any actual loss in this case.  Rather, the colossal $145 million loss amount advanced by the Government is *the combination of* (1) a "presumed loss" figure of over $81 million that is the product of a "special rule"; and (2) an "intended loss" figure of over $64 million that is speculative and unreasonable.  For these reasons, Mr. Ngo submits that the Court should reject the measure of loss advocated by the Government and substitute his gain as an alternative measure of loss, see U.S.S.G. §2B1.1, comment. (n.3(B)), which was no more than $400,000.  See ECF No. 37-4, at p. 3.  Substituting Mr. Ngo's gain would increase his offense level by 12 instead of 26.

    1.  The "Special Rule" For Access Devices Results In An "Overly Harsh" and Disproportionate Sentence Compared to the Actual Offense and Its Impact.

  Application of the special rule in this case results in the addition of a fictional loss amount of over $81 million.  This fictional loss amount adds 24 offense levels to Mr. Ngo's sentence (before the 12 additional levels of enhancements enumerated in Section D, above.  Other jurisdictions, and even the Government, have recognized the draconian results that a strict application of the overly simplistic special rule contained at § 2B1.1 n.3(F)(i) has produced in similar cases and, in such situations, has recommended sentences below the guidelines range pursuant to § 3553(a).  For example, in United States v. Huang, Case No. 13cr820 (N.D. Cal.), the court varied downward from an offense level of 23 and advisory guideline range of 46-57 months and imposed a 3-year probationary term for a defendant who was charged with "carding" (i.e., the trading of stolen or compromised credit card information and associated information).  See Exhibit B.  The Government in the Huang case noted in its sentencing memorandum that the defendant functioned as a small-time reseller, despite the fact that he possessed 8,899 access devices and card-encoding equipment.  Given these "unique circumstances," the Government took the position that the $500 per access

8

device rule, which would have resulted in a loss amount over $4.4 million, was not a reasonable estimate of the actual or intended loss in that case. Id. (Doc. 13). Mr. Ngo shares a similar background to the defendant in Huang, who was 19 years old when he was arrested, in that Mr. Ngo, too, was extremely young when he committed his crime (age 18-22). However, unlike the Huang case, there is no allegation that Mr. Ngo ever used the PII he possessed.

In United States v. Lyles, 506 Fed. Appx. 440, 445-446 (6th Cir. 2012), the defendant argued that a fourteen level enhancement based on application of the special rule was unreasonable. In Lyles, the actual loss totaled $61,419, but the special rule added nearly $500,000 in presumed loss. The Sixth Circuit affirmed the sentence but *sua sponte* noted that the special rule, leading to a "fictional loss multiplier," may violate the parsimony principle underlying section 3553(a):

> Theoretically, the $500 fictional amount should have to pass muster under the parsimony provision of 18 U.S.C. § 3553(a), which commands the court that it 'shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes' of punishment set out in the statute. In this case, for example, the special rule increased Lyles's punishment by eight levels, from 70-87 months to 140-175 months. **A rule requiring courts to automatically double a sentence based on a fictional loss multiplier is a rule that may well produce a sentence greater than necessary to achieve punishment's aims.**

Id. at 445 (emphasis added); see also United States v. Gilmore, 431 Fed. Appx. 428, 429-430 (6th Cir. 2011) (affirming sentence four months below advisory guideline range where district judge found that 16-level enhancement under special rule in § 2B1.1 n.3(F)(i) for possession and sale of 2,747 access devices (social security and bank account numbers) would result in "overly harsh" sentence).

The potential impact of the "fictional loss multiplier" is even more stark in Mr. Ngo's case. Here, application of the special rule raises Mr. Ngo's offense level from 7 to 31 -- a 24-level increase -- and this is before adding the 12 levels of enhancements set forth above. Moreover, unlike the case in Lyles, there is no proven actual loss attributable to Mr. Ngo. Mr. Ngo

9

respectfully submits that application of the special rule in this case does not pass muster under the parsimony provision of 18 U.S.C. § 3553(a).

        2.      <u>The $64,737,742 "Intended Loss" Figure Is Factually Unsupported</u>

Mr. Ngo also disputes the $64,737,742 "intended loss" figure that the Government describes as the "aggregate attempted tax fraud loss" associated with fraudulent tax returns filed using PII obtained from Mr. Ngo. <u>See</u> ECF No. 37-3, at p. 1. It is Mr. Ngo's understanding that the IRS did not actually pay out any money in connection with these fraudulent filings, which means there is no actual loss (and no monetary harm to the intended victims). <u>See</u> <u>U.S. v. Corsey</u>, 723 F.3d 366, 377 (2d Cir. 2013) (vacating defendant's sentence for conspiracy to commit mail and wire fraud where sentencing court failed to discount intended loss calculation when weighing 3553(a) factors and where conspiracy involved no actual loss). But more importantly, for purposes of calculating intended loss, the Government cannot reasonably show that Mr. Ngo intended to cause this loss. "Intended loss" is defined as "the pecuniary harm that was *intended* to result from the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)) (emphasis supplied). "'Intended loss' is not simply 'potential loss' . . . and the "court errs when it simply equates potential loss with intended loss without deeper analysis." <u>United States v. Kopp</u>, 951 F.2d 521 (3d Cir. 1991).

As set forth in the Objections to the PSR, while Mr. Ngo understood that his customers did not have legitimate reasons for purchasing PII from him, he did not know, and had no way of knowing, what his customers did with the PII once they obtained it from him. <u>See</u> ECF No. 37-4. In many instances, the PII was false and, therefore, useless. <u>Id.</u> Nor did Mr. Ngo play any role in filing any fraudulent tax returns. The contention that $64,737,742 in pecuniary harm was "intended to result" from Mr. Ngo's possession and sale of PII is unsupported by any facts regarding Mr. Ngo's actual knowledge. Accordingly, the $64,737,742 "intended loss" amount should not be used

to determine the loss amount because it has not been, and cannot be, linked to Mr. Ngo's actual intent.

While there has been a division among the circuits as to whether a subjective or an objective inquiry is required in interpreting the definition of "intended loss,"[5] the Sentencing Commission's amendment to the definition of "intended loss" resolves the debate in favor of subjective inquiry and reflects the Commission's recognition that "sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability." See excerpts from 2015 amendments to Sentencing Guidelines, attached as Exhibit C, at p. 29 (revising definition of "intended loss" to mean the "pecuniary harm" that "the defendant purposely sought to inflict.")[6]

Moreover, several recent decisions demonstrate that sentencing courts faced with high intended loss calculations and disproportionate guideline ranges have seen fit to sentence defendants with no criminal history who are convicted of economic crimes to non-guideline sentences under the factors set forth in 18 U.S.C. §3553(a). See, e.g., U.S. v. Collins, No. 07 CR 1170 (S.D.N.Y. 2013) (Preska) [Transcript of July 15, 2013 sentencing proceedings at 20 – 35] (rejecting guidelines sentence of life imprisonment and sentencing attorney convicted in $2.4 million fraud involving thousands of victims to 12 months incarceration, finding "the total offense level far overstates the nature and circumstances of the offense");[7] U.S. v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (Rakoff) (rejecting guidelines sentence of life imprisonment and sentencing defendant convicted in more than $50 million fraud involving more than 250 victims to 42 months of incarceration, noting "the utter travesty of justice that sometimes results from the

---

[5] Compare United States v. Manatau, 647 F.3d 1048 (10th Cir. 2011) (holding that a subjective inquiry is required) with United States v. Innarelli, 524 F.3d 286, 291 (1st Cir. 2008) ("we focus our loss inquiry for purposes of determining a defendant's offense level on the objectively reasonable expectation of a person in his position at the time he perpetrated the fraud, not on his subjective intentions or hopes").

[6] These amendments are final and were submitted to Congress on April 30, 2015. The Sentencing Commission has specified an effective date of November 1, 2015.

[7] A true and accurate copy of this transcript is attached hereto as Exhibit D.

guideline's fetish with abstract arithmetic" and "the harm that guideline calculations can visit on human beings if not cabined by common sense"); see also U.S. v. Corsey, 723 F.3d at 377 (reversing sentences for procedural errors and remanding for resentencing, noting that the sentencing court never resolved defendant's "significant arguments" that the intended loss calculation vastly overstated both the seriousness of the offense and the danger of the defendants to their community").

These cases reflect the increasing recognition by Courts (and the Sentencing Commission, demonstrated by the recent amendment to the definition of "intended loss") that intended loss calculations under the guidelines can lead to unfair, draconian, disproportionate and unnecessary results. Even the guidelines, as currently drafted, recognize the potential that a § 2B1.1 loss calculation may overstate the seriousness of an offense. See Application Note 19(C) to U.S.S.G. § 2.B1.1 (stating a downward departure may be warranted in cases in which "the offense level determined under this guideline substantially overstates the seriousness of the offense"); see also 28 U.S.C. 994(j) (directing the Commission to insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense).

### C. The Nature and Circumstances of the Offense and Mr. Ngo's History and Characteristics

Mr. Ngo respectfully submits that leniency is warranted in light of the fact that his criminal conduct emanated more from extremely poor judgment and a lack of maturity than a desire to inflict harm on others. As Booker emphasized, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Booker, 543 U.S. at 251. Courts have heeded this guidance and imposed reduced

sentences pursuant to § 3553(a)(1) and the policy statements in Part H of the now advisory guidelines based on the youth of a defendant.

In United States v. Carvajal, 2005 U.S. Dist. LEXIS 3076 (S.D.N.Y. Feb. 22, 2005), a 34-year-old defendant was convicted of conspiracy to counterfeit, passing $6,680 in counterfeit currency, and conspiracy to distribute crack cocaine. Because of prior convictions, the defendant was considered a career offender and the guidelines directed a 210 to 262-month sentence, instead of the 63 to 78-month sentence that the instant convictions would have warranted. In departing from the guidelines, the court cited the §3553(a) factor for rehabilitation and noted the defendant's age:

> I believe that the concept of just punishment requires a further departure below Offense Level 34 and Criminal History Category V. In my opinion, a 168 month (14-year) term of custodial punishment would be just punishment. Joseph Carvajal is 34 years old, and will be 48 years old when he emerges from prison (or 15% less if he wins reductions for good behavior). *Rehabilitation is also a goal of punishment. 18 U.S.C. § 3553(a)(2)(D). That goal cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life.* Punishment should not be more severe than that necessary to satisfy the goals of punishment.

Id. at *15-16 (emphasis added); see also United States v. Johnson, 273 Fed. Appx. 95, 96, 100 (2d Cir. 2008) (remanding case for resentencing where defendant was convicted of felony murder committed at age 19, recognizing that youth of the accused was a "nonfrivolous reason" that should have been addressed by the second trial judge at sentencing).

Here, Mr. Ngo was 18 years old when he began the offense conduct. He has been imprisoned for this offense since he was 22 years old. Under a strict application of the guideline range proposed by the Government, Mr. Ngo could effectively serve a life sentence for a crime committed shortly after he reached the age of adulthood. To impose such a sentence would inflict punishment at the expense of all other considerations and destroy any chance or hope Mr. Ngo has

13

for rehabilitation. Further, unlike the defendants in <u>Johnson</u> and <u>Carvajal</u>, respectively, Mr. Ngo is neither a violent offender that has killed a victim nor a career criminal. Mr. Ngo accepts full responsibility for his criminal wrongdoing and is deeply remorseful for his actions. However, Mr. Ngo respectfully submits that the offense conduct was a mistake that was inconsistent with the character of a young man whom his friends describe as "kind, trustworthy, caring and loving," <u>see</u> Letter from Nguyen Tien Loi, attached as <u>Exhibit E</u>, "of good moral character" and "a decent young man at the core," <u>see</u> Letter from Nguyen Thanh Van, attached as <u>Exhibit F</u>, and a person who possesses "lots of passions in his life," including volunteering his time to help "infant patients as well as cancer patients." <u>See</u> Letter from Dinh Bao Minh, attached as <u>Exhibit G</u>.

Moreover, as noted above, Mr. Ngo's family in Vietnam is very supportive of him and is committed to his rehabilitation. Mr. Ngo communicates on a regular basis with his parents and three siblings and they stand ready to assist and support him in every way possible to ensure his successful reintegration to society. In particular, his sister, Eden Ngo, has been closely involved in every aspect of her brother's criminal proceedings and will be present in the court room during his sentencing on June 15. In determining an appropriate sentence, Mr. Ngo respectfully asks the Court to consider his strong family support network and the enormous potential for rehabilitation that this support network provides him. <u>See</u> <u>United States v. Martin</u>, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month variance down from the guideline range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation;" post-<u>Booker</u>, "policy statements normally are not decisive as to what may constitute a permissible ground for a variant sentence in a given case").

    **D.**    **<u>Sufficient Punishment to Reflect the Seriousness of the Offense</u>**

As to punishment, Mr. Ngo lives each day under the weight of the profound guilt and shame caused by his actions -- and will continue to do so for the rest of his life. At the age of 24, he is a

convicted felon who has brought shame on his family and friends. This conviction, and attendant stigma, will follow him for the rest of his life. Mr. Ngo respectfully submits that he has already been seriously punished for his crimes. Far beyond any punishment that the Court could impose, Mr. Ngo has lived with, and will continue to live with, the shame and other profound consequences that his misconduct has caused. Mr. Ngo has let down his parents, his siblings, and his friends. In light of Mr. Ngo's genuine repentance, and otherwise good moral character, a sentence involving further incarceration is not necessary to satisfy the goal of deterrence.

### E. General and Specific Deterrence

With respect to specific deterrence and the need to protect the public from further crimes of the defendant, Mr. Ngo is a 24 year old man who acted both out of immaturity and a lack of appreciation for the harm that could result from his actions. He has had more than two years to reflect on the wrongfulness of his offense conduct. He has already begun the process of self-improvement. Probation Officer Buckley acknowledges that Mr. Ngo completed the Men's Therapeutic Community Program at Strafford County Department of Corrections and was recognized as a "peer leader" in the program. Revised PSR ¶ 66. Mr. Ngo has been allowed to remain in the program in order to mentor new participants. Id. Mr. Ngo has also completed programs relating to Drug and Alcohol Education, Re-entry, Parenting, Anger Management, Life Skills, and "Thinking for a Change" offered by the Strafford County Department of Correction. See Various Certificates of Completion, attached hereto as Exhibit H. Given the young age at which he committed his crime and his substantial steps towards rehabilitation, Mr. Ngo is extremely unlikely to commit another crime in the future.

### F. Rehabilitation

With respect to rehabilitation, Mr. Ngo reiterates that he has been convicted of offenses for which he has fully accepted responsibility and has experienced tremendous remorse. He has taken

full responsibility for his actions and has provided substantial assistance to the Government. He is profoundly aware that his actions were wrong, as his allocution to the Court at the time of his sentencing will demonstrate.

Mr. Ngo's exceptional personal growth while incarcerated over the past 28 months is a testament to his desire, and capacity, for rehabilitation. Mr. Ngo wakes up each morning with hope and uses his time in prison to improve himself, both mentally and physically. Mr. Ngo exercises each day. He expresses his thoughts in his journal and shares them with his family and loved ones. In a recent letter to counsel, Mr. Ngo expressed his hope for the future and desire to rebuild his life. Mr. Ngo wrote, "My message is always: 'Never Give Up.' I never stop improving myself every single day." See Letter from Mr. Ngo to Michael Connolly, attached as Exhibit I. As indicated earlier, Mr. Ngo has taken, and completed, numerous therapeutic and self-improvement programs offered at the Strafford County Department of Corrections (see Exhibit H), where he was commended for contributing frequently to the group discussions, participating in a meaningful manner, and displaying a positive attitude. See Letter from Jake Collins, Assistant Superintendent Id. at p. 1. Mr. Ngo has been recognized as peer leader in the Men's Therapeutic Community Program and has been allowed to remain the program following graduation in order to mentor other inmates. Id.

Mr. Ngo has great potential for a successful rehabilitation without the need for lengthy incarceration. This is illustrated by his genuine remorse for his criminal behavior, his productive use of his 2-plus years of incarceration, and the positive impact he has made on the Strafford County community. The Court may properly consider Mr. Ngo's strong potential for rehabilitation as a factor supporting a downward variance. Pepper v. United States, 562 U.S. 476 (2011) (abrogating prior cases that held that post-offense rehabilitation may not be considered as grounds for variance); United States v. Martin, 520 F.3d at 93-94 ("The potential for rehabilitation also may

16

comprise grist for the sentencing court's mill . . . a founded prospect of meaningful rehabilitation remains a permissible basis for a variant sentence under the now-advisory guidelines.") Mr. Ngo respectfully submits that imposition of guidelines sentence would serve only to destroy any reasonable chance of success Mr. Ngo has for rehabilitation.

### G. The Need to Prevent Unwarranted Sentence Disparities

Finally, Mr. Ngo asks the Court to consider the fact that imposition of a sentence of time-served would not cause an unwarranted disparity and, in fact, would be consistent with sentences handed down in similar cases involving stolen PII and computer hacking. As discussed above, sentencing courts routinely impose sentences below the guidelines range based upon the §3553(a) factors. This is especially true where, as here, there is no evidence of actual loss or where the defendants are non-violent first time offenders who committed financial crimes and accept responsibility for their actions. See, e.g., U.S. v. Howe, 543 F.3d 128, 133 (3rd Cir. 2008) (sentencing defendant to home confinement for wire fraud conviction where crime was an "isolated mistake" in otherwise law-abiding life); U.S. v. Garcia, 2008 U.S. Dist. LEXIS 91193, at *2-4 (E.D.N.Y. Sept. 8, 2008) (sentencing defendant who otherwise led a law-abiding life and did not receive any personal gain to five years' probation for conspiracy to commit mail fraud).

Perhaps the most instructive precedent for this Court to impose a sentence of time-served is the case of United States v. Monsegur, 1:11cr666 (S.D.N.Y.), which involved one of the largest and most sophisticated hacking rings ever prosecuted by the U.S. Department of Justice. Defendant Monsegur pled guilty to a 12-count information that charged him with various offenses related to an international cyber hacking ring, of which he was a key member. At the time of his sentencing, Mr. Monsegur had been detained for a total of seven months. See various filings in the matter of United States v. Monsegur, attached as Exhibit J. The victims of the ring included news media outlets, government agencies and contractors and private entities, and the hacking ring targeted hundreds of

17

computer systems around the world, including those belonging to an FBI affiliate, the U.S. Senate website (senate.gov), the Public Broadcasting Service (pbs.org), Sony Pictures and Nintendo, among others. Id. Mr. Monsegur's guilty pleas resolved five separate cases that had been brought against him. The loss amount was estimated to be between $20 million and $50 million.[8] The total offense level was 38, and the guideline range was 259-317 months.

Upon his arrest, Mr. Monsegur admitted to his role in various major cyber-attacks, including hacking certain government websites, taking government servers offline and providing "security research" (that is, publicizing vulnerabilities in computer systems that others could exploit). Id. He accepted full responsibility for his actions and cooperated with the authorities for a period of three years prior to his sentencing by providing information to government about the activities of significant cybercriminals affiliated with various hacking groups and engaging his co-conspirators in online chats that were critical to confirming their identities and whereabouts. Id. As a result of Mr. Monsegur's "extraordinary cooperation," the Government moved the Court to sentence Mr. Monsegur in light of the factors contained in U.S.S.G. § 5K1.1 and pursuant to 18 U.S.C. § 3553(e), without regard to any mandatory sentence. Despite the fact that Mr. Monsegur's Guidelines range was 259 to 317 months, the Court imposed a sentence of time served (i.e., 7 months).

The similarities between Mr. Monsegur's case and Mr. Ngo's case are many. Like Mr. Monsegur, Mr. Ngo has pled guilty to multiple counts stemming from computer hacking, and the pleas in both cases resolved multiple actions that had been commenced against the defendant. In both cases, the guideline resulted in an extremely high range (259-317 months for Mr. Monsegur and 360 to 780 months for Mr. Ngo). In both cases, there was no evidence of actual loss, so the loss

---

[8] This loss figure included damages caused not only by hacks in which Mr. Monsegur personally and directly participated, but also damages from hacks perpetrated by his co-conspirators in which he did not directly participate. According to the Government, Mr. Monsegur's actions personally and directly caused between $1,000,000 and $2,500,000 in damages. See Exhibit J.

18

amount was arrived at through an imperfect and / or artificial means. Both defendants immediately admitted to their role in the offense conduct and accepted responsibility. Both individuals readily and substantially cooperated with the Government over a prolonged period of time. Both individuals were relatively young when they participated in the offense conduct (Mr. Monsegur was 28 at the time of sentencing and Mr. Ngo is currently 24).

There are also several significant distinctions between the two cases that, Mr. Ngo submits, militate even more so in favor of leniency in Mr. Ngo's case. First, while not diminishing the seriousness of his conduct, Mr. Ngo respectfully points out that the hacking activity he engaged in was on a far smaller scale and far less sophisticated than that engaged in by Mr. Monsegur. Second, while Mr. Ngo has been incarcerated for approximately 28 months since his arrest in Guam on February 7, 2015, Mr. Monsegur had only been incarcerated for a total of 7 months prior to being sentenced to time served. Mr. Ngo also offers that his misconduct was the product of immaturity and bad judgment, as opposed to a coordinated effort to subvert a multitude of government and private organizations worldwide. In light of the unique and extenuating circumstances present in this case and, in particular, the sentence handed down to in the matter of United States v. Monsegur, Mr. Ngo respectfully submits that a sentence of time-served would not result in an unwarranted sentencing disparity.

## CONCLUSION

For all of the reasons set forth herein and in accordance with the directive of 18 U.S.C. § 3553(a), Defendant Hieu Minh Ngo respectfully asks the Court to impose a variant sentence of time-served.

Respectfully submitted,

HIEU MINH NGO

By his attorneys,

/s/ Michael J. Connolly
Michael J. Connolly
HINCKLEY, ALLEN & SNYDER LLP
11 South Main Street, Suite 400
Concord, NH 03301-4846
(603) 225-4334 (phone)
(603) 224-8350 (fax)
mconnolly@haslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2015, a copy of the foregoing Sentencing Memorandum and Motion for Downward Variance was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Michael J. Connolly
Michael J. Connolly
Hinckley Allen & Snyder LLP
28 State Street
Boston, MA 02109
(617) 345-9000 (phone)
(617) 345-9020 (fax)
mconnolly@haslaw.com