UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

UNITED STATES OF AMERICA,    . Case No. 3:13-cr-175
    .
    Plaintiff,    .
    . *Day 2 of Jury Trial*
   - v -    .
    . Monday, November 3, 2014
LANCE EALY,    . 9:12 AM
    .
    Defendant.    . Dayton, Ohio
. . . . . . . . . . . . . . . .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHAEL R. BARRETT, and a JURY


For the Plaintiff:    ALEX R. SISTLA, ESQ.
    ANDREW J. HUNT, ESQ.
    Assistant U.S. Attorneys
    United States Attorney's Office
    200 West Second Street, Suite 600
    Dayton, Ohio 45402


For the Defendant:    LANCE EALY (Pro Se)

    THOMAS W. ANDERSON, ESQ. (Standby Counsel)
    Federal Public Defender's Office
    Fifth Third Center
    Suite 490
    One South Main Street
    Dayton, Ohio 45402


Also present:    Laura Angelini, Esq.; Hinckley Allen
    Bradley Bierman, Internal Revenue Service
    Sophie Quang Liu, Interpreter
    My Le Nguyen, Interpreter
    Mary Beth Turk, Secret Service


Law Clerk:    Cristine V. Frankian

Courtroom Deputy:    Barbara A. Crum

Court Reporter:    Luke T. Lavin, RDR, CRR


*Proceedings recorded in stenotype;*
*transcript prepared by computer.*

P R O C E E D I N G S

1
2      (In open court at 9:12 AM, no jury present, defendant not
3  present.)
4      (Juror No. 8 enters the courtroom.)
5          THE COURT:  Hey, how are you?  Come on in.  Just come
6  around the front.
7          JUROR NO. 8:  Oh, okay.
8          THE COURT:  Yeah, yeah, yeah.  These guys might have
9  some questions.  Step back a little bit.
10          JUROR NO. 8:  Okay.
11          THE COURT:  So you are Juror Number 8; correct?
12          JUROR NO. 8:  Yes, sir.
13          THE COURT:  And my understanding was that once you got
14  back to your business on whatever day that was, you then called
15  Ms. Crum and told her that you had been informed about the jury
16  duty policy and the most that they would cover your absence was
17  up to five days; is that right?
18          JUROR NO. 8:  That is correct.
19          THE COURT:  Okay.  So do you just want to explain on
20  the record what that does for your financial situation, and
21  does it create a hardship, et cetera, et cetera.
22          JUROR NO. 8:  Yes, it does.  I'm the sole provider of
23  my household.  I have a daughter that's a senior in high
24  school.  So me taking -- I get paid every two weeks, so me
25  taking a two-week pay cut is really going to be a bad thing for

1    me.

2           THE COURT:  Okay.  Mr. Hunt, do you have any questions

3    for this juror?

4           MR. HUNT:  I do not, Judge.

5           THE COURT:  All right.  And let the record reflect

6    it's now 9:10, 9:15.  Mr. Ealy is not here yet.  We understand

7    he may be in the building.

8        But, Tom, as standby counsel do you have any questions of

9    this gentleman?

10          MR. ANDERSON:  No, Your Honor.

11          THE COURT:  Okay.  So what we're going to do is we're

12   going to excuse you.  Okay?

13          JUROR NO. 8:  Okay.

14          THE COURT:  We're going to ask you not to discuss

15   anything with anybody in the back.

16          JUROR NO. 8:  Uh-huh.

17          THE COURT:  And if you have a question about the case

18   and want to find out what happened at the end of the day, Barb

19   will -- give her your number and she'll give you a call.  But

20   other than that, until there's a verdict reached, we'd rather

21   not have you discuss anything that's discussed in the

22   proceedings.

23          JUROR NO. 8:  I understand, sir.

24          THE COURT:  Awesome.  All right.  So you'll be

25   excused, then.

1          JUROR NO. 8:  Okay.  Thank you.

2          THE COURT:  Thank you.

3          COURTROOM DEPUTY:  You can go straight out that door.

4          JUROR NO. 8:  Okay.

5          COURTROOM DEPUTY:  Did you have anything in the back

6     with you?

7          JUROR NO. 8:  No.  I've got everything right now.

8          COURTROOM DEPUTY:  All right.  Thank you.

9          THE COURT:  Okay, great.

10         JUROR NO. 8:  Thank you, sir.

11         THE COURT:  All right.  Thank you.

12    This is a weird setup.

13         COURTROOM DEPUTY:  Yeah, it's a little strange.

14         THE COURT:  We swore them in last week; right?

15         COURTROOM DEPUTY:  Yes, we did.  They're all ready to

16    go.

17         THE COURT:  Okay.  That was Number 8.  So you have

18    your batting order all organized, then?

19         COURTROOM DEPUTY:  I do, uh-huh.

20         THE COURT:  All right.  Well, let's just wait and see

21    what Mr. Ealy's status is since apparently he's in the

22    building.

23    All right.  Alex, did you make an inquiry?

24         MR. SISTLA:  Vipal is not here.  All I know from his

25    message from last Friday is that the woman had worked with

1  Vipal when he was in Afghanistan.  So presumably she probably

2  knows that he's an AUSA.  Other than that, I don't know what

3  she knows.  But I've asked Vipal to get in touch with me as

4  soon as he gets in.

5          THE COURT:  Tom, do you see any reason to broach this

6  subject unless and until we have more information?

7          MR. ANDERSON:  She's an alternate juror, is that my

8  understanding, right now?

9          THE COURT:  Yes.

10         MR. ANDERSON:  Would she be the one that's taking --

11         THE COURT:  What number is this person?

12         MR. SISTLA:  48.

13         THE COURT:  48.  You know, the other thing is, at the

14 end of the day we may discuss how we deal with alternates.  I

15 mean, normally it's the top whatever, but we may have a

16 situation where both sides can agree to additional strikes and

17 do it that way.  We'll just have to play it by ear.

18         MR. SISTLA:  Judge, I'll step out.  I can get more

19 information right now.

20         THE COURT:  Okay.

21         COURTROOM DEPUTY:  Oh, I know what number she is.

22         THE COURT:  Would you do me a favor, Barb?  Can you

23 move these two books.

24         COURTROOM DEPUTY:  Yeah.

25         THE COURT:  Yeah.  Just so I can see.

1      COURTROOM DEPUTY:  When they were fixing them they --

2      THE COURT:  Yeah.  This is kind of a weird deal here.

3      COURTROOM DEPUTY:  Yeah, it's a little awkward.

4      THE COURT:  I feel like I ought to be doing DJ tunes.

5  (The Court and courtroom deputy confer privately.)

6      A COURT SECURITY OFFICER:  He went to the clerk's

7  office.

8      THE COURT:  Okay.

9   Does either side wish to make a motion for separation?

10 Does either side wish to make a motion for separation?

11     MR. ANDERSON:  Yes, Your Honor, we would so move for

12 separation of the witnesses.

13     THE COURT:  All right.  Anybody that expects to

14 testify in this case, unless they have been designated as a

15 necessary representative for the United States Attorney's

16 office or the interpreters is to remain in the hall and not to

17 discuss their testimony with any witnesses or discuss that

18 witness' testimony.

19   Okay.  And I expect counsel to police the courtroom and

20 make sure that works.

21     MR. SISTLA:  Yes, Your Honor.

22     THE COURT:  Okay?

23     MR. SISTLA:  Your Honor, just for the record, we're

24 going to designate Special Agents Turk and Bierman as the

25 government's representatives.

1          THE COURT:  Right.  I think -- wasn't there a formal

2     motion in that regard somewhere earlier along the way?  And I

3     think I said it was okay.

4          MR. SISTLA:  It was an oral motion, but yes, Your

5     Honor.

6          THE COURT:  Well, I know it's been raised before.

7          MR. SISTLA:  Your Honor, I spoke to Mr. Patel.  He

8     says that the teacher does know that he's an assistant U.S.

9     Attorney.  His wife teaches with the woman, she goes to parent-

10    teachers, she's well aware of his role, but he's never spoken

11    to her about the case.  And, in fact, the first time he even

12    became aware that she might be a juror here is when she raised

13    it to her class about scheduling purposes.

14         THE COURT:  So she raised it to her class?

15         MR. SISTLA:  She raised it to her class, that's right.

16         THE COURT:  Tom, unless you've got a different

17    feeling, I would just as soon leave it alone.  What do you

18    think?

19         MR. ANDERSON:  That's fine.

20         THE COURT:  Who is going to do the opening, Andrew or

21    Alex?

22         MR. SISTLA:  I will, Your Honor.

23         THE COURT:  Okay.

24         A COURT SECURITY OFFICER:  Your Honor, he's supposedly

25    sitting in front of the computer in the clerk's office.

1          THE COURT:  Okay.  Well, let's get him up here.  How
2     do we do that?
3          A COURT SECURITY OFFICER:  I did tell Kelvin, and he
4     has gone to the clerk's office.
5          THE COURT:  Okay.
6          A COURT SECURITY OFFICER:  I can go myself.
7          THE COURT:  Well, that's okay.  He's probably checking
8     to see if the Sixth Circuit did anything with his motion that
9     he filed on Friday.
10        Cristina, where are you going to park?
11         THE LAW CLERK:  I'm sorry?
12         THE COURT:  Are you going to be over here?
13         THE LAW CLERK:  Right.
14         THE COURT:  Okay.
15        I introduced you last week, didn't I?
16         THE LAW CLERK:  (Nods head up and down.)
17         THE COURT:  Okay.
18         MR. SISTLA:  Your Honor, are there any pretrial issues
19     that we're going to address prior to starting openings?
20         THE COURT:  How do I know?  We'll wait and see.
21         MR. SISTLA:  Okay.
22         A COURT SECURITY OFFICER:  Kelvin has him.
23         THE COURT:  I mean, I don't have any.
24         MR. SISTLA:  We had a single issue to raise with the
25     Court.

1                THE COURT:  Huh?

2                MR. SISTLA:  We had a single issue to raise with the

3      Court.

4                THE COURT:  Oh, okay.  Well, do you want to do it now?

5                MR. SISTLA:  Certainly, Your Honor.

6                THE COURT:  Tom, the government has an issue to raise.

7      Do you want to cover it?

8                MR. ANDERSON:  Sure.

9                MR. SISTLA:  And I believe I've already advised Mr.

10     Anderson of this.  On, I forget if it was Thursday or Friday,

11     we released additional *Jencks* material for Special Agent

12     O'Neill.  They were affidavits that he filed in the District of

13     New Hampshire, search warrant affidavits.  They were released

14     to us in a redacted form in a limited unsealing order.  And the

15     Assistant United States Attorney in New Hampshire, per the

16     order from the District Court of New Hampshire, asked us to

17     request from this Court a protective order that those

18     affidavits, to the extent that they were disclosed, that they

19     only be disclosed for the purposes of trial and not otherwise

20     disseminated.

21               THE COURT:  Okay.  That's fine.

22           (The Defendant enters the courtroom.)

23               MR. SISTLA:  Would you like us to file a formal

24     protective order, or is the oral motion sufficient?

25               THE COURT:  No, you better -- I think because it's

1   under jurisdiction, you better have something you can put on

2   file.

3           MR. SISTLA:  Okay.  Yes, Your Honor.

4           THE COURT:  Okay.  It's about 9:20.  Mr. Ealy has

5   shown up and --

6       (Mr. Anderson and the defendant confer privately.)

7           THE COURT:  Mr. Ealy, Juror Number 8 had indicated a

8   work hardship.  That juror has been excused in your absence

9   because you were not here.

10      One of the conditions of your bond is that you attend all

11  court appearances, and I'm going to add the condition that you

12  timely attend all court appearances.

13          THE DEFENDANT:  Okay.

14          THE COURT:  Court does not start when you show up.

15  We're supposed to be hereby at 9:00 o'clock, ready to go.

16          THE DEFENDANT:  Okay.

17          THE COURT:  All right?  Anything else to be brought to

18  our attention before we bring the jury in?

19          MR. SISTLA:  Your Honor, just for the Court's benefit,

20  I can give you a preview of the witnesses that the government

21  will call today.

22          THE COURT:  Sure.

23          MR. SISTLA:  We'll call Mr. Ngo.

24          THE COURT:  All right.

25          MR. SISTLA:  Mr. Mathers from the IRS, and one of the

victims:  Ms. Patton.

It's the government's expectation that Mr. Ngo's testimony,
without the benefit of the interpreter, will take between two
and a half to three and a half hours.  I don't know how much
longer it will take with the interpreter.  But there's a
natural stopping point in his direct where I can alert the
Court, and we can stop there and then take a lunch break if
that's helpful for the Court.

THE COURT:  Sure.

And as for our two interpreters, thank you for coming.

INTERPRETER LIU:  Thank you, Your Honor.

THE COURT:  We appreciate that.  You guys can feel
free to switch whenever you think it's necessary.  Just give us
a sign.

And let me think.  Where does the interpreter -- is that
the witness stand over there?

COURTROOM DEPUTY:  It is.

THE COURT:  That's the witness.  Okay.  So where
should the interpreter be during the testimony?  Do we have any
thoughts on that?

INTERPRETER NGUYEN:  Usually we sit next to the
witness, Your Honor.

THE COURT:  Okay.

All right.  We'll just -- Carl, can you -- let's do this.

Barb, can you wheel that crate of -- yeah, get those out of

1    the way.  And then maybe the interpreter can sit next to Carl

2    there if we get those two chairs.

3              A COURT SECURITY OFFICER:  I'm going to have to bring

4    in another chair, because there's going to be two of us up

5    here.

6              THE COURT:  Oh, all right.

7              MR. SISTLA:  Your Honor, there's a chair on the other

8    side.

9              THE COURT:  Oh, there is?

10             MR. SISTLA:  Yes.

11             THE COURT:  Okay.

12       Okay.  I've got an idea.  Let's leave it like that, because

13   then -- that microphone at Lance's table, will that reach the

14   interpreter?

15             COURTROOM DEPUTY:  Yes.

16             THE COURT:  Okay.  So let's set that up so the

17   interpreter can speak into the microphone.

18       Will that work, ladies?

19             INTERPRETER LIU:  Yes, Your Honor.

20             THE COURT:  Okay.  Perfect.

21       All right.  So we'll do the preliminary charge.  Then the

22   government can make their opening statement.  Lance can make an

23   opening statement if he wants to, or he can defer and he can

24   ask Tom to make one, and then we'll call our first witness.

25       All right.  So, Barb, whenever you're ready and everybody's

1  ready, we'll start.

2          COURTROOM DEPUTY:  Okay.

3          THE COURT:  Remember, folks, that during the trial

4  cellphones, iPads, iPods, all of that stuff must be turned off.

5  Okay?

6      Cristina, if you need me, just throw something my way.

7          THE LAW CLERK:  All right.

8          THE COURT:  That includes you, Tom.

9          MR. ANDERSON:  Okay, Judge.

10     (Jury in at 9:25 AM.)

11         THE COURT:  You guys can sit if you want.  They're all

12 standing for you, so you guys can sit.

13         COURTROOM DEPUTY:  Please be seated.

14         THE COURT:  Good morning, folks.  How we doing?

15         MEMBERS OF THE JURY:  Good.

16         THE COURT:  Everybody ready to start the trial?

17         MEMBERS OF THE JURY:  (Nod heads up and down.)

18         THE COURT:  Again, I want to thank those of you who

19 have been selected.  Barb administered the oath you will

20 follow.  She administered that last week.  And we'll begin in

21 just a minute, but first of all I just want to just

22 introduce --

23     We're probably going to be using -- is it three or four

24 court reporters, Luke?  Three?

25         THE REPORTER:  Three.

1    THE COURT:  You met Mary Ann Ranz last week, and this

2  is Luke Lavin, and he'll be our court reporter today.  And,

3  folks, during the trial when you're in the courtroom, no

4  cellphones, iPads, or anything like that on.

5    What I'm going to do now, if anybody has trouble hearing

6  me, just let me know, and if during the course of the trial you

7  guys can't see a witness or exhibits or something, let us know

8  so we can try to work that out.

9    But anyway, my preliminary instructions are not a

10 substitute for the detailed instructions of law and the

11 evidence that I will give to you at the conclusion of the case

12 before you begin your deliberations.

13    It's a very short leash (moving microphone).  Is that

14 better, I guess?

15    Okay.  These remarks are a simple explanation of your

16 duties and responsibilities and the basic principles of law

17 that are likely to be involved in this case.  Remember your

18 purpose as jurors is to find and determine the facts.  And

19 under our system of criminal procedure and justice, you are the

20 sole judges of the facts.  And if at any time I should make any

21 comments regarding the facts other than reading a stipulation

22 or taking judicial notice, which I will explain in just a

23 minute, you are to disregard them.

24    It's especially important that you perform your duty of

25 determining the facts diligently and conscientiously, for

1  ordinarily there is no means of correcting an erroneous

2  determination of facts made by the jury.  On the other hand, as

3  we talked about during the *voir dire*, I must instruct you that

4  the law given by the Court constitutes the only law for your

5  guidance, and it is your sworn duty to follow the law as I give

6  it to you even though you may disagree with any or part of it.

7       I think you all have notepads and pens; right?

8            MEMBERS OF THE JURY:  (Nod heads up and down.)

9            THE COURT:  Okay.  If you want to take notes during

10 the course of the trial, that's fine.  You have notepads and

11 pen.  But this is important.  If you do take notes, make sure

12 the taking of notes does not interfere with your listening to

13 and considering all of the evidence and, importantly, observing

14 the witness.  Also if you take notes, do not discuss them with

15 anyone before you begin your deliberations at the very end of

16 the case.  Do not take the notes with you at the end of the

17 day.  Be sure to leave them in the jury room.  And Barb will

18 manage that.

19      If you choose not to take notes, remember it's your own

20 responsibility to listen carefully to the evidence.  You can't

21 give this responsibility to someone else who is taking notes.

22      Now, that didn't apply to me in law school.  That's how I

23 got in.  Somebody else took notes and I studied them.

24      But this is up for you guys to decide the case at the end.

25 All right?  And this is really important.  Notes are only used

to refresh the recollection of the juror who took the notes. You're not to use the notes in the jury deliberation to prove to others that your notes are, in fact, what a witness actually said, because it's your impression of what they said when you took it down.  So it would be improper for you to look at somebody and say, "Look.  See, I took it down.  That's what they said."  That's for you to remember that they took it down -- or that they said that.  Okay?  Kind of a difference and a distinction.  It's important.

The reason is we depend on the judgment of all of the members of the jury, and you are all responsible for remembering the evidence in the case.  And notes are only aids to your memory and should not be given preference over your independent recollection of the facts.

All right.  So Luke is taking down what is being said, but typically a transcript is not prepared during the course of the trial and is not available for review, so it's really important that you guys pay attention.

As I've talked about a couple of times now, including during the *voir dire*, you are to determine the facts of this case solely from the evidence.  The evidence consists of the testimony of the witnesses and any exhibits that are received into evidence.  The questions asked by the lawyers aren't evidence; only the answers given by the witness are evidence. Statements and arguments made by the attorneys are not evidence

1    either.  If the attorneys enter into agreements or the parties

2    enter into any kind of agreements as to facts that are not

3    disputed, that's called a stipulation.  And if they do that,

4    I'll let you know and you're to accept that fact as true.

5         On occasion it's possible I may tell you I'm taking what's

6    called judicial notice of certain facts, and I'll explain that

7    when I do it at that time.  But if I ask you to take judicial

8    notice of a certain fact, then you may accept those facts as

9    true, but unlike a stipulation, you're not required to accept

10   them.  It's up to you to decide what inferences are to be drawn

11   from the evidence and what facts are established by the

12   evidence.  You are to consider only the evidence in the case,

13   but in your consideration of this evidence you are not limited

14   to the bald statements of the witnesses.  In other words, you

15   are not limited solely to what you see and hear from the

16   witnesses as they have testified, but you are permitted to draw

17   from the facts that you find have been proved reasonable

18   inferences that are justified in light of your everyday and

19   common experience.  You must not consider as evidence anything

20   that you may have read or heard about the case outside the

21   courtroom, whether before or during the trial.

22        Now, again, we talked about this I believe during the *voir*

23   *dire* process, but there's two terms:  direct and circumstantial

24   evidence.  Some of you have heard those terms.  Well, you all

25   heard the terms, because we talked about it.  Remember that

direct evidence is simply evidence, like the testimony of an eyewitness, which if you believe it, it would directly prove a fact. If you believe -- if a witness testified that he saw it raining outside and you believed that witness, then that would be direct evidence it was raining. Circumstantial evidence is simply a chain of circumstances that would indirectly prove a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude it was raining.

It's your job to decide how much weight or value to give to both direct and circumstantial evidence, and the law makes no distinction between the weight or value you should give to either one or says that one is any better than the other. You should consider all the evidence presented in the case, direct and circumstantial, and give it whatever weight or value you believe it deserves in your deliberations.

An important part of your job as jurors is to decide how credible or believable the witnesses are, and this is strictly your job, not mine. It's up to you to decide if a witness' testimony was believable and how much weight or value you think that testimony deserves. You are free to believe everything a witness says, part of it, or none of it at all, but you should act reasonably and carefully in making these decisions.

Let's just go over a couple of things that may help you.

1  Ask yourself if the witness was able to clearly see or hear the
2  events to which they testified.  Sometimes even an honest
3  witness may not have been able to see or hear what was
4  happening and they may make a mistake.  Ask yourself how good
5  the witness' memory seemed to be.  Did the witness seem to be
6  able to accurately remember what happened?  Ask yourself if
7  there is anything else that may have interfered with the
8  witness' ability to perceive or remember the events.  Ask
9  yourself how the witness acted while they were on the witness
10  stand.  That means you've got to be watching the witnesses, not
11  just having your head down taking notes.  Ask yourself, did the
12  witness look honest?  Did they look like they were lying?
13  These are commonsense determinations that you'll make with your
14  own experience.
15      Ask yourself if the witness has any relationship to the
16  government or to the defendant or anything to gain or lose from
17  the case that might influence the way that witness would
18  testify.  Ask yourself if the witness had any bias or prejudice
19  or reason for testifying that might cause the witness to lie or
20  even just to slant testimony in favor of one side or the other.
21  Ask yourself if the witness testified inconsistently while on
22  the witness stand while they're actually testifying, or if the
23  witness said or did something or failed to say or do something
24  at any other time that's inconsistent with what they say when
25  they're testifying here in court.

If you believe that a witness was inconsistent, then ask yourself if it makes the testimony less believable.  Sometimes it may, and other times it may not.  Consider whether the inconsistent statement was about something important or about something unimportant.  Or ask yourself if it seemed like an innocent mistake or if it seemed like it was deliberate.

Ask yourself how believable or credible the witness' testimony was in light of all the other evidence.  Was the witness' testimony supported or contradicted by other evidence that you found to be believable?  If you believe that a witness' testimony was contradicted by other evidence, remember that people sometimes forget things, that even two honest people who witness the same event might not describe it exactly the same way.

These are only some of the things that you may consider in deciding how believable the witnesses were.  You may also consider other things that you think shed light on their believability.  Remember to use your common sense and everyday experience in dealing with other people.  Then you decide which testimony you believe, how much weight or value it deserves.  There may be instances in this case where I give you instruction that a piece of evidence is limited -- is admitted only for limited purpose.  If that happens, then you have to discuss that item only in terms of its limitations and for no other purpose.

1    No statements, remarks, or comments that I make at any time

2  during the course of the trial is intended to indicate any

3  opinion I may have as to how you should decide the case or

4  influence you in your determination of the facts.  Facts belong

5  to you guys.

6    If it's possible, at times I may ask questions of

7  witnesses.  I typically don't.  But if I do, it's only for the

8  purpose of bringing up matters which I feel should be brought

9  out and not in any way to indicate any opinion I have about the

10 facts or any opinion I may have about the testimony of a

11 witness.

12    If during the course of the trial it becomes necessary for

13 me to admonish the parties or the lawyers, that's not intended

14 to show any prejudice towards them.  Oftentimes during the

15 trial it's necessary for me to confer with lawyers out of your

16 hearing concerning questions of law and procedure that would

17 require consideration by the Court alone.  We'll try to keep

18 those to a minimum.  If I think it's going to take more than a

19 few moments, we may excuse you so you're back and comfortable.

20 Otherwise, we'll have one of those sidebar conferences like you

21 saw during the jury deliberations.  However, we will try to

22 keep it as short as possible.

23    The parties may sometimes make objections to some of the

24 testimony or other evidence.  That's fine, because it's the

25 duty of the lawyer or the parties to object to evidence that

1    they believe may not be properly offered.  You should not be

2    prejudiced in any way against a lawyer or a party who makes

3    objections.  At times I may sustain the objections or I

4    instruct you to disregard certain testimony or exhibits.  And

5    if that happens, you are not to consider any evidence to which

6    an objection has been sustained or that I've instructed you to

7    disregard.

8         Now, we talked about this in the *voir dire* process because

9    it's very important.  Mr. Ealy has pled not guilty to the

10   crimes charged in the indictment.  Now, remember, the

11   indictment is not any evidence at all of guilt or anything

12   else.  It does not even raise any suspicion of guilt.  It's

13   just the formal way the government tells Mr. Ealy what crimes

14   he is accused of committing.  Mr. Ealy starts the case with a

15   clean slate, no evidence at all against him, and the law, as

16   you must, presumes he is innocent.

17        This presumptions of innocence stays with him unless and

18   until the government presents evidence here in court that

19   overcomes that presumption and convinces you beyond a

20   reasonable doubt that he is guilty.  This means that Mr. Ealy

21   has no obligation to present any evidence at all or to prove to

22   you anything in any way that he is -- and he doesn't have to

23   prove that he is innocent.  It is always up to the government

24   to prove that he is guilty, and this burden stays with them

25   from the start to the finish.  You must find the defendant not

guilty unless the government convinces you beyond a reasonable doubt that he is, in fact, guilty.

The government must prove each and every element of the crimes charged beyond a reasonable doubt.  Proof beyond a reasonable doubt does not mean proof beyond all possible doubt. Possible doubts are doubts based purely upon speculation. They're not reasonable; they're based on speculation.  A reasonable doubt is a doubt that's based on reason and common sense.  It may arise from the evidence, lack of the evidence, or the nature or quality of the evidence.

Proof beyond a reasonable doubt means proof which is so convincing you would not hesitate to rely and act upon it in making the most important decisions in our own lives.  If you are convinced that the government has proved Mr. Ealy guilty beyond a reasonable doubt, then you'll say so at the end of the case by signing off on a guilty verdict.  If you are not convinced, you will say so by signing off on a not guilty verdict.

Now, we mentioned this a little bit in *voir dire*.  Mr. Ealy has been charged under a multi-count indictment with fraud and related activities in connection with access devices, false or fictitious fraudulent claims, wire fraud, identity theft, and aggravated identity theft and mail fraud.  As I said a moment ago, he's entered a not guilty plea to all of these charges. And the fact that there are a number of counts is not evidence

of guilt and should not influence your decision in any way.
It's your duty to consider the evidence as it relates to each
particular count and determine whether the government has
presented proof beyond a reasonable doubt as to that particular
charge.

Now, this is important.  I think we talked about this last
week.  But do not decide any issue or form any opinions on this
case until you've heard all the evidence, and you'll be
instructed on the law before you retire to the jury room.  But
until the case is submitted to you, you are not to discuss the
case with anyone, not even your fellow jurors, not even the
person sitting next to you.

I think I made that comment, that, you know, when you're
walking out you can't say, "Hey, what did you think of that
witness?"  You know, no comments like that until the very end
of the case when you're all together.

And don't let anybody else discuss the case in your
presence.  You must keep an open mind until instructed by me to
begin your deliberations.  Therefore -- I don't know if there
will be any media coverage on this case; I don't know -- but
don't read any newspaper or magazine articles or radio or
television broadcasts about this, no blogs, no Internet, no
search engines.  As we said before, you're not to do any type
of independent outside research on any issue in this case, any
of the witnesses that testify in this case, any of the parties,

any of the lawyers, or anyone associated with the case. In other words, just don't do it. After the case is submitted to you, you will discuss it only with your fellow jurors while you're all in the jury room together.

Should anyone improperly approach you concerning the case, immediately notify the United States Marshals or one of the CSOs, the guys in the blue sport coats and ties. I've been doing this for eight years. It's never happened. I was a trial lawyer before that for 35 years; I never had anybody approach a juror. But just in case, if something happens, notify these guys. Okay?

When we're in recess, you're not required to remain together, but it's highly important that you strictly observe the rules that govern you during your recess adjournment so all the parties are assured of a fair trial. As I said, don't discuss the case with anyone or let them discuss it with you, and don't deliberate in any way about the case until the very end of the case.

Now, this will happen. This is a small courtroom. This is a small courthouse. Some of the hallways are kind of adjoining. But don't talk to anybody about the case. That means if you see somebody in the hallway, just ignore them, walk by them. If you see one of the parties, if you see a witness, if you see a lawyer, just walk by them. I'm going to tell them not to talk to you, and they are certainly not being

1  rude by doing that.  They're just following the rules.  And if

2  you see somebody in the hallway, just ignore them.  You're not

3  being rude because you're following the rules.

4      Okay.  And again, during your deliberations and while

5  you're in session, no cellphone contact or any type of contact

6  with the outside world.

7      All right.  We talked a little bit about this last week,

8  but each party has the opportunity to make an opening

9  statement.  The government will make an opening statement at

10 the beginning of the case if they choose.  The defendant may

11 make an opening statement following the opening statement for

12 the government, or the defendant may defer the making of an

13 opening statement until the close of the government's case.

14 But, remember, no party is obligated to make an opening

15 statement, and what is said in opening statement is not

16 evidence anyway.  It's just what they think the case is going

17 to show.  The opening statement simply serves the purpose of

18 introducing the evidence that the party that's making the

19 statement thinks they'll produce.

20     After we do the opening statements, the government will

21 introduce its evidence first.  After the government has

22 presented its evidence, the defendant may but, again, is not

23 obligated to present evidence, because the burden is always

24 upon the government to prove every element of the offense

25 charged beyond a reasonable doubt, and the law never imposes

1  upon a defendant in a criminal case the burden of calling any

2  witnesses or introducing any evidence.

3       After everything is done, then each party has the

4  opportunity to present an oral argument in support of their

5  case.  Again, just like in the openings, what is said in

6  closing arguments isn't evidence either.  The arguments are

7  designed to be presented to you, the contentions of the parties

8  as to what they think the evidence has shown and what

9  inferences you may draw from the evidence.  The government has

10 the right to open and close the closing arguments because they

11 have the burden of proof.

12      I will instruct you on the law, and typically what I do is

13 I do that before the arguments.  You'll have a set of jury

14 instructions.  We'll either have them on that board or we'll

15 have individual sheets so you guys can read along with me.

16 That way when they're talking about the elements and what makes

17 up the various offenses, you'll have a set of those and the

18 verdict forms in front of you.  I think it helps you in your

19 understanding of the arguments.

20      So then after the arguments I usually talk about how you're

21 supposed to conduct your deliberations.  Okay?

22           MEMBERS OF THE JURY:  (Nod heads up and down.)

23           THE COURT:  You guys ready?

24           MEMBERS OF THE JURY:  (Nod heads up and down.)

25           THE COURT:  All right.  Does counsel for the

government wish to make an opening statement?

MR. SISTLA:  Yes, Your Honor.  May I proceed?

THE COURT:  Yeah, of course.

MR. SISTLA:  May I use the well, Your Honor?

THE COURT:  You can do whatever you want to do.

PLAINTIFF'S OPENING STATEMENT

MR. SISTLA:  Good morning, ladies and gentlemen of the jury.  Can everyone hear me okay?

MEMBERS OF THE JURY:  (Nod heads up and down.)

THE COURT:  Luke, are you okay?  Can you hear?

THE REPORTER:  Yes.  Thank you.

MR. SISTLA:  And he will tell me if I go too fast.  So just make sure you can hear me.

Before I begin, I haven't had a chance to introduce myself.  My name is Alex Sistla.  My colleague Andrew Hunt here introduced himself at the *voir dire* last week.  We represent the government in the case, this is a criminal case, and we thank each and every one of you for your service.

This case is about identity theft.  That's what this case is about.  This case is about the defendant -- Lance Ealy -- buying and using other people's identities to commit fraud, to file false tax returns, to open fraudulent bank accounts, to commit credit card fraud, to use other people's identities to benefit himself financially.  That's what this case is about.

Now, Mr. Ealy didn't steal other people's identities by

1    pickpocketing someone.  He didn't steal other people's

2    identities because he worked at a restaurant and was able to

3    get credit card information.  He doesn't work at a nursing home

4    and stole identities that way.  No.

5        What the evidence will show is that Mr. Ealy bought these

6    identities online.  He bought lots of identities, dozens if not

7    hundreds of identities.  And we don't know -- the evidence

8    won't show where he got all of the identities, but the evidence

9    will show where he got some of the identities, and in

10   particular the identities that were used to file fraudulent tax

11   returns in 2013, in tax year 2012.  The fraud and the identity

12   theft at issue in this case runs from approximately the end of

13   2012 to the beginning of 2014.

14       So how do we know that Mr. Ealy purchased identities

15   online?  How do we know where Mr. Ealy got the identities?

16   Well, we know because the government's first witness in this

17   case is a gentleman by the name of Hieu Minh Ngo.  He's a

18   Vietnamese guy, a young guy, mid-20s.  And what Mr. Ngo was,

19   for all intents and purposes, was a cyber criminal, and his

20   business was to sell identities.  He was a hacker.  He got

21   identities and he sold them.  He was, for the lack of a better

22   term, the Amazon.com, you would say, of personal identities.

23   If you wanted to buy personal identities, Mr. Ngo was the guy

24   to go to.  He ran a website and he sold them through e-mail.

25       Now, how did Mr. Ealy find Mr. Ngo?  We don't know.  It

doesn't really matter how he found Mr. Ngo.  What we do know is that Mr. Ealy through his e-mail account -- lanceealy123@yahoo.com, that's an e-mail account you will hear over and over and over in this case -- communicated with Hieu Minh Ngo.  And Hieu Minh Ngo's e-mail account is wangsangpi@gmail.com.

And I apologize for the sort of funny-sounding e-mail accounts, but you're going to see a lot of e-mails in this case, hundreds of e-mails, communications between Mr. Ealy and Mr. Ngo and then between Mr. Ealy and a special agent.

But the question for you, I hope, in part is:  How did we get Mr. Ngo?  How is Mr. Ngo here today?  Well, Mr. Ngo was in Vietnam engaging in this cyber crime, engaging in this fraud, selling personal identities, running a website that provided access to U.S. databases that had social security numbers and dates of birth, names, and so forth.  But at some point Mr. Ngo was lured over here -- actually to Guam -- by the U.S. Secret Service and he was caught.  That's how we know that he was behind this.

Mr. Ngo, after being caught in about February, in early February of 2013, decided to cooperate, and he's going to testify to all of that today.  He's going to explain that he ran these websites.  He sold personal identifying information.

Now, that personal identifying information, let me pause there.  Let me put a little meat on the bones.  You'll hear a

term called fullz, f-u-l-l-z.  That means full information.
It's a slang term that hackers and other people who traffic in
this information use.  And what fullz are is complete sets of
personal identifying information.  Everything you could think
that is personal of you they would have:  names, social
security numbers, dates of birth, mother's maiden name, bank
account information, bank account logins, e-mail addresses,
e-mail passwords, everything.

    And what's important is this information was generally
accurate, because without the information being accurate, it
wasn't worth anything, as you can imagine.  The names and
social security numbers don't match, you can't open a bank
account, you can't file a false tax return.  That's what Mr.
Ngo trafficked in.

    So after he gets arrested by the Secret Service, he decides
to cooperate.  He turns over control of his e-mail account to
the Secret Service.  But before that, before he does that, Mr.
Ealy is in contact with Mr. Ngo.  Now, Mr. Ealy doesn't know
Mr. Ngo, and Mr. Ngo doesn't know Mr. Ealy.  Mr. Ngo has
hundreds if not thousands of customers.  And frankly, Mr. Ngo
doesn't care about the identity of his customers.  He's just
there to make money, just there to sell identities.

    Now, the communications between Mr. Ealy and Mr. Ngo go on
in late December and throughout January of 2013.  And over that
time Mr. Ealy purchases hundreds of identities from Mr. Ngo.

1  How does one pay for stolen identities?  He didn't give him a

2  credit card.  He didn't give him his bank account information.

3  He didn't send him a check.

4      No.  The way that these transactions are paid for is

5  through a service called Liberty Reserve, and Mr. Ngo and other

6  witnesses in this case will explain what Liberty Reserve is.

7  And the reason you want to use Liberty Reserve is because it's

8  hard to trace.  You don't need a real name.  You don't need a

9  social security number.  You don't need any identifying

10 information to open an account.  You can transfer money from

11 one Liberty Reserve account to another Liberty Reserve account.

12 And that's how Mr. Ealy purchased those identities, by

13 transferring money from his Liberty Reserve account to Mr.

14 Ngo's Liberty Reserve account.

15     Now, as I said, this went on in January of 2013

16 approximately.  Many e-mails, dozens of e-mails.  And what's

17 important here is that Mr. Ngo sold this identifying

18 information not just to Mr. Ealy but to many people, and that

19 information he sold was called fullz, as I mentioned, the

20 f-u-l-l-z word.  Another way you'll hear about it is just

21 "info."  "I need to buy info."  That's another way you'll hear

22 about it.  Mr. Ngo sold these fullz and this info in two ways:

23 one, through his website and, two, through e-mail.

24     Now, what's important is that the transactions in this case

25 were via e-mail.  You'll see Mr. Ealy's e-mails to Mr. Ngo's

1  e-mail account, back and forth.  And why is that important?  It

2  is important because Mr. Ealy was buying specific sets of

3  fullz.  The term is "filtered fullz."

4     By e-mailing Mr. Ngo, Mr. Ealy and any of Mr. Ngo's

5  customers would be able to say:  I want personal information

6  for this set of people.  I want people from Ohio.  I want

7  people on disability.  I want retired people.  I want people

8  born in 1994.

9     Mr. Ngo's customers could not do that through the website.

10  If you bought fullz through the website, you just put in your

11  order and you got whatever came out.  In order to target, in

12  order to specify the kinds of personal identifying information

13  you wanted, you had to work directly with Mr. Ngo.  You had to

14  e-mail Mr. Ngo.  And the evidence will show that's what Mr.

15  Ealy did.

16     Mr. Ealy wasn't just randomly buying personal identifying

17  information.  No.  He was specifically targeting groups of

18  individuals.

19     Now, at some point, as I mentioned, Mr. Ngo got arrested.

20  And both Mr. Ngo and the special agent who was responsible for

21  arresting him will give you some background on that.  That

22  special agent's name is Matt O'Neill, and he'll testify in a

23  couple of days.  He's from the Secret Service.  And what Mr.

24  Ngo did at that point is he turned over control to his account

25  to the Secret Service.  And you can imagine why he did that.

1    He was caught.  He had admitted to what he did, and he wanted

2    to cooperate, because by cooperating, that was the best way to

3    get a deal from the government.  That was the best way to

4    ensure that he might get a lower sentence.  It didn't guarantee

5    it.  It didn't guarantee he was going to get a lower sentence,

6    but it was the only way that he might get a lower sentence, and

7    that makes sense to everyone here.  There's nothing surprising

8    about that.

9        So Mr. -- so Special Agent O'Neill then takes over this

10   account, this wangsangpi@gmail.com account.  And what does

11   Special Agent O'Neill do?  What the evidence will show is acted

12   as an aggressive undercover agent.  He was out trying to get

13   Mr. Ngo's customers.  Now, Mr. Ngo had customers all over the

14   world, not just in the United States.  So Special Agent O'Neill

15   was trying to identify individuals, as the evidence will show,

16   like Mr. Ealy who were customers of Mr. Ngo and who were buying

17   fullz from Mr. Ngo here in the United States and using those

18   fullz, that personal identifying information, to commit the

19   kind of frauds that the evidence will show Mr. Ealy committed.

20       And Special Agent O'Neill was successful.  The way he would

21   do that is he would tease out information about the users.  He

22   would tease out information where did they live, personal

23   details about them, where to ship fake packages to them.  And

24   he was successful in this case over many months, starting in

25   February 2013 and continuing until August 2013.

Mr. Ealy, unbeknownst to him, exchanged hundreds of e-mails with Special Agent O'Neill who was using the Wang Sang account, and over that period of time Special Agent O'Neill was able to elicit details about Mr. Ealy. He elicited his name, his birthday, his Facebook account, the fact that he had two kids, that he lived in Dayton, Ohio. He elicited information about addresses that were tied to Mr. Ealy, including his personal residence at 1622 Rangely Avenue, an address you will hear over and over in this case. Another address that he owned, 1486 Guenther, that you will hear over and over in this case, and his parents' address, or his mother's address, 4687 Marlin Avenue.

Special Agent O'Neill was able to elicit all of these details, and that is one of the ways that we know that the lanceealy123@yahoo.com account was used and controlled by Mr. Ealy, notwithstanding the fact that the name "Lance Ealy" is on the account.

The other thing is, Mr. Ealy didn't know that he was talking to an undercover agent, so, of course, the undercover agent wasn't going to give him personal identifying information. But what the e-mail traffic shows is that Mr. Ealy never stopped asking for fullz. Week after week after week after week: "I need fullz. I want fullz. I need fullz. I want fullz." He kept offering to buy it.

In fact, one of the things that he offered the special

agent and actually sent to the special agent were American
Express card numbers, 17 American Express card numbers in
February 2013.  Now, why did he send those American Express
card numbers?  In an effort to get personal identifying
information, to get fullz from Wang Sang at gmail.com.  He
thought he was talking to Ngo.  He didn't know he was talking
to a special agent.

     Now, the evidence will show Mr. Ealy was not authorized to
have those American Express numbers, and he was certainly not
authorized to trade American Express numbers and use those
American Express numbers in an effort to buy stolen identities.

     So I've sort of given you a background of where the stolen
identities came from.  Well, buying stolen identities is only
step one.  I mean, you have a stolen identity, it doesn't give
you much unless you use it.  You can sell it or commit other
acts of fraud, but just having it doesn't do much.  So what
does the evidence show Mr. Ealy did with those identities he
purchased from Mr. Ngo?  He used them to file false tax
returns.  And in this case we've charged 11 false tax returns,
but he filed dozens with the information that he purchased from
Mr. Ngo.

     And how do we know that the tax returns are false?  Well,
first, we're going to have the persons whose name they were
purportedly filed in, they'll testify, or representatives of
those persons.  They'll confirm:  Yeah, that's my name.  That's

1    my social security number, but I don't have live that at this

2    random South Dakota address.  I don't know this bank account

3    number, and I certainly don't work at this random employer.

4    That's the first way.

5        The second way is all these tax returns, the names and

6    social security numbers that they were filed in, all that

7    information is in Mr. Ealy's e-mail account, not someone else's

8    e-mail account.  They're all in Mr. Ealy's e-mail account, all

9    the names and social security numbers that were used to file

10   the false tax returns.  Now, there are no paper tax returns,

11   because all of the returns were filed electronically.  And a

12   representative of the IRS will be testifying, today actually,

13   and explain to you the process by which returns are filed

14   electronically, how you know that a return is filed

15   electronically, and the types of information that are necessary

16   to file a return.

17       Okay.  So he files a return.  Big deal.  Now what?  What's

18   next?  Well, the purpose for filing a false return was to

19   generate fraudulent refunds, and that is another piece of

20   evidence that the government will present that will tie Mr.

21   Ealy to the false tax returns.  The money was deposited in

22   fraudulently-opened bank accounts.  And what is the evidence

23   that those accounts were fraudulently opened?  Again, those

24   victims will testify.  The people in whose names the accounts

25   were purportedly opened, they will come in and testify, or

1  representatives will come in and testify.  And why

2  representatives?  Because some of the individuals, the evidence

3  will show, in whose name the accounts were opened are disabled.

4  They're in nursing homes.  They have dementia.  It would have

5  been impossible for them to open those bank accounts.

6      But if you look at the account statements, and an agent

7  from the IRS will go through with you, you'll see that the only

8  money that goes into these various bank accounts -- and they're

9  opened at numerous financial institutions:  JP Morgan Chase,

10  Navy Federal Credit, Wells Fargo, U.S. Bank -- the only

11  activity in those accounts are fraudulent tax refund deposits

12  or the accounts talk to one another.  The accounts are

13  transferring money from one account to another.

14      Now, those people whose names accounts are opened in -- and

15  there are lots of names, names of people that will become

16  familiar to you over time -- know nothing about these accounts.

17  The only activity in the accounts is fraudulent activity.  And

18  how do we know that Mr. Ealy is the one behind these accounts?

19  How do we know that?  What is the evidence?

20      Well, the evidence is this.  First, there was documents,

21  physical evidence, found at his house:  bank statements in

22  those victims' names.  Now, those bank statements or the

23  envelopes, they'll have the victim's name, they'll have a

24  random address, not an address tied to the victim, but it will

25  be found at Mr. Ealy's house, and not one victim, not two

victims, but multiple victims.

The evidence will show that multiple bank victims' banking information is found at the defendant's house at 1622 Rangely Avenue or 4687 Merlin Avenue.

There's also evidence of him receiving e-mails on his cellphone, e-mails on the cellphone that are addressed to the purported bank account holders, but they're on Mr. Ealy's cellphone. That's another piece of evidence.

And the third and perhaps most damning piece of evidence is we have video. We have surveillance footage. You see Mr. Ealy on the video taking money out of some of these fraudulent bank accounts, from J.P. Morgan, from U.S. Bank accounts.

So that's the kind of evidence that you will hear tying Mr. Ealy to the bank accounts. And the only money, again, that is going into those bank accounts is generated by the fraudulent tax refunds, and those fraudulent tax refunds are tied back to the personal identifying information that was purchased from Mr. Ngo.

That's the scheme, that's the tax fraud scheme here, but there's more. It wasn't just filing the fraudulent tax returns. It wasn't just opening false bank accounts. No. It was also just using people's identities to open bank accounts, checking accounts. It was using their credit cards to make purchases, for example, an $875 jacket, a size 58 to 62 jacket, from a company called Pelle Pelle. There's that kind of fraud.

1    And how do we know that other people's identities were
2  used?  Well, the agents in this case at one point executed
3  search warrants on Mr. Ealy's residence, 1622 Rangely Avenue,
4  and executed a search warrant on another related property, his
5  mom's house 4687 Marlin, and they found forensic evidence,
6  evidence off of the computer, showing those purchases.
7    And you will hear from the victims whose names are used, a
8  couple individuals, local folks right here in Dayton and in the
9  Dayton area -- actually one in Springfield and one in Dayton --
10 they'll come and testify and say, "That's not my e-mail
11 address.  I didn't purchase that jacket.  I don't know Mr.
12 Ealy.  I didn't give him permission to use my account or open
13 statements in my account."  And yet they are on computers found
14 at Mr. Ealy's house.  The orders are on Mr. Ealy's computer.
15   The fake driver's license that Mr. Ealy used to make one of
16 the orders, it physically was found at the house and it was
17 found on one of the computers at the house.  So that's the
18 scope of the fraud, so to speak, in this case.
19   But the question remains, well, how do you know Mr. Ealy
20 used those e-mail accounts?  I mean, quite reasonably the
21 government is not going to produce a witness who is going to
22 come in and stand here and say, "I saw Mr. Ealy typing on the
23 computer for one year."  That's not reasonable.  No one has a
24 guy standing in their house watching someone type an e-mail.
25 No.  The way that the government will prove, quite

1  compellingly, that the e-mail account at issue,

2  lanceealy123@yahoo.com, lanceealy@yahoo.com, and a number of

3  other e-mail accounts that are tied to the fraudulent schemes

4  that Mr. Ealy executed in this case, is in a variety of ways.

5      First, the content of the e-mails, as I explained.  There

6  was content in both the lanceealy123 and lanceealy@yahoo.com

7  e-mails which tie the e-mails to the defendant, addresses,

8  personal information, information about his family, his

9  birthday, Facebook.

10     Now, Mr. Ealy, when he was communicating with Mr. Ngo, he

11  used only the lanceealy123@yahoo.com address.  But when he

12  communicated with Special Agent O'Neill, he used both the

13  lanceealy123 account and then he switched at one point to the

14  lanceealy@yahoo.com account.

15     Now, the lanceealy@yahoo.com account we can -- there will

16  be substantial evidence tying it to Mr. Ealy.  He uses it as a

17  point of contact for his counselor at Central State University.

18  We told you that he's a college graduate.  It's tied to his

19  bank accounts.  It's tied to his PayPal account.  Water bills

20  are in that account.  E-mails with his professors are in that

21  account over this time period when he's communicating with

22  Special Agent O'Neill.

23     The same thing with the lanceealy123@yahoo.com account.

24  There's an e-mail communication with the mother of his

25  children.  It has a résumé attached to that e-mail.  There are

water bills in that account.  There are other e-mails that
are -- that have addresses that are tied to Mr. Ealy.  So the
content of the e-mail and the extrinsic evidence about how you
can tie Mr. Ealy to these various residences.  For instance,
he's the owner of 1622 Rangely Avenue.  He's the owner of 1486
Guenther Road.  His parents live at the Marlin Avenue address.

But there's more.  There's forensic evidence.  These e-mail
addresses were accessed from the computers that were seized
from his house:  lanceealy123 and the lanceealy@yahoo.com.  And
in the phone that was taken from him when he was arrested, that
phone has the lanceealy@yahoo.com.  Those are the types of --
that's an example of the types of evidence that the government
will produce to show that those e-mail addresses, the e-mail
addresses that Mr. Ealy used to buy personal identifying
information, the e-mail addresses that he used to commit the
fraud, are Lance Ealy's.

Now, I want to make very clear, so there's no confusion,
the Lance Ealy and the lanceealy123@yahoo e-mail addresses
you'll hear the government talk about a lot.  You will see a
lot of e-mail addresses, but these are not the only e-mail
addresses that were used by Mr. Ealy in order to commit fraud.
And the evidence will show other e-mail addresses -- and I
apologize.  There are many.  There's five or six e-mail
addresses.  And the government will present evidence of a
similar fashion, forensic evidence or circumstantial evidence

that tie them back to Mr. Ealy.

That's the government's case.  That's the evidence in this case.  It's a case of identity theft and of fraud, of filing false tax returns, of opening fraudulent bank accounts, and committing various other types of credit card fraud, or opening checking accounts in other people's names.

And all of that conduct together, as a result of all that conduct together the government has alleged that Mr. Ealy has committed a variety of crimes, and the government is going to call a variety of witnesses to prove those crimes.

I think, in order to organize the case for you, it's best to think of the witnesses you'll hear sort of in groups.  Now, some stand alone.  Mr. Ngo -- he sort of stands alone.  He's the cooperator.  He's going to tell you about how he sold PII.  Special Agent O'Neill, he's the undercover agent.  He's going to explain how he continued to communicate indicate with the lanceealy123 and used information to tie that account to Lance Ealy.  But there are sorts of groups of witnesses.

One group are the various victims.  They're the tax victims.  Those are the people whose identities were used to file the false tax returns.  There are the bank account victims.  Those are the people whose identities were used to open the fraudulent bank accounts that received fraudulent tax returns.  There's another smaller group, the other identity victims.  Those are the people who weren't tied directly to

1    either the bank or the tax aspect but whose identities were

2    simply used to, you know, make fraudulent purchases or open

3    fraudulent bank accounts for other reasons.

4        And finally, the last sort of group of victims are the AmEx

5    victims.  Those are the individuals whose AmEx numbers were

6    used or that Mr. Ealy possessed and attempted to use in order

7    to purchase fullz or personal identifying information, it's

8    also going to be called PII, from Special Agent O'Neill.

9    That's another set of witnesses.

10        A third set are what we call custodial witnesses.  And what

11    those witnesses are is they're the way that the government

12    brings in the various documents, the bank records, the water

13    bills, records from Facebook and Yahoo! and Google and so

14    forth.  And there will be several of those witnesses.  They'll

15    also provide some background information, such as how do you

16    open a bank account online, what kind of information does one

17    need.  And the evidence will show you just need a social

18    security number and a name in most cases, just a little bit of

19    other information, and they will just explain that.  They will

20    also explain how you can tell from the bank statements that

21    these accounts were, in fact, opened online.

22        The next group of witnesses that you'll hear are certain

23    lay witnesses.  These are folks that either know Mr. Ealy or

24    they're Mr. Ealy's teachers, professors or staff at Central

25    State, and they will provide additional details, additional

1  evidence that links Mr. Ealy to the e-mail addresses in

2  question and the physical addresses in question.

3      And finally, the last sort of group of witnesses are law

4  enforcement witnesses.  Two of whom are sitting here today:

5  Special Agents Turk and Bierman.  They worked the

6  investigation, and they will help explain how various pieces of

7  evidence fit together in this case.

8      Now, I'm not saying that those witnesses are going to be

9  called in that order, but that gives you a lay of the land of

10  the types of witnesses you will hear over the next ten days to

11  two weeks.

12      And after hearing all of the evidence in this case and

13  seeing all the documents, and there's several binders sitting

14  over there that you see, and hearing from the witnesses, the

15  government is going to ask you to return a guilty verdict on

16  all the counts in the indictment, to return a guilty verdict

17  with respect to the aggravated identity theft, to the filing

18  fraudulent tax returns, to the use of other people's

19  identities, which is aggravated identity theft, and to access

20  device fraud, the use of credit card numbers and other

21  information to commit fraud.

22      Thank you.

23          THE COURT:  Mr. Ealy, do you or Mr. Anderson wish to

24  make an opening statement at this time?

25      (Mr. Anderson and the defendant confer privately.)

1     THE COURT:  Mr. Ealy, do you want to use the podium or

2  do you want to stand?  Wherever you're comfortable.

3     Barb, can we swith that around?

4     COURTROOM DEPUTY:  Yes.

5     THE COURT:  Hang on one second.  Let us twist it so

6  it's facing the --

7     (Mr. Anderson and the defendant confer privately.)

8     MR. ANDERSON:  Your Honor, may we approach?

9     THE COURT:  Of course.

10     Hang on one second, folks.  This is one of those sidebars

11  we talked about.

12  <u>SIDEBAR CONFERENCE</u>

13     (Defendant present at sidebar.)

14     THE COURT:  Okay.  What's up, guys?

15     THE DEFENDANT:  Me and Tom Anderson, we're both going

16  to speak to the jury.

17     THE COURT:  That's fine.

18     THE DEFENDANT:  Okay.

19     THE COURT:  But you've got to take turns.

20     THE DEFENDANT:  Right.  We'll take turns.

21     MR. SISTLA:  Wait.

22     THE COURT:  Now, you don't have to stand behind the

23  podium the whole time.  Just don't get too close to the jury.

24  Okay?

25     THE DEFENDANT:  Okay.

1          MR. HUNT:  Your Honor, we would object.  It's a hybrid

2     counsel situation.  Since Mr. Ealy is proceeding *pro se*, to

3     give basically an opening statement from standby counsel, who

4     is not really counsel, and then from the defendant, who is

5     hybrid counsel --

6          THE COURT:  Well, the objection is noted, but I'm

7     going to permit them to do it if that's what they want to do.

8          MR. ANDERSON:  It's my understanding you want to

9     address them.

10          THE DEFENDANT:  Yeah.

11          MR. ANDERSON:  And, Judge, we do it one at a time?

12          THE COURT:  Yes.

13          MR. ANDERSON:  So Lance will have an opportunity to

14     address the jury, and I'll have an opportunity to come in and

15     address the jury.

16          THE COURT:  Okay.  We're going to let that happen.

17     Okay?

18     CONCLUSION OF SIDEBAR CONFERENCE

19     DEFENDANT'S OPENING STATEMENT

20          THE DEFENDANT:  Okay.  Hello, jury.  My name is Lance

21     Ealy.  I'm proceeding pro se with standby counsel Tom Anderson,

22     and I just wanted to shed some light on these allegations of

23     harm.

24        Now, what the government -- what the government accuses me

25     of is impossible for a defendant to do this magnitude of crimes

1   and being a full-time college student.  It's impossible.  You

2   know, there is no -- there is no complaining witnesses accusing

3   me of any crimes.  There is no eyewitnesses.  There is no

4   forensic evidence tying me to any crimes.

5       You know, this is just -- this is a case of malicious

6   prosecution, you know.  Two witnesses the government presented

7   to the grand jury, they presented testimony to the grand jury,

8   they recanted their statements.  They stated that I was

9   committing crimes, but they both recanted their statements.

10  And this is how I got indicted April 10th, from the false

11  testimony of Anshawn Esmond and Ashlie Mansfield.  You know, we

12  have had the affidavits.  They said they was intimidated by the

13  government and they gave false statements.  This is why we're

14  in trial:  false testimony from two grand jury witnesses that

15  will be here at the trial to testify that they lied at that

16  grand jury and they gave false testimony.

17      Now let me speak on the government's -- on the government's

18  witness Mr. Ngo.  From my understanding, he was selling

19  information from 2007 to 2012.  Well, the evidence shows that

20  Mr. Ngo sold over 200 million personal informations that

21  included e-mails with passwords, and he sold these 200 million

22  informations to 1,300 people all around the world.  Now, the

23  question is:  how did this African-American male get in contact

24  with somebody from Vietnam?  How is that possible?

25      You know, the government offered me a lot of reverse

1   proffers.  You know, I declined those reverse proffers because
2   I wanted to see the evidence first.  You know, I don't
3   understand what's really going on, but this is a clear case of
4   malicious prosecution by the government for refusing to
5   cooperate.  But how can I cooperate if they did not turn over
6   any evidence?
7           THE COURT:  Okay.  Mr. Ealy, I don't want to
8   interrupt.
9           THE DEFENDANT:  Okay.
10          THE COURT:  But talk about -- you don't have to talk
11  about anything because you don't have the burden to do
12  anything.
13          THE DEFENDANT:  Okay.
14          THE COURT:  But if you think the evidence is going to
15  show something, talk about that, but try to not to give
16  opinions.
17          THE DEFENDANT:  Okay.
18          THE COURT:  Okay?  Are you with me?
19          THE DEFENDANT:  All right.  This is a clear case of my
20  e-mail being compromised.  I have never heard of an N-g-o or a
21  Wang Sang e-mail address.  Lanceealy123 was not operated by the
22  defendant.  The only e-mail that was operated by the defendant
23  was Lance Ealy, and he used that for school.  I used that for
24  school only.  I never used -- that e-mail was never used to
25  communicate with a person from N-g-o or a person from Vietnam.

1       Now, I would like the jury to be aware of Mr. N-g-o

2   blocked -- this is according to his statement.  Mr. N-g-o

3   blocked all U.S.A. IP addresses from contacting him.  So if Mr.

4   N-g-o blocked all access from the U.S.A., how could somebody

5   from the U.S.A. access him if he blocked all communications

6   from U.S.A.?

7       (Mr. Anderson and the defendant confer privately.)

8       THE DEFENDANT:  And the government is accusing the

9   defendant of filing tax returns.  Now, I want to see how is

10  this possible.  How can somebody file tax returns and he does

11  not know how to file his own tax returns?  He had to hire a tax

12  preparer to file his own tax returns, so how can he file these

13  tax returns if he does not know how to file his own tax

14  returns?  It just doesn't make sense.  You know, there is no

15  evidence, no forensic evidence, of any tax returns on any

16  computers.  The government seized, from my understanding, seven

17  computers.  There is no evidence of no tax returns on the

18  computers.

19      So if there's no evidence of no tax returns being filed,

20  anybody could have done this crime, including those 1,300

21  people, you know.  There is no eyewitnesses.  I guess the

22  government trying to accuse me using a vanilla gift card for

23  withdrawing money.  How does -- how does somebody know that

24  that was fraud?  Somebody was given a vanilla gift card, and

25  they say he's overdrawn the money.  One time and he's guilty?

1  Withdrawing money -- how many times?  Twice.  He withdraw money

2  twice from a vanilla gift card, and he's guilty of this

3  magnitude of a crime?  It just doesn't make sense.

4      You know, anybody --

5      Well, do you want to finish?

6          MR. ANDERSON:  If you're finished, Lance, if you want

7  me to say something.

8          THE COURT:  Yeah.  Remember, Mr. Ealy, try to stay

9  away from opinion or argument.  Just stick to facts.  Okay?

10         THE DEFENDANT:  Right.  Those are facts.

11         THE COURT:  Okay, you're fine.  But the argument comes

12 at the end of the case.

13         THE DEFENDANT:  Okay.

14         THE COURT:  All right.

15         THE DEFENDANT:  Okay.  The government mentioned AmEx

16 cards.  Now, the government accusing me of having AmEx cards,

17 but where did the AmEx cards come from?  That's the question.

18 Where did the AmEx cards come from?  You know, they making --

19 the government making their case based on their opinion, but

20 they're not providing factual evidence.  There are no accusers

21 in this case.  The government, they're trying to act as the

22 complaining witness, but the government cannot act as the

23 complaining witness.  There has to be a complaining party

24 accusing the defendant of a crime.

25     Okay.  Tom, you can take over for now.  I'll take

1 additional notes.

2     MR. ANDERSON:  Ladies and gentlemen, thank you.  My

3 name is Tom Anderson.  I'm a federal public defender.  I've

4 been appointed by the Judge to represent Mr. Ealy as standby

5 counsel.

6     Mr. Ealy, as he told you, has elected to go pro se to fight

7 these charges because Mr. Ealy is not the person who sent these

8 e-mails.  The government spent a large amount of their opening

9 explaining that they will be able to link Mr. Ealy to

10 lanceealy@yahoo and lanceealy123 because they have a lot of

11 other circumstantial evidence that will tie Mr. Ealy to those

12 e-mail accounts.  The government prefaced their opening with

13 indicating, of course, there is no eyewitness standing behind

14 whoever authored those e-mails to give that information, so the

15 government, instead, will try to prove it through other things

16 that the investigation had revealed.

17     Ladies and gentlemen, you've been impaneled to hear this

18 case.  The Judge has read you instructions about what your duty

19 is.  Quite frankly, Mr. Ealy is suggesting to you that the

20 government's case is like a puzzle.  And we've all put together

21 puzzles.  Those puzzles have those sharp-edged pieces that kind

22 of give the parameter, the outline, of what the puzzle reveals,

23 and then there's sort of the meaty inside pieces that you put

24 together so you know what the puzzle shows.

25     The evidence outlined by the government, those are those

1    sharp outside edge puzzle pieces.  The government mentioned

2    that there was a cooperating witness in this case -- Hieu Minh

3    Ngo -- who will testify today.  Mr. Ngo, quite candidly, was

4    the mastermind of obtaining the information the government

5    calls fullz, and Mr. Ngo will testify.  And the government told

6    you that a Secret Service agent was investigating Mr. Ngo, and

7    they employed many of the same tactics that they did to

8    investigate Lance Ealy and lanceealy123@yahoo.  They got IP

9    addresses to find out from where the e-mails were being sent.

10   They did other circumstantial evidence to put together those

11   outside puzzle pieces to hone in on who the suspect was, who

12   was this that was communicating using various e-mail accounts,

13   including wangsangpi, who was this individual.

14        But you will also hear that the agents realized that all

15   they had were the perimeter, the outside puzzle pieces.  They

16   needed to get that center of the puzzle.  And you're going to

17   hear a tale today, and when Mr. -- or excuse me, when Agent

18   O'Neill testifies you're going to hear about an elaborate sting

19   operation, an elaborate operation to lure Mr. Ngo from Vietnam.

20   And they had to do that because Vietnam cannot extradite a

21   citizen based on probable cause.  But Special Agent O'Neill,

22   the Secret Service agent, knew that all he had were e-mails and

23   those edge puzzle pieces.  So they needed to get Mr. Ngo

24   someplace, after he was communicating with them, so they could

25   put the actual middle of the puzzle together to say this is the

person who I have been e-mailing with, the undercover agent.
This is the person who obviously is authoring these e-mails.

And that is what happened here. Mr. Ngo, because of an
elaborate ruse established by the government, showed up in
Guam. And what was waiting for him? A bunch of Secret Service
agents. He was arrested, and then obviously he decided that he
would cooperate.

You will also hear testimony that, because of Mr. Ngo's
cooperation, they were able to identify thousands of
individuals who they believed were using Mr. Ngo's services to
purchase what the government called fullz. In other words, Mr.
Ngo turned over his computer to the government. They went
through e-mails, and they found thousands of e-mail addresses
that purportedly bought these fullz from Mr. Ngo. So again
there was police work done. Let's find the edges of the puzzle
pieces here to find out where are these e-mails located, where
did this e-mail originate from. And yet again the Secret
Service needed the middle of the puzzle.

So what did they do? They would send packages to these
various e-mail users. They would set up elaborate sting
operations to get that person who authored the e-mail to appear
at an ATM to withdraw money, knowing that the Secret Service or
other law enforcement were watching those ATMs. Why? So that
they could say, yeah, clearly this is the person who was
sending these e-mails. Here was the person who communicated

1    with Wang Sang Pi to purchase these fullz.

2        In this case there will be no such evidence.  The

3    government's case will consist of a lot of the outside edges,

4    but the middle of the puzzle will be empty.

5        Now, Mr. Ealy has said he didn't write those e-mails.  The

6    government has said, well, wait a second.  It was his e-mail

7    account.  We know it was his e-mail account because he

8    communicated with other people about personal things.

9        When you listen to Mr. Ngo testify today, you will find out

10   that that's exactly what Mr. Ngo did, and, in fact, that's par

11   for the course with crimes that are committed online.  In other

12   words, Mr. Ngo did not use his own personal e-mail.  He

13   obtained the e-mail account and the password from another

14   individual in China and, therefore, he was able to send e-mails

15   using that account with simply the name of the account and the

16   password.  Mr. Ngo will testify as to how he did that.

17       So, ladies and gentlemen, what I will submit to you is that

18   at the end of this trial there's going to be a lot of distrust.

19   There's going to be a lot of distrust in Internet banking.

20   There's going to be a lot of distrust in large corporations who

21   assemble people's personal information.  But one thing is

22   abundantly clear.  What you see on a computer screen, a name,

23   an e-mail account, does not necessarily mean that that was the

24   person who sent the e-mail.  And Mr. Ealy has exercised his

25   right to go to trial because he did not orchestrate this

1    scheme.

2        So let's talk about some of the middle puzzle pieces the

3    government purported to show.  One is surveillance videos.  The

4    government has alleged they will show that Mr. Ealy showed up

5    at an ATM, withdrew money from some account where some of these

6    fraudulent tax refunds were allegedly directed.  The government

7    will say, hey, that is sufficient proof beyond a reasonable

8    doubt that Mr. Ealy was the one who masterminded this scheme.

9    That evidence shows nothing about who sent the e-mails from

10   lanceealy123 to Wang Sang.  That evidence shows nothing about

11   who filed an income tax.  And that evidence does nothing to

12   show who opened the particular bank account.

13       Again, the government understands they need to present that

14   evidence, but the evidence will show that they are just unable

15   to do that in this case.

16       So, ladies and gentlemen, respectfully, Mr. Ealy has

17   impaneled this jury to listen to the evidence with an open

18   mind, to listen to the Judge's instruction.  And with that

19   framework at the end of the day when all of the evidence is

20   heard, we're confident that you will return a verdict of not

21   guilty to the charges against Mr. Ealy.

22       (Mr. Anderson and the defendant confer privately.)

23           MR. ANDERSON:  Thank you.

24           THE COURT:  All right.  Thank you, guys.

25       Are you prepared to call your first witness?

MR. SISTLA: Mr. Ngo is here. We can take a break
or --

THE COURT: Yeah, yeah. I think we'll need a minute
to get set up for the next witness. It's my understanding that
he is going to be testifying with the aid of interpreters. Is
that correct?

MR. SISTLA: I think that's right, Your Honor. I was
actually -- are we taking a break and we can raise the issue at
a break, or are you ready to proceed?

THE COURT: That's fine. I'm just trying to alert the
jury that it might take us a few moments to prepare for this
next witness.

So I think now we'll take our mid-morning break for about
ten or 15 minutes. And if I can see the clock okay --

I don't know. Has that time been changed? What time is
it, Barb?

COURTROOM DEPUTY: It's 10:27. It looks like it's
been changed.

THE COURT: We'll probably go to like 12:30 -- would
that be okay? -- before we take a lunch break. We'll take a
lunch break at 12:30. And then at some point when you guys are
all together, if you could let me know. I'd like to go at
least till 5:00 today. If you'd let me know if that's okay.
And if you're willing to stay later, let me know that as well
and tell Barb in the back.

1    Why don't we take a recess now.  Remember, guys, you're not

2 to do any type of outside research.  You're not to look up any

3 of the Internet things on this.  It's probably tempting because

4 this sounds like an Internet case from what we've heard.  Don't

5 do it.  Don't get on the Internet.  No Googles, no blogs, no

6 Yahoo! searches, nothing like that.  Don't discuss the case

7 with anyone or let them discuss it with you.  And we'll try to

8 start up again in about 15 minutes with our first witness.

9 Okay?

10    Thanks, everybody.

11         COURTROOM DEPUTY:  Court is in recess for 15 minutes.

12         THE COURT:  Do we need to put the mechanics on the

13 record of what we're doing?

14         MR. SISTLA:  I think if it's involving the

15 interpreter, we should.

16         THE COURT:  Okay, we will.  Let's let the jury step

17 out.

18    (Jury out at 10:30 AM.)

19 BEFORE THE COURT

20         THE COURT:  Okay.  So Mr. Ngo's in custody.  We have

21 two interpreters here, right, Barb?

22         COURTROOM DEPUTY:  Yes.

23         THE COURT:  Okay.  So what's the sitch?

24         MR. SISTLA:  Your Honor, my first experience, I've met

25 with the witness multiple times.  His attorney is actually

1 present.  Her name is Laura Angelini and --

2           THE REPORTER:  I'm sorry.  The name again?

3           MS. ANGELINI:  My name is Laura Angelini, Your Honor.

4           THE COURT:  Thank you.

5           MR. SISTLA:  And he has pled guilty twice, I think

6 once with the aid of the interpreter and once without the aid

7 of the interpreter.  His English is pretty good.  I guess it's

8 ultimately the Court's decision whether you would like the

9 interpreter.  Or the witness' decision.

10          THE COURT:  Well, here's what I'd like to do.  And if

11 it's all right with you ladies, how about if you guys sit in

12 your regular interpreter situation, and if, in fact, there is a

13 phrase or a question that he needs help on, we can do that.

14 We've done that before with plenty of people.

15     So you may not be doing it word for word, but if there's,

16 you know, a slogan or something, we stumble on something, then

17 you guys can help out.  Is that okay?

18          INTERPRETER NGUYEN:  Yes, Your Honor.

19          INTERPRETER LIU:  Yes, Your Honor.

20          MR. SISTLA:  And how long do you guys usually like to

21 work before you switch off?  Does it make a difference?

22          INTERPRETER LIU:  It's just a logical break where

23 there is -- we can just determine that among ourselves, within

24 ourselves.

25          THE COURT:  All right.  And what I'll do is, before

each of you begin your jobs, I'll ask Barb to swear you in

front of the jury so that they see you being sworn in as

interpreters and taking the oath and all of that. Okay?

          INTERPRETER LIU: Yes, Your Honor.

          THE COURT: Okay. So we'll just do it that way.

This guy is custody, I guess, so why don't we get him in

here and set up and ready to go before we bring the jury back.

And, counsel, do you need a special spot to sit, or do you

want to --

          MS. ANGELINI: Wherever there's room, Your Honor.

          THE COURT: All right. So whatever you want to do is

fine.

And also, I will probably read -- at the conclusion of his

testimony I will probably read the cooperating witness

instruction that I would give at the end of the case as well.

          MR. SISTLA: No objection.

          THE COURT: Any objection to that?

          MR. SISTLA: None. The only request -- I understand

the leg shackles. Will his hands be unshackled? Because he

has to point to things. Is that a problem?

          THE COURT: That's entirely up to how the marshals

want to do it. I never interfere with what they think is

necessary for security. But if he's going to be in a chair and

there are CSOs there, I'm guessing that's probably okay, but

that's the marshals' call.

1          MR. SISTLA:  Okay.  Certainly, Your Honor.

2          THE COURT:  Okay.

3          COURTROOM DEPUTY:  Are you putting all the exhibits up

4   on the board?

5          MR. SISTLA:  So, Your Honor, the way that it works is

6   the first, probably, two-thirds or three-quarters of the direct

7   we're not really having any exhibits.  It's just background

8   information.

9          THE COURT:  Okay.

10         MR. SISTLA:  I think that -- I know the Court

11  mentioned 12:30.  There's a natural stopping point before I get

12  into the e-mails.

13         THE COURT:  Okay.

14         MR. SISTLA:  And I think that --

15         THE COURT:  Okay.  That's fine.  All right.  We'll

16  just see where that is.

17         MR. SISTLA:  Okay.

18         THE COURT:  And you guys -- for the record, you guys

19  figure out how you're going to do cross, because that is only

20  going to be one person.  Okay?

21         MR. ANDERSON:  Certainly.

22         THE COURT:  All right.

23      Okay.  So we'll start in about ten minutes, as soon as they

24  get Mr. Ngo up here and all that bit.

25      (Recess taken:  10:34 AM - 10:52 AM.)

1          (Jury in at 10:52 AM.)

2          COURTROOM DEPUTY:  All rise for the jury.  This court

3     is now in session.

4          THE COURT:  All right.  Mr. Sistla, would the

5     government call its first witness, please.

6          MR. SISTLA:  Yes, Your Honor.  The government calls

7     Hieu Minh Ngo to the stand.

8          THE COURT:  All right.  Ladies and gentlemen, we're

9     about to hear the testimony of Mr. Ngo.  He is seated over

10    here.  It's my understanding that he is going to try to do as

11    much as he can in English, but if he has a situation where a

12    translation is needed either for him to answer a question or to

13    have a question explained to him, we have the assistance of an

14    interpreter, and Ms. Crum will swear the interpreter in just a

15    minute.

16        So, ma'am, could you please state your name for the record.

17          INTERPRETER LIU:  Sophie Liu, L-i-u.

18          THE COURT:  Thank you.

19        Barb?

20          COURTROOM DEPUTY:  Ma'am, could you please raise your

21    right hand.

22        (Interpreter Sophie Quang Liu is duly sworn by the

23    courtroom deputy.)

24          COURTROOM DEPUTY:  Thank you, ma'am.

25          THE COURT:  And, Barb, would you then swear the

1    witness, please.

2            COURTROOM DEPUTY:  Sir, can you please raise your

3    right hand to the best of your ability.

4        (Hieu Minh Ngo is duly sworn by the courtroom deputy.)

5            COURTROOM DEPUTY:  Thank you, sir.

6            THE COURT:  All right.  Just a word before we begin,

7    folks.  As you heard a moment ago, Mr. Ngo has entered a plea

8    of guilty, and the fact the witness has pled guilty to a crime

9    is not evidence that Mr. Ealy is guilty, and you cannot

10   consider Mr. Ngo's plea against Mr. Ealy in any way.

11       In addition, you've heard that the government offered

12   reduced criminal liability in exchange for Mr. Ngo's

13   cooperations.  It's perfectly permissible for the government to

14   make such promises, but you should consider Mr. Ngo's testimony

15   with more caution than testimony of other witnesses.  Consider

16   whether and how his testimony may have been influenced by the

17   government's promise.  Do not convict Mr. Ealy based on the

18   unsupported testimony of Mr. Ngo standing alone unless you

19   determine that you believe his testimony beyond a reasonable

20   doubt.  Okay?

21       Mr. Ngo, for the record, could you please state your name

22   and spell your last name so that Luke can take it down.

23           THE WITNESS:  I am Hieu Minh Ngo.

24           THE COURT:  And how do you spell your last name, sir?

25           THE WITNESS:  N-g-o.

1          THE COURT:  Thank you.

2      Counsel?

3          MR. SISTLA:  May I proceed, Your Honor?

4          THE COURT:  Of course.

5  <u>PLAINTIFF'S EVIDENCE</u>

6                        HIEU MINH NGO

7  a witness herein, having been previously sworn, testified as

8  follows:

9                      DIRECT EXAMINATION

10  BY MR. SISTLA:

11  Q.  Okay.  Good morning, Mr. Ngo.

12  A.  Good morning.  How are you?

13  Q.  How are you doing this morning?

14  A.  I'm good.  Thank you.  How are you?

15  Q.  Are you from the United States?

16  A.  No.  I'm from Vietnam.

17  Q.  And how old are you, Mr. Ngo?

18  A.  I'm 25 years old.

19  Q.  Were you born in Vietnam?

20  A.  Yes.

21  Q.  And aside from your time now in the United States, have you

22  always lived in Vietnam?

23  A.  Yes.

24  Q.  Are you a native English speaker?

25  A.  Yes.

1   Q.  Native English speaker.

2   A.  No.  I'm Vietnamese.  I speak Vietnamese.

3   Q.  Are you a little nervous this morning?

4   A.  Just a little bit nervous.

5   Q.  You said you were 25 years old?

6   A.  Yes.

7   Q.  Do you have any family here in the United States?

8   A.  No.

9   Q.  All of your family is back in Vietnam?

10  A.  Yes.

11  Q.  When you were in Vietnam, what did you do?

12  A.  I was studying.

13  Q.  You were studying?

14  A.  Yes.

15  Q.  And what were you studying?

16  A.  I study information technology.

17  Q.  Where were you studying information technology?

18  A.  In Ho Chi Minh City.

19        MR. SISTLA:  Can the ladies and gentlemen of the jury

20  hear Mr. Ngo okay?

21        MEMBERS OF THE JURY:  (Nod heads up and down.)

22  Q.  Now, Ho Chi Minh City, that's in Vietnam?

23  A.  Yes.

24  Q.  Was what the name of the school you were at?

25  A.  It's -- the name is Information Technology of Ho Chi Minh

1  City.

2  Q.  And can you explain to the jury, when you say you're

3  studying information technology, what exactly does that mean?

4  A.  It mean computer programming or computer networking.  It's

5  related to computer.

6  Q.  You studied both?

7  A.  Yes.

8  Q.  With respect to the computer programming, what were you

9  learning?

10 A.  Programming.  I learn Visual Basic and C Sharp, Java,

11 database.  Yeah.

12 Q.  Did you finish your schooling with respect to programming?

13 A.  No.

14 Q.  Okay.  And then you mentioned you were also studying

15 networking?

16 A.  Yes.

17 Q.  Could you explain to the jury what you mean by networking.

18 A.  Networking to become an administrator who manage or control

19 a system, and too much so -- working well in security.  Yeah.

20 Q.  And all of this, all of the things that you were studying

21 in school, they were related to the operation of computers and

22 computer networks?

23 A.  Yes.

24 Q.  Did you finish your schooling?

25 A.  No.

1   Q.  How far did you get?

2   A.  About two years.

3   Q.  Prior to starting at the information technology school did

4   you finish high school?

5   A.  Yes.

6   Q.  And in high school did you study English, by any chance?

7   A.  Yes.

8   Q.  And your English has improved since you've been here in the

9   United States?

10  A.  Yes.

11  Q.  Aside from attending school in Vietnam, were you working

12  anywhere?

13  A.  No.

14  Q.  No occupation ever?

15  A.  No.

16  Q.  And you mentioned you have no family here in the United

17  States?

18  A.  Yes.

19  Q.  Your family back in Vietnam, who is in your family back

20  there?

21  A.  My parents, my sister, and my relatives.

22  Q.  When was the last time you saw members of your family?

23  A.  Last time when I was in Guam, and in New Hampshire for one

24  time.

25  Q.  Okay.

1  A.  At first when I got arrested.

2  Q.  The first time?

3  A.  Yeah.

4  Q.  You just mentioned you got arrested.  When were you

5  arrested?

6  A.  February 7, 2013.

7  Q.  February 7, 2013.  And does that explain why you're wearing

8  the blue outfit that you are today?

9  A.  Yes.

10  Q.  Would it be fair to say that you're currently incarcerated?

11  A.  Yes.

12  Q.  And why are you in jail?

13  A.  Oh, because I hack -- well, I was a hacker, and I hack into

14  a company in New Jersey called MicroBilt.  In another case I

15  opened a website to sell sensitive information like social

16  security number, date of birth, driver license, and fullz

17  information.

18  Q.  So you pled guilty to some crimes?

19  A.  Yes.

20  Q.  Did these crimes include wire fraud?

21  A.  Yes.

22  Q.  Identity theft?

23  A.  Yes.

24  Q.  Access device fraud?

25  A.  Yes.

1  Q.  Do you recall when you pled guilty to these various crimes?

2  A.  It's this year:  2014.

3  Q.  2014?

4  A.  Yeah.

5  Q.  And just so the ladies and gentlemen of the jury know, was

6  that all in one case, or was it in different cases?

7  A.  Different case, yeah.

8  Q.  Can you explain to them what you mean by different cases.

9  A.  One case in New Jersey about computer hacking and another

10 case in New Hampshire about running a website.

11 Q.  And that was the website with the identities, the DOBs and

12 SSNs and so forth?

13 A.  Yes.

14 Q.  And you pled guilty this year in 2014?

15 A.  Yes.

16 Q.  Have you been sentenced yet for your crimes?

17 A.  No.

18 Q.  Do you know when you're supposed to be sentenced?

19 A.  Next year.

20 Q.  Next year?

21 A.  Yes.

22 Q.  Well, why are you here today testifying on behalf of the

23 United States?

24 A.  I am here today because I want to support U.S. government.

25 And then, you know, another reason, I want -- I want to let

1    anybody know I have done a bad thing, and I want to fix my

2    mistake and I want to become a better person.

3    Q.   Are you hoping to get a benefit by testifying today?

4    A.   I hope so.

5    Q.   And what kind of benefit do you hope to get?

6    A.   I hope I can get a better change to get a -- from the U.S.

7    government to give me a better sentence.

8    Q.   When you say a better sentence, do you mean a reduced

9    sentence?

10   A.   Yes.

11   Q.   Have you been promised any particular sentence in this

12   case?

13   A.   No.

14   Q.   Have you been promised anything in exchange for your

15   cooperation?

16   A.   No.

17   Q.   Have you been told that if you testify today that your

18   sentence will be reduced by so many months or years?

19   A.   No.

20   Q.   And yet you want to testify still?

21   A.   Yes.

22   Q.   Okay.  You also mention that you want to help the

23   government because you made some mistakes.  Can you explain

24   that a little bit to the jury.

25   A.   Because I want -- before I was not an honest guy, I was a

1    liar, and then now I want to be truly honest to myself and to

2    other people.  I want to use my computer skill to help the

3    people.

4    Q.  Okay.  The conduct that you pled guilty to, it included

5    hacking?

6    A.  Yes.

7    Q.  And it included setting up a website?

8    A.  Yes.

9    Q.  Where did that conduct occur?  Was that in Vietnam or

10   somewhere else?

11   A.  In Vietnam.

12   Q.  So you've mentioned a couple times about being a hacker.

13   Can you explain that to the jury.  What is a hacker?

14   A.  There are three different kinds of hacker.  I am a black

15   hacker.  And another kind is white hacker and another kind a

16   gray hacker.  But talking about black hacker like me, it mean

17   stealing stuff off of a system, get inside the server to get

18   account information or sensitive information like credit card,

19   social security number, date of birth, open account, anything

20   related to a person life.

21   Q.  So is a hacker generally someone who tries to break into

22   computer systems?

23   A.  Yes.

24   Q.  How did you get involved in that?

25   A.  When I was a teenager about 16, 17 years old, and then I

 1  read on the news or newspaper.  And then when I heard about

 2  hacker, I very inter-- you know, it's very interesting me.

 3  Q.  Why did it interest you?

 4  A.  Because they very smart, you know.  And then they can wreck

 5  a system without any notice from -- from the people and without

 6  any permission.  They smart, and then I want to become the

 7  same.  That's why I try to research by myself through Google.

 8  Q.  And when did you start getting interested in trying to be a

 9  hacker?

10  A.  About nine years ago.

11  Q.  About nine years ago?

12  A.  Yes.

13  Q.  And ultimately how did you learn to become a hacker?

14  A.  I learned through Google and underground hacking forum.

15  Q.  When you say you learned through Google, what did you do?

16  A.  I do some research about hacking techniques to learn

17  through many websites.  And then I try to hack -- try to find

18  any website that have some problems on their website and then I

19  try to hack it, sometimes just for fun.

20  Q.  Why would you want to hack websites for fun?

21  A.  Because I really enjoy it when I break down a system and

22  try to find out what inside on their website or on their

23  server.  So I can use their administrator to control their

24  website or slew something or destroy something.  So it make me

25  feel excited.

1  Q.  It made you feel excited because of why?

2  A.  Because I can control their website without any permission,

3  you know.

4  Q.  Okay.  Now, you mentioned that you also learned at

5  underground hacking websites.

6  A.  Yes.

7  Q.  Can you explain to the jury, what is an underground hacking

8  website?

9  A.  Underground hacking website is where you can trade or sell

10 or buy hacking, or you can talk to any other hackers.  And then

11 you can see lots of stuff, illegal stuff, like ATM card, stolen

12 credit card, social security number, date of birth, driver's

13 license, fullz information, I mean, any kind of related to

14 hacking activities.

15 Q.  A lot of things there.  First, you said underground.  Why

16 are these websites underground?

17 A.  Because it's only for hackers, and then you have to be --

18 get to know each other to get inside that website, privacy.

19 Q.  Are the -- are the activities that are discussed on these

20 underground hacking websites, are they illegal activities?

21 A.  Yes.

22 Q.  One hundred percent?

23 A.  Yes.

24 Q.  Okay.  Now, are you able -- were you able to learn skills

25 on how to hack by visiting these websites?

1   A.   Yes.

2   Q.   Were you -- did anyone teach you how to hack, or was it all

3   self-taught?

4   A.   I taught myself.

5   Q.   And how long did it -- how long did it take you to become

6   proficient at hacking?

7   A.   It took me a year to become a professional hacker.

8   Q.   Would you rate yourself as a professional hacker?

9   A.   No.

10  Q.   How would you rate yourself?

11  A.   I -- I recognize myself to be a creative person.

12  Q.   A creative person?

13  A.   Yeah.

14  Q.   Okay.  Now, the hacking websites that you visited, would

15  you have a nickname when you went there?

16  A.   Yes.

17  Q.   And what was that nickname you would use?

18  A.   Hieupc.

19  Q.   Can you spell that for the court reporter, please.

20  A.   H-i-e-u-p-c.

21  Q.   Where did you get that nickname from?

22  A.   I just create by myself.

23  Q.   How long have you had that nickname?

24  A.   It's a long time.  When I was -- get involved into

25  Internet.  Yeah.

1  Q.  Was that the nickname or moniker that you used when you
2  visited the underground hacking websites?
3  A.  Yes.
4  Q.  And would other hackers recognize you by that name?
5  A.  Yes.
6  Q.  When you were on these underground hacking websites, would
7  you communicate with other hackers?
8  A.  Yes.
9  Q.  What about would you ever administer these websites?
10 A.  Yes.
11 Q.  Can you explain to the jury why you would administer a
12 hacking website.
13 A.  Because when I was young, you know, too young, you know, I
14 want to show up I can control, I can be an administrator.  And
15 then I want to be a person to control underground hacking
16 forum.  And then too many people, they invited me to become an
17 admin. and to many forum or website in Vietnam or somewhere in
18 other country like Russia or China.  Yeah.
19 Q.  Okay.  Now, you mentioned that not only could you learn
20 about hacking at these underground hacking websites, but there
21 was also personal information that's traded there?
22 A.  Yes.
23 Q.  And one of the words you used was fullz?
24 A.  Yes.
25 Q.  Could you spell that for the jury.

1    A.   Fullz, f-u-l-l-z.

2    Q.   Okay.  Are fullz known by any other term?

3    A.   Yeah.  It can be "full info," yeah.

4    Q.   Okay.  Do you know what fullz are?

5    A.   Fullz is included almost everything, almost -- sensitive

6    information related to one person.

7    Q.   Can you give examples to the jury what kind of sensitive

8    information?

9    A.   It's like full, you know, first name, last name, your

10   address, phone number, e-mail password, social security number,

11   date of birth, driver license, bank account information, middle

12   name, and what kind of job you have and how long you have been

13   working.

14   Q.   So fullz, a typical fullz for a given person would contain

15   all or almost all of that information?

16   A.   Yes.

17   Q.   Okay.  And you could get that information at an underground

18   hacking website?

19   A.   Yes.

20   Q.   You also mentioned that there was other information that

21   was traded.  Would credit cards be traded on these websites?

22   A.   Yes.

23   Q.   And what about bank logins?

24   A.   Bank login, yes.

25   Q.   Could you explain to the jury, what's a bank login?

1  A.  Bank login is included credit card numbers, ATM PIN number,

2  I mean, bank account information, user name, password to log

3  into a bank account.

4  Q.  And credit cards, what kind of information related to

5  credit cards would be available at these sites?

6  A.  Credit cards include first name, last name, your address,

7  phone number, and sometime it include e-mail or sometime it's

8  more value, like password and CVV2.

9  Q.  Would it include the credit card number itself?

10  A.  Yes.

11  Q.  And you just mentioned a term:  CVV and CVV2.  What was

12  that?

13  A.  CVV is the three or four number on the back side of your

14  card where with that I can use that to go shopping online

15  easier.

16  Q.  Was that "shopping"?

17  A.  Yes.

18  Q.  All right.  Now, have you ever heard of the term "high

19  balance"?

20  A.  Yes.

21  Q.  What does that mean?

22  A.  High balance, it mean -- it mean the limit of the credit

23  card.  You can go change -- use that to portray online order at

24  one time, maybe 5-, 10,000 at one time.  I mean high -- high

25  limit on the bank.

1  Q.  Based on your experience visiting these underground hacking

2  websites and administering them, were you able to learn if

3  certain credit cards or items are more valuable than other

4  items?

5  A.  Yes.

6  Q.  And which ones are the more valuable ones?

7  A.  High balance with CVV.  Yeah.

8  Q.  And why are those the more valuable ones?

9  A.  Because you can use that to go -- go to purchase online

10 order easier and quicklier and then make -- they can earn lots

11 of money from that.

12 Q.  Okay.  Now, underground hacking websites, that's not the

13 only place one can go to get this information; is that right?

14 A.  Yes.

15 Q.  Have you ever heard of the phrase "carding forums"?

16 A.  Yes.

17 Q.  What's a carding forum?

18 A.  Carding forum is kind of similar with underground hacking

19 forum, but over there you see lots of hackers too and you can

20 see lots of carders people too.  Carders people, they don't

21 need to be a hacker, but they just use -- they know how to use

22 the information to cash out the money.

23 Q.  I think you defined it, but what's the difference between a

24 carder and a hacker?

25 A.  Carders, they don't need to be a hacker.  They don't need

1  to know any hacking techniques.  They just know how to use the

2  information.

3  Q.  They know where to get the information?

4  A.  Yes.  And then they will use that information to withdrew

5  the money.

6  Q.  So would it be fair to say that carding forums and hacking,

7  underground hacking forums, these are all very similar, these

8  websites?

9  A.  Yes.

10  Q.  And you visited these types of websites?

11  A.  Yes.

12  Q.  For how long have you visited these -- or prior to your

13  incarceration, how long had you been visiting these types of

14  websites?

15  A.  Usually from when I was become a hacker.

16  Q.  Okay.  And then is it through these websites that you met

17  other hackers?

18  A.  Yes.

19  Q.  Are you well known in the hacking community?

20  A.  Yes.

21  Q.  And how did you -- how did you get your name out in the

22  hacking community?

23  A.  Oh, because I -- when I was young, I wrote lots of books

24  related to hacking and security.

25  Q.  When you say you wrote books, what kind of books did you

1   write?

2   A.  Oh, I wrote book to stay with the people about how to

3   become a hacker, how to secure their website.  I wrote e-books.

4   I wrote about four e-books.

5   Q.  Four e-books?

6   A.  Yes.

7   Q.  And where would these e-books be published?

8   A.  Underground hacking forum through Yahoo Messenger, through

9   ICQ, or through Skype.

10  Q.  You just mentioned -- you talked about the forums.  What is

11  Yahoo Messenger?

12  A.  Yahoo Messenger is an online instant message so you can

13  chitchat with other people.

14  Q.  Is that similar to gchat?

15  A.  Yes.

16  Q.  What about ICQ?  What's that?

17  A.  It's kind of similar with Yahoo.  Yeah.

18  Q.  And although I'm sure the jury's familiar, what is Skype?

19  A.  Skype?  Skype you can video chat or voice chat with other.

20  It's more option than Yahoo.  I mean more quality.  I mean --

21  Q.  Better quality?

22  A.  Yeah, better quality.

23  Q.  Okay.  And these were the -- these were the avenues by

24  which you sent out your e-books?

25  A.  Yes.

1  Q.  When you published the e-books, under -- what name did you

2  publish it under?

3  A.  The name is *E-Book Hacking Credit Card*.

4  Q.  I'm sorry.  Did you use the hieupc name?

5  A.  Yes.

6  Q.  So it was possible to associate those books with you?

7  A.  Yes.

8  Q.  Okay.  Now, you mentioned that when you started -- when you

9  started hacking initially, was it for fun, or was it to make

10 money?

11 A.  The first time I just hack for fun to enjoy myself, wreck

12 other system, destroy something.  I put my name on it, you

13 know, so the people, they can know their website or their

14 server just got hacked by someone.

15 Q.  And at some point did you start hacking for money?

16 A.  Yes.

17 Q.  And how did that sort of start?

18 A.  When I was in New Zealand.

19 Q.  When were you in New Zealand?

20 A.  Around 2009, '10.  Yeah.

21 Q.  Why did you go to New Zealand?

22 A.  I went to New Zealand to study English.

23 Q.  Did you have any family members there?

24 A.  Yes.

25 Q.  Who was there?

1  A.  Just my sister.

2  Q.  And how long had she been -- she was already living there?

3  A.  Yes.

4  Q.  Okay.  Where did you study English in New Zealand?

5  A.  In Auckland, Auckland city in New Zealand in an English

6  school.

7  Q.  And did you actually attend the school?

8  A.  Yes.

9  Q.  Now, you mentioned that your hacking activities turned

10 criminal, so to speak, when you got to New Zealand.  What did

11 you do?

12 A.  Oh.  I buy stolen credit card, and I also hack stolen

13 credit card.  I also sell stolen credit card in New Zealand

14 too.  And then I used the stolen credit card to buy online

15 concert tickets, I mean music tickets, to sell.  And then also

16 I buy TV, or I buy, I mean, material stuff to sell on a website

17 they call Trade Me.

18         THE REPORTER:  They call what?

19         THE WITNESS:  Trade Me.

20         THE REPORTER:  Can you spell it?

21         THE WITNESS:  T-r-a-d-e M-e, dot, c-o, dot, n-zed.

22 New Zealand.  Yeah.

23 A.  That's website kind similar with eBay.com, and I sell my

24 stuff on that website.

25 Q.  Okay.  Now, Mr. Ngo, you just went through a lot of things.

1    I'm going to break it down a little bit.  When you said --

2    first, where were you getting the credit card information from?

3    A.   Oh.  I got from online -- online shopping websites.

4    Q.   Online shopping websites?

5    A.   Yes.

6    Q.   How would you get the credit card information from those

7    online shopping websites?

8    A.   I hack into that.

9    Q.   And were these New Zealand websites?

10   A.   I mean, doesn't matter which country.  Yeah, it's -- if

11   they had problems and then I can hack into their websites, I

12   just hack to steal the credit card.

13   Q.   Okay.  After you hacked in you were able to get the credit

14   cards?

15   A.   Yes.

16   Q.   And specifically did you personally use the credit cards,

17   or did you sell the credit card information?

18   A.   Both.

19   Q.   You did both?

20   A.   Yeah.

21   Q.   Okay.  Who would you sell the credit card information to?

22   A.   To other hackers or any person who need.

23   Q.   And how would you find customers?

24   A.   They just contact me or I -- because they know my name on

25   too many forum or website, underground hacking forum, and they

1    know my Yahoo Messenger -- my Yahoo! ID so they can contact me.

2    Q.   And that Yahoo! ID, is that the hieupc?

3    A.   Yes.

4    Q.   Now, you also mentioned you used the credit cards.

5    A.   Yes.

6    Q.   And you used it to buy personal items?

7    A.   Yes.

8    Q.   And you gave some examples.  What were those examples?

9    A.   It's like online concert tickets and, I mean, electronic

10   stuff.

11   Q.   Electronic stuff?

12   A.   Yeah.  Like TV, iPod, iPhone, PlayStation.  And I sell on

13   the website kind of similar with eBay.com.

14   Q.   So after you would buy the stuff you would just resell it?

15   A.   Yes.

16   Q.   Okay.  Did you make money doing this?

17   A.   Yes.

18   Q.   How much money did you make?

19   A.   About 5-, 10,000.

20   Q.   How long did your credit card hacking scheme last?

21   A.   About two or three months.

22   Q.   Two or three months?

23   A.   Yes.

24   Q.   Why did it end after two or three months?

25   A.   Because I got caught.  Yes.

1  Q.  How did you get caught?

2  A.  Because the police in New Zealand, they contact me.  They

3  call my -- my cellphone and my sister.  Because lots of system

4  they report it to the police, and then they want the money

5  back.  That's why they asked to refund the money.

6  Q.  Did you refund the money?

7  A.  Yes.

8  Q.  And how much did you refund?

9  A.  It's about 5-, 10,000.

10  Q.  And how many victims were impacted by your -- by your

11  hacking?

12  A.  About ten or 20 person.  I don't remember.

13  Q.  Okay.  After you were -- so did you pay back the money?

14  A.  Yes.

15  Q.  After you paid back the money, what happened?

16  A.  After I pay back the money, I was so scared.  And then I

17  don't want to go to jail, so that's why I ran back to Vietnam.

18  Q.  So you fled?

19  A.  Yes.

20  Q.  You never served any prison time in New Zealand?

21  A.  No.

22  Q.  Have you tried to go back to New Zealand?

23  A.  Yes.

24  Q.  What happened?

25  A.  They didn't allow me to go back.

1   Q.  Why is that?

2   A.  Because they told me I have did something wrong in New

3   Zealand through stolen credit card and then they found out.  I

4   also hack into university in New Zealand.  That's why they

5   didn't allow me to go back.

6   Q.  You mentioned you hacked into the university.  Was this

7   where you were studying English?

8   A.  Yes.

9   Q.  Why did you hack into the university?

10  A.  Because just for fun.

11  Q.  Did you steal any information from the university?

12  A.  Yeah.  I steal the administrator account to get inside the

13  system to control the system and put my name on it, and then

14  they found out.

15  Q.  Did you acquire any personal information from the

16  university?

17  A.  No.

18  Q.  Did you resell any student information?

19  A.  No.

20  Q.  Okay.  So basically you just broke into the system?

21  A.  Yes.

22  Q.  All right.  So after you were caught in New Zealand you

23  fled back to Vietnam?

24  A.  Yes.

25  Q.  And approximately when, what year is this we're talking

1   about?

2   A.   It's about 2010.

3   Q.   2010?

4   A.   Yes.

5   Q.   When you got back to Vietnam, what did you do next?

6   A.   Oh.  I come back to school, the school that I told you

7   before, Information Technology in Ho Chi Minh City.

8   Q.   Is that when you first started school in Ho Chi Minh City?

9   A.   Yes.

10  Q.   Were you a full-time student?

11  A.   Yes.

12  Q.   No job of any sort?

13  A.   Yes.

14  Q.   Okay.  At some point, though, you started hacking again;

15  right?

16  A.   Yes.

17  Q.   Can you explain to the jury why you got involved in hacking

18  again.

19  A.   When I was -- come back to Vietnam I was so scared, but I

20  hurt my family, my parents.

21  Q.   Can you stop there.  When you say you hurt your family,

22  what do you mean by that?

23  A.   This mean I hurt their story.  I mean, their business went

24  bankrupt.  And then -- and then -- they didn't ask me to help

25  them, but I volunteer to do something to help them to pay back

1    the money to the bank.

2    Q.  So was it your parents who gave you the money to pay back

3    the folks in New Zealand?

4    A.  Yes.

5    Q.  And as a result, your parents were bankrupt?

6    A.  Yes.

7    Q.  Is that why you got back into hacking?

8    A.  Yes.

9    Q.  Okay.  Were you hacking credit cards again?

10   A.  No.

11   Q.  Why didn't you resume hacking credit cards?

12   A.  Because I -- it was so dangerous for me because I have been

13   through the bad time in New Zealand because of stolen credit

14   card.  That's why I stop hacking credit card.

15   Q.  When you say dangerous, what do you mean by dangerous?

16   A.  Because it's related to bank account and money.  I mean, it

17   can easy to hurt or harm other people.  That's why I stop.

18   Q.  So aside from your time in New Zealand, did you ever sell

19   any other credit card information or hack any credit card

20   information?

21   A.  Before or after?

22   Q.  After.  After New Zealand.

23   A.  No.

24   Q.  No, okay.  Well, you got back into hacking, obviously.

25   A.  Yes.

1  Q.  What did you decide to go after instead of credit cards?

2  A.  Oh, after that when I come back to Vietnam, after six month

3  or a year later I talk to some other hacker in Vietnam, and

4  then we say a lot of information about social security number

5  and date of birth.

6  Q.  When --

7  A.  I mean U.S. database.

8  Q.  I'm sorry.  I didn't mean to interrupt.  Go ahead, Mr. Ngo.

9  A.  I mean U.S. database.  And then I got involved to that

10 because they told me -- my friends, you know, we stay and we

11 talk.  They told me it's very easy and safe to get -- I mean to

12 make money easy.

13 Q.  It was easy to make money with social security numbers?

14 A.  Yes.

15 Q.  And date of birth, DOBs?

16 A.  Yes.

17 Q.  And this was as a result of you chatting with hacker

18 friends?

19 A.  Yes.

20 Q.  Did you do any research into this area?

21 A.  Yes.

22 Q.  What kind of research did you do?

23 A.  I do a lots of research.  It took me about a month to

24 Google.  And then I find out the website called MicroBuilt.com.

25          THE REPORTER:  "My repute, dot, com"?

1          MR. SISTLA:  MicroBuilt.

2      And may I spell it for the record, Your Honor?

3          THE COURT:  Well, maybe he could spell it for the

4   interpreter and then she --

5          MR. SISTLA:  Certainly, Your Honor.

6   Q.  Could you spell MicroBuilt for the court reporter.

7   A.  M-i-r-c-o-B-i-l-t, dot, com.  Yeah.

8          MR. SISTLA:  Thank you, Your Honor.

9   Q.  Now, you mentioned that the SS and DOB you thought was less

10  dangerous?

11  A.  Yes.

12  Q.  Why did you think it was less dangerous to sell this

13  information?

14  A.  Because I thought it's just numbers and it's not related to

15  any bank account, or it's not -- it's not money.

16  Q.  It's not directly money?

17  A.  Yes.

18  Q.  Okay.  And so after you did the Google search and talked to

19  your friends, you came across a website called MicroBilt?

20  A.  Yes.

21  Q.  What is MicroBilt?

22  A.  MicroBilt is a company.  They have business.  It's about

23  U.S. database, social security number, date of birth, credit

24  report, criminal record.  I mean any kind of information about

25  the U.S.A.

1  Q.  About people in the U.S.A.?

2  A.  Yes.

3  Q.  Was the information that MicroBilt had, was that -- do you

4  call that fullz?

5  A.  No, they don't have.

6  Q.  What was the difference between fullz and the information

7  that you could access at MicroBilt?

8  A.  The fullz I have, it's totally different.  It included bank

9  information, e-mail password, and also, I mean, how long they

10  have been working and what kind of job that they have.

11  Q.  Okay.  So the information at MicroBilt, it was a U.S.

12  database basically?

13  A.  Yes.

14  Q.  And after you found out that MicroBilt had this

15  information, what did you do?

16  A.  Oh.  I hacked into the website and then --

17  Q.  When was that?

18  A.  It's about 2010.

19  Q.  Were you able to successfully hack into the website?

20  A.  Yes.

21  Q.  What happened after you hacked into the website?

22  A.  And then I cracked down the system.  I got the

23  administrator account and then I control the system, also their

24  customer information.

25  Q.  And by customer information, was that the SSN and DOB and

1    other information?

2    A.  Yes.

3    Q.  How hard was it to hack into the MicroBilt system?

4    A.  It took me few days, two or three days.

5    Q.  Relatively easy?

6    A.  Yes.

7    Q.  After you were into the system, what did you do with the

8    information?

9    A.  After that I used the information, and then I try to send

10   to other hackers or my friend to test the information, is it

11   value or not.  So after that I try to open a website.

12   Q.  Okay.  So you opened a website.  Ultimately you opened a

13   website, but first you sent out the information to be tested?

14   A.  Yes.

15   Q.  And why did you test the information?

16   A.  To make sure it's working, to make sure it's correct.

17   Q.  That you had good stuff?

18   A.  Yes.

19   Q.  Did you sell the information when you gave it out

20   initially?

21   A.  I just sell for fun, sell for me most, and then I started

22   selling.

23   Q.  Okay.  Were you able to determine whether you had good

24   information or not?

25   A.  Yes.

1  Q.  Was the information good?

2  A.  It's good.

3  Q.  It was good.  So after determining you had good information

4  you decided to set up a website?

5  A.  Yes.

6  Q.  How did you go about doing that?

7  A.  I contact programmer, and then they build for me a website.

8  Depend on what I need.  But they didn't know what they are

9  doing, so -- and then it took them a month to build a website.

10  Q.  All right.  And after the website was built, what did you

11  do with the website?

12  A.  I sent a message to other hackers, to underground hacking

13  forum, to Yahoo Messenger, to ICQ, or to Skype.

14  Q.  Do you remember what the domain name of your website was?

15  A.  The first domain name was superget.info.

16  Q.  That would be like the Amazon place.  If I was to type in

17  Amazon.com, that's the same thing?

18  A.  Yes.

19  Q.  Now, the way that you informed your -- the way that you

20  informed people about your website was through Yahoo Messenger,

21  ICQ, and through the forums?

22  A.  Yes.

23  Q.  What did your website actually do?

24  A.  When they got over there, they came -- any queries to any

25  name, any person in the U.S.A. to find their social security

1  number, date of birth, driver's license.  And they also can buy

2  fullz information.

3  Q.  Well, let's put the fullz to the side.  Was the website

4  interfaced with MicroBilt?

5  A.  Yes.

6  Q.  And why did you want to set up a website that was

7  interfaced with MicroBilt's database?

8  A.  Because I want everything automatically, and then so I can

9  make money easier and faster.

10 Q.  When you say automatic, what was -- what was the

11 alternative?  If you hadn't set up the website, what would have

12 been the other way that you could have sold this information?

13 A.  Oh.  I can sold the information through Yahoo Messenger or

14 underground hacking forum, but it cost me so much time for

15 that.  That's why I build a website, so they can do by

16 themself.

17 Q.  So did you ever get the website up and running?

18 A.  Yes.

19 Q.  The website was operational?

20 A.  Yes.

21 Q.  Now, how would someone actually use your website?  Did they

22 have to register?

23 A.  Yes.

24 Q.  What kind of information did they have to provide to

25 register?

1  A.  They just need user name, password, and e-mail.

2  Q.  Did you confirm that information in any way?

3  A.  No.

4  Q.  After a person registered for your website, would you keep

5  that information somewhere?

6  A.  Yes.

7  Q.  In a customer list?

8  A.  Yes.

9  Q.  And where would that customer list be?  Would it be on your

10  computer, or where?

11  A.  In my computer and also in the website server database.

12  Q.  In the website server database.  And the time period when

13  you got the website set up to work with MicroBilt, this is in

14  2010?

15  A.  Yes.

16  Q.  And did you have customers for your website?

17  A.  Yes.

18  Q.  Did you make money off the website?

19  A.  Yes.

20  Q.  How much money did you make?

21  A.  Totally, two years, I make about 3- to 400,000 U.S. dollar.

22  Q.  Well, just focusing on the time when the website was

23  working with MicroBilt, how long was that website in operation?

24  A.  Oh.  It's just working about less than two weeks.  And I

25  make about 5,000; 5-, 10,000.

1    Q.  Okay.  Why did the website only work for a couple of weeks

2    with MicroBilt?

3    A.  Because MicroBilt -- I mean, their security team, they find

4    out the problem and then they find out somebody hack into the

5    system.  That's why they shut down my account.  They blocked my

6    account.

7    Q.  Were you able to gain access again to MicroBilt?

8    A.  Yes.

9    Q.  And did you set the website up again?

10   A.  Yes.

11   Q.  How much longer did it last after that?

12   A.  One or two days.  Just on and off too many times.

13   Q.  At some point did you abandon your efforts with MicroBilt?

14   A.  Yes.

15   Q.  But -- before I go there, now, the information that was

16   available through your website, you sold it; correct?

17   A.  Yes.

18   Q.  And how would someone actually go and purchase the

19   information on your website, the information that was available

20   from MicroBilt?

21   A.  They just go through my website and then put the first

22   name, last name, or any city, any state, I mean, any person in

23   the U.S., and then just click Search, and then it will show the

24   results of that.

25              THE REPORTER:  I'm sorry.  I'm not understanding at

1    all.

2        Can you ask the answer be repeated.

3    Q.   Yeah.   Mr. Ngo, can you just explain your answer again

4    slowly for the reporter.   How would someone use your website to

5    buy the information?

6    A.   They just register an account.   And they go to my website,

7    just put first name, last name, any city, any state in the

8    U.S.A., and then just click Search, and then it will show

9    results of that person.

10            MR. SISTLA:   Are you good, sir?

11            THE REPORTER:   (Nods head up and down.)

12   Q.   Okay.   Now, but you didn't give the information away for

13   free, obviously; right?

14   A.   No.

15   Q.   So how would someone actually pay to get the access on your

16   website?

17   A.   Oh, they pay through Liberty Reserve or WebMoney.

18   Q.   We'll start with the second one.   What is WebMoney?

19   A.   WebMoney is a payment processing system.   So you can use

20   that website to send money to any person in the U.S.A. or any

21   person all over the world.

22   Q.   Okay.   And there was another system you mentioned:   Liberty

23   Reserve.

24   A.   Yes.

25   Q.   What is Liberty Reserve?

1   A.  Liberty Reserve is kind of similar with WebMoney, but it's

2   more easier.  And then you can register very easy --

3   Q.  All right.

4   A.  -- and hide your information.

5   Q.  You mentioned it was very easy.  Is Liberty Reserve online?

6   A.  Yes.

7   Q.  And it was easy to register for Liberty Reserve?

8   A.  Yes.

9   Q.  Why was it easy to register for Liberty Reserve?

10  A.  Liberty Reserve more easier than WebMoney because they

11  don't need any real information from you.

12  Q.  Any real information?

13  A.  Yes.  They don't need it.

14  Q.  What kind of information was required to set up a Liberty

15  Reserve account?

16  A.  Just e-mail.

17  Q.  Nothing else?

18  A.  You can put any name, any fake name, any fake address.

19  They don't care.

20  Q.  So a Liberty Reserve account is not tied to any bank

21  account?

22  A.  No.

23  Q.  And when did you first start using Liberty Reserve?

24  A.  When I was -- about seven years ago.

25  Q.  Seven years ago?

1   A.   Yeah.

2   Q.   A little after the time you started hacking?

3   A.   Yes.

4   Q.   How did you discover Liberty Reserve?

5   A.   Through underground hacking forum.

6   Q.   Was it a common way for hackers to pay each other --

7   A.   Yes.

8   Q.   -- through Liberty Reserve?

9   A.   Yes.

10  Q.   Why is Liberty Reserve -- why did you like to use Liberty

11  Reserve as a way to receive payment for your website?

12  A.   Because it's very easy to get money from other hacker or

13  other carders and then very safe and nobody know where you are.

14  Q.   Was it a way to hide your identity?

15  A.   Yes.

16  Q.   Have you used Liberty Reserve -- now, excuse me.  All of

17  the transactions that you made with Liberty Reserve, were they

18  illegal transactions?

19  A.   Yes.

20  Q.   Have you ever used Liberty Reserve to make a legal

21  transaction?

22  A.   No.

23  Q.   You never bought a TV?

24  A.   No.

25  Q.   A car?

1  A.  No.

2  Q.  Nothing?

3  A.  Yes.

4  Q.  And as you mentioned, you've been using Liberty Reserve --

5  you had used Liberty Reserve for about seven years?

6  A.  Yes.

7  Q.  Now, Liberty Reserve, does it go by any initials?

8  A.  LR.

9  Q.  LR?

10  A.  Yeah.

11  Q.  So if you were to see "LR," would you understand what that

12  meant?

13  A.  Yes.

14  Q.  And if there was a number before it, like 5 LR, would you

15  understand what that meant?

16  A.  Yes.

17  Q.  Can you explain to the jury what that example, 5 LR, would

18  mean.

19  A.  Five LR just mean five U.S. dollar in Liberty Reserve

20  account.

21  Q.  How -- how do you actually transfer the money from one

22  Liberty Reserve account to another?  What information do you

23  actually need?

24  A.  You just need their -- their account number, Liberty

25  Reserve account number.

1   Q.  So you don't even have to know the person's e-mail address?

2   A.  No, you don't need it.

3   Q.  Just the account number?

4   A.  Yes.

5   Q.  Okay.  And you mentioned that it was safe.  Why was it

6   safe?

7   A.  Because you don't need to provide any passport ID, I mean

8   true information about, so that you can hide your information,

9   your location.  Very safe for you.

10  Q.  Now, your website, did you ever accept payment by credit

11  card or bank account --

12  A.  No.

13  Q.  -- or wire?  Why not?

14  A.  Because it's not safe for me.

15  Q.  It would be easy to find you that way?

16  A.  Yes.

17  Q.  Now, you mentioned, though, that your access to MicroBilt

18  got shut down; right?

19  A.  (Nods head up and down.)

20  Q.  Were you ever able to get access to U.S. social security

21  numbers or DOBs or other like personal information again?

22  A.  After -- after MicroBilt?

23  Q.  Yes.

24  A.  Yes.  After that I want to do a real -- I mean, I want to

25  make a real business, so that's why I do lots of research

1   through Google, and then I found out a company called Court

2   Ventures.

3   Q.  And what is Court Ventures?

4   A.  Court Venture is a company kind of similar with MicroBilt,

5   but they -- and then they do this business social security

6   number, date of birth, driver's license, criminal records.  I

7   mean, kind of similar with MicroBilt.

8   Q.  How did you find out that this information was available at

9   Court Ventures?

10  A.  At the first -- at first I try to give to other people, try

11  to test it, try to test to make sure it's good, good stuff, and

12  then I try to rebuild my website again.

13  Q.  Now a simpler question.  How did you find out Court

14  Ventures even had this information?

15  A.  Oh.  I -- because it show up on their website, and then I

16  contact e-mail and then I found out they had service about

17  social security number, date of birth.  Yeah.  And also driver

18  license too.

19  Q.  Did you ever contact Court Ventures?

20  A.  Yes.

21  Q.  And how did you contact them?

22  A.  I contact through e-mail.

23  Q.  And did you -- who you the contact there?

24  A.  His name -- I contact to the guy named Rob Gundling.

25          THE REPORTER:  Rob?

1    The name, can you repeat it if you understand it?

2         THE COURT:  Can the interpreter help on that, please.

3    (The interpreter and the witness confer privately.)

4         INTERPRETER LIU:  Okay.  Gundling.  It's G-, as in

5    gun, then u-n-l-i-n-z.

6         MR. SISTLA:  Okay.  May I continue, Your Honor?

7         THE COURT:  Yeah, of course.

8    Q.  So you e-mailed Mr. Gundling at Court Ventures?

9    A.  Yes.

10   Q.  Did you tell him it was Hieu Minh Ngo e-mailing?

11   A.  No.

12   Q.  What did you tell him?

13   A.  I lie to him that I was an investigator from Singapore.

14   Q.  What name did you use?

15   A.  I use Jason Low.

16   Q.  And what e-mail address did you use?

17   A.  I use the e-mail jasonlow7@yahoo.com.

18   Q.  And what did you represent to Court Ventures you did in

19   Singapore?

20   A.  I was an investigator, and then I do business with lots of

21   big companies.

22   Q.  Did you say that you had a company?

23   A.  Yes.

24   Q.  What was your company called?

25   A.  S-- SE Investigator or something like.  I don't remember,

1   actually.

2   Q.   Okay.  Was any of that true?

3   A.   No.

4   Q.   Now, you said you also did work for other big companies?

5   A.   Yes.

6   Q.   That's what you told Court Ventures?

7   A.   Yes.

8   Q.   And what kind of work did you tell Court Ventures you did?

9   A.   I told with him that I was with lots of big company and

10  then they want to do lots of research.  I mean to verify their

11  customer information.  And then I told -- I told them that I

12  have connection with Court Venture so I can have them to use

13  their U.S. database.

14  Q.   Were you able to gain access -- well, let me withdraw that

15  question.

16       All the information you provided Court Ventures, was it

17  false?

18  A.   Yes.

19  Q.   Nothing was true?

20  A.   Yes.

21  Q.   And were you able to gain access to the Court Ventures

22  database?

23  A.   Yes.

24  Q.   And how were you able to gain access?

25  A.   I just sign a contract with him after that.

1  Q.  You and Court Ventures signed a contract?

2  A.  Yes.

3  Q.  And so in order to get access to the database, to Court

4  Ventures' data, you did not have to hack in?

5  A.  No.

6  Q.  You got it through a contract?

7  A.  Yes.

8  Q.  After the contract was signed, what happened?

9  A.  After the contract was signed, he give me very good deal.

10  And then after that I rebuild my website again, same design but

11  different connection, different interface to Court Venture

12  database.

13  Q.  And did you pay Court Ventures under this contract?

14  A.  Yes.

15  Q.  How did you pay them?

16  A.  I pay through bank account.

17  Q.  Your personal bank account?

18  A.  No.

19  Q.  Through someone else's?

20  A.  Yes.

21  Q.  Did you ever miss a payment?

22  A.  Yes.

23  Q.  You missed it?  Did you always pay on time?

24  A.  Yes.

25  Q.  You always paid on time, okay.

1    Now, you mentioned you rebuilt your website.  Is that

2  similar to the website you were discussing that was interfaced

3  with MicroBilt?

4  A.  Yes.

5  Q.  But you made some changes?

6  A.  Yes.

7  Q.  What kind of changes did you make?

8  A.  I just -- I just changed a little bit about connection

9  interface to Court Venture, that database, and then I bought --

10  I bought another option, driver license option, on my website

11  too.

12  Q.  Okay.  Did you get the website operational?

13  A.  Yes.

14  Q.  And after the website was operational did you inform -- how

15  did you inform people or your customers that you had a new

16  website?

17  A.  By the same way.  I advertised my website through

18  underground hacking forum, through Yahoo Messenger, through

19  Skype, through ICQ, and also through the e-mail, through the

20  e-mail customer list.

21  Q.  Okay.  When you say you were able to e-mail your customers,

22  was that the -- who -- who -- what e-mails were those?

23  A.  Oh.  It's from my customer.

24  Q.  Were those the customers who had registered, previously

25  registered on the website?

1  A.  Yes.

2  Q.  And you mentioned earlier you maintained a list of your

3  customers; is that right?

4  A.  Yes.

5  Q.  Would you recognize a customer list --

6  A.  Yes.

7  Q.  -- if you were to see one?

8       MR. SISTLA:  Okay.  Could the witness be shown what's

9  been marked Government Exhibit 36.

10      COURTROOM DEPUTY:  If you show it to him, only he'll

11 be able to see it.

12      MR. SISTLA:  That's right.  It's not admitted yet.

13      COURTROOM DEPUTY:  Right.

14      THE COURT:  Right.

15      COURTROOM DEPUTY:  You can see it, Judge and the

16 witness can see it, and counsel can see it, but the jurors

17 cannot see it.

18      MR. SISTLA:  One second, Your Honor.

19   Tom, can you see the exhibit?

20      MR. ANDERSON:  (Nods head up and down.)

21      MR. SISTLA:  Okay.

22   May I proceed, Your Honor?

23      THE COURT:  Yeah, of course.

24 Q.  Mr. Ngo, do you see Exhibit 36 before you?

25 A.  Yes.

1   Q.  Can you recognize it?

2   A.  Yes.

3   Q.  What is that?

4   A.  Oh.  It's my customer list for my website.

5   Q.  And how do you know that it's your customer list for your

6   website?

7   A.  Because it contain my name:  hieupc.  It's my administrator

8   account.

9   Q.  Okay.  Is this a fair and accurate copy of the customer

10  list?

11  A.  Yes.

12  Q.  And Exhibit 36 is more than just one page; is that right?

13  A.  Yes.

14  Q.  I believe it's 18 or 19 pages.  Would you like to flip

15  through the exhibit?

16  A.  Yes.

17  Q.  Okay.  Do you want to just scroll through real quick.

18      Mr. Ngo, have you had a chance now to look through the

19  exhibit list?

20  A.  Yes.

21  Q.  And again, is it a fair and accurate copy?

22  A.  Yes.

23          MR. SISTLA:  Your Honor, at this time the government

24  would move to admit Exhibit 36.

25          THE COURT:  Any objections?

1        (Mr. Anderson and the defendant confer privately.)

2            MR. ANDERSON:  No objections, Your Honor.

3            THE COURT:  It's admitted.  The jury may see it.

4        Are you going to put it -- is the screen big enough?

5            MR. SISTLA:  There's a screen in front of every juror.

6            THE COURT:  Oh, they've got individual screens.

7            COURTROOM DEPUTY:  Just like ours.

8            THE COURT:  Okay.

9            COURTROOM DEPUTY:  I've showed it to them now.

10           THE COURT:  Hmm?

11           COURTROOM DEPUTY:  I've showed it to them now.

12           THE COURT:  Okay.  So it's up.

13       Are you able to see that okay?

14           MEMBERS OF THE JURY:  No.

15           COURTROOM DEPUTY:  The screens should pull out and up

16  so you can -- and they also tilt, if that helps, too.

17           THE COURT:  Okay.

18           MR. SISTLA:  Ladies and gentlemen of the jury, is it

19  in front of you now?

20           MEMBERS OF THE JURY:  Yeah.

21       (Government's Exhibit 36 was admitted.)

22           THE COURT:  Hang on one second, Mr. Sistla.

23       Okay, ma'am.  What's your name, please?

24           INTERPRETER NGUYEN:  My Le Nguyen, spelled -- do you

25  need my spelling?

1          THE COURT:  Yes, for the record.

2          INTERPRETER LIU:  M-y, space, L-e, last name

3  N-g-u-y-e-n.

4          THE COURT:  Thank you.

5          COURTROOM DEPUTY:  Ma'am, would you please raise your

6  right hand.

7     (Interpreter My Le Nguyen is duly sworn by the courtroom

8  deputy.)

9          COURTROOM DEPUTY:  Thank you, ma'am.

10         THE COURT:  Yeah.  I think you're going to have to use

11 blowups to show it to the jury.

12         MR. SISTLA:  That's what the agent's trying to do.

13 Give me one second, Your Honor.  I apologize.

14         THE COURT:  Because it's pretty small otherwise.

15         MR. SISTLA:  Is that better?

16    Can the Court see it now too?

17         THE COURT:  Yeah, I'm fine.  Don't worry about me.

18 Q.  Mr. Ngo, can you see the portion that's been enlarged?

19 A.  Yes.

20 Q.  You mentioned before that you recognize your administrator

21 name.  Is that shown in the blowup here?

22 A.  Yes.

23 Q.  Can you point that out for the jury, which one it is.

24 A.  This is my user name and my e-mail account.

25 Q.  And that's how you know this is your customer list?

 1   A.   Yes.

 2            THE COURT:   Hang on one second.

 3       If he touches the screen, Barb, will it underline like

 4   ours?

 5            COURTROOM DEPUTY:   It should, yeah, like ours.

 6            THE COURT:   Yeah.   You can circle it or touch the

 7   screen, sir.

 8            THE WITNESS:   Oh, yeah.   Yes.

 9            THE COURT:   And it should work.   Is it working?

10            THE WITNESS:   Yes.

11            THE COURT:   There we go.

12            MR. SISTLA:   And then, Mr. Ngo, in order to clear the

13   screen, just tap the upper right-hand corner of the monitor at

14   the end.   That should clear it.   Okay?   Yeah.

15            COURTROOM DEPUTY:   Ours is the bottom.

16            MR. SISTLA:   Oh, is it the bottom?   I'm sorry.   Bottom

17   right-hand corner.

18            COURTROOM DEPUTY:   Actually, ours is the bottom

19   left-hand corner.   I mean, you know, every one's got a

20   different system.

21       All right.   Let me see if I can do it from my --

22            THE COURT:   Yeah.   Why don't you -- can you just clear

23   it, Barb?

24            COURTROOM DEPUTY:   I can try.

25            THE COURT:   Yeah, give it your best shot.

1    There you go.  Thank you.

2    It's clear.

3         MR. SISTLA:  Thank you, Your Honor.

4  BY MR. SISTLA:

5  Q.  Now, the customer list here, in order for an e-mail address

6  to appear on this list would a customer have to have registered

7  on your website?

8  A.  Yes.

9         MR. SISTLA:  I'm sorry.

10        THE COURT:  Was there a question?

11        MR. SISTLA:  I thought Your Honor said something.

12        THE COURT:  No, I didn't say anything.

13 Q.  In order -- does a customer have to have purchased

14 something before they register, or can you just register and

15 not actually make a purchase?

16 A.  They don't have to.  They just register.

17 Q.  They just register, okay.

18    And you mentioned that when you informed your customers

19 about the new website that was working with Court Ventures you

20 would e-mail these folks on this list; is that right?

21 A.  Yes.

22 Q.  How long did you have a website that was interfacing with

23 Court Ventures?

24 A.  Almost two years.

25 Q.  And approximately from when to when?

1   A.   Around at the end -- at the end 2010 to at the end 2012.

2   Q.   At any point while you had access to Court Ventures was it

3   necessary for you to hack into the site?

4   A.   I don't have to.

5   Q.   You don't have to because you had a contract?

6   A.   Yes.

7   Q.   How much money did you make while you had access to the

8   Court Ventures website?

9   A.   About 3- to 400,000 U.S. dollar.

10  Q.   And how many customers did you have that used your website,

11  approximately?

12  A.   It's almost more than 1,000.

13  Q.   More than 1,000?

14  A.   Yes.

15  Q.   Were the customers just in Vietnam, or where were they?

16  A.   Anywhere in the world.

17  Q.   Could a -- could a person from the United States access

18  your website?

19  A.   Yes.

20  Q.   And how would they be able to access your website?

21  A.   They just used -- they knew the name.

22  Q.   At any point did you block U.S. IP addresses?

23  A.   Yes.

24  Q.   Well, if I'm in the U.S. and you've blocked a U.S. IP

25  address, how do you access the website?

1   A.  Oh, how do -- if I block your U.S., your IP address, you

2   have to change your IP address to another location in the

3   world, around the world, maybe different country.

4   Q.  Did you block all U.S. IP addresses?

5   A.  Yes.

6   Q.  Why did you do that?

7   A.  Because around 2012 some security reporter, they reported

8   my website.  And then I was so worried about that.  I was

9   afraid of police, you know, behind me.  And then that's why I

10  have to change my domain name to prevent harm.  And I also

11  block -- I also block the IP address from the U.S.A.

12          THE COURT:  Can we do a time-out.

13      Luke, did you get the new domain name?

14          THE REPORTER:  If you could spell it for me, that

15  would be great.

16          THE COURT:  Would the interpreter help us spell the

17  new domain name.

18          THE DEFENDANT:  The first domain is superget.info.

19          THE REPORTER:  Can you spell it?

20          THE WITNESS:  S-u-p-e-r-g-e-t, dot, i-n-f-o.  And

21  another one is igetnow, dot -- I get -- igetnow.me.

22          THE REPORTER:  I understand.

23          THE WITNESS:  You understand that?  And then another

24  one is figet, dot, me.

25          THE REPORTER:  F-i-g-e-t?

1          THE WITNESS:  Figet, dot, me.  Yeah.  And another one

2    is ussearching.info.

3          THE REPORTER:  U.S. searching, dot, info?

4          THE WITNESS:  Yes.

5          THE REPORTER:  Thank you.

6          THE COURT:  Thank you.

7    Q.  You mentioned a number of U.S. domain names.  Why did you

8    change the domain name?

9    A.  For security, for safe, and I was afraid of police.

10   Q.  Were you changing the domain in an effort to hide yourself?

11   A.  Yes.

12   Q.  Now, the topic before you got into the domain names, we

13   were discussing IP addresses, you mentioned you blocked U.S. IP

14   addresses.

15   A.  Yes.

16   Q.  Would it still have been possible for someone in the United

17   States, though, to gain access to your website?

18   A.  Sure.

19   Q.  And was that -- is that a difficult process?

20   A.  Very easy.

21   Q.  Very easy?

22   A.  Yes.

23   Q.  Could you explain to the jury why it's very easy.

24   A.  Because there are too many different kinds -- you can fake

25   your location or, I mean, fake your IP address very easy

1  through VPN, through proxy service, through SOCKS service, and

2  then you can access to my website through that service very

3  easy.

4  Q.  Just in case the jury is not aware of those terms, let's go

5  through them.  VPN, what does that stand for?

6  A.  VPN, this mean virtual private networking.  So you can use

7  that service to access my website to fake your location.

8  Q.  And a VPN, is that like a software program?

9  A.  It's just -- you just need your -- when you buy that

10 service, they will give you user name and password, the IP

11 address, and then you just use that through your computer to

12 set up an account through your computer by the instructions.

13 Very easy.  It take about five minutes to set up an account.

14 Q.  It takes about five minutes to set up an account?

15 A.  Yes.

16 Q.  The VPN is a virtual private network?

17 A.  Yes.

18 Q.  That allows you, then, to mask your IP address?

19 A.  Yes.

20 Q.  And it allows you to make it look like you're from not the

21 U.S.?

22 A.  Yes.

23 Q.  Do you need to be a hacker to set up a VPN?

24 A.  No, you don't need.

25 Q.  Could you get on Google and do a search and learn how to do

1    a VPN?

2    A.  Yes.

3    Q.  How long would it take someone to set up a VPN?

4    A.  It's about five minutes.

5    Q.  That's it?

6    A.  That's it.

7    Q.  You don't need any technical skills whatsoever?

8    A.  No.

9    Q.  You mentioned other ways that you could disguise your IP

10   address to gain access from the U.S.  One was SOCKS?

11   A.  SOCKS.

12   Q.  Can you explain to the jury what SOCKS are.

13   A.  SOCK and proxy are the same, but SOCK is more security,

14   more secure than proxy.  You just need the IP address and then

15   four or five other number after that, set up through your

16   browsers, and then you can -- it take about two minute to set

17   up that, it's very easy, and then you can fake your location

18   easy.

19   Q.  Now, not only would you be able to fake your location with

20   the stuff to gain access to your website, but would this also

21   be a way to hide where you're coming from?

22   A.  Yes.

23   Q.  Did you use VPNs and SOCKS or proxies to hide your

24   location?

25   A.  Yes.

1  Q.  Why would you do that?

2  A.  Because I don't know -- because I don't want the people to

3  know where I come from.

4  Q.  Now, the last two you mentioned, SOCKS and proxies, do you

5  need any specialized computer training or education in order to

6  set those up?

7  A.  No.

8  Q.  Do you need to have the kind of skills that you do as a

9  hacker to set that up?

10  A.  You don't need it.

11  Q.  Would it just be a matter of going on Google and finding

12  it?

13  A.  Yes.

14  Q.  And you mentioned it just takes a couple of minutes to set

15  up?

16  A.  Yes.

17        MR. SISTLA:  Okay.  Now, we've talked a lot about your

18  website.

19     If Mr. Ngo could be shown what's been previously marked as

20  Government Exhibit 35.  Not for the jury, though, obviously.

21        THE COURT:  Is there going to be an objection to the

22  foundation, or do you guys know?  Do you want to see how it

23  plays out?

24        MR. ANDERSON:  Your Honor, if we could see the

25  specific exhibit first before we make that determination.

1          THE COURT:  Okay, fine.

2     Can you put it up, Barb?

3          COURTROOM DEPUTY:  I cannot do that.  They're doing

4  that.

5          THE COURT:  Oh, they're doing that.  I'm sorry.

6          MR. SISTLA:  So this has to be cleared.

7          THE COURT:  Yeah, clear the screen.

8          COURTROOM DEPUTY:  I have it already where it's turned

9  off so the jury can't see it.

10          THE COURT:  Right.  But shouldn't this one come down?

11          COURTROOM DEPUTY:  I'm not sure how that works.

12          THE COURT:  Can you guys take down 36 and put up 35 so

13  everybody but the jury can see it?

14          MR. SISTLA:  You can take down 36.

15          COURTROOM DEPUTY:  They should not be able to see

16  that.

17          THE COURT:  Yeah.  Make sure the jury doesn't see it

18  before it's admitted.

19          MR. SISTLA:  35.

20          COURTROOM DEPUTY:  Hold on one second before you put

21  that up.

22     Search for your file one time, please.

23     Okay.  I fixed it.

24          THE COURT:  Are we good?

25          COURTROOM DEPUTY:  We're good, I think.

 1        MR. SISTLA:  I just want to make sure.  The ladies and

 2  gentlemen of the jury cannot see anything; right?

 3        THE COURT:  No.

 4        MR. SISTLA:  Okay.

 5        THE COURT:  Because if it's not on that screen, they

 6  can't see it.

 7        MR. SISTLA:  Mr. Ngo, can you see something in front

 8  of you?

 9        THE WITNESS:  Yes.

10        MR. SISTLA:  Tom, can you see?

11        MR. ANDERSON:  (Nods head up and down.)

12        MR. SISTLA:  Okay.

13  Q.  Mr. Ngo, do you recognize Government Exhibit 35, what's

14  before you?

15  A.  Yes.

16        THE COURT:  Mr. Sistla, I mean, just for the record,

17  my exhibit sticker is blocked out, but this is 35?

18        MR. SISTLA:  Oh, I'm sorry.  It got zoomed in.  Yes.

19        THE COURT:  Oh, there we go.  Okay, good.  Excellent.

20  Q.  What is it?

21  A.  That is my website.

22  Q.  It's a screen shot of your website?

23  A.  Yes.

24  Q.  Is it a fair and accurate copy of your website?

25  A.  Yeah, it's my website.

1   Q.   Your website.  This is the front page?

2   A.   Yes.

3   Q.   And are there any alterations of any sort?

4   A.   No.

5   Q.   No.  And Government Exhibit 35 actually consists of a

6   number of shots.  Could you scroll through.

7        Do you see page two now?

8   A.   Yes.

9   Q.   And could you identify that.

10  A.   Yes.

11  Q.   Could you actually identify it.  What is it?

12  A.   It's my website.

13  Q.   Another screen shot of your website?

14  A.   Yes.

15  Q.   Is it a fair and accurate copy of your website?

16  A.   Yes.

17           THE COURT:  I think you could have him just look at

18  all the pages and indicate the general question and that will

19  be sufficient.

20           MR. SISTLA:  That was going to be my next question,

21  Your Honor.

22           THE COURT:  Okay.

23  Q.   Mr. Ngo, the special agent is going to flip through the

24  pages.  Can you just look through, and when we get through all

25  the pages I'll ask you the question.  Okay?

1   A.  Yes.

2          MR. SISTLA:  Special Agent.

3   Q.  Can you let us know when it's okay to move forward --

4   A.  Yes.

5   Q.  -- Mr. Ngo.

6   A.  Yes.

7          MR. SISTLA:  Okay.  Go ahead.

8      Go ahead.

9      Go ahead.

10     Is that the last?  That's the last page; right?

11  Q.  Mr. Ngo, have you had a chance to look at all the pages

12  that consist of Exhibit 35, Government Exhibit 35?

13  A.  Yes.

14  Q.  And what are those images of?

15  A.  It's my website.  It's an option from my website.

16  Q.  And are all of those images that you saw fair and accurate

17  copies of screen shots from your website?

18  A.  Yes.

19         MR. SISTLA:  Your Honor, we would move to admit

20  Government Exhibit 35 at this time.

21         THE COURT:  Any objection, guys?

22     (Mr. Anderson and the defendant confer privately.)

23         THE DEFENDANT:  Yeah.  I think we would like to try to

24  object because we didn't have time to, sufficient time to view

25  this evidence --

1          THE COURT:  Okay.

2          THE DEFENDANT:  -- at the office.

3          THE COURT:  Your objection's noted.  It's overruled,

4    and it's admitted.

5          THE DEFENDANT:  Oh, okay.

6      (Government's Exhibit 35 was admitted.)

7          THE COURT:  You may proceed.  You may show it to the

8    jury.

9          MR. SISTLA:  Thank you, Your Honor.

10         THE COURT:  Yeah.

11         MR. SISTLA:  I apologize.  It's a little washed out.

12   Can the jury see it?

13   Q.  Do you see the image in front of you, Mr. Ngo?

14   A.  Yes.

15   Q.  Could you describe to the ladies and gentlemen of the jury

16   what we're looking at here.

17   A.  It's the home page of my website.

18   Q.  Okay.

19   A.  So you need user name, password.  I mean, you need to have

20   an account before you log in to my website.

21   Q.  And how would one get an account on your website?

22   A.  They just need to register --

23   Q.  Okay.

24   A.  -- click, and then you can register an account very easy.

25   Q.  And once you register an account, then you can actually get

1   on and use the website?

2   A.  Yes.

3   Q.  Is this basically what the website looked like when it was

4   interfaced with Court Ventures?

5   A.  Yes.

6           MR. SISTLA:  Okay.  If you could flip two pages in to

7   Bates Ealy ONeill 16.

8       The third page.  We might have to zoom in.

9   Q.  Can you see the zoomed-in copy now, Mr. Ngo?

10  A.  Yes.

11  Q.  What are we looking at here?

12  A.  It's my website.

13          MR. SISTLA:  Actually, go one more page.

14          THE COURT:  Counsel, if you're going to ask detailed

15  questions, I think some of the jurors are going to need it

16  magnified even larger.

17          MR. SISTLA:  Okay.  Understood, Your Honor.

18          THE COURT:  Okay.

19          MR. SISTLA:  Could you just blow up the search screen.

20      Is that better for the jury?

21          THE COURT:  And, guys, let me suggest that if you just

22  write down the exhibit number and perhaps the page, at the end

23  of the day -- not at the end of the day, but at the end of the

24  trial you will be getting hard copies.  So if you wanted to

25  make a reference to anything, I think that will help you.

1  Q.  Mr. Ngo, what are we looking at here?

2  A.  This is after you bought, I mean, an information from any

3  person in the U.S.A. to make a search, and then it will show

4  the information from that person:  social security number, date

5  of birth, first name, last name, I mean, the address, the phone

6  number, also the e-mail too.

7  Q.  And so the field where it says First Name, would the

8  customer enter that information in?

9  A.  Yes.

10 Q.  And there's a field Last Name.  Would the customer enter in

11 that information?

12 A.  Yes.

13 Q.  And basically, depending on what information you put in

14 those fields, would affect what kind of search results you got?

15 A.  Yes.

16 Q.  Okay.  But in order to do a search, did the customer first

17 have to pay?

18 A.  Yes.

19 Q.  And how did they pay?

20 A.  They pay to -- to my -- to my website.  I mean, they have

21 to pay to Liberty Reserve to get the credit for my website so

22 they can use their credits to use for this service.

23 Q.  And when the website was hooked up to MicroBilt you used

24 Liberty Reserve; correct?

25 A.  Yes.

1  Q.  And when the website was hooked up to Court Ventures you

2  also continued to use Liberty Reserve?

3  A.  Yes.

4  Q.  Was that for the same reasons that you used Liberty Reserve

5  with MicroBilt?

6  A.  Yes.

7  Q.  Okay.  Now, how would someone -- how much did it cost to do

8  a search on your website?

9  A.  It depend on how much they buy.  Look like, for example,

10  they buy ten credit.  This cost maybe three or four dollars.

11  Or the more credit they want, the more cheaper they get.  So I

12  give them discount if they buy a lot, high volume.

13  Q.  A high-volume discount?

14  A.  Yes.

15  Q.  Okay.  And would they --

16        MR. SISTLA:  If you'd turn to the very next page in

17  the exhibit.  It's that one.

18  Q.  What are we looking at here, Mr. Ngo?

19  A.  Oh, you see the Liberty Reserve.  And you see when they

20  finish that jam session they then transfer the money to my

21  account.  This is my account right here.

22  Q.  How do you recognize that that's your account?

23  A.  Because I see the name Traci Donell.

24  Q.  Is that a fake name?

25  A.  Yes.

1   Q.  Do you recognize the account number?

2   A.  Yes.

3   Q.  And that was your Liberty Reserve account?

4   A.  Yes.

5   Q.  When did you use this account number for your transactions?

6   A.  When did I use, which year?

7   Q.  Yeah, what year, approximately.

8   A.  2010 until -- I mean, I used before that, but I used the

9   most from 2010 to 2013.

10  Q.  Up to the point where you got arrested?

11  A.  Yes.

12  Q.  So would it be fair to say that in December 2012 and

13  January 2013 you were using this Liberty Reserve account

14  number?

15  A.  Yes.

16  Q.  And this shopping cart interface we're seeing, was this

17  part of your website?

18  A.  Yes.

19  Q.  And if the customer were to click on Return to Merchant,

20  where would you go?

21  A.  Oh.  They would return to my website.

22  Q.  And if they were back to the website they could make more

23  purchases?

24  A.  Yeah.  After that, if they return to my website, they would

25  get credit, or they will get the stuff they need after they

1    get -- they buy from me.

2    Q.  In order to buy credits from your website, could you go

3    just through the website, or did they have to e-mail you?

4    A.  They just go through the website.

5    Q.  Everything was automated?

6    A.  Yes.

7    Q.  In order to purchase the information that was available

8    from Court Ventures, did someone ever have to e-mail you

9    directly?

10   A.  No.

11   Q.  Everything was through the website?

12   A.  Yes.

13        MR. SISTLA:  All right.

14      Now, Special Agent, you can take down the exhibit.

15   Q.  You mentioned that you had a relationship with Court

16   Ventures for a couple of years.

17   A.  Yes.

18   Q.  At some point, though, did Experian acquire Court Ventures?

19   A.  Yes.

20   Q.  Were you aware of that fact?

21   A.  Yes.

22   Q.  What happened after -- excuse me.  What happened after

23   Experian acquired Court Ventures?

24   A.  Oh.  After they bought the company Court Venture, and then

25   they e-mail me, and then they told me they want to keep

1  business with me, because they see me, I am a good, very good

2  customer, but after that, only two or three months, they shut

3  down the service.

4  Q.  Okay.  When you say "they," just so the record is clear,

5  are you referring to Experian?

6  A.  Yes, I mean Experians.

7  Q.  So after Experian bought Court Ventures, for some period of

8  time you still had access to the data?

9  A.  Yes.

10 Q.  And your website was still working?

11 A.  Yes.

12 Q.  At any point did you disclose to either Court Ventures or

13 Experian about the existence of your website?

14 A.  No.

15 Q.  Why not?

16 A.  Because to be safe for me.

17 Q.  Was what you were doing illegal?

18 A.  Yes.

19 Q.  Did they ever know that?

20 A.  No.

21 Q.  The relationship you had with Experian, did your website

22 change in any way?

23 A.  It's still the same.

24 Q.  Exactly the same?

25 A.  Yes.

1  Q.  You didn't have to -- did you have to -- excuse me.  I'll
2  change my question.
3      Did you have to hack in to the Experian database in order
4  for your website to keep running?
5  A.  No.
6  Q.  No, okay.  But you mentioned that they shut it down after a
7  few months?
8  A.  Yes.
9  Q.  Why was that?
10 A.  Because they told me they have to shut down the old
11 database service.  They wanted me to move to a new contract
12 with them.  It would be a new database service.
13 Q.  And just to be clear, when we say shut down, it's not your
14 website that was shut down; it was your access to the data?
15 A.  Yes.
16 Q.  All right.  Do you know approximately when this happened?
17 A.  It's around two thousand-- at the end around 2012.
18 Q.  In the November-December time frame?
19 A.  Yes.
20 Q.  After they -- after Experian shut down your access to their
21 database, what did you do?
22 A.  After that I try to sign a contract with them, but we
23 didn't make it.  And then after that --
24 Q.  Would you stop right there.  Why were you unable to enter
25 into a new contract with Experian?

1   A.   Because they need a lot of information from me.  They need

2   to provide my ID, my real ID, my real information, and I was

3   afraid of that.  I was afraid of police, and I didn't do it.

4   And they also need to see me too, so I was so -- I didn't do

5   it.  Yeah.

6   Q.   So now your website was not operational?

7   A.   Yes.

8   Q.   And you weren't making money off of this information?

9   A.   No.

10  Q.   So what did you do?

11  A.   And then I bought -- I mean, I have to find out another

12  company, and then I found out the TLO company.

13  Q.   What is TLO?

14  A.   TLO is the same company, they have the same business with

15  MicroBilt and also same business with Court Ventures, and then

16  I sign a contract with them.

17  Q.   When you say you signed a contract, was it similar to the

18  type of contract you entered into with Court Ventures?

19  A.   Yes.

20  Q.   What kind of representations or what did you tell TLO you

21  were doing?

22  A.   I told TLO the same story I told Rob Gundling from Court

23  Ventures.

24  Q.   You told them that you were a Singaporean investigator?

25  A.   Yes.

1   Q.  And all of that was not true?

2   A.  Yes.

3   Q.  When you gained access to TLO's database, approximately

4   when was this?

5   A.  It's around -- actually, I got the contract from TLO around

6   August or September 2012 just for backup, and then after that I

7   contact them to sign another contract to become -- I mean to

8   become a reseller for them to have a good deal, and that

9   happened around at the end in January 2013.

10  Q.  So your access to TLO -- I'm sorry.  You gained access to

11  TLO after you lost access to the Experian database?

12  A.  Yes.

13  Q.  How long did you have access to the TLO database?

14  A.  It's about three or four days.

15  Q.  Why did you only have access for such a short period of

16  time?

17  A.  I believe they -- they end my account because they believed

18  I was a hacker.

19  Q.  Did you subsequently try to hack in to TLO?

20  A.  No.

21  Q.  No.  While you had access to the TLO database did you

22  interface it with your website again?

23  A.  Yes.

24  Q.  Were you able to make money?

25  A.  Yes.

1  Q.  Roughly how much did you make over those three or four

2  days?

3  A.  Three or four days make 1-, 2,000.

4  Q.  One- or 2,000?

5  A.  Yeah.

6  Q.  And after you lost access to the TLO database, were you

7  ever able to gain access to another U.S.-type database like

8  Experian or Court Ventures or TLO?

9  A.  No.

10  Q.  Why was that?

11  A.  Because after that I got arrested.

12  Q.  That was in Guam, as you mentioned earlier?

13  A.  Yes.

14  Q.  And that was in -- what day was that, again?

15  A.  It's February 7, 2013.

16  Q.  Okay.  Well, we'll get into the circumstances of your

17  arrest shortly.  But your business wasn't just running the

18  website; right?

19  A.  Yes.

20  Q.  You mentioned earlier something about fullz.

21  A.  Yes.

22  Q.  And you told the ladies and gentlemen of the jury what

23  fullz were.  Do you recall that?

24  A.  Yes.

25  Q.  Were you in the business of selling fullz?

1    A.   When I was -- when I begin, started to open the website, I

2    also sell fullz info too.

3    Q.   Okay.   The information that we've been talking about so far

4    from Experian and Court Ventures and TLO, that's not -- those

5    aren't fullz, right?

6    A.   No.

7    Q.   Well, where did you get the fullz from?

8    A.   I got from -- from a hacker from Russia, and he -- I don't

9    know his real name but I know his nickname:   Devil.

10   Q.   What was the hacker's nickname?

11   A.   Devil.

12   Q.   How did you meet Devil?

13   A.   Through underground hacking forum, through Skype, through

14   ICQ, through Yahoo Messenger.

15   Q.   What was the first time you communicated or chatted with

16   Devil?

17   A.   Is around 2010 to 2012.

18   Q.   So for more than two years?

19   A.   Yes.

20   Q.   And Devil is a hacker?

21   A.   Yes.

22   Q.   Did you ever meet him in person?

23   A.   No.

24   Q.   How would you communicate with him or her?

25   A.   I communicate with Devil through underground hacking forum,

1  through Skype, through Yahoo Messenger, and through Skype,

2  through ICQ.

3  Q.   And was Devil the source of the fullz you sold?

4  A.   Yes.

5  Q.   Did you pay for them?

6  A.   No.

7  Q.   How did you acquire the fullz from Devil?

8  A.   Because I want to be nice with him, I want to help him.

9  And then he told me he have lots of fullz information.  But we

10 need that mutual information.  But then I see him like a friend

11 and I help him.  He need credit from my website.  He would need

12 to use my -- he need to use my service from my website.  That's

13 why he get me the fullz, so he don't need to buy the money for

14 that.

15 Q.   So the one way that you acquire the fullz is you exchanged

16 credits on your website for the fullz?

17 A.   When --

18 Q.   You exchanged -- you gave him -- whoops.  I'm sorry.

19      You gave him credits?

20 A.   Yes.

21 Q.   And he gave you fullz?

22 A.   Yes.

23 Q.   Did you provide him any other information in exchange for

24 the fullz?

25 A.   And I also teach him how to -- how to hack.

1  Q.  What did you teach him?

2  A.  I teach him about database, AQL, I mean, hacking techniques

3  so -- because he want to learn about database and hacking

4  techniques.

5  Q.  Now, the fullz that you got from Devil, were those the

6  names, social security number, mother's maiden name, bank

7  account, all that detailed information you told the jury

8  before?

9  A.  Yes.

10  Q.  And are we talking about one or two fullz or 500 fullz?

11  How many fullz did you get from Devil?

12  A.  It's around 2- to 300,000 fullz information.

13  Q.  200- to 300,000 fullz information?

14  A.  (Nods head up and down.)

15  Q.  And do you know where Devil got them?

16  A.  He told me he got from the botnet system.

17        THE DEFENDANT:  Objection.

18        THE COURT:  Well, hang on.  The objection's sustained.

19  That's hearsay.

20        MR. SISTLA:  Do you want to strike the answer?

21        THE COURT:  Well, I don't know if the jury heard it,

22  but the answer is stricken from the record, and the objection

23  is sustained.

24        MR. SISTLA:  Okay.

25        THE COURT:  Thank you.

1    Q.  Aside from Devil, did you ever acquire fullz from anyone

2    else?

3    A.  No.

4    Q.  Only Devil?

5    A.  Yes.

6    Q.  And approximately when did you acquire these 2- or 300,000

7    fullz from Devil?  What time period, what year?

8    A.  It's around 2010 to 2011.

9    Q.  The fullz that you acquired from Devil, did you sell them?

10   A.  Yes.

11   Q.  And did you sell them through your website?

12   A.  And I also sell through e-mail too.

13        MR. SISTLA:  Through e-mail too, okay.

14      Well, why don't we start with the website.  If the Special

15   Agent could bring up Government Exhibit --

16      I'm sorry, Your Honor.  One moment.

17        THE COURT:  That's okay.

18        MR. SISTLA:  -- Government Exhibit 35, the last page.

19   It ends with Bates 34.

20        THE COURT:  Okay.  35 the last page is already in, so

21   that's fine.  Right?

22        MR. SISTLA:  Yes, Your Honor.

23        THE COURT:  Yeah.

24        MR. SISTLA:  Can the jury -- is this for jury?

25        THE COURT:  You may have to block out some of those

1   and highlight them.  I can't tell.

2           MR. SISTLA:  Can you zoom in any even more, or no?

3           THE COURT:  Do you guys need it bigger?

4           MEMBERS OF THE JURY:  Yes.

5           MR. SISTLA:  One moment, Your Honor.

6       (Mr. Sistla and Special Agent Bierman confer privately.)

7           MR. SISTLA:  Does that help?

8           MEMBERS OF THE JURY:  (Nod heads up and down.)

9   Q.  Mr. Ngo, can you see that in front of you?

10  A.  Yes.

11  Q.  Can you describe to the ladies and gentlemen of the jury

12  what we're looking at here.

13  A.  This the option where you can buy the fullz information

14  from my website.  And then they had three different type:  type

15  A, type B, and type C.

16  Q.  What's the difference between type A, B and C?

17  A.  It mean -- the type A is mean new and fresh database, and

18  type B is old database, and type C is very old database.

19  Q.  Was any of this true?

20  A.  No.  It's just -- no, it's not really true.

21  Q.  Just a sales pitch?

22  A.  Yes.

23  Q.  Well, okay.  So you have three options.  How do I let you

24  know how many I want to buy?

25  A.  You just choose -- look like, for example --

1      MR. SISTLA:  That was a prior screen, actually.

2   Q.  So you were indicating.  You were drawing a circle around

3   the --

4   A.  Yes.

5   Q.  Okay.

6   A.  So, for example, I am a customer, I just choose type A, and

7   then I choose number of -- you want to buy.  I put a number

8   like hundred and then click it make price calculate now, and

9   then click it to pay to Liberty Reserve.

10  Q.  And that would be further down on the screen?

11  A.  Yes.

12      MR. SISTLA:  All right.  So do you went to bring up

13  the bottom now.

14  Q.  Was that the price calculator you mentioned?

15  A.  Yes.

16  Q.  And after doing the price calculation it would tell you how

17  much Liberty Reserve would cost?

18  A.  Yes.

19  Q.  And then you could buy it?

20  A.  Yes.

21  Q.  Was there any limit to the number of fullz you could buy on

22  your website?

23  A.  I mean, it -- it limited.

24  Q.  It is limited?

25  A.  It's limited.

1  Q.  And why did you choose to use Liberty Reserve as the way to

2  pay for fullz?

3  A.  Because lots of hackers and other people -- I mean carders;

4  I mean anyone -- they use Liberty Reserve.

5  Q.  So for the same reasons that you used Liberty Reserve to

6  sell the Court Venture and Experian information, that's why you

7  used it for fullz?

8  A.  Yes.

9  Q.  Now, you also mentioned that a customer could buy fullz

10  through e-mail; right?

11  A.  Yes.

12  Q.  Well, why don't we go back to the first page of Exhibit 35,

13  the very top.

14      This is the front page of your website again; right?

15  A.  Yes.

16  Q.  Is there a way that a customer could contact you by e-mail

17  on your website?

18  A.  Yes.

19  Q.  How would they do that?

20  A.  They can click to the Contact Us, in here, and then just

21  put your nickname and then the message you want, you know, you

22  want to tell me, what you need, and then I will answer them

23  through my e-mail.

24  Q.  So this Contact Us button was connected to your e-mail

25  accounts?

1  A.  Yes.

2  Q.  And what were the e-mail accounts that it was connected to?

3  A.  At -- I mean too many different times I changed too many

4  different e-mails, so the last time I used the e-mail account

5  is -- was wangsangpi@gmail.com.

6  Q.  Could you spell that for the court reporter.

7  A.  W-a-n-g-s-a-n-g-p-i at gmail.com.

8  Q.  So over time the e-mail that was linked to the Contact Us

9  would change?

10  A.  Yes.

11  Q.  But it would always go to your e-mail?

12  A.  Yes.

13  Q.  And whenever a customer clicked on Contact Us, you and no

14  one else would receive the e-mail?

15  A.  Only me.

16  Q.  Only you.  You mentioned that the last e-mail account that

17  was connected was Wang Sang Pi.

18  A.  Yes.

19  Q.  Would that have been the e-mail that was linked to the

20  website in December 2012 and January 2013?

21  A.  Yes.

22  Q.  Okay.  Now, in order to purchase the information that was

23  from Experian or Court Ventures, you couldn't e-mail you; is

24  that right?

25  A.  No.

1   Q.  You had to go through the website?

2   A.  Yes.

3   Q.  But you could buy fullz by e-mailing you?

4   A.  Yes.

5   Q.  Why would someone want to e-mail you to buy fullz?

6   A.  Because they want to filter fullz info.

7   Q.  Okay.  Can you explain to the jury what you mean by

8   filtering fullz info.

9   A.  Filtering fullz info mean like I want fullz information

10  from -- from the date of birth, for example, from 1992 through

11  1995, or you can filter -- if they want to filter like by the

12  states, like the only fullz information only from state Ohio.

13  Q.  Could you filter for things like job as well?

14  A.  Yes.

15  Q.  All right.  Now, this filtering function, was that

16  available through the website?

17  A.  No.

18  Q.  They had to e-mail you?

19  A.  Yes.

20  Q.  The cost of filtered fullz, was it different than the cost

21  of the fullz that was available through the website?

22  A.  Yes.

23  Q.  Which was -- what was more expensive?

24  A.  Filtered -- filtering in fullz info.

25  Q.  And why is it more expensive?

1    A.   Because I have to do by my hand.

2    Q.   It's manual?

3    A.   Manual.

4    Q.   Now regardless if you got an e-mail for fullz or if it went

5    through the website, where did you pull that information from?

6    A.   Through the fullz information text file from my computer.

7    Q.   And the information in the fullz text file on your

8    computer, was that the information that you acquired from

9    Devil?

10   A.   Yes.

11   Q.   Okay.  You mentioned that when a user would click on the

12   Contact Us you would receive an e-mail; is that correct?

13   A.   Yes.

14   Q.   Did the e-mail have a common form to it?

15   A.   Yes.

16   Q.   And what would be the components of that e-mail?  What

17   information would be in there when you received it?

18   A.   It had to be the user name and then the message.  And then

19   just click Send and then I will answer that after I got the

20   e-mail.

21   Q.   Would you be able to recognize an e-mail sent to you that

22   would have been generated as being -- as generated from your

23   website?

24   A.   Yes.

25   Q.   Okay.  And would anyone -- well, let me take that back.

1  Did anyone but you administer this website?

2  A.  No.

3  Q.  Did you have like people who helped program for you?

4  A.  Yeah, I have.

5  Q.  Did they have administration rights?

6  A.  No.

7  Q.  Only you had administration rights?

8  A.  Yes.

9  Q.  So any e-mail that came to you through the website, did

10  anyone but you look at it?

11  A.  No.

12  Q.  I mean prior to your arrest, obviously.

13  A.  Only me.

14        MR. SISTLA:  Only you.

15     Your Honor, I think this is a natural stopping point,

16  because we were going to turn to e-mails next.  And I believe

17  it's -- that clock is hard to read.  I think it's 12:30.

18        THE COURT:  All right, guys.  We're going to take a

19  break for approximately -- let's make it an hour and ten

20  minutes to give you some time to grab lunch and things like

21  that and get squared away since it's first day down here on

22  duty itself.

23     I'm going to ask you to wait in the back for a couple of

24  minutes so we can do three things.  Number one, I want you guys

25  to tell Ms. Crum if you're willing to work past 5:00 o'clock

1    tonight, and if so, how long.  Number two, if cutting you lose

2    tomorrow at 1:00 o'clock is okay so you can accomplish voting

3    and things like that, and we had talked about that last week.

4    Then the third thing is the marshals need just a couple of

5    moments to get Mr. Ngo off the floor.  So if you wouldn't mind

6    just waiting in back for about five minutes before you break

7    out for lunch, that would be great, because you saw how crowded

8    and small the hallway is.  Okay?

9         Barb, will you take care and take the responsibility with

10   the jury to get those two questions answered?

11             COURTROOM DEPUTY:  Yes.

12             THE COURT:  All right.  Now, guys, you've heard a lot

13   of stuff about Internet things, search terms, all that stuff.

14   No outside Internet searching on your own, no independent

15   investigation, no Googling, no checking.  And don't discuss the

16   case with anyone or let them discuss the case with you until we

17   get to the very end and I ask you to discuss it among each

18   other to reach a verdict.  Okay?

19        All right.  We'll see you guys in about an hour and ten

20   minutes.  Thank you.

21             COURTROOM DEPUTY:  Court is in recess for an hour and

22   ten minutes.

23        (Jury out at 12:28 PM.)

24        (Witness temporarily excused.)

25   <u>BEFORE THE COURT</u>

1           THE COURT:  Okay.  Thanks, guys.

2       Anything I need to know before we break?

3           MR. SISTLA:  Your Honor, just a couple of things on

4   timing.

5           THE COURT:  Yes.

6           MR. SISTLA:  Of course, I can't predict, but I think I

7   probably have about 45 minutes to an hour of questions to go

8   through the, to walk through the e-mails with Mr. Ngo.

9           THE COURT:  Okay.

10          MR. SISTLA:  To preview that for the Court.  And then

11  I'm going to wrap up with some of the circumstances of Mr.

12  Ngo's arrest.

13      So I guess we'll start back at about 1:40, it looks like?

14          THE COURT:  Yeah.  Well, why don't we try to get that

15  finished, take the afternoon break, and see what the cross

16  looks like.

17          MR. SISTLA:  Okay.

18      Your Honor, I know you mentioned going after 5:00.  We have

19  two more witnesses.  One is an IRS court witness.  Mr. Hunt

20  will handle the direct.  I believe it's about 45 minutes --

21          MR. HUNT:  To an hour.

22          MR. SISTLA:  -- to an hour on direct, and then we have

23  one of the bank account -- I'm sorry, the tax return victims

24  here to testify from New Mexico, and that should be a very

25  short direct.  So I think we'll have witnesses that can fill up

1  till the end of the day, Your Honor.

2          THE COURT:  Well, I've got a feeling it's going to

3  take longer than that, so --

4          MR. SISTLA:  Okay.

5          THE COURT:  All right.  So we're good.

6     Anything from you guys?

7          MR. ANDERSON:  Judge, Mr. Ealy has the option here of

8  conducting the cross of Mr. Ngo himself or having me do it.  I

9  don't know.  It would be beneficial, I think, for him to elect

10 what option he wants to pursue at this time just to give me an

11 indication of what my role is going to be going forward this

12 afternoon.

13         THE COURT:  Well, okay.  Here's the deal.  That's

14 between you two guys.  You guys work that out.

15    But I think, Mr. Ealy, if you want Tom to be involved in

16 this, you better tell him before we come back.  In other words,

17 you better tell him as soon as we break.  But I'll give you

18 guys a minute to talk about that.  You can do that.  But it's

19 one or the other; it's not both of you guys.  Okay?

20         MR. ANDERSON:  I understand.

21         MR. SISTLA:  Your Honor -- I'm sorry, I don't mean to

22 keep you from lunch -- one other issue we'd like to preview.

23 On Mr. Mathers' testimony we have a government exhibit, 1.17,

24 we've provided to the defense.  It's the summary for the

25 Exhibit 1, which is the hundred and 68 tax returns, I believe.

1    THE COURT:  Okay.

2    MR. SISTLA:  I just want to preview in case there's

3 any issues from the defense and you want to take care of it at

4 a break while the jury's out.

5    THE COURT:  Okay.

6    MR. SISTLA:  But copies have been provided to

7 everyone.

8    THE COURT:  All right.  We're good.

9    MR. SISTLA:  Thank you, Your Honor.

10    THE COURT:  All right.  Thanks, guys.

11    (At 12:32 pm, a luncheon recess was taken.)

12              - - -

13         AFTERNOON SESSION

14    (In open court at 1:45 PM, with jury present.)

15    (Hieu Minh Ngo resumes the witness stand.)

16    THE COURT:  Okay.  Guys, I understand that 4:30 is the

17 time you want to cut it off today.  Correct?

18    MEMBERS OF THE JURY:  (Nod heads up and down.)

19    THE COURT:  And then noon tomorrow; right?

20    A JUROR:  Correct.

21    THE COURT:  And do you guys want to keep with a 4:30

22 schedule, or do you want to try any days to go to 5:00?  You

23 guys think about that and let Barb know.  Okay?

24    MEMBERS OF THE JURY:  Okay.

25    THE COURT:  Otherwise we'll just go with the 4:30

1    stuff.

2        (The Court and courtroom deputy confer privately.)

3            THE COURT:  All right.  Mr. Sistla, will you please

4    continue with Mr. Ngo.

5            MR. SISTLA:  May I proceed, Your Honor?

6            THE COURT:  Yeah, of course.

7                    DIRECT EXAMINATION (Continued)

8    BY MR. SISTLA:

9    Q.  Good afternoon, Mr. Ngo.

10   A.  Good afternoon, sir.

11   Q.  Before lunch we were discussing the selling of fullz.  Do

12   you recall that?

13   A.  Yes.

14   Q.  And, Mr. Ngo, can I ask you a favor.  The jury is on the

15   other side of the room.  Can you talk into the microphone

16   directly so they can hear you.

17   A.  Yes.

18           MR. SISTLA:  Is that better, guys?

19           THE COURT:  That's better.

20           MR. SISTLA:  Okay.

21   Q.  And just to -- not to re-cover too much territory, but one

22   of the ways that you would sell the fullz information was

23   through e-mails; is that correct?

24   A.  Yes.

25   Q.  And in the time period that's of interest here, December

1   2012 and January 2013, what e-mail account would you use to

2   transact these fullz, to do the fullz transactions?

3   A.  Wangsangpi@gmail.com.

4   Q.  And that's an e-mail account that we discussed briefly

5   before the break; is that right?

6   A.  Yes.

7           MR. SISTLA:  And just to make sure, the court

8   reporter, you have the spelling of the e-mail account?

9           THE REPORTER:  Yes.

10  Q.  This e-mail account, did you open it up?

11  A.  Yes.

12  Q.  Did you have -- did anyone else have control, access or

13  control of the account?

14  A.  No.

15  Q.  Now, just to put a caveat on that question, that's true up

16  until the point you were arrested?

17  A.  Yes.

18  Q.  And after you were arrested in February 2013 who gained

19  access to the Wang Sang e-mail account?

20  A.  U.S. Secret Service.

21  Q.  And did you give them that access?

22  A.  Yes.

23  Q.  And that was part of your cooperation with the U.S.

24  government?

25  A.  Yes.

1  Q.  Okay.  But prior to you giving access to the Secret

2  Service, who would use the Wang Sang account?

3  A.  Only me.

4  Q.  Only you?

5  A.  Yes.

6  Q.  And would you ever designate someone to -- would you ever

7  designate anyone to send e-mails on your behalf?

8  A.  Only me.

9  Q.  Only you?

10  A.  Yes.

11  Q.  All right.  No one else could log into the account?

12  A.  No.

13  Q.  You didn't share the password with anyone?

14  A.  No.

15  Q.  Okay.  Now, you would use the Wang Sang account for

16  business to sell the fullz?

17  A.  Yes.

18  Q.  Would you use it for any other purposes, like to talk with

19  your girlfriend or your family?

20  A.  No.

21  Q.  It was a business-only account?

22  A.  Yes.

23  Q.  What would be the -- what e-mail account would you use if

24  you were to talk about personal stuff?

25  A.  Hieupc@gmail.com.

1  Q.  And so that hieupc@gmail.com, did you ever use that to sell

2  fullz in December 2012 and January 2013?

3  A.  No.

4  Q.  Only Wang Sang?

5  A.  Yes.

6  Q.  All right.  Now, the fullz themselves, you testified before

7  the break that you received them from this Devil person; right?

8  A.  Yes.

9  Q.  And the fullz, where are they?  They were in a text file?

10  A.  Yes.

11  Q.  Who had access to the text file?

12  A.  Just me.

13  Q.  Nobody else?

14  A.  No.

15  Q.  Not your sister --

16  A.  No.

17  Q.  -- or girlfriend?  Nobody else?

18  A.  Nobody else.

19  Q.  All right.  So if fullz were being sent from the Wang Sang

20  e-mail account to a customer, any customer, who would have sent

21  the e-mail?

22  A.  It's me.

23  Q.  It's you.  And in order to get the fullz from the text file

24  into an e-mail, what did you have to do?

25  A.  I have -- I have to copy and paste to the e-mail and then

 1  send to the customer.

 2  Q.  Did you ever, say, ask someone to do that for you?

 3  A.  Only me.

 4  Q.  Only you?

 5  A.  Yes.

 6  Q.  No one else ever had access to those fullz text file?

 7  A.  No.

 8  Q.  Or the Wang Sang e-mail?

 9  A.  No.

10       MR. SISTLA:  Okay.  Your Honor, we discussed this

11  briefly before the break.  The government is turning Exhibit

12  41.1 through 41.49 -- I've advised Mr. Anderson of the exhibits

13  we were going to go through.

14       THE COURT:  Right.  And then somebody else is going to

15  tie that up as the person that compiled the summary; is that

16  right?

17       MR. SISTLA:  It's not a summary.  They're the actual

18  e-mails.

19       THE COURT:  Oh, okay.

20       MR. SISTLA:  And they are all -- if I can make an

21  offer of proof to the Court.

22       THE COURT:  Sure.

23       MR. SISTLA:  They are all e-mails that were either

24  sent to the Wang Sang account or --

25       MR. ANDERSON:  Judge, if the government wants to offer

1    this as proof, can we do that at sidebar on the chance that the

2    witness' -- I believe the government's anticipating witness

3    testimony.  If this has to do with the authentication of these

4    e-mails with this particular witness, that's fine.  But if he's

5    going to make an offer of proof about where the e-mails came

6    from or how the government acquired those e-mails, I think

7    that's better left for the witnesses to do that themselves.

8         THE COURT:  Well, Mr. Sistla, can you lay the

9    foundation just with the witness in a few moments?  Is that

10   easy enough, or not?

11        MR. SISTLA:  I believe, Your Honor -- I believe the

12   foundation is this is this witness' e-mail account, and I am

13   now going to want to step through e-mails with the witness.

14        THE COURT:  Right.  But are these -- but can he just

15   thumb through them and say, yes, this is from my e-mail

16   account?

17        MR. SISTLA:  Absolutely, Your Honor.

18        THE COURT:  I mean, just like you did with the other

19   exhibits --

20        MR. SISTLA:  Sure.

21        THE COURT:  -- maybe just have him scroll through.

22        MR. ANDERSON:  That's fine.

23        MR. SISTLA:  Let me talk to the agent real quick.

24        THE COURT:  Yeah, sure.

25      (Mr. Sistla and Special Agent Turk confer privately.)

1          MR. SISTLA:  Your Honor, if I may approach the

2    witness.  Can the witness be given a copy of the book?  I think

3    it would go faster than flipping through the electronic copy.

4          THE COURT:  Absolutely.  Yeah, that would be great.

5          COURTROOM DEPUTY:  Do you know what book it's in?  And

6    I'll get it from the witness book over here.

7          MR. SISTLA:  Yes, Barbara.  It is in Book 11.  And

8    it's tab 41, Barbara.

9          THE COURT:  So, sir, if you would just take a moment,

10   flip through that and familiarize yourself with the material,

11   that would be helpful.

12   Q.  And, Mr. Ngo, starting with 41.1, just flip through to

13   41.49.  Don't say anything.  Just flip through and, when you're

14   done, let the Court and everyone know.

15   A.  (Complies with request.)

16       Yes.

17   Q.  You've had a chance to look at Exhibits 41.1 through 41.49?

18   A.  Yes.

19   Q.  And do you recognize those as e-mails either to or from the

20   Wang Sang at gmail.com account?

21   A.  Yes.

22   Q.  And that was the account that you were in control of during

23   the time period covered by these e-mails, December 25th, 2012,

24   through January 27th, 2013?

25   A.  Yes.

1          MR. SISTLA:  All right.  Your Honor, I believe we've

2    laid sufficient foundation.

3          THE COURT:  Any objection?

4          MR. ANDERSON:  No objection, Your Honor.

5          THE COURT:  It's admitted.

6          MR. SISTLA:  All right.  Your Honor, we would move to

7    admit 41.1 through 41.49.

8          THE COURT:  They're admitted and may be published to

9    the jury.

10      (Government Exhibit 41.1 through 41.49 was admitted.)

11         MR. SISTLA:  Actually, can you zoom in on the top of

12   the field.

13      And, Your Honor, just as a -- we're going to step through

14   them numerically, but it may cut off the exhibit sticker.

15         THE COURT:  Just make sure that when you're asking him

16   to look at something you say the exhibit number so Luke can

17   take it down for the record.

18         MR. SISTLA:  Absolutely, Your Honor.

19         THE COURT:  Okay.

20   Q.  Mr. Ngo, you have in front of you Government Exhibit 41.1.

21   Do you see that?

22   A.  Yes.

23   Q.  And it's zoomed in.  Do you see that?

24   A.  Yes.

25   Q.  Do you recognize -- do you recognize this e-mail?

1   A.   Yes.

2   Q.   And it was an e-mail sent to you?

3   A.   Yes.

4   Q.   How do you know that?

5   A.   Because this one from the online contact form from my

6   website.

7   Q.   And we talked a little bit about this before lunch, about

8   the online contact form.  How do you know this e-mail was from

9   your online contact form?

10  A.   Because it's from -- because it's the site I set up for my

11  online contact form.  So the user name, the IP address, and the

12  date and the time they send, and the message they want.  Yeah.

13  Q.   Now, of this information, what information would a customer

14  have inputted into the contact form?

15  A.   They submit to provider the user name and the e-mail and

16  then the message they want to send to me.

17  Q.   The message you want to send?

18  A.   Yeah.

19  Q.   And then the IP address, that was automatically generated?

20  A.   Yes.

21  Q.   And you recognize from the style and form that this would

22  have come through your website?

23  A.   Yes.

24  Q.   And this e-mail would have been generated by clicking on

25  the Contact Us?

1    A.  Yes.

2    Q.  That was at the top of your website that we looked at

3    earlier?

4    A.  Yes.

5            MR. SISTLA:  All right.  Can we go to Exhibit 41.2.

6            THE COURT:  Barb, can you get the lines off, please.

7        Thank you.

8            MR. SISTLA:  Oh.  Thank you, Barbara.

9    Q.  41.2, is this similar to Exhibit 41.1?

10   A.  Yes.

11   Q.  All right.  Now, this one has a subject line of "Filter."

12   Do you understand what filter means?

13   A.  I understand.

14   Q.  Can you explain that to the jury?

15   A.  Filter mean they want to filter the fullz info, so they

16   have to e-mail for me to filter the fullz information.

17   Q.  And, Mr. Ngo, it might help the jury.  Could you circle for

18   them where the subject line is on the e-mail.

19   A.  (Complies with request.)

20   Q.  Okay.  Now, again, at the bottom there's a message; right?

21   A.  Yes.

22   Q.  Who would have generated that message?

23   A.  This one from the online contact form from my website.

24   Q.  And you don't know who wrote that message other than they

25   have a user name of Lance; right?  Is that correct?

1  A.  I don't know.  I just know they are my customer.

2  Q.  Okay.  And they are a customer with a user name of Lance;

3  right?

4  A.  Yes.

5  Q.  And the e-mail associated with that user name is

6  lanceealy123@yahoo.com?

7  A.  Yes.

8  Q.  Just to be fair, you don't know who is the person behind

9  the lanceealy123@yahoo.com account?

10  A.  I don't know.

11      MR. SISTLA:  You don't know, okay.

12    All right.  Can we go to Exhibit 41.3.

13    And can the jury see that okay?

14      MEMBERS OF THE JURY:  (Nod heads up and down.)

15      MR. SISTLA:  This e-mail is from the same day as the

16  prior e-mail:  January 12th.  And we're looking at Exhibit

17  41.3, for the record, Your Honor.

18  Q.  Was this an e-mail you sent?

19  A.  Yes.

20  Q.  How can you recognize that you sent the e-mail?

21  A.  Because this is -- I usually send e-mail very simple.  I

22  answer very simple answer, and I say -- he asked for the

23  filtering the fullz info, so I say price is 50 cent per info.

24  Q.  You wrote "per info"?

25  A.  Yeah.

1  Q.  Does "per info" mean the same thing as "per fullz"?

2  A.  Yes.

3  Q.  No difference?

4  A.  No difference.

5  Q.  And in this wangsangpi@gmail.com account, is this the kind

6  of typical communication you would have with the customer?

7  A.  Yes.

8  Q.  Would you have personal communications with the customer?

9  A.  No.

10  Q.  Never?

11  A.  Never.

12  Q.  All business?

13  A.  All business.

14  Q.  Is that one of the ways you can recognize that you sent the

15  e-mail?

16  A.  Yes.

17  Q.  Can we go to Exhibit 41.4.  Now, we've looked at a couple

18  of e-mails that look like this, Exhibits 41.2 and 41.1; don't

19  you agree?

20  A.  Yes.

21  Q.  Would this e-mail have been generated by your -- from your

22  website?

23  A.  Yes.

24  Q.  And, again, how can you tell that?

25  A.  Because it's the style from the online contact form from my

1  website, from the user name, IP address and the date, they say

2  in the message they want to send to me.

3  Q.  Okay.  If someone wanted to buy 100 fullz, do you know what

4  that means?

5  A.  Yes.

6  Q.  And if they indicate they want from a specific birth year

7  of 1980 to 1986 -- or, I'm sorry, 1996, would you understand

8  what that meant?

9  A.  Yes.

10 Q.  No questions?

11 A.  No question.

12 Q.  This message, all the messages we're looking at here,

13 they're coming from lanceealy123@yahoo.com.  Would you agree?

14 A.  Yes.

15 Q.  Would you receive messages of this nature from other e-mail

16 addresses?

17 A.  Can you explain it?

18 Q.  Sure.  Do you want me to say it again?

19 A.  Yes, please.

20 Q.  Whenever a customer, let's say, with a different e-mail

21 address used your website, would you get a similar type of

22 e-mail?

23 A.  Yes.

24 Q.  And would you -- and so that's how you recognized this as

25 coming from your website?

1  A.  Yes.

2        MR. SISTLA:  All right.  I think that's it.  We can go

3  on to the next exhibit.

4     Let the record reflect we're looking at Government Exhibit

5  41.5.

6  Q.  This e-mail is from you; is that right?

7  A.  Yes.

8  Q.  And we can tell this by looking at the From line?

9  A.  Yes.

10 Q.  That's your e-mail?

11 A.  Yes.

12 Q.  Can I ask, how did you pick Wang Sang?

13 A.  It's because I want to hide my information.  That's why

14 I -- before I tell other hackers I sold my website to a Chinese

15 guy, a Chinese hacker.  That's why I used the name Wang Sang,

16 sound like Chinese, Chinese names.  That's why I used Wang

17 Sang.

18 Q.  Wang Sang is not a Vietnamese name?

19 A.  No.

20 Q.  All right.  And in this e-mail again we see a similar line

21 as before:  Point five per one info.  Is that the price again?

22 A.  Yes.

23 Q.  Was the price ever different?

24 A.  Sometime.

25 Q.  Why would the price have changed?

1    A.   It would depend on how -- I mean, how the info I give.

2    Like is more value, I mean, it consider -- I consider is very

3    great information, maybe I give one dollar for one info, but

4    usually only 50 cent for one info.

5    Q.   So if someone was requesting filtered fullz, it was usually

6    50 cents?

7    A.   Yes.

8    Q.   Now, we talked about this in the morning.  There's a

9    reference to LR.  What is LR?

10   A.   LR means Liberty Reserves.

11   Q.   And when you wrote that, you understood what you were

12   writing?

13   A.   Yes.

14   Q.   Okay.  Now there's a number after it.  I guess it's a

15   seven-digit number:  U8109093.  What is that number?

16   A.   It's my Liberty Reserve account number.

17   Q.   Hieu Minh Ngo's Liberty Reserve account?

18   A.   Yes.

19   Q.   Did anyone else have access to that Liberty Reserve account

20   in January 2013?

21   A.   Only me.

22        MR. SISTLA:  Only you.

23   Can we go to the next e-mail, please.  It would be

24   Government Exhibit 41.6.

25   Q.   Who is this e-mail to?

1   A.  It's mine.

2   Q.  It's an e-mail you received?

3   A.  Yes.

4   Q.  And again it's from the same e-mail we've been talking

5   about:  lanceealy123@yahoo.com?

6   A.  Yes.

7   Q.  The writer says, wrote "25 LR."  Would you understand what

8   that meant?

9   A.  Yes.

10  Q.  What does it mean, would you tell the jury?

11  A.  This mean him or her who just send $25 Liberty Reserve to

12  my account and then recheck my account.

13  Q.  Is that what "Please check memo" means?

14  A.  Yes.

15  Q.  How would you confirm that money actually got sent to your

16  Liberty Reserve account?

17  A.  Usually I check my account after I got the e-mail from the

18  customer, and then to make sure I got the money.  Yeah.

19  Q.  Would you ever send fullz to someone before you received

20  money?

21  A.  No.

22  Q.  First money, then fullz?

23  A.  Yes.

24          MR. SISTLA:  Let's turn to the next exhibit please,

25  Exhibit 41.8.  I'm sorry.  41.7.

1      Is it missing?

2      All right.  Well, Your Honor, we'll just skip to 41.8.  I

3   apologize.

4           THE COURT:  That's okay.

5           MR. SISTLA:  It looks like it didn't get loaded into

6   Sanctions.

7           THE COURT:  If it's in the book, they could publish

8   it, couldn't they, Barb?

9           MR. SISTLA:  Sure.

10          THE COURT:  Well, you guys do what you want to do.

11          MR. SISTLA:  Give me one second.

12      (Mr. Sistla and Special Agents Bierman and Turk confer

13   privately.)

14          MR. SISTLA:  I'm sorry, Your Honor.  We do have 41.7

15   in the Sanctions.

16  Q.  Is this an e-mail that you received?

17  A.  Yes.

18  Q.  Again, would anyone else have seen this e-mail, aside from

19  you, at this time?

20  A.  Only me.

21  Q.  Only you.  And what is the sender request indicating to

22  you?

23  A.  The e-mail address is lanceealy123@yahoo.com.

24  Q.  And what does the content of the e-mail tell you?  Does it

25  tell you to do anything?

1  A.  It's the same e-mail before, because he -- I mean him or

2  her -- can't keep patient.  That's why he keep sending the

3  e-mail again, that $25 Liberty Reserve to my account.  Then he

4  need to filter from the date of birth 1985 to 1996 as soon as

5  possible.

6  Q.  This kind of request to filter between birth dates, was

7  that an unusual request?

8  A.  Yes.

9  Q.  It was unusual?

10 A.  No, this is normal.

11 Q.  This is normal?

12 A.  Yeah.

13 Q.  So when you receive a message like this, is there any

14 confusion on your end what to do?

15 A.  No.

16        MR. SISTLA:  Okay.  Now we can turn to Government

17 Exhibit 41.8.

18 Q.  Who sent this e-mail?

19 A.  It's me.

20 Q.  And I understand that we've zoomed in, but Exhibit 41.8 is

21 a five-page e-mail.  And what does this e-mail contain, Mr.

22 Ngo?

23 A.  This contain the fullz information.

24 Q.  And how do you know this is fullz information?

25 A.  Because it's from my text file, and then I can recognize

1  this because it contain the fullz information I tell you before

2  by order, like first name, last name, middle name, e-mail, the

3  password.

4  Q.  Okay.  Why don't we take the line that indicates "58980."

5  Do you see that?

6  A.  Yes.

7        MR. SISTLA:  Okay.  That's the very top line, ladies

8  and gentlemen of the jury, on the exhibit.

9  Q.  Why don't you walk through with the jury what's in this

10 line.  There's a number 487590.  What would that information

11 reflect?

12 A.  It's just a random number.

13 Q.  Just a random number?

14 A.  Yes.

15 Q.  All right.  What about October 6th?

16 A.  It's just a day.  Sometime I make it up.

17 Q.  Okay.  And then there's a name:  Kimberly Barton Diane.

18 What are those names?

19 A.  These are the first name, last name, and middle name.

20 Q.  Okay.  And then there's an e-mail address.  Would that be

21 the e-mail associated with that name?

22 A.  Yes.

23 Q.  And then there's an "I love him 21."  What is that?

24 A.  These are the password, the e-mail password.

25 Q.  And then there's a -- if we go to the next line, there's an

1  address 2164 Sunchon, S-u-n-c-h-o-n, Road, Apartment B.   What

2  is that address?

3  A.   This is the address of this person.

4  Q.   And then the rest of it, the city, state and zip code?

5  A.   Yes.

6  Q.   All right.  And then there's a phone number.  Whose phone

7  number is that?

8  A.   This the Kimberly phone number.

9  Q.   Okay.  And then there's a date of birth, is that what that

10 is, 12/2/85?

11 A.   Yes.

12 Q.   And then on the third line there's a number that starts

13 with 592.  What would that number be?

14 A.   It's the social security number.

15 Q.   And what's the number to the right of it?

16 A.   It's the driver's license.

17 Q.   Okay.  And what is -- there's lower case initials:  usaa.

18 What would that be?

19 A.   It mean the bank name.

20 Q.   The name of the bank?

21 A.   Yeah.

22 Q.   And then there's a series of numbers to the right of it

23 that are -- the term is delimited.  They're divided by lines.

24 What are those numbers?

25 A.   It could be checking account number and routing account

1  number.

2  Q.  For the benefit of the jury, could you underline the two

3  numbers we've just referred to on the screen.

4  A.  (Complies with request.)

5  Q.  And those are the bank account and the routing numbers?

6  A.  Yes.

7  Q.  And then there's an "MFC," what is that, next to it on the

8  right?

9  A.  This mean her job or his job.

10  Q.  Okay.  And then there's a period of time to the right.

11  What is that?

12  A.  This mean how long she -- or I mean her or him -- have been

13  working in this, in the job.

14  Q.  Now, the fullz that we're looking at and that we just went

15  through one example, these are the fullz that you received from

16  Devil?

17  A.  Yes.

18  Q.  Okay.  And the line 58980, if we were to walk through every

19  single fullz, would it look similar to that?

20  A.  Yes.

21       MR. SISTLA:  Okay.  You can zoom out now.

22  Now can you --

23  I'm sorry.  Barbara, can you -- oh, thank you.

24  Can you flip through all five pages slowly.

25  Q.  Now, this is just a continuation of the fullz you sent?

1  A.  Yes.

2          MR. SISTLA:  The next page.

3  Q.  The same thing, continuation of the fullz?

4  A.  Yes.

5          MR. SISTLA:  Next page.

6  Q.  The same thing, Mr. Ngo, more fullz, part of the fullz,

7  this fullz e-mail?

8  A.  Yes.

9          MR. SISTLA:  The next page.

10 Q.  And that's the end of them?

11 A.  Yes.

12 Q.  Aside from sending the fullz to the lanceealy123@yahoo.com

13 account, would you put any information about the fullz or just

14 send the fullz?

15 A.  Just send the fullz.

16 Q.  Just business?

17 A.  Yes.

18         MR. SISTLA:  Let's turn to the next exhibit.  Now

19 let's scroll to the -- yeah.

20 Q.  Government Exhibit 41.9, that's an e-mail in response to

21 the fullz e-mail you just sent?

22 A.  Yes.

23 Q.  And you know this because it was sent to your e-mail

24 account?

25 A.  Yes.

1  Q.  Did you understand what this request is?

2  A.  Yes.

3  Q.  What's the request?

4  A.  This person, he -- I mean him or her -- need more fullz

5  filter for the date of birth 1993.

6           MR. SISTLA:  Okay.  Let's go to Government Exhibit

7  41.10.

8  Q.  Was that your response?

9  A.  Yes.

10 Q.  Is this a typical response?

11 A.  Yes.

12 Q.  And if you received more money, what would you do?

13 A.  I send the fullz info.

14          MR. SISTLA:  Let's turn to Exhibit 41.11.

15 Q.  This is an e-mail all from the same day:  January 12, 2013.

16 It's an e-mail you would have received?

17 A.  Yes.

18 Q.  I know we've been through this before, but only you would

19 have seen and read this e-mail; right?

20 A.  Yes.

21 Q.  What do you understand this e-mail to convey?

22 A.  Yes.

23 Q.  No, no.  What information does it convey?

24 A.  Oh.  Yeah.  Him or her who have sent for me another $20

25 Liberty Reserve to my account for the fullz filter for the date

1    of birth 1994.

2    Q.   And so since it's 50 cents per info --

3    A.   Yes.

4    Q.   -- you get two infos per dollar?

5    A.   Yes.

6    Q.   So this would be for 40 fullz, then?

7    A.   40 fullz.

8         MR. SISTLA:   Let's turn to Exhibit 41.12.

9    Q.   Is this e-mail a separate payment of 20 Liberty Reserve or

10   the same one?

11   A.   It's the same one.

12   Q.   How do you know it's the same one?

13   A.   Because this person asked me again did I receive the money

14   he just, him or her, just send for me.

15   Q.   Why were you delayed sending him the money?

16   A.   Because sometime I was lazy or I was doing something or I

17   was sleeping.

18   Q.   Okay.  The time on this e-mail is, what, 5:59 in the

19   morning; right?

20   A.   Yes.

21   Q.   Do you think you were asleep then maybe?

22   A.   I think so.

23         MR. SISTLA:   Let's turn to Exhibit 41.13.

24   Q.   Now, this is similar.  This is an e-mail sent from you on

25   January 12, 2013; correct?

1  A.  Yes.

2  Q.  About 6:40 in the morning?

3  A.  Yes.

4  Q.  I'm sorry.  6:39 in the morning.  I apologize.  And 41.13,

5  is this similar to the fullz e-mail we looked at a couple of

6  exhibits ago?

7  A.  Yes.

8  Q.  Is there anything contained in this e-mail other than

9  fullz?

10  A.  Only fullz.

11  Q.  You don't -- you wouldn't write "Good luck" or anything

12  like that?

13  A.  No.

14          MR. SISTLA:  Okay.  And just for the record, Exhibit

15  41.13 is a five-page e-mail, Your Honor.

16          THE COURT:  I'm just wondering if we're going to have

17  to redact some of the personal identifiers before the jury gets

18  it at the end.

19          MR. SISTLA:  Your Honor --

20          THE COURT:  You don't have to answer that question

21  now.  I'm just thinking.

22          MR. SISTLA:  Oh, okay.  I wasn't sure it was directed

23  to me.

24          THE COURT:  No.  I'm just thinking we may have to

25  redact some of the personal IDs.

1        MR. SISTLA:  Certainly, Your Honor.

2        THE COURT:  Okay.

3        MR. SISTLA:  Can we go to Exhibit 41.14.  I'm sorry.

4   Q.  Mr. Ngo, do you need a sip of water or anything?

5   A.  No, I'm good.  Thank you.

6   Q.  Now we're looking at another e-mail again from January 12.

7   Was this sent to you?

8   A.  Yes.

9   Q.  And this is in response to the fullz you just sent?

10  A.  Yes.

11  Q.  What's the request here?

12  A.  This person requests for another fullz filter for the date

13  of birth 1996.

14  Q.  Do you know what the abbreviation "ASAP" stands for?

15  A.  I understand.

16  Q.  What does it stand for?

17  A.  This mean as soon as possible.  He need -- him or her need

18  immediately.

19  Q.  And all this correspondence is from the

20  lanceealy123@yahoo.com account; correct?

21  A.  Yes.

22  Q.  All right.  In order to generate this e-mail correspondence

23  would a person have to keep going to your website and clicking

24  on, or could they just start e-mailing you back and forth?

25  A.  Yes, they just keep going, e-mail to me back and forwards.

1  They don't need to go to my website again.

2  Q.  Would the wangsangpi@gmail.com e-mail, would you receive

3  e-mails even if the person sending it was in the U.S.?

4  A.  From anywhere in the world.

5  Q.  Your e-mail account could receive e-mails from anywhere in

6  the world?

7  A.  Yes.

8  Q.  Your e-mail account didn't block certain e-mail addresses?

9  A.  No.

10  Q.  So you had customers in the U.S.?

11  A.  Yes.

12          MR. SISTLA:  All right.  Let's turn to Government

13  Exhibit 41.15.

14  Q.  Was this an e-mail from you?

15  A.  Yes.

16  Q.  And what are you conveying by this e-mail?

17  A.  And then I say I just have the filter for info less than

18  the date of birth 1994.

19  Q.  And you agree that this e-mail is a continuation of the

20  string that we've looked at over the last couple of e-mails;

21  correct?

22  A.  Yes.

23  Q.  The bottom e-mail is the fullz you originally sent out?

24  A.  Yes.

25  Q.  Then you received a request?

1  A.  Yes.

2  Q.  And then you responded?

3  A.  Yes.

4  Q.  And I'm sorry to ask this again, but could anyone else have

5  sent this e-mail other than you?

6  A.  Only me.

7          MR. SISTLA:  Let's turn to Exhibit 41.16.  Again, for

8  the record, Your Honor, these are multipage e-mails, but we're

9  just focused on the first page.

10          THE COURT:  Sure.

11  Q.  You received a response to your e-mail?

12  A.  Yes.

13  Q.  Did you understand the response?

14  A.  Yes.

15  Q.  It's from lanceealy123@yahoo.com?

16  A.  Yes.

17  Q.  What's the request?

18  A.  This person requests more fullz info by the date of birth

19  1994.

20  Q.  Okay.  Now, what we've seen here is we've seen a lot of

21  back and forth e-mails in the same chain.  Was this kind of

22  e-mail correspondence common between you and your customers for

23  filtered fullz?

24  A.  Yes.

25  Q.  Nothing unusual going on here?

1  A.  No.

2         MR. SISTLA:  Let's turn to Government Exhibit 41.17.

3  Q.  I understand this is similar to what we've seen before.  Do

4  you understand the request here?

5  A.  Yes.

6  Q.  What does "29 LR" mean?

7  A.  This mean this person just send for me another 29 Liberty

8  Reserve to my account.

9  Q.  And what's an LR batch?

10  A.  This mean Liberty Reserve's genesis and number.  So I can

11  use this number to search in my account history so I'm

12  actual -- I got money.

13  Q.  Now, is the term fullz "info filter" common in your

14  correspondence with your customers?

15  A.  Yes.

16  Q.  All right.  And what about the fact that there's a batch

17  number in there?  Was that a typical occurrence?

18  A.  Yes.

19  Q.  It was.  It made it easier for you to find that the payment

20  had been made?

21  A.  Yes.

22         MR. SISTLA:  So if we turn to Government Exhibit

23  41.18.

24  Q.  This is similar to the previous fullz exhibits we've looked

25  at; is that correct?

1   A.  Yes.

2   Q.  And again, is this in response to a payment?

3   A.  Yes.

4   Q.  And this is in response to the user of the

5   lanceealy123@yahoo.com account sending you 29 LR?

6   A.  Yes.

7   Q.  All right.  Again, no other correspondence in there, just

8   the fullz; correct?

9   A.  Yes.

10          MR. SISTLA:  All right.  Let's turn to Government

11  Exhibit 41.19.

12  Q.  Now, this e-mail is a little bit different; correct?

13  A.  Yes.

14  Q.  Can you explain what this e-mail is conveying?

15  A.  Oh, this e-mail mention about the time I was -- I have

16  another new database service with the TLO company, and that's

17  why I e-mail my customer, to let them know I have a new

18  service.

19  Q.  And why would the lanceealy123@yahoo.com receive this

20  e-mail?

21  A.  Because this person was one of my customer from my customer

22  list.

23  Q.  And in order to be on the customer list did the person who

24  used this e-mail account have to register on your website?

25  A.  Yes.

1    Q.   Okay.   Now, it's true that they didn't have to necessarily

2    buy anything on the website, just register?

3    A.   Yes.

4         MR. SISTLA:   The next government exhibit.

5    Q.   Now we've skipped ahead.   We're up to January 23rd.   Would

6    you agree that this is similar to the previous request you

7    received from this e-mail address?

8    A.   Yes.

9    Q.   This is a request for filtered fullz?

10   A.   Yes.

11   Q.   And again, what e-mail address is it from?

12   A.   It's from lanceealy123@yahoo.com.

13   Q.   And now we've jumped ahead from January 12 to January 23rd,

14   2013.   Were you still in control of the wangsangpi@gmail.com

15   account on this day?

16   A.   Yes.

17        MR. SISTLA:   All right.   Let's turn to Government

18   Exhibit 41.21.

19   Q.   And your response here, does that mirror your earlier

20   responses?

21   A.   Yes.

22   Q.   What are you conveying through this e-mail?

23   A.   I answer I have the info filter for the date of birth 1993,

24   with the price be 50 cent per one info.

25   Q.   So there's nothing special about this filtering?   That's

1   why it was 50 cents?

2   A.  Yes.

3           MR. SISTLA:  All right.  Let's turn to Government

4   Exhibit 41.22.

5   Q.  This is an e-mail you received; correct?

6   A.  Yes.

7   Q.  What is the request here?

8   A.  This person ask me do I have access to a nursing home

9   database.

10  Q.  Did you understand the request?

11  A.  Yes.

12  Q.  And you agree that this e-mail was sent also on January

13  23rd; correct?

14  A.  Yes.

15  Q.  Just a couple of minutes after, or a minute or two after

16  your initial response about it's 50 cents per info?

17  A.  Yes.

18  Q.  And your response is just below that; correct?

19  A.  Yes.

20  Q.  All right.  Did you have a nursing home -- did you have

21  access to a nursing home database?

22  A.  No.

23          MR. SISTLA:  Let's turn to Government Exhibit 41.23.

24  Q.  What did you tell the lanceealy123@yahoo.com account?

25  A.  I lie to this person I have, but I didn't have it.

1   Q.  Why did you lie?

2   A.  Because I can create the info by zone very easy.

3   Q.  So you could create fake info?

4   A.  Yes.

5   Q.  Had you done that before?

6   A.  Yes.

7   Q.  Is that -- why would you create fake info?

8   A.  Just so more money.

9        MR. SISTLA:  Okay.  Turn to Government Exhibit 41.24.

10  Q.  Now, in response to your what we now know is a lie, what

11  did you understand this response to be?

12  A.  This person respond this person needs 20 fullz from nursing

13  home patients in the state of Ohio and from the date of birth

14  from 1940 to 1960.

15  Q.  Would you agree that the request here is for more than one

16  filter?

17  A.  Yes, it's more than one filter.

18  Q.  In fact, it's a filter for nursing home patients?

19  A.  Yes.

20  Q.  A filter for the state of Ohio?

21  A.  Yes.

22  Q.  And a filter for the date of birth?

23  A.  Yes.

24  Q.  So we're talking about three filters here?

25  A.  Yes.

1    Q.  And you responded to this e-mail; correct?

2    A.  Yes.

3           MR. SISTLA:  All right.  Let's turn to Government

4    Exhibit 41.25.

5    Q.  This is an e-mail sent on January 23rd, 2013, about five

6    minutes after the prior e-mail we just looked at; correct?

7    A.  Yes.

8    Q.  And how did you respond?

9    A.  I respond I filter only one filter at a time, and for 50

10   cent per one info.

11   Q.  So you don't do this kind of multifiltering?

12   A.  I can do it, but I don't -- I mean, at that time I think I

13   make easy on something like that, or I might not do it.

14   Q.  So whether you could do it or not, in this case you told

15   the person you weren't going to do it?

16   A.  No.

17          MR. SISTLA:  Let's turn to Government Exhibit 41.26.

18   Q.  Now, this is a response you received on the same day;

19   correct?

20   A.  Yes.

21   Q.  And this is in response to your e-mail that you only do one

22   filter?

23   A.  Yes.

24   Q.  And was this a request for only one filter?

25   A.  No.

1   Q.  How many filters are there here?

2   A.  Three.

3   Q.  Again:  nursing home, state, and a date of birth?

4   A.  Yes.

5   Q.  Okay.  And you weren't going to do that filtering; correct?

6   A.  No.

7            MR. SISTLA:  Let's turn to Government Exhibit 41.27.

8   Q.  And this is an e-mail sent again that same day, January

9   23rd, just in response; correct?

10  A.  Yes.

11  Q.  What are you conveying?

12  A.  And then I told this person again I just filter only one

13  filter at a time.

14  Q.  And all the correspondence we've been going over, this is

15  with the lanceealy123@yahoo.com account?

16  A.  Yes.

17           MR. SISTLA:  Let's turn to Exhibit 41.28.

18  Q.  And you got a response back to your one filter; correct?

19  A.  Yes.

20  Q.  Were you able to do -- what did you understand this

21  response -- request to be?

22  A.  Yes.

23  Q.  No.  What did you understand it to be?

24  A.  This person need to filter the fullz, eight nursing home

25  patients info.

1  Q.  And that you were able to do?

2  A.  Yes.

3          MR. SISTLA:  Okay.  Let's turn to Government Exhibit

4  41.29.

5  Q.  Now, we've seen this number before; correct?

6  A.  Yes.

7  Q.  And that's what, again?

8  A.  Oh.  It's my Liberty Reserve account number.

9  Q.  And again you're saying how much it cost; is that correct?

10 A.  Yes.

11 Q.  50 cents still?

12 A.  Yes.

13 Q.  And this e-mail was sent, again, on January 23rd in

14 response to the prior correspondence we've talked about?

15 A.  Yes.

16 Q.  To lanceealy123@yahoo.com?

17 A.  Yes.

18         MR. SISTLA:  Let's turn to Government Exhibit 41.30.

19 Q.  A similar type of e-mail we've seen before; correct?

20 A.  Yes.

21 Q.  Did you understand what is meant by:  I've sent 4 LR?

22 A.  Yes.

23 Q.  What does that mean?

24 A.  This mean this person just send for me four dollar Liberty

25 Reserve to my account.

1  Q.  And four dollar Liberty Reserve would get you eight fullz?

2  A.  Yes.

3  Q.  And that's what the request was for, eight fullz; correct?

4  A.  Yes.

5          MR. SISTLA:  Let's turn to Government Exhibit 41.31.

6  Q.  Are these the eight fullz you sent?

7  A.  Yes.

8  Q.  And this is the alleged nursing filter?

9  A.  Yes.

10 Q.  I'm sorry.  Nursing home filter; correct?

11 A.  Yes.

12 Q.  And you agree that the e-mail was sent on January 23rd

13 shortly after you received the e-mail about the 4 LR?

14 A.  Yes.

15 Q.  Did you send this e-mail?

16 A.  Yes.

17 Q.  Nobody else?

18 A.  No.

19         MR. SISTLA:  Okay.  Let's turn to Government Exhibit

20 41.32.

21 Q.  Is this another request from the lanceealy123@yahoo.com

22 account?

23 A.  Yes.

24 Q.  And is this a request for filtered fullz again?

25 A.  Yes.

1   Q.  And what is the filtered -- what kind of filter does the

2   person want this time?

3   A.  This person, he want to filter the fullz who don't have a

4   job or who already retired.

5   Q.  I understand.  Now, English isn't your first language;

6   right?

7   A.  Yes.

8   Q.  But were you able to understand what this request was?

9   A.  Yes.

10  Q.  Had you received similar type requests?

11  A.  Yes.

12  Q.  Not just from lanceealy123@yahoo.com but from other e-mail

13  addresses; right?

14  A.  Sure.

15  Q.  And that's how you understood what this meant?

16  A.  Yes.

17  Q.  And at this point in January 2013 how long had you been

18  selling fullz through e-mail?

19  A.  Just about the time I opened the website, from 2010 until

20  2013.

21  Q.  So two to three years?

22  A.  Yeah.

23  Q.  Okay.  So at this point you had seen lots of different

24  types of requests for fullz?

25  A.  Yes.

1   Q.  And lots of different types of requests for filters,

2   different types of filters?

3   A.  Yes.

4   Q.  And even though English wasn't your first language, you

5   could understand these requests generally?

6   A.  Yes.

7           MR. SISTLA:  Okay.  Let's turn to Government Exhibit

8   41.33.

9   Q.  And is this your response?

10  A.  Yes.

11  Q.  Was it true?  Did you have retired people?

12  A.  Yes.

13  Q.  Okay.  And that response was sent on the same day:  January

14  23rd, 2013?

15  A.  Yes.

16  Q.  Although you mentioned earlier that sometimes you were lazy

17  and didn't respond right away --

18  A.  Yes.

19  Q.  -- did you try to respond usually pretty quickly?

20  A.  Yes.

21  Q.  Why would you do that?

22  A.  Because I try to get more customer, and so they can trust

23  me and send me more money.

24  Q.  Did you think it was good business to respond as quickly as

25  possible?

1   A.  Yes.

2   Q.  Did you have a loyal customer base?

3   A.  Only me.

4   Q.  No, no.  Were your customers loyal?  Did you get the same

5   requests over and over from the same e-mail addresses?

6   A.  Yes.

7        MR. SISTLA:  Let's turn to Government Exhibit 41.34.

8   Let the record reflect we're looking at another e-mail from

9   January 23rd of 2013.

10  Q.  This was an e-mail sent to you; correct?

11  A.  Yes.

12  Q.  It would have been received in your e-mail account?

13  A.  Yes.

14  Q.  Do you understand what the request is for?

15  A.  This person need 30 retired persons for the fullz info.

16  Q.  And if you look down the e-mail, this is a continuation of

17  the chain we've just walked through; is that correct?

18  A.  Yes.

19  Q.  Any confusion on your part what the request is for?

20  A.  No.

21        MR. SISTLA:  Okay.  Let's turn to Government Exhibit

22  41.35.

23  Q.  Is this the payment for the LR for the retired persons?

24  A.  Yes.

25  Q.  And 15 LR would be what you would have to pay for 30 fullz;

1  correct?

2  A.  Yes.

3  Q.  Okay.  And once you received the payment, would you then

4  send the fullz?

5  A.  Yes.

6          MR. SISTLA:  All right.  Let's turn to the next

7  e-mail.

8      One second.

9  Q.  Government Exhibit 41.35, this e-mail is at 1:55 AM;

10 correct?

11 A.  Yes.

12         MR. SISTLA:  Let's turn to the next e-mail.

13 Q.  This is another e-mail at 2:29 AM on the same day, 1/23,

14 and this is sent to you; correct?

15 A.  Yes.

16 Q.  And it says, "I sent 15 LR."  Do you understand what that

17 meant?

18 A.  I understand.

19 Q.  Is this an additional 15 LR or the same 15 LR?

20 A.  The same.

21 Q.  The same.  Why hadn't you sent lanceealy123@yahoo.com the

22 fullz yet?

23 A.  Maybe at this time I was sleeping or I was doing something.

24         MR. SISTLA:  All right.  Well, let's turn to

25 Government Exhibit 41.37.

1  Q.  Was this the fullz that you sent in response to the payment

2  of 15 LR?

3  A.  Yes.

4  Q.  And I guess you sent that about 7:00 o'clock, so a few

5  hours later?

6  A.  Yes.

7  Q.  Okay.  Again, would there be any other content in this

8  e-mail other than fullz?

9  A.  Only fullz.

10         MR. SISTLA:  All right.  I just want to focus on one

11  in particular.  Let's go to the second item down, line 53583,

12  Special Agent.

13  Q.  Do you see that?

14  A.  Yes.

15  Q.  The individual here is Maudie Patton; correct?

16  A.  Can you repeat that?

17  Q.  The individual's name here is Maudie Patton; correct?

18  A.  Yes.

19  Q.  Do you know Maudie Patton?

20  A.  No.

21  Q.  Did she give you permission to sell this information?

22  A.  No.

23  Q.  Did she give permission for any of your customers to use

24  this information?

25  A.  No.

1    Q.  How did you get this information, again?

2    A.  From Devil.

3    Q.  Okay.  Did you know that selling this information was

4    illegal?

5    A.  Yes.

6    Q.  Were you aware that this personal information could be used

7    to commit fraud?

8    A.  Yes.

9    Q.  What kind of fraud could be committed with this kind of

10   personal information?

11   A.  The first time I saw this information, I think this

12   information they can use to open bank account or open credit

13   card or they can use to make a bank loan.  I mean --

14       And then -- and then they can use the e-mail accounts to

15   log into their e-mail account.  And then also they can use --

16   and after that I found out with this information they can use

17   to do the tax refund.

18   Q.  Did you ever do any of that kind of thing?

19   A.  No.

20   Q.  Did you ever file false tax returns from Vietnam?

21   A.  No.

22   Q.  Open bank accounts?

23   A.  No.

24   Q.  What would you do with this information, just sell it?

25   A.  I just sell it.

1  Q.  But when you sold it, did you know it could be used for

2  fraudulent activities?

3  A.  Yes.

4  Q.  Is that why it was valuable?

5  A.  Yes.

6          MR. SISTLA:  Okay.  Let's go on to Government Exhibit

7  41.38.

8  Q.  This is an e-mail a couple of days later on January 25th.

9  Do you agree?

10  A.  Yes.

11  Q.  And what is this a request for?

12  A.  Oh, this person, he need more filtered fullz info, about 40

13  fullz info that are on social security.

14  Q.  Okay.  And on January 25th, we're now a couple of days

15  later, were you still in control of this e-mail account?

16  A.  Yes.

17          MR. SISTLA:  And let's go to the next exhibit,

18  Government Exhibit 41.39.

19  Q.  Is this similar to the e-mail we just looked at in 41.38?

20  A.  Yes.

21  Q.  What's the difference?

22  A.  The difference is he need, him or her need the fullz info

23  immediately, as soon as possible.

24  Q.  Because you know what ASAP means; right?

25  A.  Yes.

1   Q.  And that e-mail was sent on the same day, January 25th,

2   2013; correct?

3   A.  Yes.

4           MR. SISTLA:  All right.  Let's turn to Government

5   Exhibit 41.40.

6   Q.  Now, this is in response to Government Exhibit 41.39 we

7   just looked at; correct?

8   A.  Yes.

9   Q.  This is your response?

10  A.  Yes.

11  Q.  And you would have been the one who wrote it?

12  A.  Yes.

13  Q.  Is it fair to say -- did you understand what the request

14  was for?

15  A.  Yes.

16  Q.  What did you understand the request to be, then?

17  A.  Actually, I thought he -- I thought him or her need 40

18  fullz info filtered by the social security number, so I just

19  ask him again to make sure I got the right answer.

20  Q.  Why does this search cost one dollar?

21  A.  Because search by the social security number has been very,

22  very -- I mean very special, and I have to do by my hand a lot.

23  So that's why it cost one dollar for one -- for one search.

24  Q.  It took one dollar for one search or one dollar for one

25  info?

1   A.  For one search.

2          MR. SISTLA:  All right.  Let's go to Government

3   Exhibit 41.41.

4   Q.  Now, was this in response to your e-mail?

5   A.  Yes.

6   Q.  And what is this e-mail conveying?

7   A.  And this person, him or her, say need me to purchase the

8   fullz info with a specific job, need to filter by the job.

9   Q.  Are you able to do that?

10  A.  Yes.

11         MR. SISTLA:  All right.  Let's turn to Government

12  Exhibit -- oh, one second.

13  Q.  That e-mail is on January 26th, so it's continuing from the

14  prior correspondence; correct?

15  A.  Yes.

16         MR. SISTLA:  Let's turn to Government Exhibit 41.42.

17  Q.  And you just told the ladies and gentlemen of the jury you

18  could do that.  And what is in Government Exhibit 41.42?

19  A.  Yes.

20  Q.  That's your response?

21  A.  Yes.

22  Q.  And why does this one cost only 50 cents but the other one

23  cost a dollar?

24  A.  Because this one easier, and I get very quick.  So it just

25  cost 50 dollar -- 50 cent for one info.

1      MR. SISTLA:  All right.  Let's turn to Government
2  Exhibit 41.43.
3  Q.  That e-mail is dated January 27th, and it's in response to
4  the e-mail we just discussed; correct?
5  A.  Yes.
6  Q.  Do you understand what the request here is?
7  A.  Yes.
8  Q.  Is this another filtered fullz request?
9  A.  Yes.
10  Q.  And what was the request specifically?
11  A.  This was a need 40 fullz info filtered by the date of birth
12  1993.
13  Q.  And you agree that the person who sent this e-mail was
14  operating the lanceealy123@yahoo.com account?
15  A.  Yes.
16      MR. SISTLA:  Let's turn to Government Exhibit 41.44.
17  Q.  Was this -- what does this e-mail mean?
18  A.  This mean this person just send for me another 20 dollar
19  Liberty Reserve to my account for the fullz info by the date of
20  birth.
21  Q.  And this was sent on January 27th; correct?
22  A.  Yeah.
23  Q.  And this e-mail is similar to the other types of e-mail
24  that we've looked at earlier in which the
25  lanceealy123@yahoo.com user has told you that he or she has

1    paid for the fullz; correct?

2    A.  Yes.

3    Q.  And whenever you received payment, what would you then do

4    in response?

5    A.  I send the fullz to that person.

6           MR. SISTLA:  All right.  So let's take a look at

7    Government Exhibit 41.45.

8        One moment, Your Honor.  I apologize.

9           THE COURT:  Sure.

10       (Mr. Sistla and Special Agent Bierman confer privately.)

11   Q.  Mr. Ngo, could you take a look at 41.45 in your exhibit

12   book.  It looks like the files have not been loaded into

13   Sanctions.  Can you flip to 41.45.

14   A.  Yes.

15   Q.  Are you there?

16   A.  (Nods head up and down.)

17          MR. SISTLA:  Your Honor, I'm not sure how we can -- I

18   don't know if we can give an exhibit book to the jury.

19          THE COURT:  No, but you've got a visualizer there.

20       Don't they, Barb?

21       COURTROOM DEPUTY:  Yes, they do.

22          THE COURT:  Can you set it up for them?

23          MR. SISTLA:  I'm sorry, Barbara.

24       COURTROOM DEPUTY:  You should have a visualizer here.

25          MR. SISTLA:  Oh, do I?

 1        (Courtroom deputy assists Mr. Sistla.)

 2             THE COURT:  And, Barb, you've got to switch the system

 3    over; right?

 4             COURTROOM DEPUTY:  Uh-huh.

 5             THE COURT:  Yeah.  Hang on a second, guys.  We'll be

 6    with you in a second.

 7             MR. SISTLA:  Huh.  Very good.

 8        Can everyone see that on the jury?

 9             COURTROOM DEPUTY:  And at the top of the light there

10    should be a wheel up there that you can zoom.

11             MEMBERS OF THE JURY:  (Nod heads up and down.)

12             MR. SISTLA:  Very fancy.

13             COURTROOM DEPUTY:  It should auto focus, though.  You

14    just have to touch the wheel.

15             MR. SISTLA:  My copy looks in focus.  Do your copies

16    look in focus?

17             MEMBERS OF THE JURY:  (Nod heads up and down.)

18             MR. SISTLA:  Okay.  I apologize for the delay, Your

19    Honor.

20             THE COURT:  That's all right.

21    Q.  Mr. Ngo, are you at that exhibit, Government Exhibit 41.45?

22    A.  Yes.

23    Q.  And what is this?

24    A.  This is the filtered fullz for -- it's for the money he

25    just pay for me.

1  Q.  Okay.  And that was in response to the payment we just

2  looked at?

3  A.  Yes.

4        MR. SISTLA:  Okay.  Let's -- hopefully the next

5  exhibit is there.

6        SPECIAL AGENT BIERMAN:  It is.

7        MR. SISTLA:  Barbara, how --

8        COURTROOM DEPUTY:  You can just leave that.  I'll just

9  switch it back over to you.

10        MR. SISTLA:  Okay.

11     41.46, isn't it?

12     Okay.  We have that one, Barbara.

13  Q.  We're now at Government Exhibit 41.46, an e-mail dated

14  January 27, 2013.  This is an e-mail sent to you, Mr. Ngo?

15  A.  Yes.

16  Q.  And this is in response to your -- the fullz e-mail that we

17  just looked at dated the same day?

18  A.  Yes.

19  Q.  What is this a request for?

20  A.  This person need 40 fullz info, filter retired persons.

21  Q.  Okay.  And, now, there's also a text here that says "Sent

22  from Samsung Mobile."  Have you ever seen that on an e-mail?

23  A.  Can you repeat that again, please.

24  Q.  There's a text that says "Sent from Samsung Mobile."  Maybe

25  Mr. Bierman can zoom in.

1          THE COURT:  You can circle it too.

2          MR. SISTLA:  Oh, I can?

3          THE COURT:  I think your screen works.

4     Doesn't it, Barb?

5          COURTROOM DEPUTY:  Yes.

6   Q.  Do you see that?

7   A.  Yes.

8   Q.  Have you ever seen that on an e-mail?

9   A.  Yes.

10  Q.  What does that mean?

11  A.  It means sent from smartphone.

12         MR. SISTLA:  Okay.  Thank you.

13    Let's turn to Exhibit 41.47.

14  Q.  And again, the user of the lanceealy123@yahoo.com made a

15  request.

16  A.  Yes.

17  Q.  And how did you respond?

18  A.  I respond 50 cent per one info.

19  Q.  And as we've seen through all these e-mails, just a

20  business response; correct?

21  A.  Yes.

22  Q.  Would you have this kind of response with other customers

23  who would make repeated requests for fullz?

24  A.  Yes.

25  Q.  Thank you.  Let's now turn to Government Exhibit 41.48.

1       Does this e-mail indicate payment from the

2   lanceealy123@yahoo.com?

3   A.  Yes.

4   Q.  And that e-mail was sent on January 27th, 2013?

5   A.  Yes.

6   Q.  And after you received payment, what would you do?

7   A.  I send them the fullz info.

8   Q.  And you agree that the rest of this string just follows

9   from the previous exhibits we looked at; correct?

10  A.  Yes.

11          MR. SISTLA:  All right.  Now let's turn to Government

12  Exhibit 41.49.

13      I'm sorry, Barbara.

14      Can everyone see that?

15          MEMBERS OF THE JURY:  (Nod heads up and down.)

16  Q.  Do you have Exhibit 41.49 in front of you, Mr. Ngo, in the

17  book, or can you see it on the screen?

18  A.  Yes.

19  Q.  The first page.  Okay.  And this is, again, a multipage

20  e-mail.  What are we looking at here?

21  A.  It's the filtered fullz info from retired persons.

22  Q.  Okay.  And you sent that because you received payment?

23  A.  Yes.

24  Q.  Now, the date of this e-mail is January 27th, 2013;

25  correct?

1   A.  Yes.

2   Q.  And you were still in control of the wangsangpi@gmail.com

3   account on that day?

4   A.  Yes.

5   Q.  Shortly thereafter you would lose control of the account;

6   correct?

7   A.  Yes.

8   Q.  What happened after January 27th, or a week or two later?

9   A.  I got arrested in Guam.

10  Q.  Why did you get arrested?

11  A.  Because some guy -- after TLO, they shut down the account.

12  And then I was so -- you know, was so stressed.  And then I --

13  and then some guy named Mack, I mean, I don't know who is it,

14  but he came to talk to me, to e-mail to me.  And he tried to

15  set me up to work and to do business with him.  That's why me

16  and my sister came over there to sign a business contract.  But

17  it was -- it wasn't -- it was not a business.  It's just a

18  trap.  And then I fall in -- I fell in the trap and I got

19  arrested.

20  Q.  And just to make sure I understand, you said you fell in a

21  trap?

22  A.  Yeah.

23  Q.  And the trap resulted in you being arrested?

24  A.  Yes.

25  Q.  Who arrested you?

1  A.  U.S. Secret Service.

2  Q.  And you were in Guam when you got arrested?

3  A.  Yes.

4  Q.  After you were arrested, what happen next?

5  A.  My account, my e-mail account turned over to U.S. Secret

6  Service.

7  Q.  And let's just be real specific.  When you say e-mail

8  account, was it the Wang Sang Pi account we were talking about?

9  A.  Yes.

10 Q.  Did you turn over any other e-mail accounts to Secret

11 Service?

12 A.  Yes.

13 Q.  All of your e-mail accounts?

14 A.  Yes.

15 Q.  Why would you do that?

16 A.  Because I don't want to go to jail, and then I want -- I

17 mean, I admitted I did something wrong.  That's why I volunteer

18 to help the U.S. government.  And then hopefully I can go home

19 soon.  Yeah.

20 Q.  Now, all the activities we've talked about this morning and

21 I guess this afternoon with you, the selling of the fullz and

22 the operation of the website, did you do that on your own, or

23 did you work with others?

24 A.  I just do it by my own.

25 Q.  You didn't work with any other family members?

1    A.   No.

2    Q.   Did you work with anyone at Experian?

3    A.   No.

4    Q.   Anyone at Court Ventures?

5    A.   No.

6    Q.   Anyone at TLO?

7    A.   No.

8    Q.   So you didn't work with anyone, agree with anyone in any of

9    those companies to do this or set up this website?

10   A.   Only me.

11   Q.   Only you.  And what about the fullz?  Did you work with

12   anyone to sell the fullz?

13   A.   Only me.  I sell to the website and through the e-mail.

14   Q.   And even though Devil gave you the fullz --

15   A.   Yes.

16   Q.   -- did you pay him back?  I mean, every time you sold a

17   fullz did he make any money off of it?

18   A.   No.

19   Q.   It was only you making the money?

20   A.   Yes.

21   Q.   Did you work with any of your customers to, you know, sell

22   fullz?

23   A.   No.

24   Q.   Just you?

25   A.   Yes.

1   Q.  So you don't know who Lance Ealy is; is that right?

2   A.  No.

3   Q.  You just know an e-mail address and that that e-mail

4   address was associated with a customer?

5   A.  Yes.

6           MR. SISTLA:  Okay.  Can I have one moment, Your Honor?

7           THE COURT:  Yeah, of course.

8       (Mr. Sistla and Special Agents Bierman and Turk confer

9   privately.)

10          MR. SISTLA:  Your Honor, that concludes my direct

11  examination of Mr. Ngo.

12          THE COURT:  Okay.  Thank you.

13      I've got an idea, guys.  Before we do cross-examination,

14  why don't we give that table a couple of minutes to get their

15  notes organized.  We'll come back in about ten minutes and go

16  till 4:30 and stop there for the day.  Does that found fair

17  enough?

18          MEMBERS OF THE JURY:  (Nod heads up and down.)

19          THE COURT:  Okay.  Let's take about a ten-minute

20  recess, then.  Don't form or express any opinion about the

21  case.  Don't discuss the case with anyone or let them discuss

22  it with you.  No independent outside research.  And don't visit

23  any of the sites, locations, or any of the Internet stuff we've

24  been talking about.

25      And do you guys mind waiting in the back for this one.  Is

1  that okay?

2          MEMBERS OF THE JURY:  That's fine.

3          THE COURT:  So we keep it shorter.  Is that all right?

4  Thank you.

5          COURTROOM DEPUTY:  Court is in recess for ten minutes.

6      (Jury out at 2:48 PM.)

7      (Recess taken:  2:49 PM - 3:00 PM.)

8  <u>AFTER RECESS & BEFORE THE COURT</u>

9          MR. ANDERSON:  Your Honor, before the jury comes in,

10  Lance would like to put something on record.  And I believe

11  he's decided the course of action with respect to the cross-

12  examination.

13          THE COURT:  Okay.  Are you ready, Luke?

14          THE REPORTER:  Yes.

15          THE COURT:  All right, Mr. Ealy.  Put on the record

16  whatever you want to put on the record.

17          THE DEFENDANT:  Yeah.  I just wanted to make it be on

18  the record that there's a pending Bar complaint against Tom

19  Anderson, but due to the circumstances, I'm inexperienced, I'm

20  going to have to let him take over the cross-examination.  But

21  I just wanted to put on record that there's a Bar complaint

22  against Tom Anderson and technically he's disqualified from

23  representing me, but I have no choice but to have him

24  cross-examine him.

25          THE COURT:  Does that mean you want him to cross-

1    examine this witness?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Mr. Anderson, are you able to do that?

4            MR. ANDERSON:  Your Honor, I have not seen the Bar

5    complaint.

6            THE COURT:  No, I'm not talking about --

7            MR. ANDERSON:  But I am prepared to conduct the cross-

8    examination.

9            THE COURT:  All right.  That's fine.

10           COURTROOM DEPUTY:  Ready?

11           THE COURT:  No.  Give Tom a second to get set up.

12       (The courtroom deputy and Mr. Anderson confer privately.)

13           MR. SISTLA:  Your Honor, may I raise just a scheduling

14   question for the Court?

15           THE COURT:  Sure.

16           MR. SISTLA:  Tomorrow we have a number of out-of-state

17   witnesses coming in.  They're custodial witnesses.  They're the

18   Google, Yahoo!, Facebook folks from the West Coast, along with

19   a bank rep from the West Coast.

20           THE COURT:  Uh-huh.

21           MR. SISTLA:  Given that the Court has indicated it

22   wants to break at 12:30 --

23           THE COURT:  12:00 actually, because on our calendar

24   when we were doing the *voir dire* we actually had noon because

25   of Election Day.

1          MR. SISTLA:  Okay.

2          THE COURT:  And one of the jurors, relying on our

3     calendar, has scheduled stuff, so --

4          MR. SISTLA:  So that's a hard noon, then, tomorrow?

5          THE COURT:  Yeah.

6          MR. SISTLA:  Does the Court anticipate taking a mid-

7     morning break even tomorrow, then?

8          THE COURT:  Understanding your situation, if we did,

9     we'd make it really short, like just a bathroom, a five-, ten-

10    minute bathroom break --

11         MR. SISTLA:  Okay.

12         THE COURT:  -- and come right back.

13         MR. SISTLA:  All right.  I just --

14         THE COURT:  I know.

15         MR. SISTLA:  They've been advised that there is some

16    chance that they could be held over, but, you know, I'd rather

17    give them a day's notice if possible.  I didn't appreciate it

18    was going to be a hard noon.  We thought we might have a

19    little --

20         THE COURT:  I didn't either.  But when Barb went back

21    and asked, they reminded us that that's what we had on the

22    calendar and they made plans.  So it's my mistake, guys, but

23    we're stuck at noon.

24         MR. SISTLA:  Sure.

25       One thing, then, Your Honor.  I don't know if I can work

1   out with Mr. Anderson and Mr. Ealy after court today, but maybe

2   we can reach agreement on sort of business records and I can

3   just jump to the factual questions I want and that will go

4   faster too, maybe something you can consider.

5            MR. ANDERSON:  I'll be happy to discuss that.

6            THE COURT:  Yeah, you guys can also talk.

7            MR. SISTLA:  We'll let the Court know by noon

8   tomorrow.

9            THE COURT:  Tom, are you ready to go?

10           MR. ANDERSON:  I am, Your Honor.

11           THE COURT:  Okay.

12           COURTROOM DEPUTY:  All rise for the jury.  This court

13  is now in session pursuant to the recess.

14      (Jury in at 3:05 PM.)

15           COURTROOM DEPUTY:  Please be seated.

16           THE COURT:  Cross-examine, please.

17           MR. ANDERSON:  Thank you.

18                      CROSS-EXAMINATION

19  BY MR. ANDERSON:

20  Q.  Mr. Ngo, my name is Tom Anderson.  I'm with the federal

21  public defender's office.  I'm standby counsel to Mr. Ealy.

22      I'm going to ask you some questions.  Obviously, you've

23  been through a lot of direct examination.  You understand

24  English.  If I talk too fast or if you need the interpreter,

25  she's available.  Okay?

1   A.  All right.

2   Q.  I'd like to jump right in to the e-mails, the exhibits that

3   the government just showed.  Those are all e-mails either to or

4   from wangsangpi@gmail.com; correct?

5   A.  Yes.

6   Q.  And those are all either from or to an e-mail address

7   lanceealy123@yahoo.com; correct?

8   A.  Yes.

9   Q.  And you've gone through the past hour or so, and you've

10  indicated that you recognize those e-mails; correct?

11  A.  Yes.

12  Q.  Now, obviously, you don't recall specifically authoring

13  those e-mails; is that correct?

14  A.  What, the --

15  Q.  The specific e-mails.

16  A.  Can you explain that a little bit?

17  Q.  Well, you were sending -- I believe you testified that you

18  had thousands of customers on your website.

19  A.  Yes.

20  Q.  Some of those customers accessed the database that hooked

21  in to a lot of other companies' database of U.S. citizens;

22  correct?

23  A.  Hmm --

24  Q.  Some of your customers would access your website to get

25  access to the database that you either hacked into or you had a

1   phony arrangement with; is that correct?

2   A.   Yes.

3   Q.   And other customers just wanted to purchase fullz; is that

4   correct?

5   A.   Yes.

6   Q.   And we've talked about what fullz are; is that correct?

7   A.   Yes.

8   Q.   And you've testified that you got all of those fullz from

9   an unknown person who you believe has the nickname of Devil; is

10  that right?

11  A.   Yes.

12  Q.   Okay.  So it's fair to say that you came into possession of

13  these fullz based on trading with Devil your expertise in

14  hacking; is that right?

15  A.   Yes.

16  Q.   You didn't pay him money for these fullz; is that right?

17  A.   No.

18  Q.   And you never met Devil?

19  A.   Never.

20  Q.   And how many fullz did you get from Devil?

21  A.   About 200- to 300,000 fullz information.

22  Q.   200- to 300,000 fullz?

23  A.   Yeah.

24  Q.   Okay.  Now, as you testified today, you don't know whether

25  Devil gave those same 200- or 300,000 fullz to other hackers;

1  correct?

2  A.  Yes.

3  Q.  He probably did; correct?

4  A.  Yes.

5  Q.  And he certainly didn't delete those fullz once he gave

6  them to you; correct?

7  A.  Yes.  I don't know about that.

8  Q.  But in the world in which you were operating, you wouldn't

9  expect a hacker named Devil to just trade the fullz to one

10 person and never try to take advantage of them again; correct?

11 A.  Yes.

12 Q.  You certainly didn't do that, did you?

13 A.  Yeah.  Me, I resell to lots of people.

14 Q.  You sure did.  You resold fullz to anybody who asked and

15 had a Liberty Reserve account; is that right?

16 A.  Yes.

17 Q.  And that could have been 13-, 1400 people?

18 A.  Yes.

19       MR. ANDERSON:  And if I could have the government put

20 on Exhibit 41.37.

21    This is an exhibit, I believe it's in front of you, that's

22 been admitted.

23    Can everybody in the jury see this specific --

24       MEMBERS OF THE JURY:  Yes.

25 Q.  This is an example, is it not, of an e-mail from Wang Sang

1  Pi to lanceealy123@yahoo where you comply with the request to

2  send fullz?  Is that right?

3  A.  Yes.

4  Q.  And specifically I believe the government directed your

5  attention to one in particular that I've circled.  That is an

6  example of a fullz that you would have gotten from Devil;

7  correct?

8  A.  Yes.

9  Q.  And you have no idea how many times Devil traded or sold or

10 what Devil did with that particular fullz; is that right?

11 A.  Yes.

12 Q.  You don't know how he got that fullz?

13 A.  No.

14 Q.  You don't know if he used it to file an income tax?

15 A.  No.

16 Q.  You don't know if he sold that to somebody else to have

17 them file an income tax; is that correct?

18 A.  I don't know.

19 Q.  So this is just one example of a fullz that you would have

20 sold to one of your customers; right?

21 A.  Yes.

22 Q.  And on that fullz there is an e-mail address; correct?

23 A.  Yes.

24 Q.  It says:  maudiepatton@yahoo.com?

25 A.  Yes.

1  Q.  And next to that there is:  1-2-3-4-j-e-r-i-a-h; correct?

2  A.  Yes.

3  Q.  That's the password to that e-mail account?

4  A.  Yes.

5  Q.  Now, when you began direct your testimony the government

6  was very clear to make sure that you were the person who

7  operated wangsangpi@gmail.com.  Do you recall that?

8  A.  Yes.

9  Q.  They must have asked you ten times whether or not you were

10  the person who would have authored an e-mail from

11  wangsangpi@gmail.com; correct?

12  A.  Yes.

13  Q.  Now, if someone -- if Devil were to sell a fullz to me that

14  had Hieu Minh Ngo's name, wangsangpi@gmail.com and then

15  whatever your password was for wangsangpi@gmail.com, that would

16  be very comparable to a fullz; is that correct?

17  A.  I mean, this e-mail just belong to me and only me.

18  Q.  I understand that.  My question to you, though, is when you

19  got on wangsangpi@gmail.com --

20  A.  Yes.

21  Q.  -- and you logged in to use that account --

22  A.  Yes.

23  Q.  -- did you have to use a password?

24  A.  Yes.

25  Q.  If I had the information just wangsangpi@gmail.com and your

1  password, the password that you used, I could access that

2  e-mail account, couldn't I?

3  A.  Yes.

4  Q.  And I could send an e-mail from anywhere in the world, and

5  I could make sure that nobody could trace from where that

6  e-mail came from by using a proxy server, or I believe you

7  testified someone with little or no experience could use a VPN

8  to send that e-mail from Dayton, Ohio, but mask it to look like

9  it was sent from Venezuela; is that correct?

10  A.  Yes.

11  Q.  So when you say no one else had access to

12  wangsangpi@gmail.com but me, you're assuming that yours wasn't

13  a fullz that Demon had for sale; is that correct?

14  A.  Could you again a little bit for me, please.

15  Q.  Well, when you say that you were the only person that

16  controlled wangsangpi@gmail.com, you can't be completely sure

17  about that, could you?  Because your information --

18  A.  Yes.

19  Q.  -- all that's needed is wangsangpi@gmail and a password?

20  A.  Yes.

21  Q.  Not even a name necessarily --

22  A.  No.

23  Q.  -- associated with that; correct?

24  A.  Yes.

25  Q.  Okay.  So you don't know whether Demon had a fullz that had

1    that information on it, do you?

2    A.  Yes.

3    Q.  Okay.  Likewise, the e-mail address lanceealy123@yahoo.com,

4    we've been talking about that e-mail a lot --

5    A.  Yes.

6    Q.  Okay.  -- when you say you received an e-mail from

7    lanceealy123@yahoo.com, you have no idea who sent that e-mail,

8    do you?

9    A.  I have one idea is my customer.

10   Q.  It's one of your customers, obviously.

11   A.  Yeah.

12   Q.  But who that person is, you don't know?

13   A.  No.

14   Q.  You don't care?

15   A.  I don't care.

16   Q.  In fact, you kept referring to "he or she" because you

17   don't know if the person who was sending those e-mails, your

18   customer, were male or female?

19   A.  Yes.

20   Q.  So in fact, with this fullz that I have circled, if

21   somebody had this information, right, they could contact you

22   from your website?

23   A.  Yes.

24   Q.  And it could be maudiepatton@yahoo.com.  And Maudie Patton

25   could say, "I want 50 fullz and I have a Liberty Reserve

1   account," and you would -- if they paid, you'd send those

2   fullz; right?

3   A.   Yes.

4   Q.   Now, you wouldn't know that that's Maudie Patton?

5   A.   I don't know.

6   Q.   And it would be completely easy for somebody to use

7   maudiepatton@yahoo.com to act as one of your customers?

8   A.   Yes.

9   Q.   Very easy for them to do that.  In fact, it's more likely

10  that somebody who is buying this type of information would want

11  to use maudiepatton@yahoo.com in case somewhere down the line

12  those e-mails were presented in federal court; correct?

13  A.   Yes.

14  Q.   Because it would look like those e-mails were coming from

15  maudiepatton@yahoo.com?

16  A.   Yes.

17  Q.   That would be something that could be done very easily with

18  these fullz.

19  A.   Yes.

20  Q.   Correct?

21  A.   Yes.

22  Q.   And you have no idea whether in those 200- to 300,000 fullz

23  that Devil gave you, you have no idea whether one of those

24  fullz had an e-mail address and password of

25  lanceealy123@yahoo.com; is that correct?

1  A.  I have no idea.

2  Q.  And you had 200- or 300,000 fullz from Devil; correct?

3  A.  Yes.

4  Q.  Obviously, this is probably a rhetorical question, but you

5  don't know how many fullz are floating around in cyberspace, do

6  you?

7  A.  Yes.

8  Q.  Yes, you do, or no, you don't know?

9  A.  Can you explain that a little bit, please?

10  Q.  Obviously there's more than 2- or 300,000 fullz that you

11  got from Devil available on the Internet for sale; is that

12  correct?

13  A.  Yeah.  I got that.

14  Q.  Okay.  In fact, before you used wangsangpi@gmail, you had

15  another e-mail address that you used to communicate with your

16  customers; is that correct?

17  A.  Yes.

18  Q.  Specifically, that e-mail address was rr2518@gmail.com?

19  A.  Yes.

20  Q.  Do you recognize that e-mail address?

21  A.  Yes.

22  Q.  When you were using that e-mail address you were also

23  communicating with customers; correct?

24  A.  Just about business.

25  Q.  Just about business?

1    A.   Yes.

2    Q.   But it was about the business of your website that you were

3    running; correct?

4    A.   Yes.

5    Q.   And people would e-mail that account.  Okay?  And they

6    would ask you about what you had for sale or how to access the

7    databases; is that correct?

8    A.   Yes.

9    Q.   And they would ask for fullz out of that account; right?

10   A.   Yes.

11   Q.   Okay.  Now, the government asked you why you used Wang Sang

12   Pi as your e-mail account when dealing with the customers that

13   pertain to the lanceealy123; correct?  And you said you did

14   that because Wang Sang was the name or nickname of a real

15   person; correct?

16   A.   No, he's not a real person.

17   Q.   He's not a real person?

18   A.   No.

19   Q.   Okay.  You had mentioned something, and correct me if I'm

20   wrong, that at least Wang Sang sounded Chinese, or it didn't

21   sound Vietnamese; is that right?

22   A.   Yes.

23   Q.   You did that on purpose; right?

24   A.   Yes.

25   Q.   And the reason you did that was because you didn't want to

1  have Hieu Minh Ngo from Vietnam at gmail.com; correct?

2  A.  Yes.

3  Q.  That way if anybody had questions about who was sending

4  these fullz, you could say it must be somebody from China;

5  correct?

6  A.  Yes.

7  Q.  And, in fact, when you were sending e-mails from

8  wangsangpi@gmail.com, you were able to hide or conceal where

9  you were when you were sending those e-mails; is that right?

10 A.  Yes.

11 Q.  And you did that, didn't you?

12 A.  Sometime.

13 Q.  Sometimes you did?

14 A.  Yes.

15 Q.  And the reason you did that sometimes is, obviously,

16 because you were afraid you could get caught?

17 A.  Yes.

18 Q.  Were you able to actually make it look like the e-mails

19 were sent from a specific location?

20 A.  Yes.  I can fake the IP address.

21 Q.  You can fake the IP address?

22 A.  (Nods head up and down.)

23 Q.  And you did that often, didn't you?

24 A.  Yes.

25 Q.  That's not difficult to do, is it?

1    A.  Yes.

2    Q.  Yes, it is difficult, or no, it's not difficult?

3          INTERPRETER LIU:  May the interpreter say something?

4    In our language, negative questions will have the opposite

5    response.

6          MR. ANDERSON:  Okay.

7          INTERPRETER LIU:  So if you ask a negative question,

8    when he agrees with you, he can say yes, that's not true.

9          MR. ANDERSON:  That's going to kill the art of cross-

10   examination.  It's very difficult.

11         INTERPRETER LIU:  I just want to clarify.

12         MR. ANDERSON:  Please.  Thank you.

13         INTERPRETER LIU:  I just want to clarify that.  So

14   negative questions will always ask for a positive statement

15   after the answer instead of just yes/no.

16         MR. ANDERSON:  Okay.  Could I have the last question

17   read back?

18         THE COURT:  Yes.

19      (Record read.)

20         MR. ANDERSON:  Thank you.

21         THE COURT:  So, yes, it's not difficult.

22   Q.  It was not difficult for you to send an e-mail and mask the

23   IP address that it was sent from?

24   A.  Yes.

25   Q.  And you did that on a number of occasions for the very

 1  purpose of throwing off somebody down the road if

 2  wangsangpi@gmail was being investigated?

 3  A.  Yes.

 4  Q.  I asked you about rr2518@gmail.com.

 5  A.  Yes.

 6  Q.  And you've acknowledged that you did use that e-mail --

 7  A.  Yes.

 8  Q.  -- prior to wangsangpi, dot, com.

 9  A.  Yes.

10  Q.  And, in fact, Mr. Ngo, that e-mail, rr2518@gmail.com, that

11  used to belong to another person?

12  A.  Yes.

13  Q.  And that other person was another Chinese hacker?

14  A.  Yes.

15  Q.  And, in fact, you were in business with him at one time or

16  another?

17  A.  Yes.

18  Q.  And what was the nature of that business?

19  A.  It's he was one of my security men to secure the server

20  system.

21  Q.  Okay.

22  A.  But after that he got into a car accident and he die.

23  Q.  Okay.  So at the time that you let this Chinese hacker --

24      Do you know his name?

25  A.  I don't know his real name, just nickname.

1  Q.  What was that nickname?

2  A.  Lou.

3  Q.  Did he have any others?

4  A.  I don't -- actually, I don't really remember.  I remember

5  his name Lou.

6  Q.  Was his nickname Wang?

7  A.  Wang, yeah.  Wang and Lou, yeah.

8  Q.  Lou or Wang, is that what you remember?

9  A.  Yeah.

10  Q.  So the Wang Sang e-mail, that had nothing to do with this

11  other Chinese hacker, his nickname being Wang?

12  A.  Yes.

13  Q.  I think I asked that the wrong way.  I had asked you before

14  if you used Wang Sang to mimic or pretend to be somebody else.

15  A.  Yes.

16  Q.  And you said you did not.

17  A.  Yes, I didn't.

18  Q.  You didn't.  But now we're talking about an e-mail that you

19  used before Wang Sang Pi.

20  A.  Yes.

21  Q.  And that e-mail belonged to a real Chinese hacker with the

22  nickname of Wang?

23  A.  Yes.

24  Q.  But that had no bearing in you deciding to start a new

25  e-mail address and call it Wang Sang Pi?  That's your

1  testimony?

2  A.  Yeah.  I just created, you know, by his name, you know, but

3  not his real name.  I don't know the Chinese name look like, so

4  I just borrow that and then make up another last name, first

5  name.

6  Q.  You borrowed -- well, you knew there was a Chinese hacker

7  named Wang.

8  A.  Yes.

9  Q.  So you thought, Well, hey, I don't want anybody to find me,

10  so I'll use wangsangpi@gmail.com?

11  A.  Yes.

12  Q.  And you testified that he was dead at this point?

13  A.  Yes.

14  Q.  He died in a car accident; is that right?

15  A.  Yes.

16  Q.  And you knew he was deceased?

17  A.  He dead.

18  Q.  Okay.  And you made the effort then to change the e-mail

19  address that you would use to sell fullz or communicate with

20  your customers to the name of this dead Chinese hacker at

21  gmail.com?

22  A.  Yes.

23  Q.  Now, before he died he had an e-mail address that we

24  discussed before, and that e-mail address was rr2518@gmail.com?

25  A.  Yes.

1  Q.  And that was his e-mail account?

2  A.  Yes.

3  Q.  And he had a password for that e-mail account?

4  A.  Yes.

5  Q.  And when he was using that e-mail you didn't know the

6  password; right?

7  A.  I know.

8  Q.  You knew the password?

9  A.  Yes.

10  Q.  Okay.  And when he died, because you knew his e-mail

11  account name, user name --

12  A.  Yes.

13  Q.  -- and his password, you were then able to take over his

14  online identity.

15  A.  Yes.

16  Q.  Correct?

17  A.  Yes.

18  Q.  You were able to communicate with your customers using this

19  dead guy's e-mail and password?

20  A.  Yes.

21  Q.  Because that's all you need to write an e-mail, is

22  somebody's e-mail and password?

23  A.  Yes.

24  Q.  And you were also in the business of selling 2- or 300,000

25  e-mails and passwords as part of these fullz?

1   A.   Yes.

2   Q.   Directing your attention back to 41, Exhibit 41.37, the

3   government asked you if you knew when you sold these fullz that

4   they would be used for unlawful purposes.

5   A.   Yes.

6   Q.   And because -- as you testified, this is pretty much

7   everything you need to conduct business online; correct?

8   A.   Yes.

9   Q.   Somebody could take this information, then, and then turn

10  back around and communicate with you with that information and

11  say I want to buy more fullz?

12  A.   Yes.

13  Q.   And as long as you had an e-mail and a user name, you would

14  sell that information; correct?

15  A.   Yes.

16  Q.   The government asked you a lot of questions about how you

17  got involved with opening this website.  And the government

18  specifically inquired about how you were able to get access to

19  these databases to get this information.

20  A.   Yes.

21  Q.   And I believe this began with a company -- let me look back

22  in my notes here -- MicroBilt.

23  A.   Yes.

24  Q.   And you testified that at this point this was 2010?

25  A.   Yes.

1   Q.   Roughly?

2   A.   Yes.

3   Q.   And up to this point you had already dabbled in hacking?

4   A.   Yes.

5   Q.   You had kind of mostly done it for fun.  You did it, I

6   guess, to kind of prove a point to your old school that you

7   could hack into their database?

8   A.   Yes.

9   Q.   And you actually had an online nickname that you used?

10  A.   Yes.

11  Q.   And you would be pretty brazen about that because you

12  wanted people to see your handiwork; is that right?

13  A.   Yes.

14  Q.   So on the Internet if it said this person hacked into this

15  system, you would have credibility with the criminal underworld

16  or people who were involved in hacking that; is that correct?

17  A.   Yes.

18  Q.   At some point you decided you wanted to make some money

19  doing this.

20  A.   Yes.

21  Q.   And that's when you were able to hack into MicroBilt's

22  website; correct?

23  A.   Yes.

24  Q.   You did research to find what are some companies that have

25  access to personal information of American citizens; right?

1   A.   Yes.

2   Q.   And you came up with MicroBilt; you found them on Google?

3   A.   Yes.

4   Q.   And then because of your expertise in computers, you were

5   able to check to see if there was any weakness in their

6   infrastructure so maybe you could hack them and then have

7   access to that?

8   A.   Yes.

9   Q.   And that's what you did?

10  A.   Yes.

11  Q.   And you could have taken that information and used it

12  however way you saw fit?

13  A.   Yes.

14  Q.   You could have opened up bank accounts in people's names?

15  A.   Yes.

16  Q.   What you decided to do, however, was not just to keep that

17  information to yourself but make it available throughout the

18  world for any paying customer to use; is that right?

19  A.   Yes.

20  Q.   Now, obviously, you knew that these people whose

21  information you had hacked into did not give you permission to

22  do that; is that right?

23  A.   Yes.

24  Q.   But you knew that anybody who wanted to find you online

25  could use any possible e-mail they could dream of, and password

1  and user name, to contact you; is that right?

2  A.  Yes.

3  Q.  And, in fact, that's the whole point of conducting business

4  online and using Liberty Reserve, is because you guys were all

5  anonymous?

6  A.  Yes.

7  Q.  You don't want to know or anybody to know what you look

8  like or where you live, and you don't care what your customers

9  look like or where they live.

10 A.  Yes.

11 Q.  Is that correct?  And at the time in 2010 when you had

12 access to this information, you made it available on the

13 superget.info website; is that right?

14 A.  Yes.

15 Q.  And you had also at this point had all of the fullz from

16 Devil as well by this time?

17 A.  Yes.

18 Q.  The e-mails the government showed you were from, I believe,

19 beginning in December of 2012, specifically the Government's

20 Exhibit 41.  Okay?

21    My question to you, and you've answered that, is you had

22 all those fullz for up to three years before the e-mails begin

23 in Government Exhibit 41; is that right?

24 A.  Yes.

25 Q.  Was this a one-time deposit of fullz that you got from

 1   Devil?  Did he give them to you all at once?

 2   A.   No.   Too many time, too many different -- different time.

 3   Q.   Two different times?

 4   A.   Yeah, too many different times.

 5          INTERPRETER LIU:   Too many different times.

 6          THE WITNESS:   Yeah.

 7   Q.   Too many different times?

 8   A.   Yes.

 9   Q.   Okay.  Well, when did you first get the fullz from --

10   A.   It's around 2010 until 2011.

11   Q.   Okay.  So from that year, 2010 to 2011, you're in

12   possession of these fullz that you would continue to sell?

13   A.   Yes.

14   Q.   And you sold them many times over?

15   A.   Yes.

16   Q.   In fact, some of your customers would say, you know, when

17   you sell me a fullz, you're going to get rid of that, right,

18   because I don't want that out in cyberspace, because that's

19   going to make this less valuable?  Correct?

20   A.   Yes.

21   Q.   That's a good concern; right?  We have Maudie Patton's

22   fullz right here circled; right?

23   A.   Yes.

24   Q.   If I purchased that fullz, I would want to make sure that

25   you weren't selling that to 5,000 other different people;

1  right?

2  A.  Yes.

3  Q.  Because what good is that if somebody beat me to the punch

4  and used this and it got compromised; right?  And you would

5  tell your customers, "Oh, yeah.  Once I sell them to you, I

6  delete them"?

7  A.  Yes.

8  Q.  That was a lie?

9  A.  Yes.

10 Q.  Just like you lied about, you know, whether you could do

11 certain searches; right?

12 A.  Yes.

13 Q.  So not only were you lying about who you were with your

14 e-mail, you were lying about whether you resold these fullz;

15 right?

16 A.  Yes.

17 Q.  And you were lying about whether or not -- you know,

18 whether or not you could even fulfill certain requests; is that

19 right?

20 A.  Yes.  I can filter them.

21 Q.  At some point you lost your access to MicroBilt --

22 A.  Yes.

23 Q.  -- their source of information; right?  And that was

24 because somebody figured out, Oh, my God, we've been

25 compromised; correct?

1  A.  Yes.

2  Q.  At that point you needed to get another source, another

3  database of information, and you probably had the tools to find

4  another company and hack into it; right?

5  A.  No.  Just Google.

6  Q.  Pardon me?

7  A.  Only Google.

8  Q.  Well, you checked Google to look for other companies?

9  A.  Yes.

10  Q.  And I believe the second one, the second source of this,

11  then, after MicroBilt was Court Ventures; is that right?

12  A.  Yes.

13  Q.  And you found Court Ventures from a Google search?

14  A.  Yes.

15  Q.  And specifically you targeted Court Ventures because they

16  had all of this information that was searchable?

17  A.  Yes.

18  Q.  But you opted not to hack in to Court Ventures' system;

19  right?

20  A.  Yes.

21  Q.  Why?  Why didn't you just hack into their system?

22  A.  Because I want to do a real business.  Because if I hack

23  into their system, it will the same thing happen with

24  MicroBilt.  So I want to pay the money to give the service.

25  Q.  Okay.  So now instead of taking the chance of all this work

 1   hacking into another database only to have them shut it down,

 2   you've moved now from kind of computer hacking to full on

 3   trying to legitimize your business; right?

 4   A.  Yes.

 5   Q.  Because you know these companies would sell access to the

 6   database, all of this information, if they thought it was

 7   legitimate?  That was your thought process?

 8   A.  Can you explain?

 9   Q.  Well, you thought that instead of trying to steal these

10   information, date of birth, social security numbers, personal

11   identifying information, instead of trying to hack into it, if

12   you could represent that you were a legitimate party, you could

13   just buy it from Court Ventures; right?

14   A.  Yes.

15   Q.  So why risk hacking?

16   A.  Yes.

17   Q.  But you realized you couldn't call up Court Ventures and

18   say, "I'm Hieu Minh Ngo, hacker, and I'd like to start

19   purchasing information from your company"; right?  You couldn't

20   do that?

21   A.  Couldn't do it.

22   Q.  So what did you do?

23   A.  I -- I fake the documents and I lie about my name, my

24   business, so I get a contract.

25   Q.  With Court Ventures?

1    A.   Yes.

2    Q.   And you spoke with an individual from Court Ventures,

3    specifically --

4         What was his name?

5    A.   Jason, Jason Low.

6    Q.   That's not the person from Court Ventures you spoke with;

7    right?

8    A.   Oh.  Rob Gundling.

9    Q.   Rob Gundling?

10   A.   Rob Gundling, yeah.

11   Q.   Okay.  And in order to get his attention you had to

12   manufacture a new identity for yourself; right?

13   A.   Yes.

14   Q.   Who was that?  Jason?

15   A.   Jason Low.

16   Q.   Jason Low?

17   A.   Yeah.

18   Q.   L-o--

19   A.   L-o-w.

20   Q.   You had to make up an e-mail address for him?

21   A.   Yes.

22   Q.   What e-mail address did you use?

23   A.   Jasonlow7@yahoo.com.

24   Q.   So when you were trying to pretend you were Jason Low, it

25   made sense to come up with an e-mail address that had "Jason

1  Low" in the title?

2  A.  Yes.

3  Q.  It makes sense.  You made up a password for Jason Low?

4  A.  Yes.

5  Q.  And you then communicated with Rob from Court Ventures as

6  this person?

7  A.  Yes.

8  Q.  Online?

9  A.  Yes.

10  Q.  You never talked with him over the phone?

11  A.  No.

12  Q.  All the communication was done via e-mail?

13  A.  Yes.

14  Q.  So we don't have Rob's e-mails from Court Ventures, but if

15  we did, it would be very similar to what you see in

16  Government's Exhibit 41.37; right?

17  A.  Yes.

18  Q.  Instead of "From wangsangpi@gmail.com," what would it say?

19  A.  It say was -- it's my e-mail, yeah.

20  Q.  Well, if this was an e-mail --

21  A.  It will be jasonlow7@gmail, dot -- yeah, at yahoo.com.

22  Q.  Say that one more time.  The From line would read what?

23  A.  It should be Jason Low, and the e-mail would be

24  jasonlow7@gmail-- at yahoo.com.

25  Q.  Okay.  Now, when you were communicating via e-mail as Jason

1    Low you certainly didn't want to have the IP address be from

2    Vietnam; right?

3    A.  Yes.

4    Q.  So you were able, then, to make it look like the IP address

5    from where that e-mail was sent was from another location?

6    A.  Yes.

7    Q.  Where did you pick?

8    A.  Singapore, U.S.A., anywhere in the world.

9    Q.  Okay.  Singapore?

10   A.  Yeah.

11   Q.  So not only would the e-mail to Rob at Court Ventures be

12   from jasonlow@gmail, the IP address would be from Singapore?

13   A.  Yes.

14   Q.  And that would match your story, which was, I'm Jason Low,

15   a private investigator from Singapore, and I need access to

16   Court Ventures; right?

17   A.  Yes.

18   Q.  And if that e-mail was turned over to law enforcement, law

19   enforcement then probably would start their investigation in

20   Singapore looking for this company; right?

21   A.  Yes.

22   Q.  And specifically looking for Mr. Jason Low?

23   A.  Yes.

24   Q.  Okay.  Who didn't exist?

25   A.  No.

1   Q.   I'm asking.

2   A.   Yes.

3   Q.   You completely made him up?

4   A.   Yes.

5   Q.   When you got access to the Court Ventures database, then,

6   again, you made that available to users?

7   A.   Yes.

8   Q.   So that they could then access Court Ventures' database?

9   A.   Yes.

10  Q.   And then they could search by name and state; correct?

11  A.   Yes.

12  Q.   And they could have access to anybody in that state with

13  that name and that social security number and their date of

14  birth?

15  A.   Yes.

16  Q.   So, again, instead of just using that information for your

17  own purposes, you decided it was more profitable to make that

18  available to any paying customer across the world?

19  A.   Yes.

20  Q.   And you testified that eventually Court Ventures was

21  purchased by Experian; is that right?

22  A.   Yes.

23  Q.   That was after you had compromised, lied to Rob about being

24  this private investigator; right?

25  A.   Yes.

1   Q.  Court Ventures was purchased by Experian after you had

2   already made Court Ventures database available to anybody with

3   a Liberty Reserve account?

4   A.  Yes.

5   Q.  Then at some point Experian decided that they needed to

6   meet this private investigator; right?

7   A.  Yes.

8   Q.  Because, you know, somebody claiming to be Jason Low was

9   paying Court Ventures $15,000 a month to have access to this

10  database?

11  A.  Yes.

12  Q.  And Experian wanted to meet with this person so that they

13  could renegotiate the contract; right?

14  A.  Yes.

15  Q.  They reached out to you?

16  A.  They send an e-mail to me, and then --

17  Q.  Who did they send the e-mail to?

18  A.  To Jason Low.

19  Q.  Okay.  In Singapore?

20  A.  Yes.

21  Q.  But you got the e-mail in Vietnam; right?

22  A.  Yes.

23  Q.  Okay.  And you opted not to go meet with them; correct?

24  A.  No.

25  Q.  Okay.  Instead you thought it was time for you to get

1   another source of these dates of birth and social security

2   numbers, another database; correct?

3   A.  Yes.

4   Q.  So instead you smelled a -- you smelled a trap --

5   A.  Yes.

6   Q.  -- with Experian?

7   A.  Yes.

8   Q.  So you figured it worked with Court Ventures, let's hop on

9   Google, let's find another company --

10  A.  Yes.

11  Q.  -- that has millions of personal identifying information --

12  A.  Yes.

13  Q.  -- and let's see if we can't pull the same trick; right?

14  A.  Yes.

15  Q.  And that's what you did with TLO; is that right?

16  A.  Yes.

17  Q.  TLO is another company like MicroBilt, like Court Ventures;

18  they store American citizens' information?

19  A.  Yes.

20  Q.  And you wanted to purchase that from them with a fake name;

21  right?

22  A.  Yes.

23  Q.  To make it available to your customers?

24  A.  At that time with TLO I used my real name.

25  Q.  You used your real name?

1    A.  Yes.

2    Q.  Hieu Minh Ngo?

3    A.  Yes.

4    Q.  Okay.  Why on earth would you do that?

5    A.  Because I want to be a real businessman.

6    Q.  You wanted to go legit. at that point?

7    A.  Yes.

8    Q.  Okay.  And, in fact, you offered to purchase this

9    information from TLO?

10   A.  Yes.

11   Q.  And they agreed?

12   A.  Yes.

13   Q.  And that arrangement didn't last very long, did it?

14   A.  No.

15   Q.  Okay.  They shut you off two or three days later, you said?

16   A.  Yes.

17   Q.  Okay.  So now you have no access to any database that you

18   could route your customers to to do these kind of queries?

19   A.  Yes.

20   Q.  And just so the jury isn't confused, the fullz that you got

21   from Devil which are the subject of this e-mail are different

22   than these queries that we're discussing through these various

23   companies; right?

24   A.  Different.

25   Q.  They're completely different?

1    A.   Yes.

2    Q.   The fullz you got from Devil you got between 2010 and 2011?

3    A.   Yes.

4    Q.   And you sold them to anybody who wanted them who could

5    pay --

6    A.   Yes.

7    Q.   -- as many times as they wanted them?

8    A.   Yes.

9    Q.   Now, when TLO shut off your access to their database, at

10   that point you were desperate to come up with another source of

11   income; is that right?

12   A.   Yes.

13   Q.   And without getting into the details, somebody presented

14   you an offer that you couldn't refuse; right?

15   A.   Yes.

16   Q.   And that somebody wound up being another well known

17   Internet cyber crook who was working for the government; right?

18   A.   Yes.

19   Q.   And that cyber crook said, "I know what you're doing";

20   right?

21   A.   Yes.

22   Q.   "I know you've been, you know, running this website for

23   some time now."

24   A.   Yes.

25   Q.   "And if you want to stay in business, you better come talk

1  to me, and we can make a lot of money together."

2  A.  Yes.

3  Q.  And that's what got you out of Vietnam; right?

4  A.  Yes.

5  Q.  That's what got you to Guam.  You came to Guam to meet with

6  this person?

7  A.  Yes.

8  Q.  It was a good business opportunity?

9  A.  Yes.

10  Q.  You were arrested?

11  A.  Yes.

12  Q.  And you've been in custody since -- when were you arrested,

13  February of 20--

14  A.  February 7, 2013.

15  Q.  Okay.  Now, Mr. Ngo, you testified that you have pled

16  guilty.  Well, let me back up.

17     Do you have any idea, Mr. Ngo, about how many people's

18  identities were in the MicroBilt, the Court Ventures and the

19  TLO database?  Do you have any idea, if you had to estimate the

20  number of people's date of births and social security numbers

21  that existed, what would that number be?

22  A.  In their database?

23  Q.  In all the databases together.

24  A.  Oh, it should be about around 250- to 350 millions people.

25  Q.  Million?

1    A.   Yes.

2    Q.   So 250- to 300 million people's identities --

3    A.   Yes.

4    Q.   -- you made available to anybody with a Liberty Reserve

5    account?

6    A.   Yes.

7    Q.   And you knew that they were going to use that to do all

8    sorts of things; right?

9    A.   Yes.

10   Q.   And, Mr. Ngo, with respect to your Liberty Reserve account,

11   you exclusively used Liberty Reserve; is that right?

12   A.   Yes.

13   Q.   You didn't accept payment for access to the databases or

14   for the fullz from any other source?

15   A.   No.

16   Q.   How many millions of dollars came into your Liberty Reserve

17   account while you were running this website from 2010 until you

18   got arrested by the Secret Service?

19   A.   How much money I earned?

20   Q.   Not that you earned.  How much money did you accept as

21   payment for all of this information?

22   A.   Umm --

23   Q.   Millions?

24   A.   Because that's -- you know, I don't own that database.  I

25   just use -- I mean, I do this -- I do business with them, so I

1  use their service.  I just borrowed, borrowed their service and

2  I don't own that database.

3  Q.  You didn't borrow their database.  You --

4  A.  Yeah.  I purchase it, yes.

5  Q.  So my question to you is, how much money did you get for

6  doing this?

7  A.  Oh, for two years, within two years I earn about 300- to

8  400,000 U.S. dollar.

9  Q.  Now, that's after you paid Court Ventures?

10  A.  Yes.

11  Q.  And paid other expenses?

12  A.  Yes.

13  Q.  But you had millions, maybe 2-, $3 million come into your

14  Liberty Reserve account --

15  A.  Yes.

16  Q.  -- from people all over the world; right?

17  A.  Yes.

18  Q.  And then, of course, all of those 250 million or 300

19  million people that you provided at least access to their

20  personal information, whatever loss they may have uncovered,

21  part of that's your responsibility, isn't it?

22  A.  Yes.

23  Q.  And you think you should be held responsible if my name was

24  in the Court Ventures database, or if I was one of these fullz

25  and you got them from Devil and then sold it 50 times and I

1   incurred all of that loss and all of the time trying to figure

2   out how I'm going to prove that I am really me, you're

3   responsible for that; correct?

4   A.  Yes.

5   Q.  And you've pled guilty not only to hacking into all of

6   these -- or hacking into the MicroBilt website and also pled

7   guilty to making false representations about being Mr. Low,

8   Jason Low.  You've acknowledged all of that; right?

9   A.  Yes.

10  Q.  And you've acknowledged making all of these fullz available

11  for resale; is that correct?

12  A.  Yes.

13  Q.  You've told a federal judge:  "It's me.  I did it.  I'm

14  Wang Sang Pi.  I'm rr" --

15      What was that rr e-mail address?

16  A.  Rr2518.

17  Q.  Yeah.  So "That was me"?

18  A.  Yes.

19  Q.  So now when you pled, the government said there's no

20  promise about what your sentence is going to be; right?

21  A.  No.

22  Q.  But they did say, hey, if you cooperate and you testify,

23  we'll ask the judge to show you leniency; right?

24  A.  They didn't say that.

25  Q.  They didn't say that they --

 1  A.  I volunteered to do it.

 2  Q.  Okay.  But you've testified that you are expecting --

 3  A.  Yes.

 4  Q.  -- that the government will put in a good word for you --

 5  A.  Yes.

 6  Q.  -- in front of the judge at sentencing; is that right?

 7  A.  (Nods head up and down.)

 8  Q.  So even though you've never seen this man in your life --

 9  A.  No.

10  Q.  -- you have agreed to come in and testify about these

11  e-mails -- okay? -- hoping that if you're truthful or if the

12  government gets a conviction that they will say to the judge,

13  in your case, "He cooperated"; right?  And when you were -- and

14  I'm not asking you to tell me what you talked about with your

15  lawyer, but I would assume that any lawyer would tell you that

16  what drives your sentence is the amount of loss you caused; is

17  that correct?

18  A.  Yes.

19  Q.  And what we just discussed with 250- to 300 million pieces

20  of citizens' information floating around out there, that's an

21  astronomical figure that could be attributed to you, Mr. Ngo;

22  is that right?

23  A.  Yes.

24  Q.  And that's what drives the sentencing guidelines in your

25  case; right?

1   A.  (No answer.)

2   Q.  And without asking if your lawyer estimated, okay, what

3   your loss amount would be, that loss amount is incredibly high,

4   is it not?

5   A.  Yes.

6   Q.  You're 25 years old?

7   A.  Yes.

8   Q.  The loss amount in the sentencing guidelines, that could be

9   a sentence for the rest of your life?

10  A.  Yes.

11  Q.  You're aware of that; right?

12  A.  Yes.

13  Q.  So the only way at least -- it's not the only way, but one

14  way that you could try to shrink that down is to, what, testify

15  for the government; right?

16  A.  Yes.

17  Q.  And in this case what they wanted you to do was to identify

18  Government Exhibit 41; right?  They wanted you to say that you

19  recognize these e-mails; right?

20  A.  Yes.

21  Q.  And this wasn't the first time they showed you these

22  e-mails; right?

23  A.  Yes.

24  Q.  They had come to you previously to get you ready for this

25  trial; right?

1  A.  Yes.

2  Q.  And they said, "Mr. Ngo, we want to show you a bunch of

3  e-mails that we got from your computer" or "we got from a

4  subpoena"; correct?

5  A.  Yes.

6  Q.  And they said, "Well, here.  Let's look at Government

7  Exhibit 41.37"; right?

8  A.  (No answer.)

9  Q.  And obviously you're in custody at this point; right?

10  A.  Yes.

11  Q.  You pled guilty?

12  A.  Yes.

13  Q.  You're awaiting to be sentenced?

14  A.  Yes.

15  Q.  Now, you don't remember authoring or specifically sending

16  this e-mail; right?

17  A.  I don't remember, yes.

18  Q.  So what you're testifying to, to try to, you know, let your

19  judge know, is that this looks like the type of business that I

20  did with one of my 1300 customers; right?

21  A.  Yes.

22  Q.  I don't remember Jones White at lanceealy123@yahoo.com;

23  right?

24  A.  No, I don't remember.

25  Q.  Of course not.  And certainly, and not to beat a dead

1  horse, but certainly you don't know, you know, who was behind

2  the computer?

3  A.   No.

4  Q.   You don't know the gender of that person?

5  A.   Yes.

6  Q.   But yet when you were shown these --

7      I'm assuming you were in prison when they showed you these

8  e-mails, right, the first time?

9      You're here to say that this looks like an e-mail that I

10  would have sent from wangsangpi@gmail.com.  This is consistent

11  with how I conducted business in selling fullz.

12  A.   Yes.

13  Q.   Is that right?

14  A.   (Nods head up and down.)

15  Q.   Okay.  And, of course, that's what you're saying here

16  testifying in front of the jury; right?

17  A.   Yes.

18         MR. ANDERSON:  Could I have one moment to talk to Mr.

19  Ealy?

20         THE COURT:  Of course.

21     (Mr. Anderson and the defendant confer privately.)

22  Q.   I just have a few more follow-up questions, Mr. Ngo.

23     You had testified on direct examination that at some point

24  you made an effort to block U.S. IP addresses.

25  A.   Yes.

1   Q.  Is that correct?

2   A.  Yes.

3   Q.  Now, we've already discussed --

4        MR. ANDERSON:  And if I could have the -- if I could

5   have Exhibit 41.1 put up.

6   Q.  Government Exhibit 41.1 I believe was the first e-mail that

7   they showed you on direct examination.

8   A.  Yes.

9   Q.  The date on that was Christmas; it looks like December

10  25th, 2012.

11  A.  Yes.

12  Q.  Okay.  Had you blocked United States IP addresses at this

13  point in time?

14  A.  At this time?  I believe at this time I don't block at this

15  time.

16  Q.  So do you know when you decided to not accept e-mail

17  communications or allow your site to be accessed from U.S. IP

18  addresses?  Do you know when that began, when you started

19  restricting that?

20  A.  When I started?

21  Q.  Uh-huh.

22  A.  Is around -- around April or July -- I mean around 2012,

23  but not the end 2012.  At around 2012 because -- because --

24  because I found out on Google one security reporter, they

25  reported my website about online hacking and fullz information

1  and all the sensitive information like social security number,

2  date of birth.  That's why I block the U.S.A. IP address.

3  Q.  And when was that, April of 2012?

4  A.  That's around that, yeah.

5           THE DEFENDANT:  He said April.

6  Q.  April or May of 2012?

7  A.  April until -- I mean around middle, around middle.  I

8  mean, it -- I blocked the IP address about four or five months,

9  and then after that, after the TLO, they block my -- my -- my

10  IP.  I mean, they shut down my account.  And then I started to

11  open own -- only IP address so anybody can access my website.

12  Q.  Okay.  So you're saying you shut it down in April of 2012,

13  blocked U.S. IP addresses, but only for four or five months?

14  A.  Yes.

15  Q.  Okay.  Let me ask you this.  You can see in this exhibit

16  there's an IP address associated with this e-mail that says, "I

17  need 200 fullz from Ohio only"; right?

18  A.  Yes.

19  Q.  You have no idea if that's a U.S. IP address or an IP

20  address from China or Jamaica; right?

21  A.  I can trace easy.

22  Q.  What's that?

23  A.  I can find easy.

24  Q.  I know you can find that out.

25  A.  Yes.

1  Q.  But what I'm saying is, in the beginning of my examination

2  you had indicated that it's very easy for you or someone to

3  make an e-mail appear to be from any IP address; correct?

4  A.  Yes.

5  Q.  Including a specific country, city or address; correct?

6  A.  Yes.

7  Q.  Okay.  Mr. Ngo, you have no idea how Devil got ahold of all

8  of his fullz; right?

9  A.  Yes.

10  Q.  Did you suspect or think that you knew that perhaps he was

11  involved with something called a bot or what is called a bot,

12  b-o-t?

13  A.  Botnet?

14  Q.  Botnet, yeah.

15  A.  Yes.

16  Q.  What is that?

17  A.  Botnet, it's a software.  It will send -- I mean, it will

18  send virus, a malware virus, to all the computer system.  So it

19  will -- it will control or monitor the computer system without

20  any notice from the user.

21  Q.  Okay.

22  A.  So it can steal the information secretly, and this will

23  send the sensitive information like -- anything.  It could be

24  anything, credit card information, my account information, it

25  could be anything, to the botnet software.

1    Q.  So you thought that maybe Devil was able to get these

2    fullz.  Because you tested them out, you tried them out, you

3    knew that they were what they purported to be, it was your

4    theory that perhaps Devil was utilizing this botnet --

5    A.  Yes.

6    Q.  -- software to actually go right into somebody's computer

7    without their knowledge --

8    A.  Yes.

9    Q.  -- and pull out their bank account info, also their e-mail

10   name -- lanceealy123@yahoo -- and the password that's

11   associated with lanceealy123@yahoo; is that right?

12   A.  Yes.

13   Q.  Did you ever deal in this botnet software?

14   A.  I have tried one time.

15   Q.  You dabbled in it?

16   A.  Yes.

17   Q.  That's probably the most efficient way to get somebody's

18   information, because you can get it right off their computer --

19   A.  Yes.

20   Q.  -- if they install the program?

21   A.  Yes.

22   Q.  And they'll never even know somebody's peeking in; correct?

23   A.  Yes.

24   Q.  And just -- I believe you testified to this before, but

25   during the period of 2010 until you were arrested in 2013, how

1  many customers did you sell fullz to?

2  A.  A lot.  I can't remember.

3  Q.  Well, can you give me an estimate?  Is it more than 5,000?

4  A.  I -- I guess about around 2,000, 3,000.

5  Q.  Two- or 3,000 is your best guess right now?

6  A.  Yes.

7          MR. ANDERSON:  Your Honor, if I could have one more

8  moment.

9          THE COURT:  That's fine.

10     (Mr. Anderson and the defendant confer privately.)

11 Q.  Mr. Ngo, following up to the botnet software, you said

12 you've dabbled in it, so you have some personal familiarity

13 with what that does.  Okay?

14     In theory, if the software was installed on someone's

15 computer, they could actually look at the person's computer

16 screen from wherever they are, and they could actually see

17 what's being put on the computer screen; is that right?

18 A.  Yes.

19 Q.  But not only could they see what's being on the computer

20 screen; they could take over the actions of that computer to

21 control what that computer does.

22 A.  Yes.

23 Q.  Is that correct?

24 A.  True.

25     (Mr. Anderson and the defendant confer privately.)

1    MR. ANDERSON:  Your Honor, I have no further questions

2    at this time.

3         THE COURT:  Thank you.  Redirect examination, please.

4         MR. SISTLA:  Brief redirect, Your Honor.

5         THE COURT:  Certainly.

6                    REDIRECT EXAMINATION

7    BY MR. SISTLA:

8    Q.  Do you need a drink of water, Mr. Ngo?

9    A.  Yes.  Thank you.

10   Q.  Take it.

11   A.  Yeah.

12   Q.  And, Mr. Ngo, just a favor.  It's getting late in the day.

13   Can you make sure you speak into the microphone slowly and

14   clearly so the jury can hear you?

15   A.  All right.  Yes.

16   Q.  You were arrested in February, on February 7th, 2013; is

17   that right?

18   A.  Yes.

19   Q.  And when did you start cooperating with U.S. authorities?

20   A.  At that time.

21   Q.  At the point when you started cooperating with U.S.

22   authorities did you know anything about the sentencing

23   guidelines?

24   A.  No.

25   Q.  Did you know anything about loss amount?

1  A.  I don't know anything about the U.S.A.

2  Q.  You don't know anything about the U.S. justice system?

3  A.  No.

4  Q.  So did you start cooperating before you met a lawyer?

5  A.  Yes.

6  Q.  You immediately cooperated with authorities?

7  A.  Yes.

8  Q.  Why did you immediately cooperate with authorities?

9  A.  Because I didn't know the law.  I didn't know anything.  I

10 thought I should cooperate, help them, and then they will let

11 me go home soon.

12 Q.  But you don't know if that could happen or not?

13 A.  I don't know.

14 Q.  And so your testimony today at trial, this is not the first

15 time you've cooperated with law enforcement and the U.S.

16 government; correct?

17 A.  Yes.  I mean -- I mean --

18 Q.  I'll ask the question again.

19         INTERPRETER LIU:  Yes, please.

20         MR. SISTLA:  I'll withdraw the question.

21 Q.  Have you, prior to testifying today, cooperated with U.S.

22 authorities?

23 A.  Yes.

24 Q.  And have you cooperated with U.S. authorities before you

25 even knew what kind of benefit you might get?

1    A.  Yes.

2    Q.  And have you cooperated before you even knew what your

3    potential sentence would be?

4    A.  Yes.

5    Q.  Okay.  And all that cooperation started right there when

6    you were arrested February 7th, 2013?

7    A.  Yes.

8    Q.  Now, Mr. Anderson asked you questions about the authorship

9    of those e-mails; correct?  Do you recall that?

10   A.  Yes.

11   Q.  And because they were a little more than a year ago,

12   whether you could specifically remember writing those e-mails.

13   A.  Yes.

14   Q.  Do you remember those questions --

15   A.  I remember.

16   Q.  -- Mr. Anderson just asked you?

17   A.  Yes.

18   Q.  We went through the e-mails in detail.  Was there anything

19   in any of those 49 e-mails that you either received or you

20   wrote or you thought "I didn't write this" or "I didn't receive

21   it"?

22   A.  I mean, I did it.

23   Q.  You did it?

24   A.  Yeah.

25   Q.  Was there anyone in the time period between December 25th

1  and January 27th, 2013, the time period of the e-mails, who had

2  control of the wangsangpi account other than yourself?

3  A.  Only me.

4  Q.  Only you.  And was there anyone other than you who had

5  access to both fullz and the Wang Sang account?

6  A.  No, only me.

7  Q.  Only you.  So based on your review of the e-mails here in

8  court, could anyone else other than you have authored those

9  e-mails?

10  A.  Only me.

11  Q.  Now, you're a -- it's fair to say you're pretty

12  sophisticated with computers?

13  A.  Yes.

14  Q.  You know how to hack?

15  A.  Yes.

16  Q.  You know ways to disguise your presence on the Internet;

17  correct?

18  A.  Yes.

19  Q.  And you use the wangsangpi account for business purposes?

20  A.  Yes.

21  Q.  And the business purposes were to communicate with your

22  customers?

23  A.  Yes.

24  Q.  You were in that e-mail account a lot; right?

25  A.  No.

1   Q.  No?

2   A.  I mean, I use it a lot.

3   Q.  You do use it a lot?

4   A.  Yes.

5   Q.  Okay.  And you had to constantly check that account because

6   it was your business account; correct?

7   A.  Yes.

8   Q.  Would you have been able to detect whether someone had

9   hacked into your account and taken control of it?

10  A.  I know.

11  Q.  You would know?

12  A.  Yes.

13  Q.  Well, based on your review of the e-mail and based on your

14  knowledge of the wangsangpi account, is there any evidence that

15  anyone hacked into your account?

16  A.  No.

17  Q.  None?

18  A.  Only me.

19  Q.  Only you used that account?

20  A.  Yes.

21  Q.  All right.  But if someone had, would you have been able to

22  figure that out?

23  A.  Yes.

24  Q.  Because it would have been obvious?

25  A.  Easy.  Instantly.  I know instantly.

1  Q.  And you would know instantly because they would send

2  e-mails that you didn't send?

3  A.  Yes.  And then I know because of the Google, they have the

4  option, they will let me -- you know, they will guess my

5  account, my e-mail account, got hacked or something like that,

6  and they can verify the IP address, you know.  I mean, I can

7  remember my IP address usually one or two days, so nobody

8  can -- I mean, nobody can get inside my e-mail account, you

9  know.

10 Q.  The bottom line is an e-mail account that you used

11 frequently --

12 A.  Yes.

13 Q.  -- you would know whether or not it was hacked?

14 A.  Yes.

15 Q.  Okay.  Now, you had several e-mail accounts that you used

16 for business; is that right?

17 A.  Yes.

18 Q.  Wangsangpi?

19 A.  Yes.

20 Q.  This rr2518 we talked about?

21 A.  Yes.

22 Q.  What were some of the other e-mail accounts you used for

23 business purposes?

24 A.  Hieupc@gmail.com, and another one, tracidonell@gmail.com.

25 Q.  The hieupc, was that your personal e-mail as well?

1  A.  Yes.

2  Q.  So hieupc you mixed business and pleasure?

3  A.  Yes.

4  Q.  Would it be fair to say that if we were to look at the

5  hieupc account there might be e-mail to your parents?

6  A.  Yes.

7  Q.  Relatives?

8  A.  Yes.

9  Q.  Girlfriend?

10  A.  Yes.

11  Q.  Would there be e-mail about plans to go do something, go to

12  the movies, go to a concert?

13  A.  Yes.

14  Q.  School work?

15  A.  Yes.

16  Q.  But there might also be e-mails about illegal stuff in

17  there?

18  A.  Yes.

19  Q.  And yet the name on that e-mail account, it's hieupc?

20  A.  Yes.

21  Q.  And your name is?

22  A.  My name too.

23  Q.  Hieu also?

24  A.  Yes.

25  Q.  Okay.

 1  A.  And on that e-mail I only do business with big reseller,

 2  only with big customer.

 3  Q.  Big customers.  So it's possible to have an e-mail address

 4  that has your name in which you do illegal activities in?

 5  A.  Only legal?

 6  Q.  Illegal, illegal activities.

 7  A.  Can you say that again, please.

 8  Q.  Your e-mail address was hieupc.

 9  A.  Yes.

10  Q.  And you were doing illegal activities in that e-mail

11  address; right?

12  A.  Yes.

13  Q.  Even though it had your name?

14  A.  Yes.

15  Q.  Now, I wanted to clear up just one -- I think there was a

16  little bit of confusion on who had access to your -- your

17  website.  In order to purchase items on your website, one of

18  the ways you accepted payment was through Liberty Reserve?

19  A.  Liberty Reserve and WebMoney.

20  Q.  And WebMoney.  But just because one had a Liberty Reserve

21  account didn't mean they were using your website?

22  A.  Yes.

23  Q.  Did you have to register for the website?

24  A.  You had to register.

25  Q.  Okay.  So it was more than just having a Liberty Reserve

1  account?

2  A.  Yes.

3  Q.  Because there -- were there lots of people out there with

4  Liberty Reserve accounts who weren't using your website?

5  A.  Yeah, a lot.  Million people, they have.

6  Q.  Okay.  Millions of Liberty Reserve accounts?

7  A.  Yes.

8  Q.  So there's no direct connection between the two?

9  A.  Yes.

10  Q.  Okay.  Now, you also mentioned -- Mr. Anderson made a point

11  about the Jason Low e-mail address.  Do you remember that?

12  A.  Yes.

13  Q.  Was that a business only e-mail address?

14  A.  Yes.

15  Q.  Would there be anything specific to Hieu Minh Ngo in that

16  e-mail address?

17  A.  No.

18  Q.  No?

19  A.  Only Jason Low name.

20  Q.  Only Jason Low.  Because you were using it to hide your

21  identity?

22  A.  Yes.

23  Q.  But if there were e-mails about Hieu Minh Ngo in that

24  e-mail address, would you agree that you could tie that e-mail

25  back to you?

1   A.  Yes.

2   Q.  For instance, if there were e-mails from Jason Low that had

3   information about your family?

4   A.  Yes.

5   Q.  Or information about your Facebook account?

6   A.  Yes.

7   Q.  Or information about where you lived?

8   A.  Yes.

9   Q.  That would be evidence that could link you -- Hieu Minh

10  Ngo -- to that e-mail address; correct?

11  A.  Yes.

12  Q.  But that kind of e-mail wasn't there, you agree?

13  A.  No.

14          MR. SISTLA:  Okay.  Can I have one moment, Your Honor?

15          THE COURT:  Yeah, of course.

16      (Mr. Sistla, Mr. Hunt, and Special Agents Bierman and Turk

17  confer privately.)

18          MR. SISTLA:  Your Honor, I've got one last line.

19          THE COURT:  Yeah.

20          MR. SISTLA:  I'm sorry.

21          THE COURT:  No, don't be.  Take your time.

22  Q.  Are you ready, Mr. Ngo?

23  A.  Yes.

24  Q.  There was also some discussion about the blocking of IP

25  addresses.  The information you were selling was U.S.

1  information; correct?

2  A.  Yes.

3  Q.  U.S. social security numbers?

4  A.  Yes.

5  Q.  About U.S. people, U.S. citizens, obviously?

6  A.  Yes.

7  Q.  Would you agree that that information was most valuable for

8  people in the United States?

9  A.  Yes.

10  Q.  Okay.  And so even though you blocked U.S. IP addresses, it

11  was possible for people in the United States to access your web

12  site; correct?

13  A.  Yes.

14  Q.  Otherwise you would lose a big part of your customer base?

15  A.  Yes.

16          MR. SISTLA:  All right.  No further questions, Your

17  Honor.

18          THE COURT:  Thank you.

19      Recross?

20          MR. ANDERSON:  Just a couple.

21                      RECROSS-EXAMINATION

22  BY MR. ANDERSON:

23  Q.  Mr. Ngo, the government brought up again that Jason Low

24  e-mail account.  That wasn't a real person; right?

25  A.  Yes.

1  Q.  It was a fake person?

2  A.  Yes.

3  Q.  You made him up out of thin air?

4  A.  Yes.

5  Q.  He didn't exist?

6  A.  Yes.

7  Q.  He didn't have a Facebook account?

8  A.  Yes.

9  Q.  He didn't go to school somewhere?

10  A.  Yes.

11  Q.  Okay.  Had you wanted to, you could have decided when you

12  were communicating with Rob at Court Ventures, you could have

13  taken it one step further, couldn't you have, and used

14  somebody's e-mail account and password and pretended to be

15  them; right?

16  A.  Yes.

17  Q.  It would have been easy?

18  A.  Yes.

19  Q.  You had 300,000 e-mail addresses and passwords from Devil;

20  right?

21  A.  Yes.

22  Q.  And one extra layer of protection you could have done,

23  right, would have been to pick one of those --

24  A.  Yes.

25  Q.  -- because you could have had all sorts of personal

1  information about them; right?

2  A.  Yes.

3  Q.  Their bank accounts?

4  A.  Yes.

5  Q.  Where they worked, where they went to school?

6  A.  (Nods head up and down.)

7  Q.  And if you really wanted to be crafty, you could have used

8  that account to communicate the business with Court Ventures;

9  correct?

10  A.  Yes.

11  Q.  By using that e-mail account, that password, by making sure

12  that the e-mails appeared to come from a specific address, and

13  you could have written anything you wanted to in those e-mails

14  because you would have known a lot of personal information

15  about that person; right?

16  A.  Yes.

17  Q.  Later on down the road if Court Ventures or the government

18  or Experian says, assuming Jason Low is a real person and got

19  access to those e-mail accounts, you could have made it seem

20  pretty obvious that this was the individual who was working

21  with Court Ventures; correct?

22  A.  Yes.

23  Q.  Now, you opted not to go that far; right?

24  A.  Yes.

25  Q.  You just made somebody up out of thin air --

1   A.  Yes.

2   Q.  -- who you didn't know anything else about; correct?

3   A.  Yes.  But the problem is you're talking about if you use

4   the e-mail account from other people, look like -- for example,

5   your e-mail account; right?  And then you have been using all

6   the time -- right? -- every day.  And then if I access your

7   e-mail account, you would know.  If I used that e-mail account

8   to keep in touch with Rob Gundling to do business, it's not

9   long time, maybe one, two day or a week and then you will know,

10  and then you will contact a company, whatever company, Goggle,

11  Yahoo!, or Microsoft, to reset your password easily, because

12  it's your name.

13  Q.  Right.

14  A.  It belong to you.

15  Q.  Well, the government asked you if somebody hacked into Wang

16  Sang Pi, you told them you would know for sure; right?  You

17  would know that because you're using Wang Sang Pi every day;

18  right?

19  A.  Yes.

20  Q.  But if somebody had made up hieuminhngo@gmail and you

21  didn't know that that e-mail account even existed --

22  A.  Yes.

23  Q.  -- you would have no way of knowing whether or not --

24  A.  Yes.

25  Q.  -- your identity was being used; correct?

A.   Yes.

MR. ANDERSON:  Nothing further.

THE COURT:  Okay.

(Witness excused.)

THE COURT:  All right.  Ladies and gentlemen, I think we'll stop here for today.  Is that okay?

MEMBERS OF THE JURY:  (Nod heads up and down.)

THE COURT:  All right.  Here's the deal.  Can you guys be back about a quarter to 9:00 tomorrow so we can start at 9:00 o'clock sharp?  And I think what I'd like to do is try to get as much in in the three hours we have as possible.  So our mid-morning break will be condensed just to a five- or ten-minute bathroom break, if that's okay, so you can plan accordingly.

And then I think some of you guys have already made plans based upon the schedule.  So we will have a hard stop at noon.  Is that okay?  And then we'll pick it back up on Wednesday at 9:00 o'clock.

All right.  So here are the rules.  Don't form or express any opinions about the case.  Don't discuss the case with anyone or let them discuss it with you.  Don't try to get on the Internet and do any of the stuff that's been talked about in the courtroom, and don't do any type of independent outside research.

And we'll see you guys tomorrow morning.  Be in the back at

1    quarter of, and we'll start at 9:00 o'clock.  Be safe.  Thank

2    you.

3            COURTROOM DEPUTY:  Court is in recess until tomorrow

4    morning at 9:00 AM.

5        (Jury out at 4:11 PM.)

6        (Recess taken:  4:11 PM - 4:15 PM.)

7    AFTER RECESS & BEFORE THE COURT

8            THE COURT:  Okay.  Anybody have anything before we

9    break for the evening?

10           MR. SISTLA:  No, Your Honor.  We have a -- is it

11   possible on Wednesday that we'll be going up to 5:00 o'clock?

12   Originally when we had done our planning we thought we were

13   doing slightly longer days --

14           THE COURT:  So did I.

15           MR. SISTLA:  -- based on what the Court had indicated.

16   Now we're in a little bit of a bind because we have a lot of

17   out-of-town witnesses coming in.  We'll go as fast as we can.

18   We'll try to get in as many witnesses as possible tomorrow.

19   Maybe Mr. Anderson and Mr. Ealy can stay after and we can

20   discuss maybe stipulating to business records, which will

21   expedite things tomorrow.

22           THE COURT:  Okay.

23           MR. SISTLA:  The bank records aren't objectionable.

24           THE COURT:  I was sort of gently trying to suggest

25   that perhaps they work till 5:00 o'clock a few days this week,

1  and we'll find out tomorrow.  Barb's not hopeful.

2         MR. SISTLA:  Well -- I apologize, Your Honor.  I

3  didn't mean to interrupt.

4         THE COURT:  No, that's okay.

5         MR. SISTLA:  Friday is a bad day.  We have, I think,

6  like 11 out-of-state witnesses coming in.

7     Sorry.

8     (Juror enters the courtroom.)

9         COURTROOM DEPUTY:  That's okay.

10         THE COURT:  Is that your notebook?

11         A JUROR:  No, that's mine.  I brought that from home.

12         THE COURT:  Okay.  All right.  See you later.  Have a

13  safe one.  You're fine.

14     (Juror leaves the courtroom.)

15         MR. SISTLA:  I don't know if the Court could impose --

16  given that we're taking Monday and Tuesday off, and if we fly

17  them in, it's just going to be very difficult to get them back

18  here again to testify --

19         THE COURT:  Right.

20         MR. SISTLA:  -- if they can't testify on Friday.

21  They're all short witnesses.  Mr. Anderson is quite the

22  cross-examiner.  I don't think the cross-examination will be as

23  long as it was on Mr. Ngo.

24         THE COURT:  Okay.  Are any of them -- can any of them

25  be squeezed in on Thursday, or are we sort of sticking --

1      MR. SISTLA:  We've tried to pack it in to go as

2  quick -- I mean, per the Court's direction, we tried to pack it

3  in.  And we already have, what, nine witnesses.

4      THE COURT:  All right.  We'll try to set the jury up

5  for that a little bit tomorrow in the morning --

6      MR. SISTLA:  Okay.

7      THE COURT:  -- and then talk to them and see what

8  they're willing to do.

9      MR. SISTLA:  And what we could do, Your Honor, is if

10  they're going along this week, the travel plans for next week,

11  like next Friday we have -- the 14th we also have out-of-state

12  witnesses from California.  We could bump those back to the

13  following week if you wanted to let the jury out a little

14  earlier next week in exchange for having them stay a little

15  later this week.  Because those travel plans we still have a

16  little flexibility with because it's ten days from now.

17      THE COURT:  All right.  Well, we'll do what we can.

18      MR. SISTLA:  Is that fair, Your Honor?

19      THE COURT:  Yeah.  No, we'll do whatever we can to try

20  to make it work.

21      MR. SISTLA:  Okay.

22      THE COURT:  Do you guys have anything?

23      MR. ANDERSON:  Lance?

24    (Mr. Anderson and the defendant confer privately.)

25      THE COURT:  Okay.  Well, I don't need to be here for

1  that discussion.  You guys figure it out.

2      Lance, here's the deal.  We are starting tomorrow at 9:00

3  o'clock, and if you're not here, we're just going to start

4  without you.  You haven't been on time the last four court

5  appearances.  It's time to start.  Okay?

6              THE DEFENDANT:  Yes.

7              THE COURT:  All right.

8      Okay.  So we'll stand in recess.  And, ladies, if you would

9  just make sure that you have all the information you need.

10      Barb, check out, see if they're okay.

11      And thanks a lot for coming up.

12              INTERPRETER LIU:  You're welcome.

13              THE COURT:  All right.  We'll see you guys tomorrow.

14  We'll start at 9:00 o'clock.  Thank you.

15              MR. SISTLA:  Your Honor, would you like the attorneys

16  here at 8:45?

17              THE COURT:  Yeah.  If you need us, just, yeah, we'll

18  be here probably by 8:30 or something.

19      (At 4:18 PM, the trial was recessed, to be continued on

20  Tuesday, November 4, 2014, at 9:00 AM.)

21                          - - -

22                        I N D E X

23  Preliminary remarks by the Court ................  14
    Plaintiff's Opening Statement ...................  28
24  Defendant's Opening Statement by the Defendant ...  47
    Defendant's Opening Statement by Mr. Anderson ....  52
25                          - - -

I N D E X (Continued)

PLAINTIFF'S WITNESS:                                    PAGE

HIEU MINH NGO
Direct Examination by Mr. Sistla .................  64
Cross-Examination by Mr. Anderson ................ 208
Redirect Examination by Mr. Sistla ............... 254
Recross-Examination by Mr. Anderson ............. 264

- - -

E X H I B I T S

EXHIBIT NUMBER:                                    ADMITTED

Government's Exhibit 35 ........................  123
Government's Exhibit 36 ........................  109
Government's Exhibit 41.1 through 41.49 ........  156

- - -

C E R T I F I C A T E

I, Luke T. Lavin, RDR, CRR, the undersigned, certify

that the foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.


                              s/Luke T. Lavin
                              Luke T. Lavin
                              Official Court Reporter

- - -