UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   12-cr-144-01-PB
            v.                  *   14-cr-81-01-PB
                                *   July 14, 2015
HIEU MINH NGO                   *   10:50 a.m.
                                *
* * * * * * * * * * * * * * * * *
```

DAY 2
TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Government:    Arnold Huftalen, AUSA
                       U.S. Attorney's Office
                       53 Pleasant Street
                       Concord, NH 03301

For the Defendant:     Michael J. Connolly, Esq.
                       Hinckley, Allen & Snyder
                       11 South Main Street
                       Suite 400
                       Concord, NH  03301

Interpreter:           Huan Dao

Probation Officer:     Sean Buckley

Court Reporter:        Diane M. Churas, LCR, RPR, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603) 225-1442

```
                          I N D E X


WITNESSES:              Direct    Cross    Redirect    Recross

MINNETT INDUISI
By Mr. Connolly          24




EXHIBITS:                                  ID          Evid.
Defendant's Exhibit A                                   28
```

                         BEFORE THE COURT

1                 THE CLERK:  Would the interpreter please

2       stand.

3                 (Interpreter duly sworn.)

4                 THE CLERK:  Thank you.  Court is in session

5       and has for consideration a sentencing in Criminal

6       matters 12-cr-144-01-PB and 14-cr-81-01-PB, United

7       States of America versus Hieu Minh Ngo.

8                 THE COURT:  Mr. Ngo, the last time we were

9       here you told me that you were comfortable proceeding

10      without having simultaneous translation by the

11      interpreter and that you would participate in the

12      proceedings without the interpreter translating

13      everything as long as the interpreter could be present

14      so you could consult with him if at any point you became

15      confused.  Do you remember talking to me about that?

16                THE DEFENDANT:  Yes.

17                THE COURT:  Is it still your position that you

18      want to proceed without simultaneous translation?

19                THE DEFENDANT:  Yes.

20                THE COURT:  It is?  Okay.  So I want you to

21      understand, if at any point you are confused, you can

22      stop the proceeding and tell your interpreter to explain

23      what's being said.  Do you understand?

24                THE DEFENDANT:  Yes.

```
 1            THE COURT:  So it's up to you, if you're

 2   confused or you don't understand, to just ask -- you can

 3   just raise your hand or tell your lawyer I'm confused,

 4   and then you can confer with the interpreter.  Do you

 5   understand?

 6            THE DEFENDANT:  Yes, your Honor.

 7            THE COURT:  Okay.  Now, Mr. Connolly, another

 8   thing I didn't raise with you at the last hearing, I

 9   don't recall, is that the presentence report describes

10   the fact that your client hears voices.  He claims that

11   although he hears voices, it doesn't interfere with his

12   ability to function because he has learned to ignore the

13   voices.  I want to know if in any of your dealings with

14   him, are you aware of any instance in which he may be

15   having problems with his mental health that interfere

16   with his ability to work with you.

17            MR. CONNOLLY:  Your Honor, I have worked with

18   Mr. Ngo now for almost two and a half years.  I've met

19   with him numerous times on a face-to-face basis, and I

20   have spoken to him innumerable times over the telephone.

21   I've also gotten to know his sister, who's again present

22   in the courtroom today, who has also been in regular

23   contact with the defendant, and throughout that entire

24   relationship I have not seen any evidence at all that

25   Mr. Ngo's cognitive functioning has been impaired in any
```

way by the voices that he has reported hearing in his head.  He has always seemed cogent to me.  He has always been responsive.  He strikes me as a very intelligent young man, and I have never had the sense that he has failed to understand the nature or the essence of what we have been discussing.

THE COURT:  Obviously when I see a reference to anyone claiming to hear voices, auditory hallucinations can be a sign of major mental illness. If you had any concern or Mr. Ngo had any concern, I would want to investigate that further, but I have seen nothing in my dealings with Mr. Ngo that would call into question his competence or his ability to participate in the proceedings.  But I do want you and he to know, if that is a concern, we need to address it now.  I would be happy to continue the case, if necessary, for a psychological evaluation.  I don't feel one is necessary, but if either of you do, now is the time to speak up.  I understand from your remarks that you don't believe such an examination would be warranted here.

MR. CONNOLLY:  That's correct, your Honor.  I feel very comfortable in representing to the Court that there is no neurological, psychological, or emotional impairment that will prevent him from fully appreciating the proceedings today.

1    THE COURT:  Mr. Ngo, do you agree with your

2    lawyer that you are ready to go forward here today?

3         THE DEFENDANT:  Yes, I agree, your Honor.

4         THE COURT:  And do you feel that you're

5    hearing voices?  Do you feel that when you hear voices,

6    that affects your ability to think and to participate in

7    this proceeding?

8         THE DEFENDANT:  I'm good today, your Honor.

9         THE COURT:  You're good today.  The voices

10   don't interfere with your ability to think.

11        THE DEFENDANT:  I think before I got that

12   hearing voice because I think I was so stressful at the

13   time.  That's why I hear that voice.  But now I'm okay

14   today.

15        THE COURT:  All right.  So that was a very

16   stressful time.  And are you hearing voices today?

17        THE DEFENDANT:  No, your Honor.

18        THE COURT:  Okay.  Thank you.  You can be

19   seated.  All right.  So it's my judgment that we can

20   proceed without any further psychological evaluation.

21        All right.  So when we last left off, we had a

22   dispute concerning the guideline calculation amount.  It

23   appears that the parties have reached an agreement about

24   how the loss amount should be calculated here that

25   reflects apparently neither -- a complete win for

1    neither side.  So I'd like each of you to just briefly

2    explain why it is that you made the judgment to agree to

3    the loss calculation you're jointly proposing that I

4    adopt, and I would like you to acknowledge what you've

5    represented in paper here, which is that you are urging

6    me to adopt this figure as a joint proposal, and you're

7    each waiving any arguments you have previously presented

8    for a different number.  So if you could just briefly

9    explain why you've decided not to pursue the maximum

10   possible loss amount that you could under these

11   circumstances, and then just make clear on the record

12   that you are, in fact, waiving any argument you have for

13   a greater loss amount, if I accept this proposal and

14   sentence him in accordance with the loss amount which

15   you've identified.  Mr. Huftalen?

16          MR. HUFTALEN:  Be happy to, your Honor.  In

17   the first instance let me very briefly tell you how I

18   arrived at the point where I agree that the Court, if it

19   were to hold a contested hearing, would find that the

20   loss is between 65 and a hundred million dollars, and

21   it's as follows.

22          Under the PSI calculations, as the Court

23   knows, the loss was found to be 145 million.  Of that

24   145 million, 64 million was attributed to fraudulent tax

25   filings.

1          In my initial sentencing memo, I addressed the
2   anticipated defense argument that that $64 million was
3   not a number that the Court should rely upon.  And I
4   said that, although I didn't concede that the 64 million
5   is not a valid number, in order to address that in a way
6   that would reach a reasonable guideline calculation and
7   take the issue out of the case, if the Court simply took
8   the 176,000 fullz and multiplied each of them by 500 as
9   opposed to excising the 12,763 and attributing to them
10  the 64, then the loss amount would be $88 million.  That
11  results in a two-level reduction.  Instead of adding 26
12  levels, if the Court accepts it, the Court would add 24
13  levels.
14          Now, at the initial hearing for the first time
15  the issue was raised about whether or not the government
16  could prove that these fullz were access devices.
17  176,000 are discreet actual fullz, and after the hearing
18  last time -- and the reason we didn't ask the Court to
19  come right back but rather put it off for a month was I
20  wanted to provide to Mr. Connolly some Excel databases
21  that showed all of the fullz that were taken off Mr.
22  Ngo's site, because there was some question about
23  whether there was duplication and perhaps the 176,000
24  was an inflated number.
25          THE COURT:  Well, there also was some

suggestion that perhaps the data was not usable because they didn't involve, say, people who were not alive, that had died, or people who had accounts that were closed and the account numbers couldn't therefore be qualified as access devices.  So there was that argument then as well.

MR. HUFTALEN:  Well, I explained to Mr. Connolly after that at the end of the first hearing that the 176,000 was actually a net number.  That if you look at all of the fullz that were taken off Mr. Ngo's site, you would have, in round numbers, almost 300 or about 300,000 fullz.

A Secret Service analyst went through those approximately 300,000 fullz and extracted from them 176,000 unique identifiable fullz, each of which had its unique Social Security number, unique date of birth, unique name, and unique address.  Therefore the 176 was a net number, not a gross number, that might represent an over magnification, if you will, of what the loss was.

As to whether those 176,000 are or were usable, I think most of the courts that have addressed this issue have come to the conclusion that if it is a number which could be used at the time, then it is, in fact, usable, used alone or in conjunction with

1    something else.

2           Of the 176,000 fullz, the Internal Revenue

3    Service has determined that 129,000, just under 130,000,

4    of those had active returns filed in those numbers.

5    Consequently, the vast majority of the 176 or the

6    majority of the 176, mainly about 130,000, clearly are

7    active because they have been used to file tax returns.

8           Of that 130,000, 12,000 and change were deemed

9    fraudulent.  The remainder were actual.  So instead of

10   getting into a lengthy, what I think the Court referred

11   to as a mini trial, as to whether or not any or all of

12   the 3.1 million queries satisfied the definition of

13   access devices, and I submit we could have gone that

14   way, I spoke with Mr. Connolly and said, here, based

15   upon this information and the Excel spreadsheets that

16   came from Mr. Ngo's site, please review this yourself,

17   please review it with Mr. Ngo, and if you agree that

18   176,000 is a fair number, and we apply $500 to each, as

19   opposed to trying to prove more -- and, in fact, most

20   SIRF returns in this case average 5,000, but if we just

21   applied the 500 from the special rule, we'd come out to

22   $88 million.  That's how I got to the 88 million to

23   recommend that we reach an agreement as to that.

24           THE COURT:  But based on what you've just said

25   to me, you're telling me that of the 176,000 fullz, you

have been able to verify that 110,000 were for returns that were not fraudulent that were filed. Therefore we can infer that the Social Security number and identification itself would be qualifiable for that 110,000, not all 176,000.

MR. HUFTALEN: What I didn't say and should have was that if Agent O'Neill were to testify, he would testify that the fullz that were being sold were marketed as full infos that were dated, fresh and not so fresh. Meaning fresh was much newer and Mr. Ngo sold them for more money than the ones that were a few months old. And Agent O'Neill would say fullz in the underworld cyber market originated with payday loan applications and people who take payday loan applications online, then harvest the data from it and sell it to miscreants, and who then turn around and sell it to other people who want to steal identities. So he would testify that in his experience, which is significant in this realm, the fullz that were being sold at the time, in particular by Mr. Ngo, were consistent with fullz that had come from payday loan applications which necessarily in that world were current -- contained current usable data and information.

The mere fact that only a hundred -- the Court

said ten -- a hundred and whatever thousand resulted in

actual returns doesn't suggest to me, and I submit it

shouldn't suggest to the Court, that the others were

necessarily not valid.  There are a number of people who

have Social Security numbers who don't file returns.  In

fact, there are more than one victim in this case who's

reached out to us saying I don't file returns and now I

have this problem with the IRS.

THE COURT:  So to add then, you could say we

know for those that -- for whom non-fraudulent returns

were filed are active and countable, and that's in

excess of 100,000 which would get you up to over 50

million based on that, and we know from that -- and more

than 50 million.  You will have to refresh my memory on

the math that you just went through with me, but I'm

recalling it as being over 110,000.

But you're telling me that for those others

for whom there isn't a return filed, that doesn't mean

that they aren't also active fullz because many people

who have identity information stolen don't have to file

returns because they don't earn enough money to have to

file returns, or if they do, they don't file them.

MR. HUFTALEN:  Yes.  And it's worth noting

that the range within the guideline book that we are

dealing with is 50 million to 100 million.  So once you

1    are over the 50 million threshold, you are in the plus

2    24 range.  You don't have to be 65.

3            THE COURT:  So then very conservatively you

4    say there were over 100,000 returns filed for the fullz

5    that he is charged with.  If you multiply 500 times

6    100,000 --

7            MR. HUFTALEN:  Over the 50 million.

8            THE COURT:  -- I assume you get 50 million.

9    Right?

10           MR. HUFTALEN:  In addition -- not that it was

11   my intention to have a lengthy evidentiary hearing, but

12   I explained to Mr. Connolly that of the 3.1 million

13   queries, the queries were made of a database that was

14   active --

15           THE COURT:  I want to stop because that's a

16   different matter I will come to in just a minute.

17           MR. HUFTALEN:  It is but it isn't actually.  I

18   understand.

19           THE COURT:  We are not counting any -- your

20   number that you've just recited to me gives him zero

21   loss figure for any access to that three million person

22   database, three million queries.

23           MR. HUFTALEN:  I'm not relying on the three

24   million queries for the guideline calculation.

25           THE COURT:  Stop.  Am I correct or not?  Okay?

1   The way I understand this case, there's a whole other

2   set of arguments that you could make about loss that are

3   not -- weren't considered by the probation office and

4   aren't being considered by you and what you're telling

5   me now, and that relates to queries to a database that

6   he charged people to make.  Those queries, although

7   presumably a significant number of them were used to

8   acquire fullz for people for improper purposes, are not

9   being counted at all.  Is that right or wrong?  Yes or

10  no.  Say yes or no.

11            MR. HUFTALEN:  Yes, and I am waiving that

12  argument for purposes of this sentencing hearing.

13            THE COURT:  That's what I wanted to establish.

14  You have an argument that if you could build the right

15  evidentiary case at sentencing could potentially result

16  in a much higher loss number than the one you're

17  presenting to me now.

18            MR. HUFTALEN:  Correct.

19            THE COURT:  And you are telling me, Judge, if

20  you accept this and the agreement is fully enforced and

21  the defendant doesn't try to renege on it later on, I'm

22  giving up that argument in order to get finality as to

23  the loss amount that we've agreed upon.

24            MR. HUFTALEN:  Yes, sir.

25            THE COURT:  And you're agreeing to give up

1    your argument that we should count the sum total of the

2    fraudulent tax returns, an argument that had been made

3    and discussed at prior proceedings.  You're giving up

4    that argument for the same reason, to get the benefit of

5    finality.  Right?

6            MR. HUFTALEN:  Yes.  I'm sorry I muddied the

7    waters.  You're absolutely correct.

8            THE COURT:  So that we are clear here, what

9    you've done is you've compromised.  You have given up

10    the potential argument that you could make for a much

11    larger loss figure to obtain agreement from the

12    defendant and finality with respect to a loss figure

13    that you believe is conservative and well supported

14    based on the evidence that you have collected.  Is that

15    correct?

16            MR. HUFTALEN:  Yes, your Honor.

17            THE COURT:  Good.  Thank you.  That's what I

18    need to hear.

19            Now, Mr. Connolly, you presented arguments to

20    me that would result in a loss figure as well as

21    $400,000, which is what you claim was the amount your

22    client made from his criminal activities.  You are today

23    agreeing to a much larger loss amount.  Could you just

24    briefly explain to me why in your discussions with your

25    client you and he have agreed to this proposed loss

1　figure.

2　　　　MR. CONNOLLY:　Your Honor, the facts which Mr.

3　Huftalen has just recited to the Court, including the

4　work done by the Secret Service as part of this case,

5　are facts as to which we do not have any material

6　disagreement in terms of the raw numbers.　We also

7　appreciate that the government had available to it

8　arguments that would have enhanced the loss amount under

9　the Sentencing Guidelines to a number in excess of a

10　hundred million dollars which would have put Mr. Ngo

11　into a higher Sentencing Guidelines category.

12　　　　My colleague, Ms. Angelini, met with Mr.

13　Huftalen and Mr. Ngo and reviewed the database, the

14　spreadsheet that Mr. Huftalen referred to, and Mr. Ngo

15　was given the benefit of assessing for his own purposes

16　the legitimacy of the data that the government is

17　relying upon.　That data was -- copies of that were

18　provided to my office by Mr. Huftalen.　We had a chance

19　to confidentially discuss that with Mr. Ngo, and based

20　upon that discussion, Mr. Ngo is satisfied that

21　essentially the information Mr. Huftalen reported to the

22　Court is accurate, and therefore he is comfortable with

23　a loss amount -- and I know that the guidelines use the

24　term "intended loss" and I'm going to come back to that

25　in a moment.　But we are satisfied that the government

```
 1   could prove that there is an intended loss amount of
 2   between fifty and a hundred million dollars, and that
 3   the government has available to it an argument that
 4   might bring the number above that range.  And so in the
 5   spirit of compromise, we agreed to accept the
 6   government's proffer of evidence for purposes of
 7   sentencing and we are comfortable with that.  I've had
 8   an adequate opportunity to discuss that with Mr. Ngo.
 9   Mr. Ngo is comfortable with that.
10           THE COURT:  Just to then make clear, you have
11   made a judgment in consultation with your client that it
12   is in your client's interest to accept a compromise
13   figure to avoid the risk that there might be a higher
14   loss amount determined and to bring finality to this
15   loss amount issue because it is in your client's
16   interest to do that, especially in view of the fact that
17   your client still has available to him arguments for
18   departure and variance, departure based on substantial
19   assistance and variance based on a whole host of
20   arguments, including an argument that the loss amount as
21   calculated here overstates the seriousness of the actual
22   offense.  That's an argument that's fully preserved to
23   you, and in light of that and in view of the potential
24   for a possibly higher guideline calculation, you're
25   telling me you and your client have agreed on this
```

1  compromise figure fully understanding that you are

2  waiving your right to challenge that figure in this

3  proceeding and in any subsequent proceeding.  Is that

4  right?

5        MR. CONNOLLY:  That's correct, your Honor.

6  Let me just confirm that my client understood what the

7  Court recited.

8        (Pause.)

9        MR. CONNOLLY:  Yes, your Honor, what the Court

10  has just stated accurately reflects my client's position

11  in light of all of the circumstances outlined by the

12  Court.

13        THE COURT:  Thank you.  I'm prepared to accept

14  the agreement on loss amount.  There is some uncertainty

15  here about how to calculate the loss amount.  The

16  defendant presented a well-briefed argument about

17  intended loss and calculating, including loss amounts in

18  the total sum of all fraudulent tax returns filed.  I

19  thought that argument was well presented and potentially

20  meritorious.

21        The defendant presented another argument

22  that -- as to why the $500 per person amount should not

23  apply in the way the government argued it here.  I

24  thought that argument had less merit to it as long as

25  the government could establish that, in fact, the

1   records were qualifying records.  The government has

2   explained what it found out in its investigation, and

3   the facts included in the government's proffer lead me

4   to believe that it's appropriate to consider the loss

5   amount the way the government has suggested it should be

6   considered.  And I also recognize that there is a valid

7   argument that the government's giving up that the loss

8   should even be higher than that because the loss

9   calculation that has been performed here does not

10  attribute any loss to queries made of the database that

11  is referred to in the presentence report.  So I think on

12  balance this is a good reasonable compromise that is

13  well supported based on the record of the case and

14  accordingly I accept it.

15          My understanding is that the guideline

16  calculation arrived at by the probation office is

17  changed in only one respect, and that is, that the loss

18  figure is reduced by two levels and that that produces a

19  Total Offense Level of 40 rather than 42.  Is that

20  right?

21          MR. HUFTALEN:  Yes, your Honor.

22          THE COURT:  And I agree with that proposal,

23  direct the probation officer to make an amendment to the

24  report to reflect this.

25          I otherwise adopt the findings of fact and

conclusions of law set forth in the report which are not
disputed, determine that the defendant's Total Offense
Level is 40, his Criminal History Category is I.
Guideline sentencing range, 292 to 365. Everybody agree
on that?

MR. HUFTALEN: Yes, your Honor, under the
November 2014 book.

MR. BUCKLEY: Yes, your Honor.

THE COURT: All right. So I adopt those
findings of fact and conclusions of law set forth in the
report which will be made a part of the record under
seal.

Mr. Huftalen, you have a motion for downward
departure. Do you want to deal with that at sidebar
under seal or are you prepared to make your proffer in
open court?

MR. HUFTALEN: I don't feel the need unless
the Court wants me to make an additional proffer to
amplify what I put in writing. It was a fairly detailed
motion, but I'm happy to explain it to the Court.

THE COURT: I am aware of it, if you don't
need to say anything in addition. So your bottom line
is reduce the sentence to a 15-year sentence based on
his cooperation.

MR. HUFTALEN: Yes, your Honor.

1    THE COURT:  And you oppose any further

2  reduction by any means, departure or variance.

3    MR. HUFTALEN:  We do, yes.

4    THE COURT:  If we look at it in terms of

5  levels and if we look at it in terms of total years,

6  you're proposing a reduction from 40 -- Level 40 to

7  Level 34?  120.

8    MR. BUCKLEY:  Mid-range of 35.

9    THE COURT:  Mid-range of 35.  180.  Yeah,

10  okay.  So you're proposing a reduction of five levels,

11  from 40 to 35.  The sentence that you're giving would

12  fall within that offense level.  Right?

13    MR. HUFTALEN:  Yes.

14    THE COURT:  And you're proposing to take

15  off --

16    (Pause.)

17    THE COURT:  Little over nine years you're

18  proposing to take off the sentence based on cooperation.

19    MR. HUFTALEN:  Yes, your Honor.

20    THE COURT:  All right.

21    MR. HUFTALEN:  Just -- there's one other thing

22  referenced in that motion, and that is a pending case in

23  the Southern District of New York where -- and Mr. Ngo's

24  referred to these things in open court before.  So I'm

25  not -- I don't believe I'm putting him at risk by

1  mentioning this on the open record.

2          The Southern District of New York has an

3  investigation and, in fact, an indictment brought

4  against people involved in the business known as Liberty

5  Reserve.  Knowing of that investigation, I made Mr.

6  Ngo's circumstance available or known to the AUSAs in

7  the Southern District of New York after I spoke with Mr.

8  Connolly who said, yes, Mr. Ngo would be interested in

9  proffering if he could help the SDNY case.

10          Mr. Ngo did go down and proffer with the

11  Southern District of New York, however, that proffer has

12  not resulted in any substantial assistance.  It hasn't

13  resulted in any movement of the case.  That case is

14  scheduled for trial in November of 2015.  I have told

15  Mr. Connolly that if the Southern District of New York

16  requests Mr. Ngo's testimony at that trial, and they

17  have told me they intend to if it goes to trial, and if

18  Mr. Ngo's testimony is of substantial assistance to the

19  government, that I'd bring that to the Court's attention

20  through a subsequent Rule 35 motion.  But I was not

21  valuing the proffer for purposes of the 5K because it

22  really hasn't resulted in anything.

23          THE COURT:  All right.  Thank you.  What do

24  you want to say, Mr. Connolly, on the substantial

25  assistance issue?

1    MR. CONNOLLY:  Your Honor, what I would like

2  to do, with the Court's permission, is to present all of

3  my arguments under both the substantial assistance

4  umbrella and under the variance umbrella at one time.

5    THE COURT:  Okay.  You can do that now and I

6  will come back and hear him on anything you want to say

7  on variance.  So you can just go ahead.

8    MR. CONNOLLY:  Okay.  So, your Honor, I'd like

9  to submit a few things to the Court.  One is we have

10  subpoenaed to testify a counselor and teacher from the

11  Strafford County Department of Corrections who's worked

12  with Mr. Ngo and who has gotten to know him personally

13  and I believe can provide some relevant testimony to his

14  character traits and his conduct while incarcerated.

15  That person's name is Minnett Induisi.  Minnett Induisi

16  is present in the courtroom and with the Court's

17  permission --

18    THE COURT:  Why don't we get that done now so

19  she can go back to doing what she was doing.  But I'd

20  just ask you to be brief and focused on it.  I'm

21  assuming that the defendant is doing everything he can

22  to rehabilitate himself.  So I don't have any reason to

23  doubt that.  That isn't the problem here.  The problem

24  isn't that he isn't doing things to rehabilitate

25  himself.  The problem is what he did to get him here is

1  the problem.

2      MR. CONNOLLY:  Understood, your Honor.  So at

3  this time let me call Ms. Induisi to the stand.

4      THE COURT:  Come on up here, ma'am, and stand

5  by the witness stand right over here and the clerk will

6  swear you in.

7                      MINNETT INDUISI

8      having been duly sworn, testified as follows:

9      THE CLERK:  Thank you.  Please be seated.

10  Would you please state your name and spell your last

11  name for the record.

12      THE WITNESS:  Minnett Induisi, I-N-D-U-I-S-I.

13                    DIRECT EXAMINATION

14  BY MR. CONNOLLY:

15      Q.   Good morning, Ms. Induisi.  Ms. Induisi, you

16  just heard me introduce you to the Court as a person who

17  works as a counselor and a teacher who does work at the

18  Strafford County Department of Corrections.  Is that

19  accurate?

20      A.   Yes.

21      Q.   And for how many years have you worked at the

22  Strafford County Department of Corrections?

23      A.   36 years.

24      Q.   And over the course of that time approximately

25  how many inmates have you worked with?

1     A.   I would say thousands over the years.

2     Q.   Okay.  And what types of programs do you

3 present at the Department of Corrections?

4     A.   I help with the -- I help teach the High-Step

5 Program, which we would know as the GED.  I do

6 Parenting, I do Positive Options, I do Women's Group,

7 and I have done Preemployment Planning.

8     Q.   And have you had an opportunity to work with

9 the defendant in this case, Hieu Minh Ngo?

10     A.   Yes.

11     Q.   In what regard have you gotten to know him?

12     A.   When he was in the TC Program, which is the

13 therapeutic community at Strafford County Department of

14 Corrections, he was in my class, which was the anger

15 management class, and I have seen him in the Positive

16 Options as my client for approximately the past two

17 months, two and a half months.

18     Q.   What does Positive Options mean?

19     A.   Just as the name indicates, it's a program

20 where you do one-on-one counseling and hopefully help

21 that person, one, to adjust to his time or her time in

22 the jail without getting in any problems, plan for the

23 future, what is best -- in his best interests or her

24 best interests, and really to hopefully funnel him in

25 the right direction or direct him in the right direction

1  so that he doesn't return to jail.

2      Q.    So through your role in working with Mr. Ngo

3  in the Therapeutic Community Program and through the

4  private counseling and the Positive Options Program, do

5  you feel that you've gotten to know Mr. Ngo as an

6  individual and his character traits?

7      A.    Yes, I feel I know him as the person -- I only

8  know him for the time I knew him in the jail, but I do

9  feel I have an idea of the man that he is.

10      Q.    Can you tell us, what are your views in terms,

11  first of all, of his own appreciation for the wrongful

12  conduct that he's engaged in?

13      A.    Which doesn't always happen when you're in a

14  jail setting.  Mr. Ngo has definitely owned up to what

15  he has done.  He has repeatedly spoken about how his

16  youth and his greed has led him astray and that he has

17  brought shame to his family, to his country.  He feels

18  that he has disappointed so many people.  He has -- in

19  the jail someone is always -- someone else did it.  The

20  person very rarely says I did it and -- I did it and I'm

21  sorry.  Hieu has had no problem saying this is what I

22  did and I'm sorry and I want a better life than this.

23      Q.    And have you talked to him specifically about

24  the role that greed played in his criminal conduct?

25      A.    Yes.  We talked about how -- what greed does

1   to a person and how it changes. I think that -- we

2   talked about the domino effect, how one act leads to

3   another and leads to another and leads to another and

4   how many people get hurt in the process. So, yes, we

5   have addressed that.

6         Q. And has he accepted the fact that his conduct

7   has resulted in harm to many, many people?

8         A. Yes, he has.

9         Q. Now, have you also had an opportunity to view

10   Mr. Ngo's interactions with other individuals at the

11   Strafford County prison, including administrators,

12   correction officers, inmates, and other counselors?

13         A. If I had a word to describe how people feel

14   about Hieu, it's respect. He gives respect, he gets

15   respect. In all the time that I have known Mr. Ngo, I

16   have not known of any incidents where he has been

17   inappropriate or on call for any inappropriate act or

18   saying in the time. I think people -- under other

19   circumstances people would like him as a friend. I

20   think under the circumstances, they respect him for the

21   inmate that he is.

22         Q. And Ms. Induisi, do you have a view as to what

23   your belief is as to how Mr. Ngo will be able to

24   transition into post-incarceration life when that

25   opportunity presents itself?

1     A.   He showed me the plan that he has for the

2  future.  I was so impressed because many times when you

3  ask what are your plans when you get out of jail, it's a

4  one-day plan.  It's what they're going to do the first

5  day or the first week they're out.

6          That's not what Mr. Ngo showed me.  He has a

7  long-term plan of what he wants to do, how he wants to

8  help people, how he wants to write a book about how

9  greed can turn you from a good person into a bad person

10 and the harm that it can do others.

11         MR. CONNOLLY:  Your Honor, I'd like to present

12 a copy of that plan to the witness and then have it

13 marked as an exhibit for the Court.

14         THE COURT:  All right.

15         MR. CONNOLLY:  We'll mark this as Defense

16 Exhibit A.

17         (Defendant's Exhibit A was marked for

18 identification.)

19         MR. CONNOLLY:  I have a photocopy for the

20 Court.

21    Q.   Is what I've just presented to you the plan

22 that Mr. Ngo prepared?

23    A.   Yes, it is.

24    Q.   And without going through the details of it,

25 there are basically three components to the plan that

1   Mr. Ngo has prepared.  The first one is referenced as

2   plan A and it describes a security system platform which

3   is designed to protect people who have been the victims

4   of the type of criminal conduct that Mr. Ngo engaged in

5   in this case.  Correct?

6       A.   Correct.

7       Q.   And then the second component of the plan is

8   that Mr. Ngo plans to write a book about his life where

9   he examines his own misjudgments and wrongful conduct

10  and his view toward the future and how he can turn his

11  life around.  Is that correct?

12      A.   Correct.

13      Q.   And then the third component of his plan has

14  to do with a long-term goal of, once he's returned to

15  civilian life and he's able to return to his family and

16  his home country of Vietnam, he plans to work toward

17  developing a not-for-profit foundation that would help

18  young people who had problems with drugs, alcohol, and

19  other poor behavior in order to rehabilitate them.  Is

20  that correct?

21      A.   Yes, it is.

22           MR. CONNOLLY:  Given that that's submitted to

23  the Court, I don't think there's any need to go through

24  that any further.

25      Q.   So, Ms. Induisi, just in conclusion, based

upon your knowledge of Mr. Ngo and having talked to him, having an opportunity to have observed him with others and everything that you've been testifying about this morning, is it your view that Mr. Ngo is at a point in his life right now where he could successfully transition into post-incarceration civilian life?

A.    Although no one can ever give that a definite, but I have faith in Mr. Ngo and I think he has a chance to change his life, and I think he really has a plan to do it.  It's not just verbiage.  It's a plan.  So, yes, I think so.

MR. CONNOLLY:  Thank you, Ms. Induisi.

THE COURT:  Any questions?

MR. HUFTALEN:  No, your Honor.

THE COURT:  Ma'am, thanks a lot for coming today.  I really appreciate the work that you folks are doing in Strafford County.

THE WITNESS:  Thank you.

THE COURT:  It's been a good program.

THE WITNESS:  The therapeutic community makes the difference.

THE COURT:  I think it does.  Thank you. You're excused.  All right.  What's next, Mr. Connolly?

MR. CONNOLLY:  Your Honor, I know that it's customary for a defendant to allocute after counsel has

1    made remarks to the Court, but given the context of what

2    I expect Mr. Ngo is going to say to the Court in his

3    allocution, I would request permission to allow Mr. Ngo

4    to proceed with his allocution now and then I would like

5    to address the Court afterward.

6              THE COURT:  All right.  Mr. Ngo, this will be

7    your only chance to speak.  You don't have to say

8    anything.  I won't hold it against you if you don't, but

9    if you want to say anything, I will be happy to hear it.

10   Go ahead.

11             THE DEFENDANT:  Good morning, your Honor.  I

12   am Hieu Minh Ngo who grew up and lived my whole life in

13   Vietnam.  I'm so sorry.

14             I was a student at Information and Technology

15   of Ho Chi Minh City.  I was a computer hacker who have

16   done a very serious crime that it hurts and harms so

17   many people in the USA.

18             (Pause.)

19             THE COURT:  Why don't you take a minute, sir.

20   Here's the problem.  My court reporter has to take down

21   everything that you're saying.  I think you speak well,

22   but when you're reading, you have your head down

23   completely so she can't see your lips.  I can't.  And

24   you're so emotional that your crying and emotion make it

25   almost impossible to understand you.  So I'm happy to

1  hear what you have to say, and I recognize that you're

2  very emotional about it, but if you can't deliver the

3  comments in a way that we can understand, I'm going to

4  ask your lawyer to read them instead because it's just

5  too difficult for the reporter.  So if you want to try

6  again, you can.  But we'll have to have you either do

7  them in Vietnamese and have them interpreted or your

8  lawyer can read them, but if you're going to read them,

9  you've got to speak in a way that we can record what's

10  being said.  Okay?

11             THE DEFENDANT:  Yep.

12             THE COURT:  Okay.  Go ahead.

13             (Pause.)

14             THE DEFENDANT:  Good morning, your Honor.  I

15  am Hieu Minh Ngo who grew up and lived my whole life in

16  Vietnam.  I was a student at Information and Technology

17  of Ho Chi Minh City.  I was a computer hacker who has

18  done a very serious crime that it hurts and harms so

19  many people in the USA.  Being here today, I really want

20  to take my responsibility for my wrongdoings, for my

21  action.  I'm terribly sorry to the U.S. Government, to

22  the U.S. citizens, and to my family.  I know it was too

23  late to say sorry.  So please forgive me.  I feel very

24  guilty.

25             I know my time today is limited, but I hope

1  your Honor to give me a chance to express myself, and

2  it's also because today is my last chance to talk about

3  myself.  In sincerely I really appreciate a lot for this

4  permission.  For being here today I am grateful.

5          Your Honor, through 29 months and 7 days in

6  jail, I realized that I am a very lucky person.  First,

7  because U.S. Government taught me a very good lesson by

8  putting me in jail.  I shared with my family and my

9  girlfriend, if it was not happened to me, I might never

10  learn how to live.  Second, because I am who I am today,

11  is a new different person than before.  Incarceration

12  has been a valuable time for me to look at myself, to

13  look at what I have done wrongs in my life, especially

14  how bad that I have hurt and harm the people in the USA,

15  also to my family, my girlfriend, and other loved ones.

16          Today I can say that I was born again.  I feel

17  I'm alive.  Because to look at my past, honestly I was

18  dead because I had a body without a soul or a spirit.

19          Before I thought I was doing the right thing

20  and having the right decision by helping my family to

21  pay back all of the money that my parents owed to the

22  bank, but at the end it turned out to be a very wrong

23  decision because I could have ruined so many people's

24  lives in the U.S. by selling their personal information.

25  I have brought the shame and suffering to my family, my

 1  girlfriend, and other loved ones, especially to myself.

 2          Being incarcerated I realized that I was too

 3  young at that time, that I was a selfish, a liar, and a

 4  stubborn and a greedy person.  I realized that I fell

 5  into temptation of money and material stuff.  I really

 6  repent of what I have done.  I can't forgive myself

 7  until today because the consequences are so bad and so

 8  suffer.  I couldn't believe someday that I could have

 9  ruined so many people's lives.  I feel like I'm a very

10  bad person.  I can compare to being like a killer.

11          Through what I have done I realized that I

12  really lack of understanding and experiences.  It's not

13  anyone's fault but it's my own fault because I never

14  wanted to listen to anyone and I was too young, to

15  childish, and too stupid, and that's why before I never

16  thought about what I was doing, that it was a very

17  serious thing and that it'll bring my life to the rock

18  bottom, that it'll keep me away from my loved ones, and

19  because of my wrongdoings that it will ruin so many

20  lives of the people in the USA.  Someone may never have

21  a car, a house, or even a loan from a bank again.  I

22  don't want to blame for my actions to anyone.  Deeply in

23  my heart I had no purpose to hurt and harm these people.

24  I'm terribly sorry.  Please forgive me.

25          During the time in jail I have learned a lot

about myself because I realized so much of things in
this life is about perception.  So I have to start to
change the way I used to think and the way I used to do.
I can say that life is not easy behind a wall,
especially as a young Vietnamese man who never been to
jail before, who never live in a culture that's
completely different than Vietnam's culture, and who
just know a little bit of English at the day I got
arrested.  However, with courage and good will from God
I opened my mind to learn the new things day by day.
Each day to me is a bonus.  I told myself that I have to
work hard to improve myself because I know if I can't
change the circumstance or the situation, I have to face
the challenge to change myself.  And then I have tried
to take advantage of as many programs as possible,
especially the Therapeutic Community Program at
Strafford County Jail.  I stayed in the program for
eight months.  This has been a very wonderful time for
me to improve myself, and I was given a special chance
to remain in the program, to help and mentor newcomers,
especially people addicted to drugs and alcohol.  This
program is a great gift for me even though I didn't have
any addictions problem, but I really love it because
it's very strict environment so I can challenge myself
to open my mind to learn in a positive way.  And also I

can help the people by telling my story and my positive thoughts to give them more hope and make the best of everything they have. I always told them never give up on recovery. I learned how to take it one day at a time because I believe today is the day of the future. If I stay positive and do the right things today, I will have a better tomorrow. Because I'm very young, because of the very strong support from my family, from my girlfriend I never lose my hope. Even if I have only one percent of hope today, I still want to keep it. I have to be strong for my loved ones because not only me doing time, they are, too.

There are 86,400 seconds a day. I try to make the best out of each second in a positive way. Today I want to say that I am the richest person in the world because I am -- I understand myself more than ever. I realized through suffer and painful moments, I found the true happiness of my life. It's all about my family, my girlfriend, and other loved ones. I'm writing my journal day after day to give me more hope. I wrote down a lot of plans for my future.

Furthermore, I totally agree with the government opinions about sentencing me to 15 years. It will be a good example to send message to other hackers, and to protect the society. I want to take fully

1  responsibility for my action.  Because of me that's

2  nearly impossible for these people to get a new

3  identity.  I completely understand the consequences that

4  I have created.  I am not trying to argue or disrespect

5  anyone in here and the government and you, your Honor.

6  Today I want to share my opinions.  I realized that

7  maybe there's something I can do to fix my mistake by

8  helping the people in the USA to protect their identity;

9  second, to look at the reality of Internet's cyber

10  crime, it's clearly that we have attempted to protect

11  the Internet.  We have come up with many ideas for

12  making the Internet more secure and it's been around for

13  many years, but nobody who really have a right solution

14  for it, especially is identity theft.

15          My solution is about creating a security

16  system to protect the people's identities.  I have

17  already written down this solution's idea by my own

18  experience and knowledge.  I hope your Honor and the

19  government to take a little bit of time to see my

20  solution and see some of my other future plans.  I

21  believe God, He wanted to teach me this lesson, to

22  realize the true happiness of my life and he wanted me

23  to use my mind to help the society.  To be honest this

24  solution not only help these people that I have hurt and

25  harm, it also help any other people in the USA.  It also

help the government to reduce identity theft and of course to arrest more hackers. I believe nothing is impossible. I don't mean my idea is a perfect solution, but at least it's a possible idea that we should try. I have a lot of passion and courage to make these ideas happen. More than two years being incarcerated, I always hope some days when I go home I want to write a book about my life to share with the people, especially young people and our next generations, about what I have learned from my mistakes. I want to motivate them to do the right things because young generations are the future of the society, and this book is my hope because I hope that every young generation will focus more on their meaning of a human being, stop wasting their life on drugs and alcohol or doing the wrong things and stupid things like me. More than that, I have a plan to build a foundation. I call it Humility Foundation to help anyone who needs help, especially focus on people with addiction, homeless people, and poor, young, talented people. I also have a plan to travel around the world to share my story, share my experiences, to give people more hope and encourage them to say never give up to have a better life, to be a better person. I have learned if I want to change the world, I have to keep my mind open, use what I am good at and do the best

1  of my abilities.

2          If I want to change the world, I have to keep

3  my hope, my dream that some days I can change the lives

4  of the people with a good intention and in a meaningful

5  way.  Your Honor, after everything I am very grateful

6  and appreciate for giving me a chance to share my

7  thoughts.  I want to say that not only I agree that this

8  was my fault, I admitted to it.  I am guilty and

9  terribly sorry for what I have done, and I really want

10  to have a second chance to rebuild my life, to get back

11  to the society, to fix my mistake, and to live a normal

12  life with my family, my girlfriend, and my loved ones

13  again.  This is my last chance to be a better person.  I

14  hope your Honor please have a consideration to look at

15  what I have done to change myself, what I have realized

16  and learned from my mistake, and I understand that

17  learning is a process and it's never ending.

18          To the U.S. government I would like to say

19  many thanks.  I really appreciate for giving me a chance

20  to support and help them when I was incarcerated.  I

21  also want to say even if today I have a second chance, I

22  am willing to help U.S. Government wherever and whenever

23  they want my support.  And I always believe if I had a

24  chance to support the U.S. Government in the outside

25  world, I'm really sure it would be a lot different and

1   of good benefits for the government.  I want to be the

2   one who will save the Internet by stopping other hackers

3   or cyber crimes.  I know it's nothing easy, but to me I

4   never give up on hope.  I mean, I never give up on hope

5   on something that I really want to do even if it's

6   difficult to wait, but it will be more difficult to

7   regret later.  I believe in this world everything can or

8   will be made better, and victory comes from

9   perseverance.  To the teachers and the consulators at

10   Strafford County Jail, I am thankfully for their

11   compassion and their support for me until today.  They

12   taught me how to live and learn.  They gave me the keys

13   to my life, honestly, open-mindedness, and willingness.

14   For the first time I found my own spiritual.  I feel so

15   grateful because I understand my meaning to live in this

16   life.  That's to use my experience to help the people.

17   To win myself I had to learn the lesson in loss.  I

18   learned that I'm not a perfect human being but I am

19   perfect to be a human being, to be a human being.  I

20   learned that life is too soft -- I learned that life is

21   too short to be anything but happy.  Falling down's a

22   part of life and getting back up is living.

23         To my lawyers I appreciate for helping me

24   about the laws and almost everything else.  To my

25   wonderful family, I am grateful for their unconditional

love, for their strong support until today.  It mean a
lot to me when my parents have say what matters more
than the mistakes I made is what I am able to learn from
them.  They're my spirit and hope.  No matter what I
have done before, they always forgive me.  Especially
today, my sister Eden come back to support me from a
long way from Vietnam.  She told me that she will never
give up and she doesn't want me to be alone today.  I
don't know what I have to say, but I feel very happy and
I feel so sad at the same time because I took so many
things for granted from my family before.  Now I
realized that, it hurts my heart a lot.  For more than
two years I never seen my family, my loved ones.  I
always pray to God to wish for everyone I love will
always happy, stay positive.  I don't want any things
bad to happen to them.  Sincerely, incarceration not
only affects my life but it also affects my family, my
girlfriend, and other loved ones.  Luckily I can call
them to hear their voice almost every day but it's not
easy, especially to have a chance to see only my sister
today.  This feeling is very hard to explain.  I love my
sister and appreciate a lot for her support.  She is
very special and amazing sister.

To my wonderful girlfriend, I wish to have a
better word to say -- to express my feeling.  I really

1  appreciate her support.  She wanted to wait for me until

2  today.  She never give up on me.  She have said before

3  it doesn't matter who I was before.  It does matter who

4  I am today, and even over the longest distance, our true

5  love got a chance to grow.  I am so grateful and so

6  lucky to have her in my life.

7            In conclusion, I want to take fully

8  responsibility for what I have done.  I'm sincerely and

9  terribly sorry to the people in the USA and to the U.S.

10 Government.  No matter how I feel today, I am

11 responsible for what I have done, and for whatever my

12 sentence will be today, I know it's fair for me.  I hope

13 there will be a second chance for me.  It will also be

14 my last chance to put in action to do what I have said

15 and promised today because I believe action is louder

16 than words.  I never want to hurt my loved ones again,

17 also to anyone else.  I am completely surrendered all my

18 faults to God.  As my Bible teacher has said, even I was

19 a bad person and a sinner, but God love and welcomes the

20 sinner who repent.  Through His love, I am still alive

21 and survive until today without getting any problems

22 when I was in jail.  I stay healthy and positive day by

23 day, never stop improving myself.

24            I believe sooner or later some days I can do

25 something to help the world.  I want to show with the

world that even though I was a bad person, I can still
be a better person.  Through what happened to my life,
for what I have done, I never forget and never forgive
myself.  It's something I have to live with.  I cannot
run from it.  I owe these people who I have hurt and
harm, also to my family, my girlfriend, and other loved
ones for the rest of my life.  I'm sincerely ask for
forgiveness, a second chance from your Honor.  Please
forgive me.  I'm terribly sorry again for what I have
done.

Thank you very much for listening to me in
patience who doesn't speak good English.  I want to say
sorry for talking too much and I appreciate very much,
your Honor, for your time, also to everyone in here
today.

THE COURT:  Thank you.  I believe you're
completely sincere in the statements that you are
making.  I think you've made a strong statement that
reflects your understanding of the seriousness of your
offense, which is an important thing, to come to the
realization about the harm that you have caused to
others.  It's an important step on the way to
rehabilitation.

And I have to say I'm impressed with your
ability to learn English as well as you've learned it

1  over the time that you've been in prison.  You speak

2  English very well.  And to some extent the problems that

3  you find yourself in are so serious here because your

4  capacities are so great.

5          You are quite cunning in how you committed

6  your crimes and quite sophisticated because you're an

7  obviously very capable young man.  You're obviously very

8  smart and thoughtful and very capable, and because you

9  had those capabilities, in a way you were able to commit

10  a crime on a much larger scale than most other people

11  would have been able to do in your circumstances.

12          But you've made a clear statement of regret

13  that counts for something.  It can't erase everything

14  you have done, but I appreciate your statement.

15          All right, Mr. Connolly, what else do you want

16  to say?

17          MR. CONNOLLY:  Thank you, your Honor.  Your

18  Honor, I'd like to start by commending the prosecution

19  team in this case led by DOJ Trial Attorney Mona Sedky

20  and Assistant U.S. Attorney Arnie Huftalen and Special

21  Agent Matt O'Neil.  I think that they have done an

22  extraordinary job in a very complicated case involving a

23  crime that presents one of the greatest dangers to our

24  economy today, and I think the work that they do can't

25  be overstated how important it is, and in this

particular case it was done extremely professionally and

capably and I want to commend all of them for that.

Your Honor, in terms of our recommendation for

Mr. Ngo's sentence, the Court understands from our

written submission that we recommend a time-served

sentence, and we do so principally under the factors

enumerated under Section 3553(a) and the parsimony

principle which is embodied in that. And I want to talk

about just a few of the factors that are pertinent to

the Court's analysis under that statute.

The first, your Honor, is that I can't help

but focus on the fact, particularly given that I am the

father of four boys, that these are crimes that were

committed by a young man who at the time he committed

them, ages 18 to 22, was barely an adult. He was a

young adult and he was a young male adult, and I

understand, particularly now in my stage of life, that

oftentimes young men struggle from immaturity issues.

Having gotten to know Mr. Ngo as well as I've

gotten to know him, I believe that the misjudgments, the

extreme misjudgments that he engaged in, emanated

largely from an extreme lack of maturity. And I don't

mean to minimize the severity of his wrongfulness, but I

do mean to suggest to the Court that this is something

that thankfully young men can grow out of. So in terms

1    of his personal rehabilitation I firmly believe --

2           THE COURT:  I can short circuit this.  Mr.

3    Huftalen, I don't think you're presenting an argument

4    that you think he's likely to go out and repeat his

5    offenses, are you?  That's not -- the principal problems

6    here, the reason why we are considering a lengthy prison

7    sentence, are under the sentencing statute two reasons.

8    One is what is a just sentence and how will a sentence

9    here achieve general deterrence.

10          In imposing a sentence on your client, I don't

11   think there's a very high risk that he will repeat his

12   offenses.  He seems to have grown a great deal, to have

13   understood, come to an understanding of the wrongness of

14   his behavior, and I don't personally consider him to be

15   a substantial recidivism risk.  So that isn't it.

16          I agree that his immaturity at the time of the

17   offense was a contributing factor to his committing the

18   offense.  I also agree that there's something in the

19   nature of these kinds of offenses.  It's like the

20   difference between someone who bumps you on the street

21   and someone who, when you're driving your car, rear-ends

22   you.  The potential that you're going to end up in a

23   road rage incident is much greater, we all know, if you

24   have two people in a car that you're going to end up in

25   a fight on a street when two people bump into each

other.  And when you remove the personal contact even
further by using the Internet to address harm -- to
commit harms on people who are in another continent who
you will never possibly know, it's so easy to
rationalize that behavior, to say, oh, no one will
ultimately be hurt.  I don't know those people.

That combination of immaturity and distance
that you can get with a machine makes crimes like this
far more likely to occur.

So I fully accept all that.  But the problems
are it's a horrendous crime that has really seriously
hurt many, many people, and we just can't overlook that
and we just can't overlook the fact that we have got to
have a criminal justice system that can effectively
deter people like your client from engaging in this kind
of behavior, and the best way to deter people is to
reliably catch them quickly.  But we have a very limited
ability to do that, particularly when people are over in
other countries committing crimes against U.S. citizens.
So when we catch people who commit these kinds of crimes
that are so serious, ordinarily a lengthy prison
sentence is required to achieve general deterrence.

Those are the two factors I'm concerned about,
a just sentence in terms of the harm that the defendant
did to the people that he injured, the harm that it does

1    to the U.S. economics system when people can steal

2    identifying information, and the need to deter others.

3    Those are the two things that are driving my sentencing

4    judgment.

5           So make whatever arguments you want, but I

6    accept that your client was young and immature when he

7    committed this offense.  I believe that your client has

8    fully accepted responsibility.  I believe that he has

9    made extraordinary efforts at post-offense

10   rehabilitation.  Those warrant some consideration in the

11   ultimate sentence, as does his cooperation with the

12   government, but none of them can erase the very serious

13   nature of the offense that he committed, and none of

14   that can sufficiently address the need for general

15   deterrence.

16          So you can say what you want about these other

17   things, but I'm going to keep coming back to, when I

18   figure out my sentence, what's a just sentence for this

19   defendant given the harm that he committed and what's

20   the need to deter others from engaging in this kind of

21   conduct in the future.

22          MR. CONNOLLY:  Your Honor, I obviously can't

23   disagree with any of the Court's observations and I

24   fully embrace them and I don't want any of my comments

25   to suggest that I disagree with the court because I do

1    not.  But I do think that in issuing a just sentence, it

2    is appropriate for the Court to take into account on a

3    subjective level what was the intended loss, and I do

4    believe that in the case of Mr. Ngo, due to his

5    immaturity and lack of judgment, that he failed to

6    appreciate the magnitude of the harm that would result

7    from his conduct.  And while that doesn't excuse the

8    criminal conduct, I believe it is an appropriate factor

9    for the Court to take into account in deciding an

10   appropriate sentence.

11            THE COURT:  In some ways it's unfortunate that

12   we have to use loss as a proxy for seriousness of the

13   harm in these kinds of cases because it is just a proxy.

14   It can't fully substitute for the kind of individualized

15   analysis that I have to engage in when determining the

16   harm here.  I don't frankly think that your client gave

17   much of a thought at all about how much money would

18   actually be reaped by the people that he was selling

19   this information to.  He knew they were going to use it

20   for criminal purposes.  He knew that they were going to

21   be trying to get as much money as they could, but I

22   don't think he was thinking about that at all.  He

23   wasn't doing a calculation, oh, each of them is going to

24   get $10,000 per, so I should be able to charge $2,000.

25            No, I think he figured out these people are

1  going to have their identities stolen.  A certain number

2  of them are going to have substantial sums taken out of

3  their accounts.  Other people probably will have nothing

4  taken out of their accounts.  They probably won't

5  ultimately have to pay.  I don't care.  It's how much

6  can I get for selling them.  That's what he was thinking

7  about.

8       But that doesn't mean that his crime isn't

9  extraordinarily serious because of far more harm than

10  the actual dollar loss of identity theft is the harm

11  that it does to the individual whose identity is stolen

12  whether there is a loss or not.  In most instances the

13  losses are ultimately born by entities that simply

14  transfer the costs to others.  But the person whose

15  identity is stolen has a feeling of being violated and a

16  fear that their lives will be continually plagued by

17  that violation, that it won't go away.  That harm is a

18  really serious harm that isn't reflected in the dollar

19  amount of what is actually intended to occur.

20       So a loss amount is a proxy.  It's not

21  meaningless, but it's hardly sufficient to try to

22  quantify the harm here and translate it into some kind

23  of sentence.  I agree with you, he didn't think about

24  how much money each person was going to lose here, but

25  to the extent you think that's the only issue, it isn't.

1  The harm is much greater than that.  We have this harm

2  to our whole commercial system where fraud costs get

3  built into the transaction costs of doing business in

4  the United States.  So we are all bearing the costs of

5  the defendant's criminal activity and people like him

6  and -- first, and, second, those people whose identities

7  are stolen suffer a significant harm whether there's a

8  dollar loss to them or not.  And that's the problem.

9         But I agree with your basic point.  I don't

10  think your client was calculating how much he thought

11  would ultimately be stolen from these people.  He just

12  didn't care.

13         MR. CONNOLLY:  Right.

14         THE COURT:  And he didn't care in part because

15  he is young and in part because he is dealing with them

16  at a distance.  He isn't stealing from his family.  He

17  isn't stealing from the next-door neighbor.  He's

18  stealing from people that are far away that he doesn't

19  know, will never know.  He doesn't treat them as human

20  beings.  They're just names to him.

21         MR. CONNOLLY:  I understand.

22         THE COURT:  I believe that's what's going on.

23         MR. CONNOLLY:  Your Honor, and to address the

24  specific concerns of the Court, we have made reference

25  in our written submission to the Monsegur case in the

1　Southern District of New York.

2　　　　THE COURT:  I don't know who that judge was,

3　but I won't be doing anything close to that I can tell

4　you because that is a completely unjust sentence from my

5　perspective.

6　　　　MR. CONNOLLY:  So I need not go through the

7　particulars.

8　　　　THE COURT:  I wouldn't bother because the

9　description that you gave of someone who could be so

10　involved in criminal activity and get essentially a

11　time-served sentence is not the way that I do business.

12　　　　MR. CONNOLLY:  But just by way of point of

13　reference, one of the factors that's invited in 3553(a)

14　is a sense of proportionality.

15　　　　THE COURT:  But that one judge gives an

16　unjustly light sentence should not require other judges

17　to go along with it.

18　　　　MR. CONNOLLY:  And I'm not suggesting that

19　this Court impose the same sentence.  In fact, it

20　wouldn't be possible to do so given the fact that Mr.

21　Monsegur was given a seven-month time-served sentence,

22　and that's for someone who committed a bail violation

23　when he was released pretrial and working with the

24　government.

25　　　　THE COURT:  I've made mistakes as a judge.

1   That judge made a mistake there in my view.  Whoever he

2   or she is, they're entitled to their views.  Maybe they

3   don't think it's a mistake, but I won't do that.

4           MR. CONNOLLY:  I understand that, your Honor,

5   but in contrast to that case where Mr. Monsegur who in

6   my judgment engaged in far more egregious conduct, with

7   far more harmful effects, with far more dangerous

8   co-conspirators than Mr. Ngo engaged in, was given a

9   seven-month sentence.

10          THE COURT:  I feel no obligation to lighten

11  the sentence I'm giving your client based on a mistaken

12  sentence given by another judge in another case.  The

13  responsibility of avoiding unwarranted sentencing

14  disparity does not require a judge to deviate down or

15  deviate up based on anomalous sentences that don't

16  reflect the judge's own conception of what a just

17  sentence is.

18          I avoid unwarranted sentencing disparity by

19  considering the guideline sentence, and that's what I

20  will do here, but I'm not -- I mean, you can keep

21  talking about this other case if you want, but I'm

22  telling you, I view that as an anomalous case outside

23  the range of what I think is reasonable based on the

24  circumstances, and I will not allow my sentencing

25  judgments to be influenced by it.  I don't believe I

1    have any obligation to do that.  Indeed, I believe it's

2    a mistake.  If we had an anomalous sentence that was

3    many, many years too high, should I give a higher

4    sentence in order to avoid unwarranted sentencing

5    disparity?  No.  That's not the way unwarranted

6    sentencing disparity calculations should work.

7                MR. CONNOLLY:  Understood, your Honor.  Your

8    Honor, perhaps an example that's a little closer to home

9    is the case involving Colin Lindsay which your Honor

10   handled about four or five years ago if I remember

11   correctly.  You may recall Mr. Lindsay was engaged in a

12   fraud scheme involving life insurance policies which

13   were issued for purposes of later sale, and they were

14   issued to people who were essentially indigents based

15   upon misrepresentations that they had a very significant

16   net worth.  The policies were issued and then after a

17   two-year period were sold on the open market as

18   commodities, and as a result of Mr. Lindsay's conduct,

19   he engaged in tens of millions of dollars of fraud.  Mr.

20   Lindsay fully cooperated with the government and Mr.

21   Lindsay stood in this courtroom and made a very

22   compelling statement of acceptance of responsibility.

23   And based upon all of the factors in that case, the

24   Court reduced the guideline sentence of the range of

25   eight to nine years down to approximately three years,

1  which with 15 percent off was less than that. And I
2  submit, your Honor --

3      THE COURT: I don't remember the facts of that
4  case to be honest with you. So I'm not sure what I can
5  say about it. I don't remember the case. I've
6  sentenced a small city of people to prison, 3 or 4,000
7  people to prison in my lifetime. So I can't say that I
8  can remember that case.

9      MR. CONNOLLY: Well, I bring it to the Court's
10 attention because I do think there are parallels, and
11 indeed I think there are favorable comparisons to this
12 case given that Mr. Lindsay was an older, much more
13 mature individual than Mr. Ngo was at the time he
14 committed his criminal offense.

15     THE COURT: Was he stealing people's
16 identities?

17     MR. CONNOLLY: Well, he was misrepresenting
18 people's identities. He was misrepresenting the fact
19 that indigents were worth tens of millions of dollars so
20 that insurance companies would write insurance policies
21 worth tens of millions of dollars when the insurance
22 companies never would have done so had they known the
23 true identity and the true net worth of those
24 individuals.

25     THE COURT: I'm not sure this is worth our

1   time, but if you want to spend it on it, you will have

2   to refresh my memory about it.  That case was a case in

3   which he was an insurance broker?

4          MR. CONNOLLY:  I believe he did function as an

5   insurance broker and he functioned in other roles.  But

6   he was involved in a conspiracy of people who recruited

7   homeless people essentially, indigents, to apply to

8   insurance companies based upon a completely fraudulent

9   application as to their income --

10          THE COURT:  To get a life insurance policy?

11          MR. CONNOLLY:  To get a life insurance policy.

12          THE COURT:  And then what would happen with

13  it?

14          MR. CONNOLLY:  Well, the policies would be

15  issued.  The premiums would be paid by a third party.

16  And after a two-year period, life insurance policies

17  become incontestable and therefore they're like

18  commodities that can be sold on the open market.

19          The purpose of the scheme was to get these

20  high-dollar life insurance policies issued so that they

21  could then be sold to hedge funds and other commercial

22  investors because these are commodities that have value

23  on the open market.  They were issued based upon a

24  completely fictionalized representation as to who the

25  insureds were.

1          Now, your Honor, I'm not sure --

2          THE COURT:  I don't remember this case at all.

3  I don't remember it at all.  So I can't tell you -- you

4  know, I'm sorry I don't remember it.

5          MR. CONNOLLY:  That's all right.  I don't

6  think we need to get into the weeds of the Lindsay case.

7  The point that I wanted to make, your Honor, is that Mr.

8  Lindsay engaged in a type of commercial fraud that

9  resulted in tens of millions of dollars of damage, and

10  it is comparable in egregiousness to the wrongful

11  conduct engaged in by Mr. Ngo.  I realize that what Mr.

12  Ngo did is different in that he did it from abroad and

13  that it involved --

14          THE COURT:  Not so much that he did it from

15  abroad.  It's that he stole hundreds of thousands of

16  people's identities, and the harm that you inflict when

17  you do that is egregious.  I can't compare it to a case

18  that I can't remember.  If you want me to go into the

19  ECF, get the file out, read the presentence report, look

20  back at the sentencing hearing transcript and try to

21  explain to you why I reached that sentence, and you

22  think it's important enough for me to do that, I will do

23  that, but I don't think it really has a big bearing.  I

24  can tell you, if I sentenced Mr. Lindsay as you say, and

25  I don't remember it, I would have done so after careful

consideration of the unique facts of that case, just as
I'm doing when I sentence your client.  When I try to
sentence your client, I try to do that with a full
understanding of the facts that are relevant to his
case.

I didn't recall you having an extensive
briefing about the Lindsay case in your materials, so I
didn't come prepared to discuss the Lindsay case.

MR. CONNOLLY:  Your Honor, I don't mean to
overemphasize the importance of the Lindsay case.  The
case that we were relying on, obviously from our papers,
was the Monsegur case.

THE COURT:  Right.  And I read your
description of that and thought about it and I said,
wow, I would never do that.  So I'm not going to use
that as a comparator in trying to sentence your client.

MR. CONNOLLY:  I'm not wanting to revisit that
argument.  I understand the Court's position and I
accept the Court's position.  So I was moving to another
example of what I viewed to be a very significant
downward departure in a fraud case.  But, again, I don't
want to overemphasize the Lindsay case.  I'd like to
emphasize the facts of this case, your Honor.  And,
again, I don't mean to diminish the seriousness and the
egregiousness which the Court has outlined, and I think

1   my client fully understands.

2          But the fact of the matter is Mr. Ngo has done

3   everything within his power from the moment he was

4   arrested to try to undo the harm that he has done.  He

5   immediately began cooperating with the government.  He

6   never challenged the prosecution for a moment.  He has

7   had the opportunity --

8          THE COURT:  He's going to get, if I accept the

9   government's view, nine years off of that alone.  Nine

10  years off a sentence, that's a long and very and, I

11  think, appropriate reduction for his substantial

12  assistance, but that's certainly generous in the way the

13  government measures its departures, among the more

14  generous departures I've seen from the government in

15  recent years.

16         MR. CONNOLLY:  Well, your Honor, respectfully,

17  I would submit that given all of the facts in this case,

18  that a more generous departure, or if the Court would

19  prefer a variance under the 3553(a) factors would be

20  appropriate in this case.  This is a person --

21         THE COURT:  Well, the problem is your client

22  was the principal bad guy in this scheme.  There wasn't

23  anybody else that he cooperated against that was more

24  culpable than him.  He didn't work for somebody else as

25  a programmer or low level person.  He was the guy that

conceived and implemented the scheme over a long period of time. And that's what I was alluding to in the past earlier in the sentencing hearing. Your client's a very capable young man. He's very smart. He's very thoughtful. He's very skilled. And it's in part because of all those things that he was able to commit such a crime on such a vast scale. Most criminals can't get out of there own way to do a small crime. He was able to do very big crimes because he's so capable. But he did it all on his own. He didn't have anybody leading him into it. He didn't end up ratting out people above him on the chain. He testified against other people in the U.S. that were using his information for the most part and people who are not of greater capability. So that's one of the problems that we have here.

But I agree, he was young. He didn't have a prior criminal record. He didn't engage in violence, but his scheme was not aberrational. It occurred over a significant period of time and he was the principal executor of the scheme. It wasn't some father figure who brought him into the crime and indoctrinated this innocent young man into it. We just can't overlook those things.

I know, you want to talk about other things.

1   Those are the things that I have to think -- I agree

2   with you on the things -- most of the things you want to

3   talk about except when you want to compare him to other

4   people.  I agree with you on most of the things you want

5   to talk about.  I think your client is not likely to

6   commit future offenses.  I think your client has fully

7   accepted responsibility.  I think your client has

8   engaged in extraordinary efforts of post-offense

9   rehabilitation.  I think your client has engaged in very

10  valuable, highly important cooperation to the

11  government.  All of those things will affect the

12  sentencing judgment that I want to impose.  So you can

13  keep talking about those, but I already agree with you

14  on all that.

15          MR. CONNOLLY:  Well, really it boils down to a

16  question of what is a just sentence in this case, your

17  Honor, and I would respectfully submit that in light of

18  all that he has done, literally from the moment that he

19  was taken into custody up to this point in time, he's

20  done everything possible to try to heal the harm that

21  he's done.  And he can't erase it, and I understand that

22  and he understands that, and we both understand that a

23  serious sentence needs to be imposed.

24          Looking at the examples that are cited in our

25  written submission, there's other cases besides the

1  <u>Monsegur</u> case where courts have taken into account the

2  youth of offenders, including hacking cases.  There was

3  a case, I believe, involving 8,800 identities that were

4  stolen by a defendant and that particular defendant was

5  given a nine-month probation sentence.  I'm not arguing

6  for that here.  I'm simply saying that courts have

7  acknowledged under 3553(a) --

8            THE COURT:  I think you're giving your client

9  a false impression that everybody else in the world that

10  commits similar crimes to him ends up getting slapped on

11  the wrist and sent back home.  You know, that's just not

12  the truth.  You can highlight aberrational, out-of-line

13  sentences, but there's a reason the guideline for him is

14  over 200 months, okay?  So you can keep doing this and

15  you can give him and his sister the feeling that, wow,

16  this judge has given a completely out-of-line sentence.

17  No, the in-line sentence is a couple hundred plus

18  months.  So, you know, keep saying it, but it isn't

19  true.

20            A sentence like the one that the government is

21  recommending, I'm not saying I'm agreeing with that

22  sentence, but it's not out of line with what is

23  routinely done in serious cases like this across the

24  country, okay?  I'm sorry, to the extent you're giving a

25  false impression to people from outside the United

1    States that somehow your client is being treated

2    differently, and he isn't.

3              MR. CONNOLLY:  Your Honor, I apologize if

4    that's the impression --

5              THE COURT:  That's the fear I have is that you

6    are giving a misimpression to your client and his family

7    that everybody else walks when they do these kinds of

8    crimes and they don't.  They don't in my court.  They

9    don't across courts in the United States.

10             Yes, there are judges who don't believe that

11   white-collar criminals should ever serve time.  There

12   are judges who have that view, but that's not what the

13   Sentencing Commission thinks is the ordinary case.

14   That's not what happens in the ordinary courtrooms

15   around the United States.  And I am concerned about the

16   misimpression that's created that people can commit

17   crimes of this magnitude and receive essentially no

18   punishment.  It has happened, but you have tried to

19   identify every light case -- sentenced case you can

20   think of and pay no attention to every sentence that's

21   given within the guideline range.

22             The departure rates in the United States are

23   about 60 percent.  Forty percent of the sentences are

24   within the guideline range.  And I don't know what they

25   are for these particular theft crimes, but there are a

significant number of people doing time in prison for

white-collar crimes that are serving 20, 30, 40-year

sentences.  There are.  There just are.

　　　　　But go ahead.  Say anything else you want to

say.

　　　　　MR. CONNOLLY:  Well, your Honor, I understand

that there are -- I think that there are two legitimate

bases for a below guideline sentence here.  One is the

one identified by the government.  We appreciate the 5K1

motion, and as I've already said, Mr. Ngo has done

everything and will continue to do whatever he can to

cooperate with the government's important efforts in

prosecuting this type of offense.  But there also are

factors where courts have decided to exercise their

discretion to grant a variance in cases that are similar

to this one.

　　　　　And I don't mean to suggest that Mr. Ngo ought

to be given a probation sentence.  He's already served

29 months.  And I understand from the Court that the

Court intends to impose additional time.  What I am

suggesting is that under 3553(a) it would be appropriate

for the Court to sentence Mr. Ngo to a more lenient

sentence than 15 years than that which is being

suggested by the government.

　　　　　THE COURT:  Well, that's a fair argument.  I'm

just saying I think we've covered areas -- is there
anything more you want to say about how serious and
wrong the offense is?  I think you prefer not to talk
about that.  Is there anything you want to say about why
this sentence is not needed to achieve general
deterrence?  You probably don't have much to say about
that.  But if you want to say anything about those two
things, those are things that are concerning to me.

On the things that you want to talk about, I
largely agree with you on, although I don't think on
balance I can take the sentence down to the extent you
think because of those considerations.

The government always wants me to focus on the
crime, the crime, the crime, and the defendant always
wants me to focus on what a good person he really is and
how this was a mistake that will never happen again.

I have to consider all those things.  I can't
just consider the defendant is a good guy and he's
really sorry for what he did.  I can't do that.  I can't
just consider the crime he committed is horrendous and
he deserves to be in prison for life.  I can't do that
either.  I have to consider all of the factors.

So I've explained to you the two factors on
which you and I -- you don't want to say much.  Those
are concerns to me.  The factors that -- I've read your

memo and I agree with a lot of it on what your client's
done after he's been incarcerated, and I agree with you
that he was very young and that his relative youth is a
factor in how he ended up committing this crime.  I
agree with that.

MR. CONNOLLY:  Your Honor, let me just say,
because I'm afraid that the Court has the wrong
impression of my intended message.  Remember, I began my
remarks by commending the government.  I fully
acknowledge that the harms caused by computer hackers
stealing personal identity information of individuals is
an extremely damaging crime.  The fact that it can be
committed in such an insidious way, particularly from
overseas where people don't have a sense of the
individuals being harmed, who they are and the impact
they're having on their lives, I recognize that, and I
recognize that it's your job to impose a sentence that
reflects the severity of that crime.  And I don't mean
to diminish the importance of any of those factors.

I think Mr. Huftalen has done an exceptional
job in all of the proceedings up to this point in
conveying to the Court, both verbally and in his written
submission, the harmfulness of the conduct and indeed
the aggravating factors that involved the particular
conduct of Mr. Ngo, and I don't mean to diminish that at

all.  In fact, your Honor, without revealing

attorney-client confidences, Mr. Ngo knew fully from his

legal counsel how important it was for him to convey to

your Honor the magnitude of the harm that he caused,

which is why he included that and made a very detailed

presentation on that point.  I didn't write that.  That

was all from Mr. Ngo.  But Mr. Ngo understood from me

that he's engaged in very serious criminal wrongdoing

and that his sentence is going to reflect that.

THE COURT:  Mr. Ngo's statement, it could have

been somebody who had listened to me impose sentences

for ten years and pulled out of it everything that I say

to somebody when I sentence them.  Actions speak louder

than words is something that I use many, many times.  He

used that exact phrase in his speech fully accepting

responsibility.  If I were ever advising a criminal

defendant who came in front of me what to say, I would

say without qualification or explanation or excuse, say

I'm wrong and I realize it.

He did that.  Those are all really good

things.  I'm sure that was consistent with the advice

you were giving him, but I believe he was sincere and

that it's his own view about these things.  I think he

actually -- that's one of the benefits of the

Therapeutic Community Program is it does -- not for

1   everybody, but it does cause many people to rethink

2   their own life and their responsibility for what happens

3   to them in their life, and I think he did a great job of

4   reflecting that, and I'm going to give him credit for

5   it.

6           MR. CONNOLLY:  Your Honor, just a few more

7   remarks.  I think I have made all the points that are

8   important, but I'm troubled that the Court may think

9   that I've given a misimpression to the family of Mr.

10  Ngo.  Those conversations are not privileged so I can

11  tell you --

12          THE COURT:  What I don't want is people who

13  are not familiar with the U.S. legal system to get the

14  impression, which will be totally, totally false here,

15  that any sentence that Mr. Ngo gets will be somehow due

16  to the fact that he's not a U.S. citizen or that he

17  committed his crime from outside of the United States

18  and that U.S. citizens who do these kinds of things

19  actually end up with lighter sentences.

20          That is not true.  That is completely false.

21  And I know you're not doing it deliberately, but that is

22  a danger in the arguments that you are making, and I

23  don't want people to feel that way.  It does an

24  injustice to Mr. Ngo if he were to leave this courtroom

25  with that feeling because it is just absolutely not

1 true.

2          Okay.  So that was my concern.  I'm not saying

3 you did anything deliberately.  I'm just saying that is

4 an effect of saying this guy did much worse and got

5 nothing.  This guy did much worse and got very little.

6 You're giving such a huge sentence to my guy.  Why?

7 There's no justification for it.

8          That's the implication of what you're saying.

9 But in truth, as you know, the whole concept of avoiding

10 unwarranted sentencing disparity is to use the

11 guidelines as advisory.  The guidelines determine what

12 you should do to avoid unwarranted sentencing disparity,

13 and the guidelines for your client are way, way, way

14 over here, much longer than the sentence I'm going to

15 impose against him.

16          So to suggest otherwise creates a real risk of

17 misunderstanding that is concerning to me because I want

18 Mr. Ngo to know that I'm sentencing him as an

19 individual, and whether he came from Vietnam or another

20 country has nothing to do with the sentence that I

21 ultimately am imposing on him.  I would impose that

22 sentence on somebody who grew up right down the street

23 three houses down from me.  It's the crime that he is

24 committing that matters to me.  And his sentence that

25 I'm going to give him is not going to be out of line

1  with sentences that other people have gotten and other

2  sentences that I have imposed.

3          I just do not respond well to that argument.

4  You've gone a marvelous job of presenting the case for

5  him, but that argument does not resonate with me.  I do

6  not accept it.  I do not believe in the cherry picking

7  identifiable cases and going to the judge and saying

8  this guy got a light sentence.  You should give my

9  client the same sentence.  I just don't buy it.

10         I've been very clear about that over the

11  years, and I believe the Court of Appeals agrees with me

12  that you don't avoid unwarranted sentencing disparity by

13  trying to find other cases out there where someone else

14  has gotten an extremely light or an extremely heavy

15  sentence and then sentence in accordance with that.

16  That's just not the way it works.

17         But in any event, I appreciate what you've had

18  to say.  You've obviously done an outstanding job for

19  your client.

20         I've got to give the court reporter a break.

21  We'll have to come back at 1:30.  I will deal with the

22  case then.

23         (Lunch recess taken.)

24         THE CLERK:  This hearing is back in session.

25         THE COURT:  So, Mr. Connolly, I've had a

1   chance to go back and look at the case you wanted me to

2   consider as a comparator, the Lindsay case, and I have

3   to say it's not very useful as a comparator case. First

4   of all, the scheme at issue in Lindsay is somewhat

5   different from what you described. You described one

6   part of it and that's why it wasn't ringing a bell with

7   me. But more importantly, in that case the loss amount

8   was between 2.5 million and 7 million. The loss amount

9   here obviously is between 50 million and 100 million.

10   The guideline sentencing range in the Lindsay case was a

11   28-I, whereas this case is a 40-I. The sentence that I

12   imposed was a 51-month sentence which was in response to

13   the government's motion for a 5K1 departure, and the

14   government asked me to impose a 51-month sentence and I

15   imposed a 51-month sentence.

16         I went back and looked at the sentencing

17   transcript. To the extent that you consider it a

18   comparator, it's just completely not. It's not even in

19   the ballpark of a comparator. Your client has a much,

20   much higher loss amount. You represented Lindsay, too.

21         MR. CONNOLLY: I did.

22         THE COURT: This client has a much, much

23   higher loss amount, a much, much higher guideline

24   sentence, gets a much greater downward departure that

25   the government is proposing, and the sentence you're

1  asking me to give is way, way, way, way below the

2  sentence that the government is asking me to give based

3  on his substantial assistance.

4        So I really don't think we ought to spend much

5  more time talking about comparisons to the Lindsay case.

6  We ought to be focusing on the facts of this case and

7  why you think this case should produce the sentence that

8  you're asking for.  Did you want to comment on the

9  Lindsay case.

10       MR. CONNOLLY:  No, your Honor.  I had

11  remembered the sentence as being less than 51 months,

12  but the Court has the record.

13       THE COURT:  I went back over the sentencing

14  transcript.  I may have it wrong, but that's what I

15  understood in looking at the sentencing transcript.  If

16  you doubt it, I will go back and check the judgment and

17  we'll see what the actual judgment is.  But I believe I

18  sentenced him to 51 months.

19       MR. HUFTALEN:  Judgment is 51 months.  I have

20  a copy here.

21       MR. BUCKLEY:  Same thing in ECF.

22       MR. CONNOLLY:  Fair enough, your Honor.  It is

23  what it is.

24       THE COURT:  It is what it is.  Why don't you

25  make your concluding remarks and then I will hear from

1    Mr. Huftalen.

2              MR. CONNOLLY:  Your Honor, without wanting to

3    minimize the gravity of the wrongdoing here, I think

4    there's one more factor that should be pointed out in

5    support of our argument that the guideline loss amount

6    on some measure overstates the seriousness of the

7    offense, and that is that, as the Court knows, the law

8    in the First Circuit is to use an objective standard in

9    determining the intended loss amount and not a

10   subjective standard, which has been embraced by other

11   circuits.  And as we have pointed out in our papers, I

12   believe there is an amendment to the Sentencing

13   Guidelines which is likely to become effective later

14   this year which would opt for the subjective standard

15   over the objective standard.  And to the extent that the

16   subjective standard would apply here, it's clear there's

17   an enormous loss, but there's also no evidence, and

18   indeed it's not the case, that Mr. Ngo appreciated that

19   the personal identification information that he was

20   selling would be used for the tax fraud scheme which it

21   was used for.  Mr. Ngo wasn't involved in that.  But,

22   again, your Honor, I say that --

23             THE COURT:  He's a smart guy; right?  You say

24   he made 400,000 out of this deal; right?

25             MR. CONNOLLY:  Yes.

1        THE COURT:  So he's a smart guy and must

2   realize the people who are willing to pay him 400,000

3   are going to be making vastly more out of these

4   transactions.

5        MR. CONNOLLY:  No doubt.

6        THE COURT:  Even from the subjective

7   component, he had to have known that this was a

8   multimillion-dollar scheme, that it would produce losses

9   in the multimillion-dollar range.  Otherwise rational

10  people wouldn't pay him 400,000 for it, and, in fact,

11  you wouldn't pay anything like -- just like a fence

12  doesn't pay the full value of the diamonds.  When you're

13  selling this kind of information, people are not going

14  to pay you anything close to 1/100th of what they expect

15  to be able to reap from it.

16        So there is good evidence that would support a

17  position that your client understood that this was a

18  massive fraud loss that he was intending would happen,

19  even if you use a purely subjective standard.

20        But, again, the loss amount here is not a

21  particularly good way of identifying the harm.  It's

22  more important to think about, in terms of what a just

23  sentence is, what it means to violate the privacy of

24  however many hundreds of thousands of people that he

25  violated the privacy of when he took this information

1   and resold it to be used by people who would abuse the

2   private information of the people who had the accounts.

3          And so, I mean, we can debate about the money.

4   You already got a conservative figure by compromising,

5   but frankly, in my mind, the concept of a just sentence

6   requires looking very carefully at what your client did.

7   And he violated the privacy of these individuals by

8   appropriating their private information and selling it

9   for other people to use for fraudulent purposes.  And I

10  think that's a really serious thing, and I think the

11  fact that he did it for many, many, many tens of

12  thousands of people is what the problem is here.  And in

13  figuring out what a just sentence is, I can't pretend he

14  did it for only one person.  He did it for hundreds of

15  thousands and the sentences are not the same.  If

16  somebody just steals your personal information and just

17  defrauds you, they get one sentence.  But if they

18  defraud you and 100,000 other people in the same way,

19  they get a longer sentence; right?  That's the problem.

20  It's that he used his skill with the Internet, knowledge

21  of technology and his criminal cunning, to commit this

22  crime on a vast scale, and as a result he faces a

23  significant potential sentence.  That's what it comes

24  down to.

25          MR. CONNOLLY:  Your Honor, I can't disagree

1    with anything that the Court has said, and I understand

2    that.  More importantly, my client understands that, and

3    so we appreciate that this is a case that requires a

4    very serious sentence, that it needs to be a just

5    sentence, that it needs to create a general deterrence

6    to those who might be inclined to engage in similar

7    conduct.

8              Respectfully, your Honor, in light of all of

9    the circumstances, particularly those unique to Mr. Ngo

10   and the magnitude of his cooperation and his own efforts

11   to improve upon his own criminal past and the future

12   that he may have, I respectfully submit that a sentence

13   less than 15 years would be a just sentence, and I will

14   leave it to the Court's discretion to decide what that

15   sentence is.

16             THE COURT:  Thank you.  Mr. Huftalen, so Mr.

17   Connolly has pointed out certain outlier sentences and

18   suggests I should give a lighter sentence to avoid

19   unwarranted sentencing disparity.  You don't need to

20   comment on the Lindsay case because I think I've already

21   explained why that is not a good comparator.  But did

22   you have any comment about this attempt to use what

23   seemed to me to be very unusual sentences given by other

24   judges to warrant a lower sentence here.

25             MR. HUFTALEN:  I know the AUSA in the Monsegur

case.  I've met with him.  I spoke with him as recently

as yesterday.  I know what went on in that case.  I

don't think the Court's wrong in its assessment of what

went on.  He certainly helped.  He thwarted 300 hacks of

of governmental agencies and other businesses.  But if I

were to talk about it and compare and contrast, I think

at the end of it, you wouldn't think any differently

than you do now.  These are so dramatically different

individuals, dramatically different situations, and

frankly dramatically different judicial temperaments and

interpretations of how to exercise judgment.

THE COURT:  I agree, judges should try to

sentence people in a way that avoids disparity based

solely on the subjective views of the judge.

I, for one, am a believer in the Sentencing

Guidelines and would prefer that policy judgments about

whether the guidelines are excessive or too lenient

should be left to the Sentencing Commission so that

judges can't simply substitute their own subjective

policy views for the views of the Sentencing Commission.

Instead I think judges should vary based on things about

their case that is unusual in their case that the

commission couldn't take into account.  If it were up to

me, I wouldn't allow judges to vary because, oh, I think

drug crimes are being prosecuted too harshly or too

leniently.  That isn't in my mind what judges should be
doing.  But we are required to do that to some extent,
and I do what I'm required to do.

So I believe in trying to avoid unwarranted
disparity, but I don't believe you achieve it by
ignoring a guideline and instead focusing on one or two
outlier cases and say those were extreme cases, you
should sentence my person in the same extreme way.  I
just don't buy that.

MR. HUFTALEN:  And it's magnified here
because, to use a real estate analogy, there are no
comparables in the neighborhood here.  I mean, what Mr.
Ngo did is qualitatively different, and that has not
been lost on the Court, I know from your comments
earlier.

When you compare sentences in cases for people
who hack and steal credit card data, you're looking at,
as the Court noted, a crime which under the rules of the
calculistic system within which we work, you know, the
cost gets spreads among everyone.  If somebody steals my
credit card, they steal my credit card, the bank gives
me a new one.  My son has to change the Netflix account
and I've got to change the gym membership and I move on.
But if somebody gets my Social Security number, my date
of birth, my mother's maiden name, my last five

1  addresses, there isn't anyplace that I can go to have

2  those replaced.

3          So I think that even if there are comparable

4  cases in terms of sentences imposed -- and there are

5  some.  I mean, across the hall -- let me apologize.  I

6  didn't introduce Ms. Sedky when we first started.  Mona

7  Sedky is with the Computer Crime Intellectual Property

8  section.  She and I have worked a number of cases.  She

9  and I worked a case that was sentenced across the hall

10  with Adrian Oprea, a Romanian national who from afar,

11  hiding behind not only his computer but the

12  international boundaries of eastern Europe and the

13  United States, was hacking in and stealing credit card

14  data here.  Judge McAuliffe sentenced him to our

15  recommended sentence of 15 years not for any reason

16  other than that was a fair and just sentence given what

17  Mr. Oprea had done, but a 15-year sentence for Mr. Oprea

18  was fair under those circumstances, and we didn't make

19  the 15-year recommendation in this case cavalierly at

20  all.  I mean, we took into account all of the conduct.

21  We took into account the cooperation and his trial

22  testimony in the Ealy case, although maybe unnecessary.

23  It is what it is and he testified and it weighed heavily

24  in our decision.

25          But as far as comparable cases go, the ones

1　that are closest are ones that this Court has already

2　sentenced.  I mean, the underlings or the people who

3　bought PII from Mr. Ngo have been sentenced here, one in

4　this courtroom.  In fact, you sentenced an individual

5　named Quenten Hall.  Quenten Hall had purchased -- the

6　proof was 23 fullz.  The loss under the guidelines was

7　$11,000.  This Court gave Mr. Hall an 18-month sentence.

8　　　　　Across the hall Judge McAuliffe in U.S. versus

9　Theoc sentenced Mr. Theoc who also bought fullz and

10　engaged in SIRF fraud and other frauds with the

11　information he bought from Mr. Ngo.  The loss

12　calculation in the PSI there was $312,500, and he was

13　sentenced to, I believe -- he was sentenced to

14　27 months.

15　　　　　So when I look at 11 fullz and -- or 23 fullz

16　rather and $300,000 and I see the sentences that are

17　based in part, in large part, on the guideline

18　calculation as the Court has found it, and then I read

19　the sentencing memo that says:  Because of post-offense

20　rehabilitation, Mr. Ngo should get a time-served

21　sentence, I scratch my head.

22　　　　　To the extent there are comparables, it is the

23　people who are way, way, way downstream from Mr. Ngo,

24　and there are those people who are in prison and in the

25　future will be in prison because of what he did.

So I don't think it's helpful to the Court or to society in general to pick cases and say, in the Southern District of New York -- and there's another quote from Judge Rakoff that's getting to be a habit. I'm hearing people tell you that you should stay and do what Judge Rakoff says in his cases. That's their world. Those are their cases and they have their philosophies and their sentencing judgments.

These cases I think need to be started with the guideline calculation. I think it was page one. If it wasn't page one, it was page two of my memo. I said: Qualitatively this is a different case. And the guidelines are significant, but in the end, it isn't the guidelines that are going to drive or should drive this case because the true harm here is to the people who's identities have been stolen and this proxy -- and I'm glad the Court referred to it as a proxy loss. Because it really isn't an intended loss as Mr. Connolly referred to it. It's a proxy loss that's reflective of the bare minimum that Congress has said, when you're dealing with access devices which are identity, there's a value there. Whether it's been compromised, whether it's been used, whether there are financial detriments that flow to the individual or not, there's a value in it and it can't be anything less than $500.

In this case, in the SIRF returns, the SIRF returns that we know of on average averaged $5,000 per return.

I've talked to people that I've indicted. I've got people who are probably going to be pleading guilty. I've got other people that may be indicted in the future who engaged in SIRF returns based on information they bought from Mr. Ngo. I know what they do because they've told me. I know how they think because they've told me. And all they wanted was the name, the date of birth, and the Social Security number, and once they had that, that was it, and they sit there at the computer and they just file return after return, and if they get a 10 percent or a 15 percent positive, they're on easy street because every positive is a $5,000 check that gets laundered through a couple of different bank accounts and they walk away with it.

But the real harm are to the people. And I know the Court has some of the victim letters in this case. As I sat reading through victim letters and listening to voice mails that victims had left -- the Department of Justice has this program in Washington for mass cases of victims, and in this case they sent out 13,600 and some odd letters. People call, people send in emails, people leave voice mail messages. I was

1  taken by -- and I don't mean this in a pejorative way at
2  all -- how simple so many of these victims are.  They're
3  living day to day.  They suffered harm.  And I'm not
4  going to read from the victim letters.  You have them,
5  you've seen them.  But people say it isn't just me.  My
6  wife and my children suffer from this because I work
7  hard enough for the few things that I have.  I shouldn't
8  have to deal with this as well.  One woman said:  I was
9  asked two days ago whether or not I had recently applied
10 for a mortgage.  The answer is no.

11         But that's what they're facing.  And most of
12 the people who are victims in this case I tend to -- and
13 I won't ascribe this to anybody else.  I tend to assume
14 that the impulses pass through everybody's brain the way
15 they pass through mine, for better or worse.  And
16 occasionally I'm reminded, and I was reminded in this
17 case, that if I were a victim in this case, I wouldn't
18 say I'd be at my wit's end, but I'd have my work cut out
19 for me in terms of dealing with the three major credit
20 bureaus trying to get my credit history cleaned up,
21 trying to get adverse things taken off, trying to
22 rehabilitate myself.

23         When I listen to some of these victims and the
24 tone in their voices, I think, this is it.  This is
25 their life.  They're going to live with this.  They're

1    going to wait, they're going to worry, they're going to

2    wait, they're going to worry, and they are going to be

3    adversely impacted.  Hopefully not, but they probably

4    will be.

5            So what I think the Court needs to look at is

6    the real harm that Mr. Ngo did, and 15 years is harsh,

7    especially with a 5K recommendation, 15 years is a very,

8    very harsh sentence recommendation.

9            There's one thing that we didn't focus on

10   sufficiently in our written pleadings, and it's the only

11   thing from here on that I want to comment on because I

12   think the Court obviously has read all the pleadings and

13   understands what's going on.  That is, who Mr. Ngo is.

14   And I'm not saying that the Court is wrong in its

15   assessment that he will not be a recidivist, but I don't

16   think that I or Ms. Sedky have made it clear to the

17   Court that Mr. Ngo really did this starting ten years

18   ago, and he started hacking when he went to college in

19   New Zealand, and he started stealing credit card numbers

20   and he was making money off the credit card numbers, and

21   then he hacked into his college in New Zealand.  He got

22   caught by the police, he got kicked out of New Zealand,

23   he got kicked out of college.  His family helped him --

24   and this comes from his trial testimony in the Lance

25   Ealy case in Ohio in November of 2014.  His family

1  helped him pay off the victims from his credit card

2  hacks that he conducted when he was in New Zealand, and

3  he said his parents went bankrupt.  So he had a

4  supportive family who helped him.

5           He ran back to home.  He ran to Vietnam.  He

6  started to attend college in Ho Chi Minh City, which

7  lasted between six and twelve months.  After taking the

8  benefit of his supportive family and putting them in

9  bankruptcy to pay off his victims, having a fresh start

10  he went back to hacking.  And this time he said he

11  learned not to go after the bank information.

12           THE COURT:  Wait a minute.  Maybe I didn't get

13  all the details.  I thought -- did your memo talk about

14  him engaging in identity theft while he was in college?

15  You reference in your memo to him having been expelled

16  from college for hacking.  But you're telling me he was

17  in the identity theft business in college.  He got found

18  out.  His family made restitution.  They went bankrupt,

19  and then he came back and did it again.

20           MR. HUFTALEN:  Yes.  And he testified to those

21  facts in U.S. versus Ealy in the Southern District of

22  Ohio.

23           THE COURT:  That he got caught and his family

24  tried to help him and then he went back and did it again

25  is an important fact.  I hadn't heard that fact up to

1   now.

2          MR. HUFTALEN:  That's why I said I think we

3   failed in bringing that to your attention.

4          Once he started into the hacking business in

5   the United States, to say that he was persistent would

6   be a dramatic understatement.  He hacked into other

7   people's email accounts, read their emails to position

8   himself better to get contracts to get into the business

9   he ended up with a contract with, Court Ventures, so he

10  could get into this database of hundreds of millions of

11  people.  He assumed the identity of two people by

12  creating an email account that looked almost the same.

13  It would be like if somebody took mine and changed it

14  from Arnold.Huftalen to Arnold.Huftalem@usdoj.gov and

15  represented himself to be these other people.  They were

16  references to him so that he could become contractually

17  engaged and get access to this.

18          He set up an email account -- I did put this

19  in a memo -- in the name of a name that he thought was

20  Chinese because he was trying to deflect attention away

21  from him being in Vietnam.  He laundered the money that

22  he paid.  He was paying 20, 25, $30,000 a month to Court

23  Ventures for all of these on average 50 or 60,000

24  queries a month by wire transfer, but he laundered that

25  money through a third party in another country to hide

1  himself from being found.

2         When Court Ventures sold their assets to

3  Experian, he learned that Experian was buying the

4  business.  He sent emails to Experian saying this is who

5  I am, this is what I do, I'm a good businessman, I'm a

6  good resource of money for you.  Please keep things the

7  way they were, and Experian kept him on.

8         Finally when the Secret Service realized where

9  the database was, Secret Service reached out to Experian

10  who was holding a pipeline into it at that time and he

11  was shut down.

12         But he didn't give up.  He went and he found

13  another source for PII, and this time it took the Secret

14  Service only three days to find the company.  It was a

15  company in Florida, TLO, another data aggregator with

16  hundreds of millions of people's PII, name, DOB, Sosh,

17  addresses.

18         In order to get the contract with TLO, he

19  falsely represented himself as a private investigator,

20  not from Singapore like he did with Court Ventures, but

21  this time from Michigan I believe.  Illinois, excuse me.

22         He fabricated a driver's license saying he was

23  from Illinois, and that was his justification as a

24  private investigator in the U.S. to get into the TLO

25  database.  The Secret Service let TLO know about it.

1 TLO shut him down.

2        And he didn't give up.  He kept going and he

3 kept looking and he kept looking.

4        You see a lot more sentencings than I do so

5 you probably don't remember this, but we sentenced, you

6 sentenced, two defendants that I had a long time ago

7 from England, Mark Britain and Paul Ubsdell.

8        THE COURT:  I remember them.

9        MR. HUFTALEN:  Mr. Britain was instrumental in

10 helping Agent O'Neill lure Mr. Ngo out of Vietnam so

11 that he could be arrested, because we don't have an

12 extradition treaty with Vietnam and we thought the

13 likelihood of having him arrested and conveyed to us was

14 slim to none.  But then Mr. Ngo was actively engaged

15 reaching out to other people to get a new source of PII

16 because on average, for the four years before he was

17 arrested, he was making $389,000 a year.

18        THE COURT:  So you just disagree with what Mr.

19 Connolly says, he made 400,000.  You're saying he made

20 hundreds of thousands.

21        MR. HUFTALEN:  If Agent O'Neill were to

22 testify, he would tell you that the Liberty Reserve

23 records show $1.75 million in proceeds or in

24 transactions going to Mr. Ngo.  He used Liberty Reserve

25 exclusively for the sale of PII.  He had accounts in

other dark market money changers, but it was de minimis. Through the undercover access, Agent O'Neill learned, if you want to buy, you've got to go to Liberty Reserve. $1.75 million. Whether it's 1.75 -- maybe the 400 is a net. I don't know. We see wire transfers to Experian in the neighborhood of 22,000, $23,000 a month. So he had expenses. But for each 14 cents that he's paying for a query, he's charging people 2.50 to $3 or 2.70 to $3.

So all of those victim letters that you've seen where people say why has somebody done this to me, somebody did it to him so that Mr. Ngo could get $2.70. Each one of those people is going to live with this the rest of their life because Mr. Ngo decided 2.70 to $3 was a fair price.

I'm not saying that I think he's going to be a recidivist. I hope that whenever he gets out of prison he won't, but when you look at the 3553(a) factors, I don't think, I don't believe, and I submit to the Court that they do not warrant going below the government's recommendation of 15 because the general deterrent message is clearly the most important.

THE COURT: You have given me significant new information which, if Mr. Connolly doesn't dispute it, is obviously important in trying to assess recidivism

1   risk.  But my sentence here isn't going to be driven by

2   a concern about recidivism because the sentence that's

3   required to address the other aspects of the sentencing

4   statute is also sufficient to address any recidivism

5   risk, even if everything you tell me is true and if

6   there's no additional mitigating information to be

7   provided.

8           But I have to say, I do find the defendant's

9   post-offense efforts at rehabilitation to be important

10  and significant, and I did find the defendant's

11  statement of remorse to be credible and a positive

12  thing, and my assessment on those issues hasn't changed

13  based on this new information.

14          If you ask me does that significantly increase

15  the risk of recidivism, it does if it's true because

16  people who already have been caught once, effectively

17  had to pay a price, and then go back to the same thing

18  are more likely to repeat their behavior again.  But as

19  I said, that won't drive my sentencing judgment in this

20  case because my concerns with the importance of

21  achieving a just sentence and with achieving general

22  deterrence, a sentence required to satisfy those aspects

23  of the sentencing statute is high enough to also address

24  any potential need to deter him from engaging in further

25  criminal conduct when he's eventually released.

1          MR. HUFTALEN:  Mr. Connolly said at his point

2    in life he sees things differently being the father of

3    four boys.  I mean, we're all older.  We all see things.

4    And it's not easy for me to recommend that a young,

5    charming, engaging man like Mr. Ngo be sentenced to

6    15 years in prison.  My job pales in comparison to yours

7    who will when you impose sentence I think --

8          THE COURT:  You don't even have a clue,

9    because I've been a prosecutor and prosecutors don't

10   have a clue about the responsibility for sentencing that

11   we have versus what you have.  I sat there and

12   recommended all kind of sentences, didn't bother me a

13   bit.

14         MR. HUFTALEN:  Well, this bothers me.  It

15   bothers me a lot.

16         THE COURT:  In any event, I appreciate what

17   you have to say.  Anything else?

18         MR. HUFTALEN:  No, thank you.

19         THE COURT:  Mr. Connolly, do you want to say

20   anything in response?

21         MR. CONNOLLY:  Can I have a moment, your

22   Honor?

23         (Pause.)

24         MR. CONNOLLY:  Your Honor, just a couple of

25   comments, and really none of them are intended to

1  mitigate the seriousness of what Mr. Huftalen had to

2  say.  Mr. Ngo was engaged in hacking activities in New

3  Zealand.  He was caught and he did repay that amount.

4       Now, this is nothing that he's proud of.  His

5  parents didn't repay it.  He did.  He repaid it from his

6  own hacking conduct.

7       It's all part of the misconduct and the

8  terribly wrongheaded state that he was in engaging in

9  criminal conduct.

10      In terms of the profit, Mr. Ngo doesn't

11  dispute the total revenues being well in excess of a

12  million dollars.  The $400,000 figure is a net number

13  because he did have expenses.  But, again, I'm not sure

14  given the Court's focus on a just sentence and all that

15  has been described in connection with that, that these

16  factors necessarily --

17      THE COURT:  They're not going to cause me to

18  impose a different sentence.  It does cause me to have

19  somewhat greater concern about the potential for

20  recidivism, but not in a way that's going to affect my

21  ultimate sentence.  If I had fully understood that he

22  had engaged in identity theft once, got caught, and went

23  back to it, I would have been more cautious in my

24  statements about likelihood of recidivism.

25      I mean, I've been doing this for 23 years.  I

 1    don't feel that I can reliably predict recidivism.  It's

 2    a very difficult thing to do.  My sense is that your

 3    client is a changed person, and I still believe that,

 4    but I can't be certain and that additional piece of

 5    information causes me greater concern.

 6            MR. CONNOLLY:  Your Honor, the facts are what

 7    the facts are.  I agree with the Court.  It's impossible

 8    to predict recidivism.  The one thing I can point out is

 9    that this change in mind and heart and soul has occurred

10    after a period of time during which he was engaged in a

11    regular course of criminal conduct, and that's not

12    disputed.

13            But you've heard the defendant speak.  You've

14    heard his sister speak.  You've heard somebody who's

15    been a counselor to him speak about the man who he is

16    today, and I think we all hope that he will not engage

17    in recidivism, but only the future will give us an

18    answer for that.  Other than that I don't have any

19    additional comments, your Honor.

20            THE COURT:  All right.  Thank you.  All right.

21    I'm going to impose a sentence of 156 months.  That's

22    somewhat lower than what the government is recommending.

23    Let me explain my reason.

24            First, let me say that my sentence is being

25    driven primarily by concerns for trying to achieve a

1  just sentence given the totality of relevant

2  circumstances in this case and the need to deter others

3  from engaging in similar conduct.

4          I do not believe this sentence by itself would

5  be required to deter the defendant from harming others.

6  I think his risk to the public is relatively low and it

7  isn't a significant factor in driving my sentencing

8  determination.

9          The most important consideration in my

10  sentencing judgment here is the seriousness of the crime

11  that the defendant committed.  Under the guidelines he

12  scores out as an Offense Level 40, Criminal History

13  Category I.  The bottom of the range is 292 months.  In

14  my view given the seriousness of the crime that the

15  defendant committed, absent his cooperation with the

16  government and some additional mitigating circumstances

17  that I'm going to identify, it's my view that a sentence

18  of 290 months is an appropriate sentence for someone who

19  engages in conduct that is as serious as the conduct

20  that the defendant engaged in here, and I don't think I

21  need to explain it further.  I've expressed my views

22  about that during the course of the sentencing hearing.

23          Now, the government is seeking a departure

24  here which is really quite a generous departure based on

25  substantial assistance, among the larger departures I've

1   seen the government request in any case that I've had

2   over the last 23 years.  But in this case I believe that

3   departure is a warranted one.  I think the government

4   has it about right, and although the departure is a

5   generous one, I think it is warranted under the

6   circumstances.  I think the defendant has provided

7   timely, truthful, and valuable assistance to the

8   government that warrants the government's request for

9   departure and I grant that request.

10          I am going to give a sentence below that that

11  the government is seeking primarily because I believe

12  that the defendant's post-offense rehabilitation efforts

13  are serious, substantial, and considering the totality

14  of the circumstances in this case, require a sentence

15  lower than that being recommended by the government.

16  And I do think your efforts in the Therapeutic Community

17  Program, your efforts while incarcerated, are important

18  and valuable and worthy of consideration in determining

19  your ultimate sentence.  And so that's why effectively

20  I'm taking two years off below what the government is

21  recommending here to tell you that I believe you, that

22  you are serious about changing your life, and I believe

23  you've done a lot of good work since you've been

24  incarcerated in addition to your cooperation that

25  reflects well on you, and you should get credit for that

1   when it comes to sentencing.

2          I'm not otherwise persuaded -- I recognize and

3   agree with Mr. Connolly that you were relatively young

4   when you committed these offenses.  You are still a

5   young man, but I don't believe that that fact alone is

6   sufficient to justify any lighter sentence, nor am I

7   otherwise persuaded by your lawyer's arguments that you

8   should get a lighter sentence.  I categorically reject

9   the idea that you need a lower sentence to avoid

10  unwarranted sentencing disparity, and I'm simply not

11  persuaded by other arguments in your lawyer's brief and

12  in his oral presentation that they warrant a sentence

13  lower than the one that I'm proposing to give here.

14          So in short I am saying that a guideline

15  sentence at the low end of the range would be

16  appropriate absent departure, any extenuating

17  circumstances.  I believe the government motion for a

18  downward departure based on substantial assistance is

19  warranted at precisely the level recommended by the

20  government, and I believe that an extra 24 months should

21  come off the sentence by way of variance based on the

22  defendant's post rehabilitation -- post-offense

23  rehabilitation, and the judgment should reflect that as

24  the ground for the variance as well as the 5K departure.

25          Now, let me read the proposed sentence.

1          Mr. Connolly, have you reviewed the proposed

2    supervised release conditions that were -- I guess there

3    are no unusual conditions here because he will be

4    deported following the sentence?

5          MR. HUFTALEN:  Correct.

6          MR. CONNOLLY:  Correct.

7          THE COURT:  So there aren't any special

8    conditions of release because he will be deported upon

9    the completion of his sentence.

10         Okay.  Let me read the proposed sentence.

11         Let me first ask the probation officer, what's

12   the maximum sentence on each of the counts?

13         MR. BUCKLEY:  On Count 1 it is 20 years and on

14   Count 2 it's 15 years.  So on recommendation, I would

15   recommend substituting 156 for the 240 on Count 1 and

16   156 for the 180 in Count 2.

17         THE COURT:  And then on Count 3, 60 months?

18         MR. BUCKLEY:  Count 3 is ten years.

19         THE COURT:  So let me just get this right.  1

20   and 2, I can give 156 concurrently; right?

21         MR. BUCKLEY:  Correct.

22         THE COURT:  3 I have to give 120 months

23   concurrent you're saying.

24         MR. BUCKLEY:  Correct.

25         THE COURT:  120 months concurrent.  And the

1  same on Count 4.  Does that have a 120-month maximum?

2         MR. BUCKLEY:  And then for the second case,

3  60 months on Counts 1 through 4.

4         THE COURT:  60 months, that's the stat max?

5         MR. HUFTALEN:  On each of four counts in the

6  second case, your Honor.

7         MR. BUCKLEY:  Yes, to run concurrent with each

8  other.

9         THE COURT:  All right.  If I get the numbers

10  wrong, you will correct me, okay?

11         So pursuant to the Sentencing Reform Act of

12  1984, it is the judgment of the Court that the defendant

13  is hereby committed to the custody of the Bureau of

14  Prisons to be imprisoned for a term of 156 months on

15  Count 1, 156 months on Count 2, 156 months on Count 3 --

16  Count 2, excuse me, 120 months on Count 3, and in the

17  companion case, 60 months on each of Counts 1 through 4,

18  all such terms to be served concurrently to each other.

19  Is that clear?

20         The defendant shall pay the United States a

21  special assessment of $300 and a $400 assessment with

22  respect to the companion case, for a total of $700.

23         The defendant shall pay a fine -- have we

24  determined he has the ability to pay a $5,000 fine?

25         MR. BUCKLEY:  What he reported to us, your

1   Honor, is that he has a net worth of $25,000. A lot of
2   that is -- consists of a 2010 BMW worth $23,000.
3          THE COURT: What do you think about that, Mr.
4   Huftalen?
5          MR. HUFTALEN: I don't think he has sufficient
6   assets to pay a fine.
7          THE COURT: Yeah, my inclination is he's going
8   to be serving a fairly long sentence. He has very
9   minimal assets here. I don't think they are sufficient
10  under the circumstances. I appreciate your point, but
11  I'm going to determine the defendant does not have the
12  ability to pay a fine. I waive the fine in this case.
13         And therefore the defendant's total financial
14  penalties are for the special assessment totaling $700
15  which shall be due in full immediately.
16         The defendant is remanded to the custody of
17  the United States Marshal. Are there any objections to
18  this sentence other than those previously raised?
19         MR. HUFTALEN: No objection by the government.
20         MR. CONNOLLY: No objection, your Honor.
21         THE COURT: All right. I will impose the
22  sentence as I've read it. You may have a limited right
23  to appeal. If you want to appeal consult with your
24  attorney and direct him to file a notice of appeal on
25  your behalf, or if you prefer you can ask the clerk's

1   office for help, but any notice of appeal does have to

2   be filed within 14 days or you lose your right to

3   appeal.  Anything else?

4           MR. HUFTALEN:  One other thing.  I'm going to

5   be filing an additional exhibit to my supplemental

6   sentencing memo.  I made reference in my argument to

7   testimony that the defendant made in trial testimony of

8   U.S. versus Ealy.  The transcript of that, I only put in

9   excerpts of the transcripts with my supplemental memo.

10  I think in light of the fact that I made reference to

11  what was in that transcript specifically with respect to

12  his hacking in New Zealand, him paying the victims back,

13  his parents' involvement, I think I should have filed

14  the entire transcript.

15          THE COURT:  All right.  I don't see any

16  problem with that.  Anything else?

17          MR. HUFTALEN:  No, Judge.

18          (Adjourned at 2:20 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, Diane M. Churas, do hereby certify that the

4   foregoing transcript is a true and accurate

5   transcription of the within proceedings, to the best of

6   my knowledge, skill, ability and belief.

7

8   _____

9   Submitted: 9/4/15        **DIANE M. CHURAS, LCR, CM**
                             LICENSED COURT REPORTER, NO. 16
10                           STATE OF NEW HAMPSHIRE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25